**CIVILLE & TANG, PLLC**
SUITE 200, 330 HERNAN CORTEZ AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE : (671) 472-8868
FACSIMILE :   (671) 477-2511

*Attorneys for the Person Being Detained As*
*Defendant Roman Seleznev*


## IN THE UNITED STATES DISTRICT COURT

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, | MAGISTRATE CASE NO. 14-00056 |
| Plaintiff, | |
| vs. | |
| ROMAN SELEZNEV, | **MOTION TO DISCHARGE AND** |
| aka TRACK2, | **RELEASE DEFENDANT PURSUANT** |
| aka ROMAN IVANOV, | **TO FED. R. CRIM. P. 12(b)(3)(A);** |
| aka RUBEN SAMVELICH, | **MEMORANDUM OF SUPPORTING** |
| aka nCuX, | **POINTS AND AUTHORITIES** |
| aka Bulba, | |
| aka bandysli64, | |
| aka smaus, | |
| aka Zagreb, | |
| aka shmak, | |
| Defendant. | |

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ...........................................................................................ii

MOTION OF ROMAN SELEZNER TO TERMINATE
PROSECUTION FOR OUTRAGEOUS GOVERNMENTAL
MISCONDUCT ........................................................................................................ 1

MEMORANDUM OF SUPPORTING POINTS
AND AUTHORITIES ............................................................................................... 1

I.      PRELIMINARY STATEMENT ............................................................... 1

II.     FACTUAL BACKGROUND ..................................................................... 3

III.    ARGUMENT ............................................................................................. 7

        A.   The Court Lacks Jurisdiction Over Mr. Seleznev Because His
             Abduction By U.S. Agents In The Maldives Constitutes Outrageous
             Governmental Misconduct ................................................................... 7

             1.   Jurisdiction over the Person of Mr. Seleznev Must be
                  Determined Prior to Conducting the Rule 5 Hearing ................... 7

             2.   The Government's Shocking and Outrageous Conduct in
                  Securing Mr. Seleznev's Presence Violates Due Process
                  Requiring that the Court Divest Itself of Jurisdiction over
                  the Person of Mr. Seleznev ......................................................... 9

             3.   Extraterritorial Abduction by U.S. Agents Violates Customary
                  International Law and Constitutes Shocking and Outrageous
                  Governmental Misconduct ......................................................... 11

        B.   Alternatively, The Court Should Exercise Its Supervisory Power
             And Dismiss The Case Because Mr. Seleznev's Abduction By
             U.S. Agents In The Maldives Violates *Jus Cogens* Norms Of
             International Law And Is Thus Outrageous Governmental
             Misconduct ....................................................................................... 15

IV.     CONCLUSION ........................................................................................ 17

i

# TABLE OF AUTHORITIES

Page(s)

**Case Law**

*Corley v. U.S.*,
    556 U.S. 303, 129 S. Ct. 1558, 173 L. Ed. 2d 443 (2009) ................................................... 7

*Ex parte McCardle*,
    74 U.S. 506 (1868) ........................................................................................................ 8

*Higazy v. Templeton*,
    505 F.3d 161 (2d Cir. 2007) .......................................................................................... 8

*Ker v. Illinois*,
    119 U.S. 436 (1886)........................................................................................................ 9

*Frisbie v. Collins*,
    342 U.S. 519 (1952).......................................................................................................... 9

*Pon v. U.S.*,
    168 F.2d 373 (1st Cir. 1948) .......................................................................................... 8

*Ramsey v. U.S.*,
    248 F.2d 532 (9th Cir. 1957) .......................................................................................... 8

*Rothgery v. Gillespie County, Texas*,
    554 U.S. 191, 128 S. Ct. 2578, 171 L. Ed. 2d 366 (2008) ................................................... 7

*Siderman de Blake v. Republic of Argentina*,
    965 F.2d 699 (9th Cir. 1992) ..................................................................................... 12, 16

*The Paquete Habana*,
    175 U.S. 677 (U.S. 1900) .............................................................................................. 11

*United States v. Alvarez–Machain*,
    504 U.S. 655 (1992) ................................................................................................*passim*

*United States v. Anderson*,
    472 F.3d 662 (9th Cir. 2006) ......................................................................................... 10

*United States v. Barragan-Mendoza*,
    174 F.3d 1024 (9th Cir. 1999) ....................................................................................... 8

*United States v. Cervantes*,
    13-cv-01910, 2014 WL 1716080
    (C.D. Cal. Apr. 29, 2014) .............................................................................................. 8

*United States v. Clevenger*,
   2011 WL 4862413 (S.D. Cal. Oct. 13, 2011) .................................................................. 15

*United States v. Hill*,
   210 F.3d 881 (8th. Cir. 2000) ........................................................................................ 9

*United States v. Fuselier*,
   2008 WL 352207 (W.D. La. Feb. 7, 2008) .................................................................... 8

*U.S. ex rel. Lujan v. Gengler*,
   510 F.2d 62 (2d Cir. 1975) .......................................................................................... 10

*United States v. Matta-Ballesteros*,
   71 F.3d 754 (9th Cir. 1995) .............................................................................. 10, 12, 15

*United States v. Rauscher*,
   119 U.S. 407 (1886) ....................................................................................................... 9

*United States v. Struckman*,
   611 F.3d 560 (9th Cir. 2010) ......................................................................... 10, 12, 15-16

*United States v. Toscanino*,
   500 F.2d 267 (2d Cir. 1974) ...................................................................................*passim*

*United States v. Yousef*,
   2011 WL 2899244 (S.D.N.Y. June 30, 2011) ............................................................. 10

## Constitutional Provisions

### United States

U.S. Const. Art. I Sec. 8 Cl. 10 ..................................................................................... 11

U.S. Const. Art. VI ........................................................................................................ 11

### Maldives

The Constitution of the Republic of Maldives (2008)
   (Functional Translation), Articles 45-48 ..................................................................... 4

## Statutory Provisions

18 U.S.C. § 3056 ............................................................................................................ 2

22 U.S.C. § 2291(c) ....................................................................................................... 2

**Treatise**

Vienna Convention on the Law of Treaties,
    art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679 .................................................. 16

**Federal Rules of Criminal Procedure**

4(c)(2) ..............................................................................................................................5

5.........................................................................................................................................9

5(c) ...................................................................................................................................2

5(c)(3)(D)..........................................................................................................................1

12(b)(3)(A)....................................................................................................................1, 9

**Other Sources**

*Extraordinary Rendition, Extraterritorial Detention and Treatment of
    Detainees:  Restoring Our Moral Credibility and Strengthening
    Our Diplomatic Standing*, Hearing before the Senate Foreign Relations
    Committee, 107th Cong., 1st Sess. 110-257 (2007) ............................................. 11

http://www.justice.gov/usao/eousa/ foia_reading_room/usam/
    title9/crm00611.htm................................................................................................ 6

http://www.interpol.int/INTERPOL-expertise/Notices .............................................. 6

Iraola, Roberto, "A Primer on Legal Issues Surrounding the
    Extraterritorial Apprehension of Criminals,"
    29 Am. J. Crim. L. 1 (2001)................................................................................... 2

Kidnapping Suspects Abroad, Hearings before the Subcommittee on
    Civil and Constitutional Rights of the Committee on the Judiciary,
    102d Cong., 2d Sess. (1992) ................................................................................ 13

Kosmetatos, Argiro, "U.S.-Mexican Extradition Policy:
    Were the Predictions Right about Alvarez?",
    22 Fordham L. J. 1064 (1998) .............................................................................. 11

Op. USDOJ Office of Legal Counsel 163 (1989)........................................................ 2

S.C. Res. 579, pmbl., U.N. Doc. S/RES/579 (Dec. 18, 1985) .................................. 15

Secretaria de Relaciones Exteriores, 2 *Limits to National Jurisdiction:Documents and Judicial Resolutions on the Alvarez Machain Case* 7 (1993) ................................................................. 13, 14

Stephan Wilske and Teresa Schiller, "Jurisdiction over Persons Abducted in Violation of International Law in the Aftermath of United States v. Alvarez-Machain", 5 U. Chi. L. Sch. Roundtable 205 (1998) .................................................. 12, 14

The Cantu Case, 2 Hackworth, Digest of International Law 310 (1914)............................................................. 13

The Case of Blatt and Converse, 2 Hackworth, Digest of International Law 309 (1911) ............................................ 12

The Vincenti Affair, 1 Hackworth, Digest of International Law 624 (1920)............................................................. 12

U.N.Doc. S/4349 (June 23, 1960), quoted in W. Friedmann, O. Lissitzyn & R. Pugh, *International Law: Cases and Materials* 497 (1969) .......................................... 12

Winkler, Matteo M., "When 'Extraordinary' Means Illegal: International Law and European Reaction to the United States Rendition Program", 30 Loy. L.A. Int'l & Comp. L. Rev. 33 (2008) ................................................. 16

# MOTION OF ROMAN SELEZNEV TO TERMINATE PROSECUTION FOR OUTRAGEOUS GOVERNMENTAL MISCONDUCT

Roman Seleznev, a Russian citizen who was forcibly rendered into the United States, and who is being detained on Guam and accused of being the Roman Seleznev in the above-captioned matter (referred to herein as "Seleznev" or "Defendant")[1], by and through his undersigned counsel, hereby moves this Honorable Court for an order divesting itself of jurisdiction over Seleznev, including jurisdiction to order removal, and discharging and releasing him from custody pursuant to Federal Rules of Criminal Procedure 12(b)(3)(A) and 5(c)(3)(D).


## MEMORANDUM OF SUPPORTING POINTS AND AUTHORITIES

## I.    PRELIMINARY STATEMENT

Roman Seleznev was rendered into U.S. custody illegally and in a manner contrary to law.    Although the United States in official press releases and briefings from the State Department and Department of Homeland Security contends that Seleznev was arrested in Guam, in fact he was taken into custody by agents of the United States Secret Service while physically present in the Republic of the Maldives.    While on foreign soil, Seleznev was detained, handcuffed and questioned by U.S. law enforcement agents who then quickly spirited Seleznev away from Maldives to Guam on a private jet chartered by the United States.    His arrest therefore occurred on foreign soil, not upon the territory of the United States, and thus his

---

[1] This motion is brought to address the grave infirmities that underlie the arrest and transfer to Guam of the person detained as Roman Seleznev. This motion should not be construed as and does not in any way constitute an admission that the Defendant is the same individual named in the indictment and warrant attached to the Government's Petition for Removal filed on July 7, 2014.  Defendant reserves and does not waive all possible challenges to his identity under Fed.R.Crim.P. 5, and does not waive the Government's burden of proof required under Rule 5.

1

presence before this Court has been procured in an unlawful manner. Seleznev now opposes the Government's request for removal pursuant to Fed.R.Crim.P. 5(c) and seeks discharge and release on jurisdictional grounds.

As set forth more fully below, U.S. law enforcement agents have no power to execute an arrest warrant outside the United States absent express statutory authority; and yet, this is precisely what occurred in this case. *See* 18 U.S.C. § 3056.[2] Seleznev was placed under arrest long before his arrival in Guam and while he was physically present on Maldives soil. While Maldives law enforcement agents were present during the arrest, no Maldives-related criminal charges were ever filed against Seleznev nor was he ever placed (temporarily or otherwise) into the custody of Maldives law enforcement officials or presented before a Maldives judicial officer at any time. Had he been, under Maldives law he would have immediately been afforded exactly the same rights enjoyed by any Maldives national including, without limitation, the right to counsel and the right to a prompt hearing concerning the detention, and in this case an extradition hearing, before a Maldives court.

Instead, United States agents, well aware that officially placing Seleznev into Maldives custody would trigger his due process rights under Maldives law, took Seleznev into their own custody – to the exclusion of Maldives authorities thus effectuating an unlawful and extraterritorial arrest contrary to international law. The presence of Maldives officials at the time of arrest was used as a pretext to camouflage Seleznev's extraterritorial arrest by the United States and to create the false appearance that he had been expelled by Maldives officials into

---

[2] In 1976, Congress enacted the Mansfield Amendment to the Foreign Assistance Act of 1961 in order to prevent excessive conduct by U.S. agents in foreign countries and help preserve good relations with those countries. *See* 22 U.S.C. § 2291(c); *see also* Iraola, Roberto, "A Primer on Legal Issues Surrounding the Extraterritorial Apprehension of Criminals," 29 Am. J. Crim. L. 1 (2001). A logical extension of that law is that federal agents be prohibited from participating in *all* such extraterritorial arrests. The Justice Department, through the Office of Legal Counsel, has opined, however, that the Mansfield Amendment by its terms is limited to enforcement of the federal narcotics laws. *See* 13 Op. Office of Legal Counsel 163, 165 n.19 (1989).

U.S. custody when, in fact, it was *the* United States and *only* the United States that took him into custody in the first place.

Seleznev's extraterritorial arrest and rendition were effectuated contrary to U.S. law, in violation of well-recognized standards of international law and in derogation of the protections afforded by substantive Maldives law. His presence before this Court has not been lawfully procured and thus constitutes a material and ultimately fatal defect in the institution of criminal proceedings within the meaning of Fed.R.Crim.P. 12(b)(3)(A), which deprives this Court of personal jurisdiction. Moreover, notwithstanding the principle of *mala captus bene detentus*, his physical presence before the Court is not dispositive of jurisdiction and where, as here, his presence was procured through a shocking series of acts that violate basic principles of United States and international law, jurisdiction is patently absent.

## II.  FACTUAL BACKGROUND

Defendant Roman Seleznev is a citizen of the Russian Federation ("RF" or "Russia") and resided in Russia at all times relevant hereto. *See* Declaration of Roman Seleznev, dated July 19, 2014 ("Seleznev Decl."), ¶ 3.

On or about July 5, 2014, following a vacation with his partner and her minor child in the Republic of the Maldives, and while preparing to board a commercial airliner scheduled to depart at approximately 11:55 a.m. local time en route to Moscow, Russia, Seleznev was taken into custody by law enforcement agents of the United States Secret Service. Seleznev Decl. ¶ 6.

Those agents: (i) detained Seleznev at the Ibrahim Nasir International Airport, (ii) informed him that he was under arrest; (iii) separated him from his travel companions; (iv) confiscated his mobile phone and laptop computer and prohibited him from having any communication with his family; (v) prohibited him from making telephone calls; (vi) placed him

3

into a confined holding area; (vii) searched his person; (viii) physically pushed him onto a couch and instructed him to remain seated; (ix) presented him with a copy of an indictment purportedly originating from the United States District Court for the Western District of Washington; (x) informed him that he was under arrest; and (xi) handcuffed him – all the classic hallmarks of an arrest. Seleznev Decl. ¶¶ 7-17.

Thereafter, while in the physical custody of U.S. law enforcement agents and while handcuffed, Seleznev was surreptitiously led from his holding facility through the airport and bundled onto a private jet chartered and/or otherwise procured by the United States. From Maldives, Seleznev was flown to Guam where he was finally permitted to make one telephone call, despite actively requesting legal counsel and consular assistance at all stages of his rendition. Upon arrival in Guam on July 5, 2014, a U.S. Secret Service agent believed to be named "Dave" transferred a still-handcuffed Seleznev into the custody of the United States Marshals Service where he remains at present. Seleznev Decl. ¶¶18-20; *see also* Declaration of Robert W. Ray ("Ray Decl.") ¶¶ 3-9.

At the time of arrest, Seleznev was lawfully present in the territory of Maldives which had not filed any criminal charges against him and which had not ordered his arrest under Maldives law. At no point in time was Seleznev ever taken into custody by law enforcement officials of the Republic of the Maldives. Seleznev Decl. ¶ 9. Had he been, under Maldives law, Seleznev would have been entitled to certain fundamental legal protections including, without limitation, the right to counsel, the right to consular access and the right to be brought without delay before a Maldives court for an extradition or similar hearing pertaining to the lawfulness of his detention. *See* Constitution of the Republic of the Maldives (2008) (Functional Translation), Articles 45-48, relevant portions of which are attached as **Exhibit "1"** to the Declaration of

4

Joshua D. Walsh ("Walsh Decl." filed herewith)[3]. Moreover, under Maldives law, given that Maldives is not a party to any extradition treaty with the United States, if expelled following a judicial proceeding, Seleznev would have been returned to his home jurisdiction of Russia and not to the United States.

Mindful that Seleznev would have been entitled to certain legal protections under Maldives law or that his expulsion would result in his return to Russia (where he was headed immediately prior to his arrest), United States law enforcement agents took physical custody of Seleznev, thus purposely circumventing the legal protections afforded under local law.

However, because law enforcement agents of the United States cannot execute an arrest warrant outside the territorial United States absent statutory authority, Fed.R.Crim.P. 4(c)(2), the United States used dissemblance to create the appearance that Seleznev was "expelled" by Maldives officials into U.S. custody when, in fact, he was plainly arrested by U.S. law enforcement agents conducting operations on foreign soil.

Post-arrest statements made by U.S. authorities suggesting that Seleznev was "arrested" upon his arrival in Guam are both factually inaccurate and intentionally misleading. Upon information and belief, Seleznev arrived in Guam on July 6, 2014. However, according to an official press release issued by the United States Secret Service, Seleznev was clearly arrested on July 5, 2014, prior to his arrival in Guam. *See* **Exhibit "2"**. A similar official press release was issued by the United States Department of Homeland Security ("DHS") which also confirms July 5, 2014, as the actual arrest date. *See* **Exhibit "3"**. In its Petition for Removal, the Government thus misstates that "[o]n the early morning hours of July 6, 2014, the defendant was arrested on Guam." *See* Docket # 1, July, 7, 2014, Petition for Writ of Removal as to Roman Seleznev.

---

[3] All Exhibits referred to in this Memorandum are attached to the Walsh Declaration and are true and accurate copies to the best of the Declarant's knowledge.

Moreover, post-arrest statements suggesting that Maldives, an Interpol member nation, rendered Seleznev into U.S. custody because he had been wanted by Interpol on a *prior* Red Notice[4], are also factually inaccurate. In this case, the Government produced a document purporting to be an Interpol Red Notice that was issued *on* July 5, 2014, not *prior to* July 5, 2014. *See* **Exhibit "4"**. Given that Seleznev was taken into custody at approximately 10:00 - 11:00 a.m. Maldives time on July 5, 2014 (*i.e.,* 10:00 - 11:00 p.m. Seattle time on July 4, 2014), substantial open questions exist as to the timing of any Interpol Red Notice and whether it had anything to do with Seleznev's rendition into U.S. custody.

Moreover, had an Interpol Red Notice actually been honored, Seleznev would have been taken into the custody of Maldives authorities "with a view towards extradition or similar lawful action", not for purposes of a governmental abduction carried out by U.S. agents on foreign soil. *See* http://www.interpol.int/INTERPOL-expertise/Notices. Additionally, the document the Government produced purporting to be an Interpol Red Notice that was issued on July 5, 2014 providing for the arrest of Roman Seleznev contains the command that "The country at the request of which the present notice has been published has given assurances that extradition will be sought upon arrest of the person, in conformity with its national laws and/or the applicable bilateral and multilateral treaties." *See* **Exhibit "3"**. Thus, the plain language of the Red Notice – language based upon assurances from the United States – requires the use of proper national laws and international accords. Rendition is not permitted.

---

[4]An Interpol Red Notice is the closest instrument to an international arrest warrant in use today. Interpol (the International Criminal Police Organization) circulates notices to member countries listing persons who are wanted for extradition. The names of persons listed in the notices are placed on lookout lists (*e.g.*, NCIC or its foreign counterpart). When a person whose name is listed comes to the attention of the police abroad, the country that sought the listing is notified through Interpol and can request his provisional arrest and/or file a formal request for extradition. *See generally*, http://www.justice.gov/usao/eousa/ foia_reading_room/usam/title9/crm00611.htm.

In their zeal to apprehend Seleznev, the Government: (i) disregarded U.S. law which prohibits the execution of arrest warrants on foreign soil absent express statutory authority; (ii) disregarded Maldives law which affords fundamental legal protections; and (iii) disregarded well-established and accepted principles of international law which prohibit government-sponsored abduction of non-combatants. The Government's conscious decision to overrun at least three separate bodies of substantive law deprives this Court of personal jurisdiction, hopelessly taints the prosecution and requires Seleznev's immediate discharge and release.

## III.     ARGUMENT

### A.     The Court Lacks Jurisdiction Over Mr. Seleznev Because His Abduction By U.S. Agents In The Maldives Constitutes Outrageous Governmental Misconduct.

#### 1.     Jurisdiction over the Person of Mr. Seleznev Must be Determined Prior to Conducting the Rule 5 Hearing

The Government's fatal defects in the institution of criminal proceedings against Seleznev within the meaning of Fed. R. Crim. P. 12(b)(3)(A) deprive this Court of personal jurisdiction.

The Federal Rules of Criminal Procedure afford a criminal defendant the opportunity to challenge a court's lack of jurisdiction "at any time," while his case is pending, Fed. R. Crim. P. 12(b)(3)(B), or, broadly speaking, "before trial." Fed. R. Crim. P. 12(b)(3)(A). A Rule 5 initial appearance, which begins a criminal proceeding, occurs before trial and has been described as "the point at which the judge is required to take several key steps to foreclose Government overreaching." *See Corley v. U.S.*, 556 U.S. 303, 320, 129 S. Ct. 1558, 1570, 173 L. Ed. 2d 443 (2009) (declining suggestion that Rule 5 proceeding is "administrative nicety"); *see also Rothgery v. Gillespie County, Texas,* 554 U.S. 191, 128 S. Ct. 2578, 171 L. Ed. 2d 366 (2008)

7

(describing Rule 5 initial appearance as marking start of adversary judicial proceedings); *Higazy v. Templeton*, 505 F.3d 161, 170-73 (2d Cir. 2007) (recognizing that first appearance is beginning of criminal case). Accordingly, a court overseeing a defendant's initial appearance may consider jurisdictional challenges prior to a defendant's appearance in the court from which his indictment emanates. *See, e.g., United States v. Fuselier*, 2008 WL 352207 (W.D. La. Feb. 7, 2008) (court overseeing initial appearance entertained defendant's motions purportedly contesting jurisdiction prior to his arraignment in court from which indictment emanated).

A Rule 5 court's consideration of whether there is personal jurisdiction over a defendant is consistent not only with the plain language of the Federal Rules; it is buttressed by longstanding jurisprudence that without jurisdiction, a court is powerless to act. *See Ex parte McCardle,* 74 U.S. 506, 514 (1868) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."); *see also United States v Barragan-Mendoza*, 174 F.3d 1024, 1026, 1030 (9th Cir. 1999) (recognizing need for initial determination of jurisdiction and ultimately refusing to exercise jurisdiction over government appeal not lawfully before court). Indeed, the issue of whether a presiding court has jurisdiction over a criminal defendant is a threshold issue and should be heard by a Court at the earliest opportunity. *See, e.g., United States v. Cervantes,* 13-cv-01910, 2014 WL 1716080 at **4-5 (C.D. Cal. Apr. 29, 2014) (recognizing that subject matter and personal jurisdiction are threshold questions in federal prosecution) (internal citations omitted).

Similarly, Defendant seeks to immediately raise the issue of whether there exists personal jurisdiction, a critical issue potentially subject to waiver. *See, e.g., Ramsey v. U.S*., 248 F.2d 532, 533 (9th Cir. 1957); *Pon v. U.S.*, 168 F.2d 373, 374 (1st Cir. 1948) (recognizing that defendant waives objection as to exercise of jurisdiction over him or her by failing to raise such objection

8

upon initial appearance); *United States v. Hill*, 210 F.3d 881, 884 (8th. Cir. 2000) (acknowledging that the filing of valid indictment is prerequisite to jurisdiction but cautioning that appearance without objection waives personal jurisdiction). Because Defendant was brought before the Court in contravention of law, this Court cannot proceed to conduct a Rule 5 identity hearing until personal jurisdiction has been established, which we submit is lacking here. *See, e.g., United States v. Toscanino*, 500 F.2d 267, 275 (2d Cir. 1974) ("[T]he government should be denied the right to exploit its own illegal conduct, and when an accused is kidnapped and forcibly brought within the jurisdiction, the court's acquisition of power over his person represents the fruits of the government's exploitation of its own misconduct . . . [T]he government should as a matter of fundamental fairness be obligated to return him to his status quo ante.").

> **2. The Government's Shocking and Outrageous Conduct in Securing Mr. Seleznev's Presence Violates Due Process Requiring that the Court Divest Itself of Jurisdiction over the Person of Mr. Seleznev**

Federal Rule of Criminal Procedure 12(b)(3)(A) allows a defendant to make a motion "alleging a defect in instituting the prosecution" before trial. The defect here is the Court's lack of jurisdiction over Mr. Seleznev as a result of his forcible rendition by U.S. agents in a foreign country, in violation of international law and Mr. Seleznev's constitutional right to due process.

Although the *Ker-Frisbie*[5] line of cases have been interpreted as standing for the proposition of *mala captus bene detentus*,[6] Chief Justice Rehnquist's majority opinion in *Alvarez-Machain* acknowledged, through its discussion of *United States v. Rauscher*, that the

---

[5] *Ker v. Illinois*, 119 U.S. 436 (1886); *Frisbie v. Collins*, 342 U.S. 519 (1952).

[6] *Mala captus bene detentus*, meaning wrongly captured, properly detained, is an ancient doctrine that "courts may assert *in personam* jurisdiction without inquiring into the means by which the presence of the defendant was secured." Lonner, Jonathan, "Official Government Abductions in the Presence of Extradition Treaties", 83 J. Crim. L. & Criminology 998, 1006 n.79 (1992-93) (internal citations omitted).

mere presence of a criminal defendant in a U.S. court does not automatically confer personal jurisdiction over him.[7]  *See United States v. Alvarez–Machain*, 504 U.S. 655, 667-69 (1992).

That a defendant's mere presence before the court is not dispositive of jurisdiction has been confirmed by at least two additional cases – *Struckman* and *Toscanino*.

In *United States v. Struckman*, the Ninth Circuit recognized an exception to *Ker-Frisbie* where the government engages in "misconduct of the most shocking and outrageous kind to obtain [the defendant's] presence." *United States v. Struckman*, 611 F.3d 560, 571 (9th Cir. 2010) (citing *United States v. Anderson*, 472 F.3d 662, 666 (9th Cir. 2006) and *United States v. Matta-Ballesteros*, 71 F.3d 754, 764 (9th Cir. 1995)). "Where the Government's conduct to obtain a defendant's presence is so shocking and outrageous as to violate the universal sense of justice, the means of obtaining jurisdiction over the defendant amounts to a due process violation, and dismissal is required." *Id.* at 573 (internal citations omitted).

Additionally, in *United States v. Toscanino*, the Second Circuit noted that the Supreme Court's expansion of due process "now requir[es] a court to divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights." *United States v. Toscanino*, 500 F.2d 267, 275 (2d Cir. 1974). The court concluded that its holding was "an extension of the well-recognized power of federal courts in the civil context to decline to exercise jurisdiction over a defendant whose presence has been secured by force or fraud." *Id.*[8]

---

[7] Justice Rehnquist, writing for the majority, discussed *Rauscher*, a case in which the jurisdiction of a court was held to be limited by the requirements of a treaty. *See Alvarez-Machain*, 504 U.S. at 667-69 (citing *United States v. Rauscher*, 119 U.S. 407 (1886)). The Supreme Court in *Rauscher* implied a term into a treaty because of the practice of nations regarding extradition. *See id.* (citing same).

[8] The Second Circuit limited *Toscanino* to its facts a year later, but neither the Second Circuit, nor the Supreme Court, has overruled the decision. *See U.S. ex rel. Lujan v. Gengler*, 510 F.2d 62, 63 (2d Cir. 1975). The district court in *United States v. Yousef*, 2011 WL 2899244 (S.D.N.Y. June 30, 2011), was doubtful that *Toscanino* remained good law and noted that in an abduction case, there must be "truly disturbing facts" to justify dismissal.

10

### 3. Extraterritorial Abduction by U.S. Agents Violates Customary International Law and Constitutes Shocking and Outrageous Governmental Misconduct.

The United States as a nation and the world as a whole have matured since *Alvarez-Machain*. The unilateral abduction of an accused by U.S. law enforcement agents on foreign soil, in contravention of the host nation's laws and judicial processes, violates customary international law. *See Extraordinary Rendition, Extraterritorial Detention and Treatment of Detainees: Restoring Our Moral Credibility and Strengthening Our Diplomatic Standing*, Hearing before the Senate Foreign Relations Committee, 107th Cong., 1st Sess. 110-257 (2007).

Significantly, in the aftermath of *Alvarez-Machain*, the United States' leaders signed a new treaty agreement with Mexico's leaders to expressly prohibit kidnapping, signaling that we as a country recognize that international kidnapping – in whatever form – is no longer acceptable. *See* Kosmetatos, Argiro, "U.S.-Mexican Extradition Policy: Were the Predictions Right about Alvarez?", 22 Fordham L. J. 1064, 1084, 1097-98 (1998) ("The end result was the negotiation and signing of a new extradition agreement to prohibit transborder abductions").[9]

International opinion and law has clearly recognized this evolution.[10]

---

However, *Yousef* is distinguishable from this case because the defendant in *Yousef* was not initially abducted by U.S. agents, and Honduras had already issued a deportation order. *See id.*

[9] "Bilateral negotiations between U.S. and Mexican leaders in responses to *Alvarez* resulted in the signing of the Transborder Abduction Treaty," which, while not presently legally binding on the United States until ratification by the Senate, "signifies a renewed effort [by] both governments toward improvement of extradition policies." *Id.* at 1098.

[10] To be sure, the Supreme Court has, since the days of the Spanish-American war, declared that "International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination." *The Paquete Habana*, 175 U.S. 677, 700 (U.S. 1900). The American Constitution makes direct reference to international law by giving Congress the power to define and punish "Offenses against the law of Nations." U.S. Const. Art. I Sec. 8 Cl. 10. Article VI of the American Constitution demonstrates the high status of international agreements by declaring that "This Constitution, and the Laws of the United States which shall be made in pursuance thereof; *and all Treaties made, or which shall be made,* under the Authority of the United States shall be the supreme Law of the Land." (emphasis added).

The Ninth Circuit defines customary international law as the "general and consistent practice of states followed by them from a sense of legal obligation." *Struckman*, 611 F.3d at 576 (quoting *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992)). "Courts ascertain customary international law 'by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations or by judicial decisions recognizing and enforcing that law.'" *Id.*[11]

Specifically, in determining whether a rule has become international law, courts look to: judgments and opinions of international judicial and arbitral tribunals; judgments and opinions of national tribunals; the writings of scholars; and "pronouncements by states that undertake to state a rule of international law". *See* Stephan Wilske and Teresa Schiller, "Jurisdiction over Persons Abducted in Violation of International Law in the Aftermath of United States v. Alvarez-Machain", 5 U. Chi. L. Sch. Roundtable 205, 213 (1998) ("Wilske").

At least one U.S. court has cited a U.N. resolution regarding a kidnapping case stating that it is "a long standing principle of international law that abductions by one state of persons located within the territory of another violate the territorial sovereignty of the second state and are redressable usually by the return of the person kidnapped." *Toscanino*, 500 F.2d at 277-78 (citing U.N.Doc. S/4349 (June 23, 1960), quoted in W. Friedmann, O. Lissitzyn & R. Pugh, *International Law: Cases and Materials* 497 (1969); The Vincenti Affair, 1 Hackworth, Digest of International Law 624 (1920); The Cantu Case, 2 Hackworth 310 (1914); The Case of Blatt and Converse, 2 Hackworth 309 (1911)).

---

[11] The Ninth Circuit has noted as dicta in a footnote that while torture, murder, genocide and slavery rose to the level of *jus cogens* norms, kidnapping did not. *United States v. Matta-Ballesteros*, 71 F.3d 754, 764 n.5 (9th Cir. 1995). Since that time, however, the Ninth Circuit has left open the possibility that a defendant could introduce evidence that his abduction violated *jus cogens* norms of international law. *Struckman*, 611 F.3d at 576. This would require making more than "bare assertions" by providing international materials concerning the defendant's asserted *jus cogens* rights, and the application of those rights under the circumstances of the case. *Id.*

12

Even the Supreme Court in *Alvarez-Marchain*, which dealt with a narrow issue related to the interpretation of a U.S.-Mexico extradition treaty, acknowledged that "[r]espondent and his *amici* may be correct that respondent's abduction was 'shocking' and that it may be in violation of general international law principles." *Alvarez-Marchain*, 504 U.S. at 669.[12]

Since *Alvarez-Machain* was decided, the U.S. Department of Justice has issued a memorandum stating "the *Alvarez-Machain* decision does not constitute a 'green light' for unrestricted efforts to secure custody over persons abroad without regard to international extradition treaties, or the laws of foreign states, or international law." Wilkse at 234 (citing U.S. Department of Justice Memo on *United States v Alvarez-Machain*, 32 Intl Legal Mat 277 (1993)) (internal brackets omitted).

The very same year that *Alvarez-Machain* was decided, two international bodies condemned the decision. The Organization of American States requested that the Inter-American Juridical Committee issue an opinion about the legality of the ruling. *See id.* at 214 (citing Secretaria de Relaciones Exteriores, 2 *Limits to National Jurisdiction: Documents and Judicial Resolutions on the Alvarez Machain Case* 7 (1993) ( "*Limits II*")). With nine votes in favor and only an American abstention, the Committee issued an opinion (with no binding effect) stating that the reasoning of the Supreme Court in *Alvarez-Machain* was contrary to the norms of international law. *See id.* (citing Kidnapping Suspects Abroad, Hearings before the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary, 102d Cong., 2d Sess., 267, 269 (1992)). Additionally, the Conference of Heads of Government of the Caribbean Community issued a statement "emphatically reject[ing] the notion that any State may seek to enforce its domestic law by means of abduction of persons from the territory of another

_____

[12] The question before the Court, however, was whether the abduction violated the extradition treaty between the U.S. and Mexico. *Id.* at 657.

13

sovereign state with the intention to bring them within its jurisdiction in order to stand trial on criminal charges." *Id.* at 215 (citing *Limits II* at 13). The Conference noted that "[s]uch actions constitute a violation of the most fundamental principles of international law and must be unequivocally condemned by the international community." *Id.*

Informed at least in part by international law, courts of various nations have also pushed back against forcible abductions in foreign states. For example, English courts now have the discretion to decline jurisdiction in forcible abduction cases. *See* Wilske at 216-19. South African courts must decline jurisdiction in such cases. *See id.* at 220-21. Zimbabwean courts have discretion to decline forcible abduction cases, even where the host country consented to the abduction. *See id.* at 221-22. Australian courts have implied that a forcible unilateral abduction would be a strong case for staying criminal proceedings. *See id.* at 222. Switzerland "strongly rejects the exercise of jurisdiction over abductees." *See id.* at 228. Finally, the national judicial tribunal of Costa Rica has rejected the exercise of jurisdiction over persons abducted by state agents. *See id.*

The views of the United States on the legality of government-sponsored abductions have also evolved over the last two decades and are now more reflective of and on par with customary international law on the subject. Thus, just as U.S. law does not permit U.S. law enforcement agents to execute warrants on foreign soil absent statutory approval, customary international law prohibits the United States from arresting Seleznev on foreign soil and bundling him into the United States on a private jet. His presence before the Court has therefore been procured in a manner contrary to law that we respectfully submit should shock the conscience of this Court and cause it to divest itself of jurisdiction.[13]

---

[13] Illegal arrest and rendition are not the only acts that can shock the conscience of the court. The Ninth Circuit has acknowledged that "blatant lies to a foreign government that induce the foreign government to transfer a defendant

**B.** **Alternatively, The Court Should Exercise Its Supervisory Power And Dismiss The Case Because Mr. Seleznev's Abduction By U.S. Agents In The Maldives Violates *Jus Cogens* Norms Of International Law And Is Thus Outrageous Governmental Misconduct.**

Alternatively, the Court may exercise its inherent supervisory powers to terminate a prosecution based on governmental misconduct, even where the conduct does not rise to the level of a due process violation. *United States v. Clevenger*, 2011 WL 4862413 (S.D. Cal. Oct. 13, 2011); *see also United States v. Toscanino*, 500 F.2d 267, 276 (2d Cir. 1974).

Such exercise of extraordinary authority may be necessary "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct." *United States v. Struckman*, 611 F.3d 560, 574 (9th Cir. 2010) (citing *United States v. Matta-Ballesteros*, 71 F.3d 754, 763 (9th Cir. 1995)).

Since states are obligated under international law to refrain from exercising their sovereign powers within another state's territory, the abduction of foreign citizens in a foreign country is universally forbidden. *See* S.C. Res. 579, pmbl., U.N. Doc. S/RES/579 (Dec. 18, 1985) (under international law, abduction still stands as an "offence ... of grave concern to the international community, having severe consequences for the rights of the victims and for the promotion of friendly relations and co-operation among States."). Such violation of international law is amplified when the foreign citizen's state has objected to the kidnapping of its citizen, as Russia has done in this case.

---

to the United States when it otherwise would not" could amount to conduct so shocking and outrageous as to violate due process and require dismissal of proceedings. *Struckman*, 611 F.3d at 574. Mr. Seleznev seeks a hearing to determine the nature and timing of the communications between the United States and the Republic of the Maldives. As noted above, the timing of the Red Notice raises important unresolved questions about whether Maldives acted in reliance upon an official Interpol arrest warrant and whether the Red Notice was offered as a pretext to justify an otherwise illegal arrest overseas.

15

The Ninth Circuit has explained that "a *jus cogens* norm, also known as a 'peremptory norm' of international law, 'is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.'" *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992) (*citing* Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679).

In the Ninth Circuit, "a violation of *jus cogens* norms could provide a basis for dismissal under a court's supervisory powers because, like statutory and constitutional laws, they are justiciable in our courts." *Struckman*, 611 F.3d at 576.

Commentators on the development of international law have stated that "[a]n emerging body of jurisprudence suggests that when an accused has been forcibly abducted from another national jurisdiction – particularly if the abduction was done with the aid of the same government that subsequently seeks to prosecute him – a court may exercise its supervisory authority and decline to try the accused." *See* Matteo M. Winkler, "When 'Extraordinary' Means Illegal: International Law and European Reaction to the United States Rendition Program", 30 Loy. L.A. Int'l & Comp. L. Rev. 33, 76 & n. 95 (2008).

As set forth above, the institution of this prosecution is already marred by material and troubling discrepancies regarding the location and timing of the arrest, the legal foundation for the arrest and the possibility of post-arrest dissemblance designed to camouflage acts contrary to international law. To the extent that such allegations are borne out at a hearing, this Court should, in the exercise of its supervisory powers, terminate the prosecution and release the defendant.

16

## IV.    CONCLUSION

**WHEREFORE**, this Honorable Court should (i) decline jurisdiction and terminate the prosecution; (ii) discharge the case; (iii) release the defendant forthwith; and (iv) issue such other and further relief as may be appropriate under the circumstances.    Defendant respectfully requests an evidentiary hearing.

Respectfully submitted this 21st day of July, 2014.

CIVILLE & TANG, PLLC

By: _____
    **G. PATRICK CIVILLE**
    *Attorneys for the Person*
    *Being Detained as Defendant*
    *Roman Seleznev*