**CIVILLE & TANG, PLLC**
SUITE 200, 330 HERNAN CORTEZ AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE : (671) 472-8868
FACSIMILE :  (671) 477-2511

*Attorneys for the Person Being Detained As*
*Defendant Roman Seleznev*

## IN THE UNITED STATES DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, | MAGISTRATE CASE NO. 14-00056 |
| Plaintiff, | |
| vs. | |
| ROMAN SELEZNEV,<br>    aka TRACK2,<br>    aka ROMAN IVANOV,<br>    aka RUBEN SAMVELICH,<br>    aka nCuX,<br>    aka Bulba,<br>    aka bandysli64,<br>    aka smaus,<br>    aka Zagreb,<br>    aka shmak, | **LOCAL RULE GR 4.1(A) SUBMISSION OF AUTHORITY CITED OR RELIED UPON IN SUPPORT OF MOTION TO DISCHARGE AND RELEASE DEFENDANT PURSUANT TO FED. R. CRIM. P. 12(b)(3)(A)** |
| Defendant. | |

Pursuant to District Court of Guam Local Rule GR 4.1(a), submitted herewith are copies

of authority not available in either this Court's library or the Guam Territorial Law Library, cited

or relied upon in support of the *Motion to Discharge and Release Defendant Pursuant to Fed. R.*

*Crim. P. 12(b)(3)(A)* filed by The Person Being Detained as Defendant Roman Seleznev.

Respectfully submitted this 23rd day of July, 2014.

**CIVILLE & TANG, PLLC**

By:___ */s/ G. Patrick Civille*_____
**G. PATRICK CIVILLE**
*Attorneys for the Person Being Detained As*
*Defendant Roman Seleznev*

# TABLE OF CONTENTS

| | |
|---|---|
| **1.** | *Extraordinary Rendition, Extraterritorial Detention and Treatment of Detainees: Restoring Our Moral Credibility and Strengthening Our Diplomatic Standing*, Hearing before the Senate Foreign Relations Committee, **110th Cong.**, 1st Sess. 110-257 (2007)<br><br>\*\* Cited in error on page 11 of the Motion as "Hearing before the Senate Foreign Relations Committee, ***107th Cong.***, 1st Sess. 110-257 (2007)" |
| **2.** | Kidnapping Suspects Abroad, Hearings before the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary, 102d Cong., 2d Sess. (1992) |
| **3.** | S.C. Res. 579, pmbl., U.N. Doc. S/RES/579 (Dec. 18, 1985) |

1.

*Extraordinary Rendition, Extraterritorial Detention and Treatment of
Detainees: Restoring Our Moral Credibility and Strengthening Our Diplomatic
Standing*, Hearing before the Senate Foreign Relations Committee, **110th Cong.**, 1st Sess.
110-257 (2007)

\*\* Cited in error on page 11 of the Motion as "Hearing before the Senate Foreign
Relations Committee, *107th Cong.*, 1st Sess. 110-257 (2007)"

[Senate Hearing 110-257]
[From the U.S. Government Printing Office]

S. Hrg. 110-257

# EXTRAORDINARY RENDITION, EXTRATERRITORIAL DETENTION AND TREATMENT OF DETAINEES: RESTORING OUR MORAL CREDIBILITY AND STRENGTHENING OUR DIPLOMATIC STANDING

======================================================================

HEARING

BEFORE THE

COMMITTEE ON FOREIGN RELATIONS
UNITED STATES SENATE

ONE HUNDRED TENTH CONGRESS

FIRST SESSION

_____

JULY 26, 2007

_____

Printed for the use of the Committee on Foreign Relations

Available via the World Wide Web: http://www.gpoaccess.gov/congress/
index.html

U.S. GOVERNMENT PRINTING OFFICE

40-379 PDF               WASHINGTON DC:  2007
----------------------------------------------------------------------
For sale by the Superintendent of Documents, U.S. Government Printing
Office  Internet: bookstore.gpo.gov Phone: toll free (866)512-1800
DC area (202)512-1800  Fax: (202) 512-2250 Mail Stop SSOP,
Washington, DC 20402-0001

COMMITTEE ON FOREIGN RELATIONS

JOSEPH R. BIDEN, Jr., Delaware, Chairman

CHRISTOPHER J. DODD, Connecticut     RICHARD G. LUGAR, Indiana
JOHN F. KERRY, Massachusetts         CHUCK HAGEL, Nebraska
RUSSELL D. FEINGOLD, Wisconsin       NORM COLEMAN, Minnesota
BARBARA BOXER, California            BOB CORKER, Tennessee
BILL NELSON, Florida                 JOHN E. SUNUNU, New Hampshire
BARACK OBAMA, Illinois               GEORGE V. VOINOVICH, Ohio
ROBERT MENENDEZ, New Jersey          LISA MURKOWSKI, Alaska
BENJAMIN L. CARDIN, Maryland         JIM DeMINT, South Carolina
ROBERT P. CASEY, Jr., Pennsylvania   JOHNNY ISAKSON, Georgia
JIM WEBB, Virginia                   DAVID VITTER, Louisiana

Antony J. Blinken, Staff Director
Kenneth A. Myers, Jr., Republican Staff Director

(ii)

# C O N T E N T S

----------

Page

Biden, Hon. Joseph R., Jr., U.S. Senator from Delaware, opening statement........................................................... 1
    Press release dated July 26, 2007............................ 58
Byman, Dr. Daniel, director, Center for Peace and Security Studies, Edmund A. Walsh School of Foreign Service, Georgetown University, Washington, DC..................................... 30
    Prepared statement........................................... 33
Eaton, MG Paul, USA (Ret.), former Commanding General, Office of Security Transition, Baghdad, Iraq............................ 38
    Prepared statement........................................... 40
Lugar, Hon. Richard G., U.S. Senator from Indiana, opening statement........................................................... 3
Malinowski, Tom, Washington Advocacy Director, Human Rights Watch, Washington, DC......................................... 6
    Prepared statement........................................... 9
Zelikow, Dr. Philip, White Burkett Miller Professor of History, University of Virginia, Charlottesville, VA.................... 15
    Prepared statement........................................... 19
    Responses to questions submitted by Senator Feingold........ 60

Additional Material Submitted for the Record

American Civil Liberties Union, news release dated July 26, 2007. 63

EXTRAORDINARY RENDITION, EXTRATERRITORIAL DETENTION, AND TREATMENT OF
DETAINEES: RESTORING OUR MORAL CREDIBILITY AND STRENGTHENING OUR
DIPLOMATIC STANDING

----------

THURSDAY, JULY 26, 2007

U.S. Senate,
Committee on Foreign Relations,
Washington, DC.

The Committee met, pursuant to notice, at 9:47 a.m., in
room SD-419, Dirksen Senate Office Building, Hon. Joseph R.
Biden, Jr. (chairman of the committee) presiding.
Present: Senators Biden, Feingold, Cardin, Casey, Lugar,
Corker, Sununu, and Isakson.

OPENING STATEMENT OF HON. JOSEPH R. BIDEN, JR.,
U.S. SENATOR FROM DELAWARE

The Chairman. The hearing will come to order. Good morning
gentlemen, thank you for being here. I'm glad you all could be
here today to discuss one of the--I think--defining challenges
of this decade, is how to effectively combat international
terrorism while both maintaining our national values and our
commitment to the rule of law, and respecting individual rights
and civil liberties. Some have suggested that we need make a
Faustian bargain that gives up one in order to accomplish the
other. That's what I'd kind of like to discuss with you all
today.
We meet today against the backdrop of the most recent
national intelligence estimate, which concluded that the
terrorist threat to the United States of America from al-Qaeda
is back in full force. One conclusion, I believe, we can draw
from this is that the administration's policies dealing with
terrorism, thus far, are not working.
Today's hearing focuses on two of the less often discussed,
but no less controversial counterterrorism policies we've
employed since September the 11: Extraordinary rendition and
extraterritorial detention.
Rendition is the practice of detaining a terrorist
operative in a foreign country and transferring him or her to
the United States or to another foreign country. It has proved
to be an effective way to take terrorists off the street and
collect, on occasion, some valuable information.
But the U.S. Government's use of rendition has been
extremely controversial. Foreign governments have criticized
the practice because it operates outside the rule of law and
has allegedly been used to transfer suspects to countries that

torture or mistreat them or to seek extraterritorial prisons, in countries where we have listed the countries as abusing the human rights of their fellow citizens.

As a result, the current rendition program has taken a toll on the relationships with some of our closest foreign partners. Consider the following: Italy has indicted 26 Americans for their alleged role in a rendition. Germany has issued arrest warrants for an additional 13 United States intelligence officers. The Canadian Government Commission has censured the United States for rendering a Canadian-Syrian dual-citizen to Syria, where he was allegedly tortured. The Counsel of Europe and the European Union have each issued reports critical of the United States Government's rendition program and the European countries' involvement in, or complicity with, that program.

Sweden and Switzerland have each initiated investigations of us, as well. Just yesterday, the United Kingdom issued a report on the United States rendition program, concluding that it would have, ``serious implications,'' for future intelligence relationships between the United States and the United Kingdom, one of our most important partners.

Rendition as currently practiced, in my view, is undermining our moral credibility and standing abroad and, more importantly, I guess in the minds of the real politik crowd of which I occasionally consider myself one, weakening, weakening the coalition with foreign governments, the very governments that we need if we're going to be able to combat international terrorism. We also put our intelligence officers at risk by not providing them with clear guidelines to govern their conduct.

As one of the witnesses today recently wrote, ``Successful counterterrorism depends in part on convincing the world that there is no moral equivalency between the terrorist and the government they oppose. When the United States muddies those waters, this distinction begins to blur.''

More ominous, the controversial aspects of the U.S. Government use of renditions have been used by propagandists and recruiters to fuel and sustain international terrorist organizations with a constant stream of new recruits. That's not my judgment, that's the judgment of many in the intelligence community.

Allegations of U.S. lawlessness and mistreatment make their job easier--that is the recruiters--adding a refrain to the recruitment pitch, and increasing the receptivity of their target audience. Our counterterrorism authorities have not only--our counterterrorism authorities should not only thwart attacks, take dangerous terrorists off the street, and bring them to justice--these authorities should also strengthen international coalitions, win the hearts and minds of Muslim populations that are--would otherwise be prepared to cooperate with us and help diminish, if not deprive, recruitment, the narrative that they now have.

In our long-term effort to stem the tide of international terrorism, our commitments to the rule of law and individual rights and civil liberties are among our most formidable weapons, in my view. They are what unite foreign governments behind us in effective antiterrorism coalitions. They are what unite public opinion in this country in support of our counterterrorism efforts. They are what prevent the recruitment

of the next generation of international terrorists, or at least slow it up.

If we continue to pursue a rendition program ungoverned by law, without sufficient safeguards and oversight, we will take individual terrorists off the streets at the expense of foreign coalitions that are significantly more consequential long term and essential to our efforts to combat international terrorism at the expense of facilitating the recruitment of a new generation of terrorists who are just as dangerous--and what we know from the intelligence report--far more numerous.

There is not a tradeoff--this is not a tradeoff I believe we have to make. We can have a robust and agile rendition capacity governed by the rule of law and subject to sufficient safeguards and oversight. In this way, we can take terrorists off the streets, while at the same time strengthening our standing and credibility among foreign governments and the global community and diminishing the recruitment efforts of tomorrow's--for tomorrow's terrorist.

Yesterday I introduced a bill, the National Security with Justice Act, which maintains rendition as a robust and agile tool in our fight against international terrorism, but brings that tool within the rule of law, provides additional safeguards against error, prohibits rendering of individual to countries that will torture or mistreat them or to secret extraterritorial prisons.

My bill also closes a hole intentionally left open by the President's recent Executive order on the treatment of detainees. The President's order is notably silent on some of the more controversial techniques the CIA has allegedly used in the past, such as waterboarding, sleep deprivation, sensory deprivation, and extremes of heat and cold. When we countenance this treatment of detainees, we diminish our ability to argue that some techniques should not be used against our own troops.

I wonder what the response is in this country if we find that those techniques are being used. We can't continue to equivocate and dissemble on this matter. We need to send a clear message that torture, inhumane, and degrading treatment of detainees is unacceptable, is not permitted by U.S. law, period. Therefore, my bill prohibits all officers and agents of the U.S. Government from using techniques of interrogation not authorized by, and listed in, the U.S. Army field manual on intelligence interrogation.

Today we have several distinguished experts who will help us understand how we can maintain these vital tools in our fight against terrorism, without endangering the safety of our troops, jeopardizing the international partnerships so critical in this long-term fight, and alienating modern Muslim populations, and meeting our standard of what we consider, what the average person considers fairness; the rule of law.

I now invite my good friend, Chairman Lugar, to offer some opening comments.

OPENING STATEMENT OF HON. RICHARD G. LUGAR, U.S. SENATOR FROM INDIANA

Senator Lugar. Thank you very much, Mr. Chairman. I would just comment that in the current fight against

terrorism, we have employed some of our most talented minds to leverage America's overwhelming technical capabilities. Yet we realize that many terrorists employ tactics designed to frustrate our technological advantages. Terrorists' orders are now seldom transmitted over the Internet or by mobile phones, both of which are prone to electronic eavesdropping. Instead, messages are couriered by hand, or passed by word of mouth. And terrorist cells often deliberately keep small and isolated from one another to avoid penetration.

In this environment, our ability to disrupt terrorist organizations depends greatly on the oldest form of espionage, namely human intelligence. Identifying, locating, and obtaining access to individuals with information about terrorist cells is now one of our most vital national security tasks. As a result of these facts on the ground, the U.S. policymakers have been forced to contend with moral, legal, and tactical questions that defy easy answers.

How do we handle terrorists who have been pinpointed outside of countries where the U.S. military and intelligence agencies can operate with the cooperation of the local government? Where should suspected terrorists be detained, and under what regulations? To what length should we go to obtain information from a prisoner that could prove vital to saving the lives of hundreds, or even thousands, of people? And how can we be sure that the information we obtain is truthful and valuable?

We all agree that actionable intelligence items that enable us to destroy terrorist cells or disrupt terrorist activities are essential in our current struggle. But we have not developed a national consensus on how far the U.S. Government can go in seeking such items. We also have not come to grips with the question of whether information obtained through methods that draw international criticism is worth the loss of United States standing.

Last summer, the Foreign Relations Committee held a hearing on counterterrorism, in which we discussed the growing ability of terrorist organizations to conduct anti-American propaganda, and to franchise themselves. Decisions about individual cases can not be made in a policy vacuum with no reference to broader antiterrorism strategy. The policy of rendition has proven in the past to be a useful tool in bringing to justice narcotraffickers and other international criminals. In most of those instances, individuals were sent to the United States with the consent of the countries where they were located. Either because the country's judicial system was inadequate and prone to corruption, or because the country in question believed that the U.S. judicial system was better suited to handle the case.

The issue before us is the impact of so-called ``extraordinary rendition.'' When suspected terrorists are rendered to justice, not in the United States, but to other countries, many of whose judicial systems have questionable levels of human rights protection and due process procedures.

Today's hearing is an opportunity to grapple with the complexities of that issue. And I appreciate the study that our witnesses have given to those questions. I look forward to their insights.

Thank you, Mr. Chairman.

The Chairman. Thank you very much.

We have a very distinguished panel this morning. Tom Malinowski has been the Washington advocacy director for Human Rights Watch, an organization dedicated to protecting human rights around the world since 2001.

Prior to his joining Human Rights Watch, he was Special Assistant to President Bill Clinton and Senior Director of Foreign Policy Speech Writing at the National Security Council. From 1994 to 1998, he was a speech writer for Secretaries of State Christopher and Albright and a member of the State Department Policy Planning staff. He has also worked for the Ford Foundation as a legislative aide and as a legislative aide to our great colleague, who's no longer with us, Daniel Patrick Moynihan.

Professor Daniel Byman--Professor Byman has been director for the Center for Peace and Security Studies and the Security Studies Program at the Edmund A. Walsh School of Foreign Service at Georgetown University since 2005. He also serves as an associate professor, and since 2003 has been a nonresident senior fellow at the Saban Center for Middle Eastern Policy at the Brookings Institution. From 2002 to 2004, he was a professional staff member of the 9/11 Commission and prior to that worked as a professional staff member in the Joint 9/11 Inquiry for the U.S. House and Senate Intelligence Committee. He's worked from 1997 to 2002 as a policy analyst and director of research for the Center for Mideast Policy, Public Policy at the Rand Corporation, and worked from 1990 to 1993 as a political analyst for the CIA. He has a Ph.D. in political science from the Massachusetts Institute of Technology.

Dr. Philip D. Zelikow--Dr. Zelikow is the White Burkett Miller Professor of History at the University of Virginia. From February 2005 until December 2006, he was counselor to the U.S. Department of State where he served as a senior policy advisor to the Secretary of State. He also served as the executive director of the 9/11 Commission and is a member of the President's Foreign Intelligence Advisory Board. He also taught at Harvard University Kennedy School of Government and director at the University of Virginia's Miller Center for Public Affairs. He has a Ph.D. in international law and diplomacy from Tufts University, the Fletcher School, and a law degree from the University of Houston.

And MG Paul Eaton. General Eaton, who is not a stranger to us, is retired from the U.S. Army, 2006, after more than 33 years of distinguished service. From 2003 to 2004, he was a commanding general charged with reestablishing Iraqi security forces, where he built the command and established the structure and infrastructure for the Iraqi Armed Forces. He has commanded infantry from the company to the brigade levels, commanded the infantry center at Fort Benning and has been Chief of Infantry. He's also served the Joint Chiefs as Deputy Commanding General for the transformation and striker unit development and has operational--and has had operational assignments in Somalia, Bosnia, and Albania.

I welcome you all, gentlemen, and why don't you begin your testimony in the order that you were recognized. Thank you.

STATEMENT OF TOM MALINOWSKI, WASHINGTON ADVOCACY DIRECTOR,
HUMAN RIGHTS WATCH, WASHINGTON, DC

Mr. Malinowski. Thank you very much, Senator Biden, Senator
Lugar, members of the committee. Thank you for holding this
hearing and inviting me to testify.

I'll start with a simple observation that when I joined
Human Rights Watch about 6 years ago, I thought I'd be spending
most of my time dealing with situations in places like Sudan
and Burma and China. I never thought for a moment that I'd end
up as preoccupied as I've been with the policies that you're
focused on here.

But here we are and here we must be, because as you said,
Mr. Chairman, these policies have done so much to diminish
America's standing, it's influence in the world. And because
they have hindered, ironically, not helped, our efforts in
fighting terrorism. So, I'm really glad that you're doing this
and particular that you're focusing on the most difficult and
the most complicated aspects of this problem, those involving
rendition and CIA detention.

As Senator Lugar mentioned, rendition is nothing new, but
there is a difference. In the past when we've seized people
overseas, we brought them to justice, we brought them to face
criminal trial in the United States or elsewhere. What we're
doing now, what we have been doing is essentially hiding people
from justice. People have been sent to secret facilities or
they've been held for years without any process, not even
visits from the International Committee for the Red Cross. Some
subjected to interrogation methods that, well, methods that I
first learned about when I was reading accounts by Soviet
dissidents of what they endured in KGB prisons years ago. Now,
some of these men committed terrible acts, inevitably a few
turned out to be innocent. Some have since been transferred to
Guantanamo Bay, many others were rendered to countries where
torture is standard operating procedure and those people
remain, essentially, disappeared, vanished.

Now those are the facts. They were meant to be secret. Of
course, they were not going to be secret for long, that was
inevitable. What I'm particularly interested in is the argument
that these policies are making to the rest of the world. Here's
the argument I think the administration is making, in a
nutshell.

First, that the whole world is a battlefield in an open-
ended war against terror. Anyone, the Chief Executive of a
country believes to be associated with terrorism is a combatant
in that war and can, therefore, be attacked on sight or held
without charge. Such people can be seized anywhere, anytime,
without judicial authorization and if they're considered
especially dangerous, they can be held in secret for as long as
a country likes. So long as these people are in the custody of
an intelligence agency, governments can also subject them to
interrogation procedures that would normally be prohibited in
wartime.

Now, I've deliberately stated these propositions in their
generic form, not as statements of what the United States can
do, but as statements of what any country can do. Because
that's, essentially, the implication of the arguments that

we're making. And I think it's extremely dangerous. Imagine, for example, if the Government of Iran were to seize a bunch of Americans in Iraq, take them across the border back to Iran, and held them in a secret prison with no judicial process. Would we accept that that was OK, just because, for example, they were being held by the Iranian Intelligence Agency and not the Iranian military?

Imagine if China or Burma accused an American of aiding rebels in their country, as they often do. And on that basis, seized that American off the streets of Wilmington or Indianapolis, bundled that person on a plane, took them back to China or Burma, held them for years in secret. Would the President of the United States say, ``Well, you know, no problem, I guess the leaders of China and Burma thought that guy was an enemy combatant and they have a right to do that.''

Or just for the sake of argument, imagine if the President of Russia declared that his country was engaged in a global war on terror and that anyone with any connection to any group that supported separatist elements, in a place like Chechnya, was a combatant in that war who could be detained or shot or poisoned, wherever he was found, whether in Moscow or Berlin or, just for the sake of argument, London.

Now clearly, we live in a world where such things are possible; they happen. But do we want to live in a world where they are considered legitimate? That's what's at stake here-- whether we're going to preserve a set of legal and moral rules that this country has struggled to develop over generations, and whether the United States is going to remain the world's preeminent champion of those rules.

Right now we're obviously losing that status. When we go around the world, talk about freedom and democracy, these policies are thrown in our face, whether we're a human rights organization or the U.S. Government. Dictators all around the world take pleasure now in saying to their people, that even America, which preaches all these fine moral ideals to the world, tortures prisoners and locks them away without charge. Even America throws away the legal niceties and behaves ruthlessly when it feels threatened. The Americans use all this human rights talk to beat up their enemies, but you know, they're really just the same as us. I hate the fact that dictators and authoritarian leaders like Vladimir Putin can now say that with some degree of legitimacy to their people.

Now, those are some of the costs. The question is: Do we benefit at all, are there national security benefits to these policies? I agree with Senator Biden that the answer to that is no. It's certainly no if--you know--if you agree, for example, with what General Petraeus has been saying to his troops in Iraq. He recently said, ``This fight depends on securing the population, which must understand that we, not our enemies, occupy the moral high ground.'' We're losing the moral high ground because of these policies, in a way that creates far more enemies than they could ever take off the battlefield.

Now, it's also vital to get good intelligence, as you suggested, Senator Lugar. But I don't think these policies are the answer to that challenge. Partly because folks who live in communities where terrorists hide are going to be much less likely to give us information to turn over their neighbors and

friends if they think those neighbors and friends are going to
be subjected to torture or shipped off to a secret prison. And
partly because these practices, you know, they're designed to
elicit false confessions from people, they're not really
designed to get at the truth.

And I think one of the best examples of this is one of the
first known cases of extraordinary rendition, one that we
haven't mentioned yet. An al-Qaeda member named Ibn al-Sheikh
al-Libi, who was taken in Afghanistan after the fall of the
Taliban regime, first interrogated by the FBI, which was making
progress, reportedly. Then given to the CIA, which rolled out
its enhanced interrogation techniques and then shipped to Egypt
for, I suppose, further enhancement. What did Libi say to his
interrogators? Precisely what they wanted to hear: That Saddam
Hussein was training al-Qaeda in the use of chemical weapons.
And where did that piece of information end up? It ended up
being the closing argument in Secretary of State Powell's
famous speech to the U.N. Security Council on Iraq's weapons of
mass destruction program.

So you can say, I think, with credibility that one of the
greatest intelligence failures in American history came about,
in part, because somebody trusted the tortured confession of a
man who went through the extraordinary rendition program. And
that ought to give us pause.

Then there's the whole problem of not being to bring
terrorists to justice. Not a single 9/11 planner has been
successfully prosecuted in this system. The only person the
administration has managed to convict, in the system that
they've created, is a minor al-Qaeda guy, if he was at all, an
Australian kangaroo trapper by the name of David Hicks, who got
a 9-month sentence and is now serving it in Australia.

At the same time our Federal courts, which have been
disparaged as not being capable of dealing with terrorism, have
quietly prosecuted and put away dozens of international
terrorists for sentences up to, and including, life. And you
know what? Nobody is saying that those people who our Federal
courts have processed were treated unfairly. Nobody is
clamoring for their release. Nobody--terrorists are not using
their fate to recruit new terrorists. To use one of President
Bush's favorite expressions, ``Those people who got justice
with due process are no longer a problem for the United States
of America.'' Every single person who's gone through this
rendition program remains a problem for the United States of
America.

Now legislation you've proposed, Senator Biden, addresses
the most complicated aspects of that problem and Human Rights
Watch strongly supports the goals of your bill: To protect
legitimate intelligence activities while getting the CIA out of
this long-term detention business and limiting rendition to
cases where a prisoner is sent to face justice with due
process. Drafting the language to accomplish those goals is
really, really hard. Particularly when we have some lawyers in
this administration who believe the constitutional function of
Congress is to enact loopholes not laws, and they will scour
your legislation for any loophole that they can find. So, I
would urge you, as this legislation moves forward, to be
extremely careful, look at the language again and again, make

sure that it's absolutely airtight.

In my written testimony I suggest a few adjustments that I hope you'll consider making. For example, granting the Red Cross access to every prisoner in U.S. custody. And I ask whether the FISA Court procedure that you outlined in the legislation is the best way of overseeing this process. So, I look forward to working with you, your staff, and other Senators as that process moves forward.

I also want to just strongly commend you for including in the legislation a provision that establishes a single interrogation standard for the entire U.S. Government, one that is humane, one that is effective, one that is lawful. Clearly, the message of the Executive order and some of the statements the administration has made in the last few days suggests that they want to go back to at least some elements of the enhanced interrogation program. I think that would be a tragic, tragic mistake for the reasons that you outlined, Mr. Chairman. And again, I commend you for trying to prevent that.

The very fact we're even having this discussion, I suppose, is kind of sad. You know, how this country treats its enemies ought to be what distinguishes us from our enemies. And the story of how we've actually done so in the last few years doesn't always make me proud, but I think that there's another story out there that's waiting to be written, and that is that, you know, the United States was hit hard on 9/11, we responded mostly in ways that were honorable and smart. We made some mistakes out of fear. Our institutions, the Congress, the court, our military are now correcting those mistakes and bringing us back to a path of which we can be proud. I think that's a really good story that I hope will be told. And I'm very glad that this committee is playing its part in helping to write it.

Thank you.

[The prepared statement of Mr. Malinowski follows:]


Prepared Statement of Tom Malinowski, Washington Advocacy Director,
Human Rights Watch, Washington, DC


Mr. Chairman, thank you for holding this hearing and for inviting me to testify.

When I joined the staff of Human Rights Watch 6 years ago, I assumed I would be spending most of my time dealing with outrages committed by governments in countries like Sudan and China and Burma, and urging the United States to be a force for good in such places. I never imagined that I would see my own government engaging in the kinds of activities it has long condemned around the world: Disappearing prisoners in secret facilities for years without any legal process, sending them to be interrogated in countries where torture is standard practice, and subjecting them to interrogation methods that I first learned about while reading accounts by Soviet dissidents of what they endured in KGB prisons.

These policies have undermined standards that defenders of human rights everywhere rely upon to fight for their cause. They have diminished America's moral standing and influence in the world. They have hindered, not aided, the fight against terrorism, handing America's enemies a victory they could never have achieved on their own.

For the last 6 years, a growing number of voices have been pushing back: Members of Congress, the Supreme Court, active and retired members of the U.S. military and intelligence community, not to mention organizations dedicated to promoting civil liberties and human rights. We have made considerable progress in righting the wrongs of the last few years and encouraging a counterterrorism strategy that will be more effective as well as lawful. But much more needs to be done. And I am very glad, Mr. Chairman, to see you taking the lead in addressing some of the most complex and important aspects of the problem, including extraordinary rendition and secret detention.

What I'd like to do is discuss what we know about the CIA's detention, interrogation, and rendition program, as well as its consequences and the importance of fundamentally changing it. I will then offer a few comments on the legislation you have introduced.

the program

The administration has acknowledged that around 100 prisoners have been held in the CIA program, in facilities operated by the Agency in undisclosed locations around the world. The International Committee of the Red Cross has repeatedly asked for access to these facilities and been denied. These prisoners were effectively disappeared. In international law, an enforced disappearance is considered to be ``the arrest, detention, abduction or any other form of deprivation of liberty committed by agents of the State . . . followed by a refusal to acknowledge the deprivation of liberty or by concealment of the fate or whereabouts of the disappeared person, which place such a person outside the protection of the law.'' That is precisely what happened to prisoners held by the CIA.

Some of the prisoners were subjected to what the administration has euphemistically termed ``enhanced interrogation.'' These methods reportedly included ``waterboarding''--in which interrogators strap the prisoner to a board with his feet above his head, cover his mouth and nose with cellophane, and pour water over his face to create the sensation of drowning. They also apparently included a technique known as ``long-time standing,'' in which a prisoner is forced to stand motionless for up to 48 straight hours, and extreme sleep deprivation for days on end--methods that survivors of some of the world's most brutal regimes have said cause as much suffering as the worst physical torture.

Last September, the President announced that the last (at that point) 14 prisoners held in CIA facilities were being transferred to military detention at Guantanamo Bay. But of course many more prisoners had been in CIA custody at some point before that. Human Rights Watch has identified 21 people who were almost certainly held in CIA facilities, and another 18 who may have been held, whose whereabouts remain unknown. Most, presumably, were rendered to other countries, most likely in the Middle East.

The administration says that it does not render people to torture. But the only safeguard it appears to have obtained in these cases was a promise from the receiving state that it would not mistreat the rendered prisoners. Such promises, coming from countries like Egypt and Syria and Uzbekistan where torture is routine, are unverifiable and utterly untrustworthy. I seriously doubt that anyone in the administration actually believed them.

We also know that the CIA detention and rendition program remains in operation today. This spring, four more prisoners were delivered to Guantanamo, some reportedly from secret CIA custody. At least one had actually been arrested months earlier. There is also strong evidence

that the Agency may have participated in or condoned the rendition to
Somalia and Ethiopia of a number of people who had escaped the conflict
in Somalia earlier this year.

consequences for global human rights and america's moral authority

Here, in a nutshell, are the arguments the administration has made
to the world through these detention policies: First, the whole world
is a battlefield in an open-ended war on terror. Anyone the Chief
Executive of a country believes to be supporting or associated with
terrorism is a combatant in that war, and can therefore be attacked on
sight or held without charge. Second, such people can be seized
anywhere, at any time, without judicial authorization, and if the
leader of a country considers them especially dangerous, he can hold
them in secret for as long as he likes. So long as these people are in
the custody of an intelligence agency, governments can also subject
them to interrogation procedures that would normally be prohibited in
wartime, even though such practices have been prosecuted as torture by
the United States for over a hundred years.

I have deliberately stated these propositions in their generic
form--not as statements of what the United States can lawfully do, but
as statements of what any government can lawfully do. This is how this
debate should have been framed from the beginning--because America's
policies inevitably set an example for others. But it was not framed
that way. The administration failed to consider, before it embarked on
its interrogation and detention policies, how the United States might
react if others mimicked those policies and the arguments it was using
to justify them.

Imagine if another government--let's say, for the sake of argument,
the Government of Iran--set up a prison camp on some island to which it
claimed its domestic laws did not apply, and that it held there,
without charge or trial, several hundred men of multiple nationalities,
captured outside of Iran, who it accused, based on classified evidence,
of supporting groups it claimed were hostile to Iran.

Imagine if some of these prisoners were Americans--not soldiers,
but say a contractor the Iranians accused of housing or feeding U.S.
troops, or a Treasury Department official they accused of financing the
Pentagon. Imagine if Iran transferred those Americans to the custody of
its intelligence agency, and on that basis claimed that it could hold
them in secret without any legal process for as long as it wanted.
Imagine if those Americans were ultimately given a makeshift military
hearing, in which they tried to say that they had been tortured by
their interrogators, but that the Iranian tribunal kept this testimony
secret because it didn't want Iran's enemies to learn how it
interrogates prisoners.

Imagine if the intelligence service of the United Kingdom suspected
a lawful U.S. resident of sending money to the IRA in Northern Ireland,
or the secret police in China or Burma accused an American of
supporting rebels in their country, and on that basis, kidnapped that
American off the streets of Wilmington or Indianapolis, bundled him on
a plane, and held him for years in a secret facility, hidden even from
the International Committee of the Red Cross. How would the U.S.
Government react? Would the President say ``sure, no problem, I guess
the leader of China or Burma decided that guy was an enemy combatant,
so I can't really complain?'' If it happened to one of your
constituents, Mr. Chairman, would it matter to you if some official in
the U.S. intelligence community had given Burma or China permission to
whisk that American away?

Or, just for the sake of argument, imagine if the President of

Russia declared that his country was engaged in a global war on terror, and that anyone with any connection to any group that supported separatist elements in places like Chechnya was a combatant in that war who could be detained or shot or poisoned wherever he was found, whether in Moscow or Berlin or just for the sake of argument, London.

Clearly, we live in a world in which such things are possible. But do we want to live in a world where they are considered legitimate? That is what is at stake here. Whether we will preserve the legal and moral rules we have struggled to develop over generations to limit what governments--and here I mean not just the United States but all governments--can and can't do to people in their power. And whether the United States will have the credibility to be the world's preeminent champion of those rules.

Now, it is important to note that nothing the administration has done can compare in its scale to what happens every day to victims of cruel dictatorship around the world. The United States is not Sudan or Cuba or North Korea. The United States is an open, democratic country with strong institutions--its Congress, its courts, its professional military leadership--which are striving to undo these mistakes and uphold the rule of law.

But the United States is also the most influential country on the face of the earth. The United States is a standard setter in everything it does, for better or for worse.

When Saddam Hussein tortures a thousand people in a dark dungeon, when Kim Jong Il throws a hundred thousand people in a prison camp without any judicial process, no one says: ``Hey, if those dictators can do that, it's legitimate, and therefore so can we.'' But when the United States bends the rules to torture or to secretly and unlawfully detain even one person, when the country that is supposed to be the world's leading protector of human rights begins to do--and to justify--such things, then all bets are off. The entire framework upon which we depend to protect human rights--from the Geneva Conventions and treaties against torture--begins to fall apart.

It is simply an undeniable, objective fact that when President Bush talks about his freedom agenda today, most people around the world do not conjure images of women voting in Afghanistan or of Ukrainians and Georgians marching for democracy or of American aid dollars helping activists in Egypt or Morocco fight for reform. Even America's closest friends now turn their minds to Guantanamo, to renditions, to secret prisons, and to the administration's tortured justifications for torture.

These policies have not only discredited President Bush as a messenger of freedom, they also risk discrediting the message itself. Because the whole idea of promoting democracy and human rights is so associated with the United States, America's fall from grace has emboldened authoritarian governments to challenge the idea as never before. As the United States loses its moral leadership, the vacuum is filled by forces profoundly hostile to the cause of human rights.

A couple of years ago, Human Rights Watch was meeting with the Prime Minister of Egypt, and we raised a case in which hundreds of prisoners rounded up after a terrorist bombing were tortured by Egyptian security forces. The Prime Minister didn't deny the charge. He answered, ``We're just doing what the United States does.'' We've had Guantanamo and the administration's interrogation policies thrown back in our face in meetings with officials from many other countries, including Saudi Arabia, Jordan, Pakistan, and Lebanon. U.S. diplomats have told us they face the same problem. A U.S. Ambassador to a major

Middle Eastern country, for example, has told us that he can no longer raise the issue of torture in that country as a result.

The master of the tactic is Russia's President, Vladimir Putin, who uses it preemptively to ward off criticism of Russia's slide back to authoritarianism. Just before the recent G-8 summit, a reporter asked Putin about his human rights record, and he immediately shifted the subject: ``Let's see what's happening in North America,'' he said. ``Just horrible torture . . . Guantanamo. Detentions without normal court proceedings.''

Now, don't get me wrong: Putin doesn't need American renditions and secret prisons as an excuse to persecute his critics in Russia. These policies are not the reason why Egypt or any other country tortures and detains prisoners without charge. Still, America's detention policies are a gift to dictators everywhere. They can use America's poor example to shield themselves from international criticism and pressure, to say, to their own people as well as to the world, ``we are just the same as everybody else.''

In the days of the cold war, the Communist leaders of Eastern Europe tried to do the same thing. But it didn't work. Dissidents and ordinary people behind the Iron Curtain knew that America wasn't perfect. But they believed that the United States was at least dedicated to the principle that governments were bound by law to respect human rights. It was profoundly important to them to know that the government of the world's other superpower limited its power in accordance with this principle. It gave them hope that a different way of life was possible, and the courage to fight for it.

Leaders like Putin understand how powerful America's example has been in the past, and they use the administration's policies to tear that example to shreds. They use it to tell their people that all this American-inspired talk about human rights is hypocritical rubbish. ``Even self-righteous America,'' they say, ``which preaches moral ideals to the world, tortures prisoners, and locks people up without a trial. Even America throws away the legal niceties and behaves ruthlessly when it feels threatened. The Americans use human rights talk to beat up their enemies, but they're really just the same as us. And if you think that things can ever be different here or anywhere else, you're just naive.''

                    harm to counterterrorism
These are some of the costs of the administration's detention and interrogation policies. Do these policies have national security benefits that justify such costs? I believe the answer is ``No.''

I believe that the fight against terror is as much a moral and political struggle as it is a military one. That's not just my view.

Listen to former Marine Corps Commandant Charles Krulak and former CENTCOM Commander Joseph Hoar, who have written: ``This war will be won or lost not on the battlefield but in the minds of potential supporters who have not yet thrown in their lot with the enemy.'' Listen to General David Petraeus, who recently told his troops in Iraq: ``This fight depends on securing the population, which must understand that we--not our enemies--occupy the moral high ground.'' Look at the most recent National Intelligence Estimate, which says that the United States needs to ``divide [terrorists] from the audiences they seek to persuade'' and make ``the Muslim mainstream . . . the most powerful weapon in the war on terror.'' Read the U.S. Army's Counterinsurgency Manual, which says that in a war like this, you can't kill or capture every enemy fighter; the challenge instead is to diminish the enemy's ``recuperative power''--its ability to recruit new fighters--by

diminishing its legitimacy while increasing your own.

When America violates its own principles by secretly detaining, abusing, and rendering prisoners to torture, it cedes the moral high ground and loses the Muslim mainstream. These policies are one of the main sources of the terrorists' recuperative power.

What's more, secret detention, torture, and rendition hurt, rather than help, efforts to collect accurate intelligence about the enemy.

One of the best sources of intelligence on terrorist plots are the communities in which terrorists hide. Public cooperation has been the key to preventing many potentially deadly attacks: For example, it was a tip from a member of the Muslim community in London that allowed British investigators to foil a plot to bomb several transatlantic flights last year. But people who live in those communities are much less likely to come forward with information about their neighbors, acquaintances, and relatives if they think the people they're turning in are liable to be abused, or held for years in a secret prison, or sent to a dungeon in a country where torture is rampant.

Interrogation of prisoners is also an important source of intelligence. But torture is not a reliable method of interrogation. Sure, if you waterboard a prisoner or strip him naked in a freezing room or deny him sleep for days on end, sometimes he'll blurt out the truth. But more often than not, tortured prisoners will say whatever they think their interrogator wants to hear, whether true or not, to end their suffering. And keep in mind: When prisoners confirm what their interrogators already believe to be true, interrogators are often highly tempted to believe it. Torture tends to confirm whatever false assumptions the intelligence community brings into an interrogation.

Perhaps the best example of this involves one of the first prisoners to be subjected to extraordinary rendition after September 11--a suspected al-Qaeda member named Ibn al-Sheikh al-Libi. At first, al-Libi was held by the FBI, which used traditional, tried and true, psychological interrogation methods. The FBI was apparently making progress. But the administration lost patience, turned him over to the CIA, which applied its enhanced procedures, and eventually sent him to be interrogated in Egypt. Reportedly, Libi's family was threatened; he was waterboarded; and he was forced to remain standing overnight in a cold cell while being repeatedly doused with icy water.

Libi eventually told his interrogators exactly what the administration wanted to hear: That Saddam Hussein was helping al-Qaeda obtain chemical weapons. This false information became one of the most powerful arguments for the war in Iraq, and the closing argument in Colin Powell's presentation to the U.N. Security Council in February, 2003. One of the greatest intelligence failures in American history came about in part because the administration believed in the CIA program and the tortured confessions it produced.

How much more good intelligence was lost because of the use of these methods? How many false leads have intelligence agencies wasted their time following as a result? How many innocent people have been detained, and how many guilty people have escaped capture? We will probably never know. But the damage has surely been great. And the United States did not have to endure it.

Talk to the military interrogators who are using the professional, humane interrogation methods outlined in the U.S. Army Field Manual on Intelligence Interrogation. They will tell you that these methods are far more reliable in obtaining truthful, useful intelligence than the amateurish and cruel methods the CIA used in its facilities. As for detention of dangerous terrorists--talk to the career prosecutors at

the Justice Department. They will tell you that they know how to bring terrorists to justice in ways that showcase America's commitment to the rule of law.

Consider this: In the 6 years since September 11, the administration's system of holding terrorists in secret detention while creating an entirely new system of military justice to handle terrorism crimes has resulted in exactly zero prosecutions of anyone remotely connected to those attacks. Only one man has been convicted in this system--an Australian former kangaroo trapper who was at best a bit player in al-Qaeda, and who got just 9 months in prison, which he's serving in Australia.

Meanwhile, U.S. Federal courts have successfully tried and convicted dozens of persons for international terrorist offenses, sentencing many to long prison sentences.

What's more, no one is complaining that the men sentenced in the Federal courts were treated unjustly. No one is clamoring for their release. Al-Qaeda cannot exploit their fate to recruit more terrorists to its ranks. To use one of President Bush's favorite phrases, those terrorists who got justice with due process are no longer a problem for the United States of America. Every single person who's been held in Guantanamo, or in a secret prison, or subject to extraordinary rendition remains a profound problem for the United States.

legislative solutions

The legislation you've proposed, Senator Biden, addresses a major part of this problem. Human Rights Watch strongly supports the fundamental goals of your bill--to protect legitimate intelligence activities, while getting the CIA out of the detention business, limiting rendition to cases where a prisoner is sent to face justice with due process, and having an independent court review transfers to ensure that no one is sent to face torture or detention without charge.

Drafting language to accomplish these goals is extraordinarily difficult, especially when we have an administration that believes that Congress's job is to enact loopholes, not laws. This administration has a long track record of interpreting what appear to be clear prohibitions on outrageous government conduct in ways that allow the President to do virtually whatever he wants--and of keeping these interpretations secret so that no one can challenge them. As your bill moves forward, Mr. Chairman, I trust that you will continue to look carefully at the language, and to make any adjustments that may be necessary to ensure that it definitively shuts the door on the extraterritorial detention and rendition to torture that you seek to prohibit.

Based on our initial reading of the bill, there are a few adjustments I would encourage you to make:

First, while your bill requires the FISA Court to evaluate humane treatment assurances from a foreign government in light of that government's overall record on torture and the individual circumstances of the detainee--rather than simply accepting humane treatment assurances--the detainee himself has no opportunity to raise fears of torture or persecution to the court. As we've seen in the case of Guantanamo detainees, each of these cases is highly individualized. Some prisoners from countries with poor human rights records very much want to go home; others have legitimate, personal reasons to fear mistreatment, based on their own past activities and dealings with their home governments. The process you seek to create should give prisoners an opportunity to make such concerns known to the court, with proper representation, so that they can be fairly evaluated, and to

challenge assurances the United States receives from their home
countries.

Second, this raises the question of whether the FISA Court provides
the best oversight mechanism for this process. While I understand your
desire to respect the sensitive nature of intelligence activities, it
may prove very difficult to design a process in the FISA Court, which
operates on an ex parte basis, that allows prisoners a fair chance to
raise legitimate concerns about torture and persecution before their
transfer. An alternative would be to mandate a special article III
court to sit by designation--abroad if necessary--on cases involving
overseas detention. Designated panels of Federal judges, with existing
rules of procedure and experienced in trials, fact-finding, and strong,
tested rules for dealing with classified evidence, could well prove
better able to handle the hearings envisioned in your legislation, and
to give the process the legitimacy it needs. Congress has created
numerous courts in the past to sit on cases involving particular topics
or places, even courts in foreign countries.

I would add that the prisoners in Guantanamo Bay also need a
process that gives them advance notice of transfers to other countries
and an opportunity to raise concerns about torture. I know your
legislation is not intended to deal with the special issues raised by
Guantanamo--but that is an important piece of the larger puzzle that
Congress needs to address somewhere.

Third, while your bill requires prisoners taken into custody by the
CIA to be transferred in a timely manner to face justice with due
process--as soon as a rendition order is received from the oversight
court--it doesn't set a time limit within which such an order must be
issued. A limit would be important to prevent the government from
deliberately prolonging CIA detention by, for example, not providing
the court with the information it needs in a timely manner.

Even if the process is conducted in a ``timely'' manner, prisoners
would still spend some period of time in CIA detention. This raises a
number of important legal concerns. At the very least, I would urge you
to require that the International Committee of the Red Cross have
access to all detainees in U.S. custody, including those held by the
CIA. There is simply no logical reason why any prisoner should be
hidden from the ICRC, unless the CIA wants to use interrogation
techniques that are in any case illegal, immoral, and unreliable.
Allowing ICRC access to all detainees would not interfere with any
legitimate intelligence gathering activities, while assuring the world
that the United States is abiding by its values and the law, and
preserving America's ability to demand ICRC access to its own soldiers
and citizens being held in conflicts abroad.

I would also recommend that your bill require the administration to
report on the fate of rendered prisoners in a public way, rather than
in classified form to the Intelligence committees. The clear intent of
the legislation is for rendered detainees to be prosecuted in their
home countries in accordance with international due process standards.
The United States would have no need to keep the fate of these people
secret if it were asking the receiving governments to settle their fate
in an open, transparent process--as you intend.

Finally, Mr. Chairman, I want to commend you for including a
provision in your bill that limits all agencies of the U.S. Government
to the interrogation techniques described in the Army Field Manual on
Intelligence Interrogation.

Ever since the Congress passed the McCain amendment in 2005, the
CIA has reportedly limited itself to those humane techniques. In that

time, it has repeatedly claimed that it was getting good intelligence from prisoners in its custody.

The Executive order President Bush issued July 20 appears to prohibit torture and cruel treatment. But the administration has not released the actual guidance it is giving the CIA. Administration officials have said that guidance is designed to allow the CIA to return to at least some aspects of the old ``enhanced'' interrogation program. The administration clearly believes that the CIA now has the authority to go beyond the guidelines the U.S. military lives by. Officials--including Attorney General Alberto Gonzales testifying to the Senate 2 days ago--have categorically refused to rule out interrogation techniques like waterboarding that clearly constitute torture. The Director of National Intelligence, Admiral John McConnell, even acknowledged on ``Meet the Press'' on Sunday that he would not want to see American citizens subjected to the techniques the CIA can now use again. All he could say by way of reassurance was that those subject to these methods would not suffer ``permanent harm.''

Admiral McConnell seems to be missing an elementary point: If the U.S. Government does not want American citizens or soldiers to be subjected to these techniques, then it cannot employ them itself. Remember: Everyone now agrees that Common Article 3 of the Geneva Conventions governs all interrogations conducted by all agencies. If the CIA is allowed to use a particular method under the new Executive order, that means the U.S. Government considers that method to be compliant with Common Article 3. And if it's compliant, that means U.S. enemies can use it against captured Americans in any situation governed by Common Article 3.

Your legislation fixes this problem in the right way. The United States Government should not have two different standards of morality and lawful behavior, depending on which agency is holding a prisoner. It cannot teach its soldiers in Iraq and Afghanistan that harsh interrogation techniques are counterproductive and wrong, while telling its intelligence agencies that the same techniques are productive and right. And it can't expect the techniques the CIA is using to remain secret. Eventually, these methods always come to light. And America will not regain its moral authority unless it can speak with absolute moral clarity on the issue of torture.

Mr. Chairman, that we are even having this discussion in America is profoundly sad. How this country treats its enemies ought to be what distinguishes it from its enemies. The story of how it has actually done so in the last few years is not one of which we can be proud. But the full story has not yet been written. And when historians tell it many years from now, a more hopeful narrative may emerge. It will, I hope, go like this. That America was hit hard on September 11, 2001. It tried to react in ways that were honorable and smart, but also made some terrible mistakes out of fear. But in a relatively short period of time, its democratic institutions corrected those mistakes, just as they were designed to do. That is a story of which, on balance, I would be proud. I'm glad to see that this committee wants to play its part in writing it.

    The Chairman. Thank you very much.
    Doctor.


STATEMENT OF DR. PHILIP ZELIKOW, WHITE BURKETT MILLER PROFESSOR
    OF HISTORY, UNIVERSITY OF VIRGINIA, CHARLOTTESVILLE, VA

Dr. Zelikow. Chairman Biden, Senator Lugar, members of the committee, thank you for the opportunity to offer my views on this important subject.

We are now nearly 6 years into a greatly intensified global struggle against violent Islamist extremism. In several ways, we are involved in armed conflicts. But though we are at war, the struggle is much more than a war and the American military will not be the main shield of our Republic.

I've had unusual opportunities to consider these issues from several perspectives: As a lawyer, investigator, and policymaker. And I'm here today as a private individual, not as a representative of the administration.

There is a pattern in how our country tends to react to the trauma of surprising reversals or attack. In 1917-18, 1940 to 1942, or 1950 to 1952, the United States mobilized everything that was to hand followed by a vast outpouring of spending and energy, trying whatever it could, making many mistakes, but also getting some things right. These past episodes have always been followed by a period when we catch our collective breath, reflect a little on what we have been doing, and decide how or whether to make lasting changes in the way we protect our country. We are in just such a period today. That means a good, healthy national debate.

I've contributed to the public debate about how to treat captives. Rather than repeat those remarks, they're attached as an annex to my statement. As you'll see, I agree with many of the premises that Chairman Biden announced for this hearing. Our ideals do matter. They matter, not just for public opinion, they matter concretely in the quality of operational collaboration and what must be a coalition effort, to succeed in this struggle.

Today I want to focus more directly on some of the policy ideas under consideration by the committee, especially concerning renditions, and make four basic points.

One, renditions are an indispensable instrument of policy in order to protect the United States. Two, concerns about rendition have less to do with the practice itself, than with arguments about how the captives may be treated at their point of arrival. If that is the concern, then confront it directly and substantively. Three, the practice of renditions has already changed from what it was in 2002 and 2003. It is continuing to evolve along with many other facets of American policy. So, I urge the committee to be careful not to overreact now, to the way you think people may have overreacted then, years ago. Four, the particular proposed remedy of banning participation in renditions, except if approved by FISA Court, could create lasting risks that might outweigh the original concerns.

Renditions are vital. There are many situations when formal extradition of deportation of terrorist suspects is not a viable option. The practice of rendition itself has repeatedly been upheld in cases, both in the United States and in Europe.

To give you a sense of how this works in practice, I tried in my statement to give you the concrete hypothetical illustration of a Yemeni terrorist suspect in Malaysia and the options people would confront in figuring out what to do with that person. I won't recapitulate all that in detail here,

except to say that dilemmas like these involve an intricate weighing of circumstances and risks: The risk to America; the risk to the person if he is sent to Yemen; appraisals of opportunities to gather further intelligence about the person's plans or associates; U.S. assessments of and relationships with both Malaysia and Yemen; and so on.

So then you have to decide who is best positioned and what institutions are best positioned to make those complicated judgments, often under very severe time pressure.

But we should get at the heart of the problem. The practice of renditions itself is not the main concern. So called ``extraordinary renditions'' appear to be focused, not on renditions to trial, instead the concern is with renditions for purposes of interrogation outside the normal legal system with the expectation that the detainee will be tortured or subjected to other cruel or inhuman treatment.

So my suggestion, which I elaborate in the statement, if you're concerned about the way people are treated at Guantanamo, address that directly. If you're concerned with how people are treated in Yemen, or how people are treated in Saudi Arabia, then let's look at that problem. But again, however, the various obligations must be considered together, including the obligation to protect the people of the United States.

If Guantanamo is closed down with no replacement under the Law of Armed Conflict, if practically all the home countries of captives are regarded as inhumane destinations for a terrorist suspect, then the default mode for everyone involved--the path of least resistance, will be to do nothing.

Third, I suggested using oversight. Practices may be changing. Most, if not all, of the principal allegations of abusive rendition are several years old and appear to date from the period of initial mobilization after the 9/11 attacks. Therefore, to avoid the possibility of overreacting to practices that may already have changed or be changing, I suggest Congress might use its oversight powers to look at specific cases, make a diagnosis, see if lessons have been learned. The Congress will also find, I think, that some of the accountable senior officials have changed and it can judge whether the current office holders are worthy of public trust. Because I think, actually, a lot of this legislation is, frankly, a symptom of a breakdown of trust in executive discretion.

Beginning in 2005, the U.S. Government began comprehensively reviewing a number of aspects of its treatment of persons captured in the struggle against violent extremism. This review occurred for many reasons. And one, as I mentioned earlier, is that this is not just a problem of public opinion. It interferes concretely with our coalition warfare against terrorism around the world. The Congress and the Supreme Court played important parts in these reevaluations, culminating in President Bush's statement of September 2006. The administration made a number of moves, many of which are not well understood and which are recounted in more detail in the remarks I put into the statement.

Look, some of you may be satisfied with the administration's progress so far, some not. My main point is this. These issues can, and should now be, handled in a genuine

partnership of shared powers between the President and Congress. They are now working in more of a partnership than they were. That partnership also extends to foreign governments.

In 2004, the 9/11 Commission, which I had the honor to direct, bluntly recommended that the United States turn a national strategy into a coalition strategy, and in fact, adopt Geneva Convention Common Article 3 as the floor for treatment of captives. That is now the law and policy of the United States.

In September 2006, President Bush pledged that the administration would, ``work with the international community to construct a common foundation to defend our Nation and protect our freedoms.'' The administration and State Department specifically have been working hard to develop a coalition approach.

I have noted that the draft legislation also includes a requirement that all questioning conducted by intelligence officials should conform with the requirements of the Army field manual. As some of you can tell from my earlier remarks on this subject, which I'm not recapitulating in detail today, I sympathize strongly with the concern about interrogation practices. But I believe that members may have underestimated the significance of the President's recent Executive order.

That order not only defines the scope of prohibited conduct just as strongly as the draft bill, equating cruel and inhuman treatment to the prohibitions of the 5th, 8th, and 14th amendments. The Executive order goes beyond the draft legislation. It adds prohibitions that also conform to generally recognized international standards as well, that have come out of the international trials of Yugoslav criminals, for example.

Properly applied, I believe the Executive order can set interrogation practices on a sustainable path and does address concerns about some of the practices that have been alleged in the media. As, in part because of the new partnership with Congress, all the members of the intelligence committees know what practices are going to be allowed under that Executive order. And there can be a colloquy between the administration and Members of Congress now, a much healthier colloquy about whether the dial has been set in the right place.

But the circumstances of the intelligence community and this program may warrant a bit more flexibility than is needed or wanted in the Army field manual. In other words, though the balance may not satisfy everyone, these policies are on a healthier path. I do support new legislation on Guantanamo. But on rendition and interrogation, I urge the appropriate committees to look hard at what is being done and be sure they still believe there is a systemic problem before they legislate new systemic solutions.

My final point, my statement now is that the risks of the cure might outweigh the risks of the problem. There are real risks of executive abuse. You've heard about those risks already. In my statement I tried to illuminate the risks of the other side. And what I did, is I re-ran the circumstances of the 9/11 plot itself against this new legislation.

For example, in late 1999 and early 2000 we tracked two

members who later participated in the 9/11 attacks to a meeting with some of their colleagues in Kuala Lumpur, Malaysia. So what I did is imagine--let's suppose that we had done just the job the 9/11 Commission wanted the intelligence community to do about that Kuala Lumpur meeting. They've now done all of our recommendations. They're doing it just the right way. They've tracked the people, they've assimilated what they know about them, they're ready to act. And then what I did in this hypothetical is, I then ran the requirements of the legislation against what they would have to do about those people in Kuala Lumpur, and I go through it point by point. I won't go through that again now in my oral statement, but I think it's a pretty intimidating set of hurdles that they would have to confront.

And, my conclusion was then, that you would have a scenario in which all the problems that the 9/11 Commission identified having been wondrously and happily solved. New hurdles have arisen, officials would hesitate about whether they should strenuously lobby Malaysian officials to detain these individuals at all. Due efforts would then be made to keep watching the men before they moved on, but they would move on with their planning and with their actions.

As I mentioned earlier, there is a balance of risks involved in calculating how to deal with the problem of renditions, as with so many other aspects of this global struggle. Congress and the Executive should shoulder directly the burden of setting this country's core values and policies for this difficult struggle. I don't think that you should respond, essentially, to the breakdown of trust in executive discretion by creating a whole new set of statutory requirements and then a whole new court process to overcome that breakdown of trust and concern about discretion. Instead, I think it's too early to give up on solving that problem, if you look hard at how this is already changing in the last year or two and could change further aided by congressional oversight.

Thank you.

[The prepared statement of Dr. Zelikow follows:]

Prepared Statement of Philip Zelikow, White Burkett Miller Professor of History, University of Virginia, Charlottesville, VA

Chairman Biden, Senator Lugar, and members of the committee, thank you for the opportunity to offer my views in your consideration of this subject.

We are now nearly 6 years into a greatly intensified, global struggle against violent Islamist extremism. In several ways we are involved in armed conflicts. But, though we are at war, this struggle is much more than a war. And the American military will not be the main shield of our Republic.

I have had unusual opportunities to consider these issues from several perspectives, as a lawyer, investigator, and policymaker.

  --As a civil rights lawyer in Texas more than 25 years ago, I
      represented Vietnamese shrimpers being attacked by domestic
      terrorists, the Knights of the Ku Klux Klan. Based on our
      successful experience, my colleague in that case--an Alabama
      lawyer named Morris Dees--and I later offered advice to

Congress after the bombing in Oklahoma City.
--In the 1990s, while teaching at Harvard, I prepared a set of case
    studies, after fieldwork in Belfast and London, on policing in
    Northern Ireland.
--In 1997-1998, along with John Deutch and Ash Carter, I coauthored a
    study of how to counter a coming danger that we called
    ``catastrophic terrorism.''
--During the last 6 years I was a member of the President's Foreign
    Intelligence Advisory Board, directed the Markle Foundation's
    bipartisan work on national security in the information age,
    served as the executive director of the 9/11 Commission, and in
    2005-2006--as counselor of the State Department--was a deputy
    to the Secretary for terrorism, homeland security, and
    intelligence policy.

    So I've tried to understand these problems from several different
angles. And I am here today as a private individual, not as a
representative of the administration.
    There is a pattern in how our country tends to react to the trauma
of surprising reversals or attack. In 1917-18, 1940-42, or 1950-52, the
United States mobilized everything that was to hand, followed by a vast
outpouring of spending and energy, trying whatever it could, making
many mistakes, but also getting some things right.
    These past episodes have always been followed by a period when we
catch our collective breath, reflect a little on what we have been
doing, and decide how or whether to make lasting changes in the way we
protect our country. We are in such a period today. That means a good,
healthy national debate.
    I have contributed to the public debate about how to treat
captives. Rather than repeat these remarks, they are attached as an
annex to this statement. As readers will see, I agree with many of the
premises of this hearing. Our ideals do matter.
    Today I want to focus more directly on some of the policy ideas
under consideration by the committee, especially concerning renditions
and make four basic points:

        1. Renditions are an indispensable instrument of policy in
    order to protect the United States.
        2. Concerns about renditions have less to do with the
    practice itself, than with arguments about how the captives may
    be treated at their point of arrival. If that is the concern,
    then confront it directly and substantively.
        3. The practice of renditions has already changed from what it
    was in 2002 and 2003. It is continuing to evolve, along with
    many other facets of American policy. So be careful not to
    overreact now to the way you think people may have overreacted
    then.
        4. The particular proposed remedy of banning participation in
    renditions except if approved by a FISA Court could create
    lasting risks that outweigh the original concern.
                    renditions are vital
    There are many situations when formal extradition or deportation of
terrorist suspects is not a viable option. The practice of rendition
itself has repeatedly been upheld in cases both in the United States
and in Europe.\1\
------------------------------------------------------------------------

    \1\ See, e.g., United States v. Alvarez-Machain, 504 U.S. 655

(1992) (abduction from Mexico, without Mexican permission, of Mexican
national involved in torture/murder of a DEA agent); United States v.
Yunis, 924 F.2d 1086 (D.C. Cir. 1991) (rendition of Fawaz Yunis, wanted
for a 1985 hijacking, lured out of Lebanon onto a yacht and then
transported back to the United States). Or, in Europe, Case of Ocalan
v. Turkey, European Court of Human Rights (May 2005) (Turkish abduction
of PKK leader from Kenya), esp. paras 87-90; or Ramirez v. France,
European Commission of Human Rights (June 1996) (French rendition of
``Carlos the Jackal'' from Sudan).

------------------------------------------------------------------------

Take the case of a Yemeni, living in Malaysia. Let us say that the
United States has gained signals intelligence indicating that this
Yemeni national is involved in planning to attack some nearby American
target, perhaps having taken detailed photographs of the American
Embassies in Singapore and Bangkok--but taking care not to violate
local Malaysian law.

- --The activities and protection of a citizen of a foreign country
      living in a third country is first, the responsibility of the
      country of residence--in this case, Malaysia.
- --Second, his activities and protection is the responsibility of the
      country of which he has the good or bad fortune to be a
      citizen--in this case, Yemen.


The United States must protect Americans and act honorably in their
name. Therefore, if it knows that the person is involved in potential
terrorist activity against America, U.S. officials cannot let this
slide. Since Malaysia has a responsible, sovereign government, the
United States would work with Malaysian officials. If those authorities
are persuaded that the United States concerns deserve action, they may
help.

But Malaysia's ability to act is bounded by its laws, its politics,
and its lack of access to some U.S. intelligence information. Formal
extradition may not be available. Indeed, most countries do not have
established bilateral extradition treaties with each other.

The dilemmas for the United States may thus be real and immediate.
Do nothing? Take the person into American custody even if the case is
not indictable in Federal court?

The Malaysian authorities also may feel uneasy about the situation.
So all concerned may decide that it is time for this Yemeni citizen to
go home. And the Yemeni Government, of course, is entitled to know why.
It may even be asked to help contain the risk of this person going back
to his terrorist work.

Since even many Yemenis cannot reliably predict what will happen to
them in government custody, especially over time, it will be even
harder for Americans and Malaysians to make a reliable guess. Yet, to
the Yemeni resident in Malaysia the United States Government owes the
obligations it owes to any of the billions of human beings in the
world, such as the duty not to send anyone, knowingly, off to be
tortured.

Dilemmas like these involve an intricate weighing of circumstances
and risks: The risk to America; the risk to the person if he is sent to
Yemen; appraisals of opportunities to gather further intelligence about
the person's plans or associates; U.S. assessments of, and
relationships with, both Malaysia and Yemen and so on.

get at the heart of the problem

The practice of renditions itself is not the main concern. So-

called ``extraordinary renditions'' appear to be focused not on
renditions to trial. Instead the concern is with renditions for
purposes of interrogation outside the normal legal system, with the
expectation that the detainee will be tortured or subjected to other
cruel or inhuman treatment.

So, is the real concern with renditions that the captive will be
detained at Guantanamo as an enemy combatant, or questioned inhumanely
by U.S. officials? Then the Congress could again take on the policy
issue of how or whether it wants Executive officials to detain and
question captives under the international law of armed conflict. Nor is
it really an answer to just set up new rights of habeas access to the
Federal courts.\2\

--------------------------------------------------------------------------

    \2\ Bills now being proposed would also provide much broader habeas
corpus rights for any detainees in Guantanamo. This remedy is not well
connected to the fundamental problem. On this point I cannot add much
to the observations of Benjamin Wittes, ``Punt Return,'' The New
Republic Online, July 23, 2007.

--------------------------------------------------------------------------

Or, is the real concern that Yemen or some other country will
mistreat its own citizens if they are involuntarily repatriated? This
then becomes part of a larger set of issues, about the responsibility
of the United States for how other countries treat their citizens, on
their territory.

The United States has moral and legal responsibility if it has
arranged or participated in the involuntary repatriation of a person
back to his home country. Therefore, as Secretary Rice explained
publicly in December 2005: ``In conducting such renditions, it is the
policy of the United States, and I presume of any other democracies who
use this procedure, to comply with its laws and comply with its treaty
obligations, including those under the Convention Against Torture. . .
. The United States has not transported anyone, and will not transport
anyone, to a country when we believe he will be tortured. Where
appropriate, the United States seeks assurances that transferred
persons will not be tortured.''

Again, however, the various obligations must be considered
together, including the obligation to protect the people of the United
States. If Guantanamo is closed down with no replacement under the law
of armed conflict, if practically all the home countries of captives
are regarded as inhumane destinations for a terrorist suspect, then the
default mode for everyone involved--the path of least resistance--will
be to do nothing.

                use oversight . . . practices may be changing
Most, if not all, of the principal allegations of abuse of
rendition are several years old, and appear to date from the period of
initial mobilization after the 9/11 attacks. Therefore, to avoid the
possibility of overreacting to practices that may already have changed,
or be changing, Congress might use its oversight powers to review
specific cases. Make a diagnosis. See if lessons have been learned. The
Congress will also find that some of the accountable senior officials
have changed and it can judge whether the current officeholders are
worthy of public trust.

I was recently impressed by the British Parliament's own
investigation of its government's involvement in renditions. This was
an oversight report of the Intelligence and Security Committee, which
in turn elicited an appropriate government response. Although the
investigators sheltered themselves a bit too cozily from the hard

dilemmas I have outlined above, they did display sensible professionalism in sifting myth from fact, and there is quite a bit of myth surrounding allegations about ``extraordinary rendition.'' \3\

---
\3\ Both the committee report and the government's response can be found at www.cabinetoffice.gov.uk/intelligence.

---

Beginning in 2005, the U.S. Government began comprehensively reviewing a number of aspects of its treatment of persons captured in the struggle against violent Islamist extremism. This review occurred for many reasons. One was that increasing international concern is not just a problem of public opinion; such concern creates concrete obstacles to effective international operations.

The Congress and the Supreme Court also played important parts in these reevaluations. Culminating in President Bush's statement of September 2006 the administration made a number of moves, which are recounted in more detail in the remarks I have appended to this statement.

Some of you may be satisfied with the administration's progress so far; some not. My main point is this: These issues can and should now be handled in a genuine partnership of shared powers between the President and Congress. That partnership also extends to foreign governments.

In 2004 the 9/11 Commission bluntly recommended that the United States turn ``a national strategy into a coalition strategy,'' adding that ``coalition warfare also requires coalition policies on what to do with enemy captives.'' \4\ That is one reason why, to make an armed conflict approach sustainable, the Commission was the first major public report to endorse adoption of Geneva Convention Common Article 3 as a common foundation.

---
\4\ The 9/11 Commission Report (New York: Norton, 2004), p. 379.

---

In September 2006 President Bush pledged that the administration would ``work with the international community to construct a common foundation to defend our Nation and protect our freedoms.'' The administration, and the State Department specifically, has been working hard to develop a coalition approach. As a result of meetings in many countries over the last year and a half, there is growing recognition of how difficult the challenge is and of the need for creative, practical solutions to sustain the rule of law in what some European officials concede is the ``grey area'' between established procedures and approaches that fall outside of recognized legal principles.\5\

---
\5\ For a description of these efforts and the basic approach, see the testimony of the State Department's Legal Adviser, John Bellinger, to the Helsinki Commission (June 21, 2007).

---

I have noted that the draft legislation also includes a requirement that all questioning conducted by intelligence officials would conform with the requirements of the Army Field Manual. As you can tell from my earlier remarks on this subject, I sympathize strongly with the concern about interrogation practices. But I believe that members may have underestimated the significance of the President's recent Executive order.

That order not only defines the scope of prohibited conduct just as strongly as the draft bill, equating cruel and inhuman treatment to the

prohibitions of the 5th, 8th, and 14th amendments; the EO goes beyond the draft legislation. It adds prohibitions that also conform to generally recognized international standards as well. Properly applied, I believe the EO can set interrogation practices on a sustainable path, addressing concerns about some of the practices that have been alleged in the media. But the circumstances of the intelligence community and this program may warrant a bit more flexibility than is needed or wanted in the Army Field Manual.

In other words, though the balance may not satisfy everyone, these policies are on a healthier path. I do support new legislation on Guantanamo. But on rendition and interrogation, I urge the appropriate committees to look hard at what is being done and be sure they believe there is still a systemic problem before legislating a new, systemic solution.

### risks of a cure may outweigh the problem

There are real risks of Executive abuse. You have heard about those risks already. So I will say more about the risks on the other side, the risk of hobbling vital action. As an illustration we can use part of the 9/11 plot.

In late 1999 the NSA analyzed communications associated with individuals who later participated in the 9/11 attacks--especially Khalid al-Mihdhar and Nawaf al-Hazmi. Intelligence officials correctly concluded these two people were part of an operational cadre. They were tracked to Kuala Lumpur, Malaysia. The United States did not know it, but those two were joined there by two other members of the cell involved in an early version of the ``planes operation.'' Those four men also met with and were aided by a top Southeast Asian operative named Hambali, who set them up at the home of another important terrorist, Yazid Sufaat.

Supposing that it had some of the management practices, tools, and procedures now in place, the U.S. Government might have done more than just track Mihdhar and Hazmi to Kuala Lumpur. It might have more fully assimilated what its agencies knew about these two men and prepared rapidly to act on that information.

Officials then would have the following options, with very little time to decide what to do:

--Leave the two men alone and try to keep tracking them. All these individuals soon began traveling in different directions. The United States did not know it, but Mihdhar and Hazmi were going to Bangkok, where the trail might be lost (as it was in January 2000).
--Ask Malaysian authorities to detain them. Since the U.S. officials had key information about Mihdhar and Hazmi, the United States probably needed to participate directly in the detention, questioning, and rapid exploitation of captured materials, perhaps leading them to Hambali, Sufaat, and the others.
--But the United States probably would not have captured hard evidence about the planned ``planes operation.'' So any further decisions would be based on intelligence about evident planning for some operation, still unclear.
--Even if the Malaysian security services had obliged with some temporary arrest or detention, the Malaysians might well feel no wish to hold Mihdhar and Hazmi, or any other individuals who might have been detained in this operation. None, besides Sufaat, were Malaysian. They had committed no evident crimes in Malaysia. They were not planning any attacks in Malaysia.

Malaysia was then ruled by Prime Minister Mahathir Mohamed, who was not very receptive to U.S. concerns about Islamist extremism and would have had little appetite for any public proceedings, even if the grounds had been firmer. And, anyway, little if any of the key American evidence could be used in a public court.

--So the United States could then either release the men or, under current options, render them into American custody with a possible end destination at Guantanamo, with all that implies.

--If that option seemed unappealing, the best alternative to indefinite and problematical American custody would be a rendition to send the men back to their home countries. For Mihdhar and Hazmi that would be Saudi Arabia (though Mihdhar also retained strong ties to Yemen).

Under the draft proposed legislation that I have reviewed, called the ``National Security with Justice Act of 2007,'' the U.S. Government officials would then face the following hurdles, perhaps with the clock ticking on Malaysian willingness to hold these men for even another hour:

--Overcome a statutory presumption firmly against rendition, or even participating in such a rendition;

--Prepare an application to a Federal judge in Washington, DC, and first get it reviewed by the Attorney General or his deputy;

--Affirm in writing that each individual is ``an international terrorist'';

--Pledge that the Saudi Government will not subject either man to cruel or inhuman treatment;

--Pledge that the Saudi Government will initiate timely legal proceedings against the men that comport with fundamental due process;

--State in writing why Malaysian courts (or its politics) are not likely to succeed in handling these men adequately (presumably getting State Department clearance for the depiction of Prime Minister Mahathir's government);

--Make sure the Federal judge can consult all the State Department and U.N. reports about Saudi Arabia that the law expressly requires the judge to check;

--Hope that the Federal judge will make a positive finding of ``substantial likelihood'' that Saudi Arabia will not subject either man to cruel or inhuman treatment;

--Promise that the State Department will regularly monitor Saudi treatment of both these men for as many months or years as they may be confined, reporting on their status to the Congress every 6 months; and

--Persuade his agency heads to assume the risk of the civil suit provided for by law if the rendition violated the above rules, with the litigant entitled to sue for punitive damages and attorney's fees.

Thus a scenario in which, all the problems that the 9/11 Commission identified having been wondrously and happily solved, new hurdles have arisen. Officials hesitate about whether they should strenuously lobby Malaysian officials to detain these individuals at all. Due efforts would be made to keep watching the men before they moved on. And they would move on with their planning and with their actions.

As mentioned earlier, there is a balance of risks involved in calculating how to deal with the problem of renditions, as with so many other aspects of this global struggle. Congress and the Executive should shoulder, directly, the burden of setting this country's core values and policies for this difficult struggle.

## ANNEX

``Legal Policy for a Twilight War'' by Philip Zelikow, White Burkett Miller Professor of History, University of Virginia--Annual Lecture, Houston Journal of International Law, April 26, 2007

After the 9/11 attack on the United States, the U.S. Government adopted a different approach to defending the country against attack from the al-Qaeda organization, its affiliates, and its allies. The new approach was fundamentally sound. Yet it was developed and implemented in a flawed manner, and these problems were then greatly compounded by the way law and lawyers were used to rationalize the policy and frame the debate.

In 2006 the policy approach was greatly revised, though the character and significance of the changes are still largely unrecognized. A difficult, healthy transition is now well under way and will need to continue for some time to come. As part of that transition, the United States Government, and those who follow its work should deeply reflect upon and reconsider the role that law and lawyers have played in framing the policy choices. I come at these issues as both a lawyer and former policymaker.

Before 9/11 our conceptual framework was mainly the framework of traditional American criminal justice. Bin Ladin was indicted in the Southern District of New York. Naturally, neither the FBI nor the U.S. Marshals service could apprehend him or his principal associates. Therefore the United States Government asked foreign governments to help and also secretly hired foreign friends to try to capture him, using deadly force only if necessary. There were brief exceptions to this approach in 1998, but the government had lapsed back into this default position by the middle of 1999. The story is recounted in the report of the 9/11 Commission.

The 9/11 attack was at least the third major intercontinental operation that al-Qaeda had carried out against the United States. Al-Qaeda's leaders had asserted for years that their organization and its allies were at war with the United States. And, after the 9/11 attack, the United States Government finally, completely agreed with them. The United States then began engaging in an armed conflict with al-Qaeda, its affiliates, and its allies. That worldwide conflict continues today.

An enormous debate also began in this country and around the world about the appropriate way to conduct such a conflict. In this country, as in every other developed country, the debate has been dominated by lawyers arguing with other lawyers. Their debate is about what the law--U.S. law or international law--allows and does not allow.

i. how lawyers found themselves at the center of the policy debate

The policy choices in the conduct of this armed conflict were novel. Put aside the rules governing combat operations in Afghanistan itself in 2001-2002. In other operations the administration had to set policies for lethal engagement of enemy members of al-Qaeda, its affiliates, and its allies; for the transfer of captives to preferred jurisdictions; for the questioning of captives; and for their longer

term detention. For many of these choices there was no established body of experience or precedents.

For the CIA and DOD in particular, some of these activities involved developing entirely new organizational capacities that did not exist, or no longer existed, in their institutions. Any seasoned manager or student of organizations knows how challenging it can be for an organization to develop new capacities, with all the requirements to define tasks, guide implementation, build physical capacities, and recruit/train/manage people to perform these new jobs.

Operating under broad legal parameters set shortly after the 9/11 attacks, a series of policy choices were made, especially in 2002 and 2003, about how to conduct the armed conflict. Especially in the case of CIA, it appears from publicly available sources that, responding to some informal guidance from the White House, the Agency designed, developed, and implemented various techniques and capabilities with little substantive policy analysis or interagency consideration.

Lawyers from other agencies and departments, as well as the White House, were apparently assembled to consider and approve the legality of the proposed methods as, or after, the critical policy choices were being or had already been made. The legal defense then became the public face of the policies. The debate became framed as a legal debate. Legal opinions became policy guides. Opinions to sustain the CIA program had an indirect effect on the guidelines developed for DOD activities as well, since DOD did not wish to develop positions inconsistent with those already in place.

Able bureaucratic players in the Bush administration were able to use legal opinions to provide formal policy cover for Agency operations and deal with internal dissent and unease (``the Attorney General has said it is legal''). Above all, using the legal defenses as the public face of the issue moved the terrain of debate to the President's legal powers in wartime--strong ground indeed. Also interesting is that opponents of the policies found this battleground congenial too. Habits of thinking in legal terms were reinforced. Constitutional and civil liberties lawyers eagerly stepped forward, and they could do so without having to soil their hands by confronting the concrete policy necessities at hand. Thus the public debate was decisively framed--and deformed.

ii. reframing the debate: from ``can'' to ``should''

In other words, instead of asking: What can we do?, start by asking: What should we do? Just this difference, changing ``can or cannot'' to ``should or should not'' changes the framework of debate, changes the evidence and reasoning you use, and changes the role that lawyers should play in the policy process.

By ``legal policy,'' I mean those policies for the enforcement of international, criminal, or civil law and the policies for the effective administration of justice.

Lawyers are not generally trained in legal policy. Even some of the finest lawyers cannot be considered expert in it. Confronted with a novel problem, the habit of thought developed in law schools, and practice, is to spot the legal issue and determine an authoritative, or at least arguable, position on what the law requires. It is important for lawyers, and those who use them, to know the strengths and limitations of these skills. Two examples:

First, moral reasoning. Moral reasoning, which most people think has something to do with ``right and wrong,'' is not taught in law school. The relationship of law to morality is an interesting question, wonderfully explored by thinkers as diverse as Edmond Cahn and James Q.

Wilson. But, for better or worse, moral reasoning is not generally taught in law school. Nor is it generally taught--by the way--in schools of public policy. ``Ethics'' is taught, but that is actually a different set of ideas, though the two subjects overlap.

Second, policing and public order. Generally law schools do not teach about policing, or how societies go about preserving public order. Of course you will find courses on criminal law and criminal procedure, but that is quite different. In fact, in our most elite universities, policing is vaguely regarded as left to vocational schools. To be even blunter, it's perceived as a blue-collar subject. There are rare exceptions. And there are rare policemen and policewomen, or court administrators or corrections officials who can step up to engage in the wider issues of public policy that frame what they do. But I've seen firsthand--in places like Iraq and Afghanistan-- just how difficult it has been for this country to find experts and help others in tackling the basic policy issues of policing and public order that are so evident in so much of the world.

So, as the United States Government developed a new approach to combating Islamist terrorists around the world, many of the formative deliberations were defaulted to being conducted, at the subcabinet level and below, by lawyers--mainly constitutional lawyers. It was the hour of experts like John Yoo, a brilliant scholar who has recently published an illustrative memoir of these experiences.

And these lawyers tended to look for the legal answer. And so the problem tended to be framed less as a detailed analysis of what should be done, and more as a problem of what could be done.

And the lawyers naturally look to legal sources to find the answers. Then they construct whatever answers they can from the available legal sources and pronounce it as a legal opinion.

The worldwide conduct of armed conflict and other actions against al-Qaeda, its affiliates, and its allies presents an exceptionally complex and uncertain set of rules. There are arguments over the scope and reach of international law and the meaning of the relevant international legal concepts even if they do apply. There are arguments over the boundaries between international law, military law, and ordinary domestic (``municipal'' is the technical term) laws. And the arguments over these boundaries set off various theological disputes that have political resonance in the United States and other countries.

So by applying legal interpretation to this set of issues, instead of legal policymaking, we do so in an area where the legal sources are few and fragmentary, uncertain and contested. The arguments immediately become polarized, because they invoke clashing philosophies of international and constitutional law.

To the public at large, the arguments quickly become technical. And they are therefore coarsened into: Are you for civil liberties? Are you for fighting terrorism? And the polarization of ``liberty versus security'' is one of the most vicious byproducts of the debate. This can be politically useful, but it is bad policy.

The direct results were indeed simple and bipolar. For the administration, in such a murky and contested area of law, it was easy to make plausible arguments that a great many things could be done. Indeed the administration feared it would set limiting legal precedents to take any other view as a matter of law.

For the enemies of the administration, it was obvious that they should argue established legal protections were being trampled. And if one takes the view that the original pre-9/11 paradigm--criminal justice plus diplomacy--remains in force, then everything needs to be

done in accordance with established precedents, Article III courts, and the Bill of Rights.

    iii. a legal policy perspective: should we treat this as an armed conflict?

    The first stage after 9/11 was the transition of the core paradigm from criminal justice to the paradigm of armed conflict. Viewed from a policy perspective, that transition needs to be defended as something we should do, and continue doing, not just as something we can do, and are legally able to continue doing. From this same policy perspective, it would be wise to achieve the essential assent of the Congress and key allies that it was—and is—now necessary to deal with this problem as an armed conflict, and then work with relevant partners to develop effective, common rules of engagement.

    Why should we treat this struggle as an armed conflict?

--The criminal justice framework has been developed for use against a finite group with a relatively small number of individuals who are within a given jurisdiction. With al-Qaeda, its affiliates, and its allies the United States confronted large, transnational substate groups that had a partnership with at least one former regime (Taliban Afghanistan). These groups still prefer to operate in areas where nominal state sovereignty is ineffective or nonexistent.

--There are special problems of scale. The problem is well beyond the scale we would traditionally associate with a criminal conspiracy, even with the kind of terrorist groups that we had become used to dealing with in the 1980s, which tended to be associated more with state sponsors of terrorism.

--The threat is also qualitatively different. Societies tolerate certain risks and limitations when they deal with more ordinary crime. But now the United States was confronting groups with the demonstrated capacity to carry out acts that can kill thousands of Americans on a beautiful fall morning and inflict at least tens of billions of dollars worth of prompt, direct damage to the American economy just within the first hour. That level of risk challenges the usual assumptions in fashioning legal policy.

--It is harder to apprehend suspects. The problem with al-Qaida in Afghanistan was obvious, but other, similar challenges exist today. In some cases local governments cannot or will not arrest enemies planning to attack the United States or its friends. In some cases the local governments may wish to help, but such arrests, or judicial extradition, is beyond their capacity. The governments involved will often concede their incapacity—in private.

--Then there are problems in gathering evidence. Some of the pre-9/11 indictments were triumphs of investigation under extremely adverse circumstances. But in many circumstances, it will be hard to overcome those limits or be able to find the resources for the fantastically labor-intensive effort that's required to construct the criminal case from so many scattered fragments, when dealing with large numbers of individuals involved in many different kinds of violent acts.

--And those evidentiary investigations were all after the fact. Often they were triumphs of forensic reconstruction. But policymakers aren't paid to wait for the bodies and debris.

There were and are compelling reasons to sustain the armed conflict approach, complemented by respect for local laws and responsible sovereignty.

It is therefore striking and regrettable that the United States has not persuaded most states, including many of our allies, to agree that a policy of armed conflict is appropriate. This is partly their fault, partly ours.

--Many governments, including practically all of Western Europe, have never accepted any change from the pre-9/11 criminal justice/ diplomacy approach. Many of their leading politicians and lawyers are fundamentally pacifist and believe that armed conflict is rarely, if ever, a solution to a problem--and certainly not if it is proposed by Americans.

--Some of these same governments feel they know the problem well, yet they have not actually been attacked or threatened on the scale suffered by the United States. And, while they still assess the risk as being more ordinary, they also lack the capabilities to join very effectively in more forceful or distasteful measures. So they turn such necessities into virtue.

And the problem is our fault too. It is tempting for some local governments to let the Americans do the distasteful things that protect their people, too. Then these free riders can criticize and distance themselves as they wish. But it is unwise for America to play along with that game. When Americans design processes that are exclusively American--``our show''--because we do not want foreign intrusion, we contradict our argument that this is a global struggle waged in common with others and we encourage free riders.

To build an appropriate coaliton, at home and abroad, a leading government needs to do four things:

(1) Accept the need for a real partnership where the other side gets to have some say and offer a process for policy cooperation--not just tactical help on the case du jour.

(2) Get out and make the policy case--not just a legal argument--for why a fundamentally different approach is needed.

(3) Develop an interpretation of the new approach that, with work, can plausibly be sustained in the partner's politics. In other words, if they are receptive to the basic policy argument, develop a design for implementing it that they can defend.

(4) If they want to help, identify tasks that they can do, with or without help, that commit them to the common enterprise.

Despite many, many bilateral relationships and contacts, usually to solve a tactical problem of the moment, the United States Government did not begin such a systematic effort to build a coalition for this armed conflict against Islamist terrorism until 2005. Legal policy development is part of such an effort because, in running a multinational enterprise, policymakers need to ask their lawyers to develop a legal foundation that can work in foreign markets.

The obvious counterargument, of course, is that the prospective partners will offer aid so limpid and legal policies so unrealistic that it is worse than useless to lash up with them. To this the answers are also apparent:

--Set the right terms for given partners.
--It will help that you made your policy case and sought a coalition,
    even if you fail. And the effort will be remembered if the
    prospective partner changes their views--reevaluating the risk
    of attack or if other circumstances change.
--Sliding into habits of growing noncooperation and alienation is not
    just a problem of world opinion. It will eventually interfere--
    and interfere very concretely--with the conduct of worldwide
    operations.

So far I have focused on the nature of the conflict itself. And, as
President Bush says, it is a war. This is not a metaphorical point.
Though the expression ``armed conflict'' is technically more precise,
the United States is engaged in war against al-Qaeda, its affiliates,
and allies in at least four ways.

--A war in Afghanistan. That partly involves an enemy that is a
    transnational enemy, not simply a participant in an internal
    Afghan conflict.
--A war in Iraq. The war going on in Iraq is mainly internal. But it
    also has a transnational quality because transnational
    combatants and transnational organizations are combatants in
    that war. That fight, layered on the various internal
    struggles, is another reason why U.S. operations should be
    governed under international law and policies for armed
    conflict.
--Occasional operations to target terrorists in effectively
    ungoverned areas of the world where there is complete state
    failure or effective state failure. If terrorist organizations
    are actively planning violent attacks against Americans in
    places that are effectively ungoverned, the United States then
    has to have some kind of way of dealing with those
    organizations, which are at war with the United States.
--Advising and partnering with local governments in their military
    and paramilitary operations against Islamist terrorist
    organizations.

``War'' is not a misnomer. But it is insufficient. The struggle
includes armed conflict but it is more than an armed conflict. It is
not just a war.
Armed conflict is one aspect, and not even the most important
aspect, of a wider struggle to defeat violent Islamist extremism and
help moderate Arab and Muslim governments adapt peacefully to the
modern world. And using ``war'' as the umbrella label signals to people
that the U.S. Government doesn't ``get'' that fact. (Although I believe
President Bush actually does get it.)
            iv. a legal policy perspective: questioning captives
The most important policy choices are guidelines on the
circumstances for killing people; guidelines on how and when to
transfer captives to different jurisdictions; guidelines on how to
question captives; and guidelines on whether and how to detain them--
and for how long. In all these matters the guidelines extend to cover
the character of cooperation with local partners who may help us with
all these tasks.
These are all large subjects. I'll focus on just one, which is the
most important: How we question captives.

Beliefs in how the United States questions captives colors discussion of every other aspect of the conduct of operations. For example, the controversy over transferring captives--the quite defensible policy of renditions--is fired by beliefs about how these people will be questioned when they arrive at their destination.

The administration has disclosed that, in 2002, the United States began making a series of important decisions about how it would question captives. In essence, the United States made careful, deliberate choices to place extreme physical pressure on captives, with accompanying psychological effects. The limits of those practices were set at the limits of Federal criminal prohibitions. The international legal strictures were interpreted so that they would not add any constraints beyond the chosen reading of American law. In other words, the policy guidelines devolved into legal guidelines, which were to do everything you can, so long as it is not punishable as a crime under American law.

Brilliant lawyers worked hard on how they could then construe the limits of vague, untested laws. They were operating so close to the frontiers of our law that, within only a couple of years, the Department of Justice eventually felt obliged to offer a second legal opinion, rewriting their original views of the subject. The policy results are imaginable and will someday become more fully known.

My point, though, is not to debate the delineation of the legal frontier. That focus obscures the core of the issue. The core of the issue, for legal policy, is this: What is moral--not, what is legal? What is cost-beneficial?

A. The moral question

The moral question is subjective, of course. It is closely related to another question: What standard of civilized behavior should the United States exemplify, in a fight to preserve civilization against barbarism?

My own view is that the cool, carefully considered, methodical, prolonged, and repeated subjection of captives to physical torment, and the accompanying psychological terror, is immoral. I offer no opinion as to whether such conduct is a Federal crime; merely that it is immoral.

My moral standards are entitled to no special regard. My argument is not that others should adopt my morality. It is that the responsible policy officials should explicitly, thoughtfully, employ moral reasoning of their own. And, further, my argument is that the substitution of detailed legal formulations for detailed moral ones is a deflection of responsibility. Such deflections, often unconscious, are too common in our modern age.

The quick moral justification is that a greater good is being served--saving more lives. Three initial cautions are in order, before turning to this argument on its merits.

--In most moral lexicons, there is some absolute core of behavior that is improper, whatever the policy gain.
--For that conduct which is morally problematical, but justifiable by necessity, the burden of proof may be high. Consider that the enemies we are fighting have used, even celebrated, the most barbaric and nihilistic tactics of violence ever employed by any terrorist organization in history. To the civilized world, this gives our Nation moral ground about as high as one could have. The policy case would need to be compelling indeed to persuade our officials that they should slide and stumble their

way down into the valley.
--These dilemmas are not new in American history. There is a long
    history of experience with questioning captives, both in law
    enforcement and in several recent American wars. In World War
    II, for example, the United States had a special program for
    high-value captives; the British had a comparable program. The
    threats were very great; the fate of thousands of lives could
    hang in the balance in many ways and on many issues (from
    antisubmarine warfare to
    A-bomb research to campaign plans, etc.). There was much
    trickery and deception. But, as far as I know, neither
    government found it necessary to use methods analogous to those
    our government has more recently chosen.


    Some of these periods, like World War II, were hard and degrading.
The moral climate was not quaint. Horrifying methods were authorized to
win the war. But men like Henry Stimson or George Marshall--or Winston
Churchill--did not rely on lawyers to tell them what was right and
wrong. It is difficult to imagine such men recommending analogous
interrogation techniques for President Roosevelt, much less doing the
clever work of developing and designing them.
B. Analyzing Cost-Effectiveness
    Good intelligence can be gained by physically tormenting captives.
Some critics argue that physical coercion is always worthless and
elicits garbage. This goes too far. Various experiences have shown that
these methods can have value in breaking captives, and in doing it more
quickly.
    But the issue of how to obtain intelligence from questioning
captives is a first-class intelligence collection problem. In every
sense, it deserves the same professional attention that the United
States devotes to its most important and powerful collection systems--
like those we use for signals and imagery.
    A revealing study of the state of scientific knowledge on ways to
elicit information from captives, euphemistically termed ``educing,''
was recently prepared by a panel of the Intelligence Science Board. It
is unclassified and available on the web at http://www.fas.org/irp/dni/
educing.pdf. The Israelis and the British have considerable recent
experience with all the pros and cons, much of it a process of painful
trial and error. My own 1994 case study of ``Policing Northern
Ireland'' is available from the case program at Harvard University's
Kennedy School of Government. There are many other sources.
    It is not evident that those who developed such methods, mainly at
the CIA, drew on the available evidence and applied adequate
professional analysis to consider it. From the evidence available in
the unclassified literature, in 2002 the CIA had little organizational
capability or experience in the interrogation of hostile captives. The
FBI and other law enforcement agencies had much more relevant
experience. The Department of Defense had some.
    Everyone knows the scenario of the imminent terrorist operation
that can be averted with desperately tough methods. But the ``ticking
time-bomb'' scenario is mainly the invention of scriptwriters.
Intelligence is usually more of a patiently assembled mosaic, where
many pieces are usually missing, and leads are pursued to find more
pieces. And even broken captives can reveal much, while hiding a
little.
    The administration cites examples of people who have been caught or
operations that may have been stopped. It would be useful to have a

professional, objective analysis of such successes in order to determine and illustrate the contributions of various forms of intelligence.

In such an analysis, the elementary question would not be: Did you get information that proved useful? Instead it would be: Did you get information that could have been usefully gained only from these methods?

--This question is especially apt because the United States has been employing other sets of methods, under different rules, against extremely dangerous and hardened captives in places like Iraq. So there are many fruitful bases for comparison and learning.
--It is also apt because--contrary to much public understanding--a special intelligence program can actually derive its main added value from the readiness to devote a great deal of individualized time and expert attention to a high-value captive--not from coercing him.

No institution would benefit more from such an objective appraisal than the CIA itself. A reputation for relying on physical coercion can have some benefits, of course. But, over the long run, it might be better for the institution if CIA was regarded as special for its willingness to apply patient, labor-intensive expertise, rather than a (largely false) reputation of having the opposite preference.

Finally, once the gain from coercive techniques is better and more professionally understood, there is still the next step in the policy analysis, of balancing these gains against the moral stain and the political cost of relying, or appearing to rely, on physical torment.

All these suggestions can be criticized as a time-consuming, academic effort for which there was no time during the threatening days of 2002 and beyond. Yet, if the problem had been properly framed, the analytical effort suggested here could have been done quite rapidly, in days or weeks. And there were months and years to deepen understanding. To get some perspective, also reflect a moment on the effort private firms will devote to the analysis of far less consequential matters, from acquiring a company to building a refinery.

My hypothesis is that the problem was not properly framed, and that lawyerly interpretation was often substituted for thorough policy analysis at the critical and formative subcabinet and expert level. The result produced a situation in which cabinet principals, and the President, were not well served--even if at the time they thought they were getting what they wanted in those very anxious days. In time, perhaps, more information will allow a firmer judgment on whether my hypothesis is correct.

v. the transition of the american approach during 2006

This process of transition was spurred on by congressional action, especially the role of John McCain, and by the Supreme Court's decision last year. But the transition was already well underway in 2005 and all the main options had been fully developed before the Supreme Court ruled.

The United States Government has made a comprehensive adjustment in its approach to the conduct of the armed conflict and associated operations against violent Islamist extremist groups such as al-Qaeda.

The public debate is still dominated by the lawyers, arguing over the details of the legislation passed last year. But it is important to recognize all the elements of the policy change embedded in and surrounding President Bush's more narrowly focused September 2006

address. I'll list just nine of the elements in this new paradigm.

1. The decision that we need a sustainable policy for the long haul built on partnership: Domestically with the Congress; internationally with allies and partners.

2. A new and public Army field manual and DOD directive providing baseline policies for the detention and treatment of captured terrorists.

3. A new approach to military commissions, already underway before the Supreme Court's decision and then informed by it as well.

4. Employing those military commissions for major war criminals and al-Qaeda's leaders, not Osama's driver. These commissions will finally bring the 9/11 conspirators to justice and, I hope, usher in a process where America will be reminded what the struggle is really about.

5. The decision announced in the East Room of the White House that America does intend to close Guantanamo. The glide path is necessarily lengthy and difficult, working on problems involving 33 different countries, many of whom don't want their people back. There are still decisions to be made about how to replace and improve the Guantanamo detention system.

6. The vital decision to disclose and explain a particular CIA interrogation program, implicit in the decision to bring the 9/11 conspirators to justice (and one reason that decision was so difficult for the administration).

7. The decision to transition such a special interrogation program so that it has different capabilities, different goals, and different methods. Guidelines for future treatment of such captives will be developed in consultation with Congress so that the Executive can sustain an important intelligence collection program for the future.

8. Putting the program in a more durable legal framework. Such a framework reiterates America's commitment against torture, but also accepts, as a minimum standard, that America will adhere to Common Article III of the Geneva Conventions.

--Incidentally, the legislation passed in 2006 did not reinterpret the meaning of the terms in Article III. Congress and the United States, do not have the authority to reinterpret such international treaty terms unilaterally. The legislation did clarify the relation between those binding treaty provisions and the scope of Federal criminal liability for violating them, specified in Title 18 of the United States Code.

9. An offer to foreign governments, telling them that the United States Government has listened to their concerns and challenging them to work with us on what President Bush called ``a common foundation to protect our nations and our freedoms.''

The work of now building a more viable coalition, at home and abroad, is well begun. Foreign governments are now quietly wrestling with hard questions they had hitherto avoided, and in turn posing hard questions to American officials about the scope and character of their policies.

This process is healthy. With this framework, and the predictable policy and political deliberations that are already unfolding, the United States has an excellent opportunity to develop a durable and effective legal policy approach for worldwide operations against Islamist terrorist groups. To keep the pendulum from swinging too hard back and forth, America's leaders need to strike the right policy balance, avoiding an unconscious slide back toward the magnetic poles

of absolutist legal propositions.

The Chairman. Thank you very much.
Doctor.

STATEMENT OF DR. DANIEL BYMAN, DIRECTOR, CENTER FOR PEACE AND
SECURITY STUDIES, EDMUND A. WALSH SCHOOL OF FOREIGN SERVICE,
GEORGETOWN UNIVERSITY, WASHINGTON, DC

Dr. Byman. Mr. Chairman, Senator Lugar, members of the
committee, thank you for allowing me to testify before you
today.

Renditions are a vital counterterrorism tool, so vital that
they must be used sparingly so that they can remain an
effective part of the U.S. counterterrorism arsenal. Rather
than stop renditions altogether, policymakers should increase
the programs transparency, strengthen oversight efforts, and
embed within the process procedures that ensure more accord
with the rule of law.

For counterterrorism purposes, renditions are attractive
for several reasons. Most important, they are often the only
option for interrogating a suspect and bringing him to justice,
when extradition is not politically or legally possible. In
some countries of the world the formal court system is not a
true alternative because the judges and those who would try
suspects are sympathetic to terrorists, or because they are
vulnerable to intimidation.

When Pakistan allowed Mir Amal Kanzi--who murdered two CIA
employees in Virginia in 1993, to be sent to the United
States--several cities in Pakistan saw demonstrations. That was
1993 when the opinion of the United States in Pakistan was not
nearly as low as it is today. Imagine if Pakistan captured bin
Laden tomorrow, would the Musharraf Government really want him
tried in a Pakistani court or even to go through the
extradition process? Pakistan would rather dodge this political
bullet.

Many governments of the world are weak, but some are
actively hostile. And here renditions become vital. In those
cases, renditions are truly the only option for getting
terrorists off the street.

Renditions can also produce considerable information, even
when they do not lead to a trial and a lengthy imprisonment.
Security forces can question suspects, examine the documents
they have, and otherwise gather information that might be
relevant to past or future attacks.

Renditions would be far less controversial if they only
involved cases like Ramzi Yousef, the mastermind of the first
World Trade Center bombing, who was brought home to the United
States for trial. However, U.S. counterterrorism officials at
times find it better to send suspects to the Middle East rather
than bringing them to the United States. There has been a focus
in the public discourse on the use of torture on this, which I
believe is somewhat misguided, and I'd like to point out the
other advantages for extraordinary renditions to the Middle
East.

One obvious one is that in some cases the terrorists and
the evidence against them can not meet the ``beyond a

reasonable doubt'' standard of a U.S. court. Hearsay, rumor, and circumstantial evidence are often the only available intelligence and information can be maddeningly imprecise, incomplete, or at times even contradictory. Many allies of the United States in the Middle East, however, have a far lower standard of evidence, and are at times willing to bend some rules they have in response to a U.S. request.

Interrogations abroad also have their advantages. Jordan, for example, has contended with radical terrorism for decades. Its officials know a remarkable amount about the motivations, world view, and desires of jihadists. This is knowledge that countries like Sweden or Germany and even the United States are only slowly gaining. And even when evidence is plentiful, it must be available for use in the court of law without revealing sources or methods. To jeopardize a well-placed informant would actually, overall, hurt U.S. counterterrorism efforts, rather than help them.

Ironically and rather painfully, the operational value of renditions has grown as the U.S. detention of enemy combatants in Guantanamo has become legally, politically, and diplomatically problematic. Renditions, when successful, are a behind-the-scenes program. They do not require new legal systems and codes. But to be clear, this is a failure of U.S. policy. The United States has no established legal procedures for suspected terrorists who are not U.S. citizens beyond sending them through the U.S. court system where they are essentially treated as U.S. citizens.

I will add as an aside that I am somewhat skeptical of very recent European criticism about renditions that occurred from Europe in the immediate aftermath of 9/11. I would be very surprised, based on my knowledge of this program, if this did not occur without the knowledge of--excuse me--I believe this occurred with the knowledge of the European governments and, in particular, their intelligence agencies.

All this said, renditions are a flawed instrument even though I believe they are necessary. Renditions, of course, often violate the laws of the country in which they occur and at times they have involved truly horrible human rights violations. In particular, if individuals are sent to countries like Syria. And sending anyone to face these violations is a heavy moral burden, but this should weigh on policymakers extremely heavily because the United States will, at times, render the wrong people.

The lower evidentiary standards I mentioned, makes rendering the wrong person almost inevitable if this program is done enough times. This is simply a risk that is inherent to the program. Human rights abuses, however, arresting the wrong people, hurt Americas standing in the eyes of the world and, in particular, in the Muslim world, which is vital for U.S. counterterrorism today.

So, how do we square the circle? Unfortunately, there's no easy way to do so, no simple way. But I do believe that there are ways to reduce the level of abuses, and also, over time, to restore the credibility of this program to a degree that would satisfy most Americans. In general, Washington should return to the practice of sending suspects only to countries where they are wanted under that country's legal system in order to ensure

that a legal procedure of some sort is eventually followed and that the individual will not simply disappear within the country's darkest prisons.

Reducing the likelihood of torture is particularly important. The United States should avoid the worst offenders, like Damascus. In addition, the United States must redouble efforts to make sure that the assurances it receives regarding torture are honored by the governments in question, as the human rights records of countries like Egypt are poor.

This increased care regarding the treatment of the detainees and greater attention to the legal dimensions of renditions is particularly important today, because the program as a whole is tainted by the lack of transparency and its association with torture. In the public mind today, torture is the purpose of renditions, a perception that is even stronger among the public of U.S. allies. If this program were in 2000, I believe that many of these problems would be easily surmountable. Unfortunately today, the barriers are much higher.

Essential for the legitimacy of this process is some degree of legal review and, in general, bureaucratic review outside the intelligence community. And here, I'd like to applaud the chairman's efforts to increase oversight and I will note that this effort has to balance efficiency and prudence. That we need a program that can remain as efficient as renditions are, while at the same time reducing the likelihood of risks. At the very least, there should be a senior official in the Department of Justice who has some degree of separation from the executive branch officials involved in the program itself. And that person should be consulted to vet the quality of the intelligence and, overall, to examine the rendition operation and procedure.

I'm going to conclude, Mr. Chairman, by noting that for controversial programs like renditions, we need a degree of public consensus. As Dr. Zelikow mentioned, early on after a crisis the United States often oscillates between unfortunate extremes. What we need is a degree of consensus that will allow our programs and procedures to last for, truly for decades. And with that we need to have hearings like this, even if they discuss a rather grim subject, and in so doing, build programs that will sustain different administrations and, over time, lead to the results we want.

Thank you very much.

[The prepared statement of Dr. Byman follows:]

Prepared Statement of Dr. Daniel Byman, Director, Center for Peace and Security Studies, Edmund A. Walsh School of Foreign Service, Georgetown University; Senior Fellow, Saban Center for Middle East Policy at the Brookings Institution, Washington, DC

Chairman Biden, Ranking Member Lugar, distinguished members of the committee, and committee staff, I am grateful for this opportunity to speak before you today.

Renditions are a vital counterterrorism tool--so vital, that they must be used sparingly so they can remain an effective part of the U.S. counterterrorism arsenal. Renditions are troubling because they can exact a high human and diplomatic price, but dangerous terrorists would

go free if the program were abandoned. Unfortunately, this flawed instrument is often the only one available. Rather then stop renditions altogether, policymakers should increase the program's transparency, strengthen oversight efforts, and embed within the process procedures that ensure more accord with the rule of law.

The renditions program is under attack today, in part due to legitimate faults of the program and in part because of preventable misunderstandings. Critics have blasted renditions as outsourcing torture because the recipient countries often have abysmal human rights records.\1\ New York Times columnist Bob Herbert even declared that renditions stand ``side by side with contract killings.'' \2\ Not surprisingly, calls to end or curtail renditions are growing.

---

\1\ Jane Mayer, ``Outsourcing Torture,'' New Yorker, February 14, 2005.

\2\ Bob Herbert, ``Torture, American Style,'' New York Times, February 11, 2005, p. 25.

---

The contrast to this ever-louder criticism is the quiet embrace that both Republican and Democratic administrations have given to the program. Former Director of Central Intelligence George Tenet testified that before September 11 the CIA and the FBI had rendered 70 terrorists (about 20 of whom went to the United States for trial), and newspaper reports dating from 2005 indicate that over 100 suspects have been rendered since then.\3\

---

\3\ Statement of Director Tenet before the Congressional 9/11 Joint Inquiry, (p. 11); Dana Priest, ``CIA's Assurances on Transferred Suspects Doubted,'' Washington Post, March 17, 2005, p. A1; Douglas Jehl and David Johnston, ``Rule Change Lets CIA Freely Send Suspects Abroad,'' New York Times, March 6, 2005, p. 1.

---

Typically a rendition occurs when the local government, in cooperation with U.S. officials, bundles a suspect on a plane and sends him to another country. In contrast to an extradition, the suspect does not go through the legal system of the country where he is arrested. More rarely, U.S. officials or their agents may pull a suspect off the streets without the cooperation of the host government, but in the vast majority of cases the local police or intelligence services make the initial arrest. Contrary to some conspiracy theories, the CIA does not help render suspects without the approval of White House officials and government lawyers.

Although several notable terrorists, including Ramzi Yousef who masterminded the first World Trade Center bombing, were rendered to face justice in the United States, the usual destination is a country in the Middle East--one article claims that Egypt, Morocco, Jordan, and Syria are all common destinations.\4\ Sending suspects to face justice in the United States is far less morally, legally, and diplomatically controversial than is rendering suspects to countries in the Middle East. The latter is the focus of my testimony.

---

\4\ Mayer, ``Outsourcing Torture.''

---

My statement first outlines the advantages of the renditions program from a counterterrorism point of view. It then describes the very real costs and faults of the program, some of which are inherent to it and others of which can be reduced. The statement concludes by

offering a set of recommendations for how to improve the program, with an emphasis on ways to improve oversight, reduce the abuses, and make the program more in accord with U.S. values and thus more sustainable in the long run.

## advantages of the renditions program

Counterterrorism officials find renditions attractive because they get terrorists off the streets. Although the world is not safe now that Ramzi Yousef is in a supermax prison in Colorado, it is safer. In 1998, the Wall Street Journal reported that CIA officers and the Albanian police closed down an Egyptian Islamic Jihad cell that planned to bomb the U.S. Embassy in Tirana. The suspects were sent to Egypt, where two were executed and others jailed. Their interrogations also led to the arrests of numerous affiliates, dealing a crushing blow to the organization and removing them as a threat to U.S. facilities.\5\

---

\5\ Rajiv Chandrasekaran and Peter Finn, ``U.S. Behind Secret Transfer,'' Washington Post, March 11, 2002, p. A1; Andrew Higgins and Christopher Cooper, ``Cloak and Dagger: A CIA-Backed Team Used Brutal Means to Crack Terror Cell,'' Wall Street Journal, November 20, 2001, p. A1.

---

Renditions can also produce considerable information even when they do not lead to a trial and lengthy imprisonment. Security forces can question suspects, examine their documents, and otherwise gather information that might be relevant to past or future attacks. ``Pocket litter'' often produces particularly important evidence. As Michael Scheuer, the former chief of the CIA's bin Ladin unit, has testified, one goal of renditions is ``to seize hard copy or electronic documents in [the suspected terrorists'] possession when arrested. Americans were never expected to read those, and they could provide options for follow-on operations.'' \6\

---

\6\ Statement of Mr. Michael F. Scheuer, ``Extraordinary Rendition in U.S. Counterterrorism Policy: The Impact on Transatlantic Relations,'' House Foreign Affairs Committee, April 17, 2007.

---

Renditions are often the only option for interrogating a suspect and bringing him to justice when extradition is not politically or legally possible. In some countries the formal court system is not a true alternative because judges are sympathetic to terrorists or vulnerable to intimidation. Even more worrisome, given rock-bottom approval ratings of the United States in much of the world, a highly publicized extradition hearing could increase sympathy for the suspect and damage the government's popularity. Historically, the United States has shielded such cooperative but weak regimes from the adverse publicity associated with extraditions.

When Pakistan allowed Mir Amal Kansi, who murdered two CIA employees in Virginia in 1993, to be sent to the United States, several cities in Pakistan saw demonstrations. Many Pakistanis saw Kansi's actions as heroic. Pakistanis' approval of jihadist violence against the United States has grown since then.\7\ Imagine if Pakistan captured bin Ladin tomorrow. Would the Musharraf government really want him to be tried in a Pakistani court or even have an extradition request go through the country's legal system? Pakistan would prefer to dodge this political bullet.

---

\7\ Leslie Wayne, ``Jury Recommends Death for Pakistani,'' New York

Times, November 15, 1997, p. 1; John Burns, ``Spiriting Off of Fugitive by U.S. Irks Pakistanis,'' New York Times, June 23, 1997, p. 9.

---

Some governments are hostile, not weak, and here renditions become vital. In the spring of 1998, intelligence officials plotted to render bin Ladin from Taliban-controlled Afghanistan, an operation made necessary because the Afghan regime supported the terrorist leader. No standard legal measure would have worked in place of a rendition.

Although the value of renditions is clearest when the government is weak or hostile, even strong democratic governments have acquiesced in renditions. Several European countries, notably Italy and Germany, apparently cooperated with U.S. officials after 9/11 to render several suspects to the Middle East. As Scheuer notes, ``Any operation in Europe was done with the cognizance, support, and approval of the European security services involved.'' \8\ These governments chose a covert path because they recognized that their own legal systems would not be able to take these suspects off the street. Their own counterterrorism laws were weak and allowed individuals to recruit and organize with little impediment. In addition, their legal systems often were not able to incorporate their own intelligence agencies' information, let alone that of U.S. agencies.

---

\8\ Statement of Mr. Michael F. Scheuer. See also Dana Priest, ``Italy Knew About Plan to Grab Suspect,'' Washington Post, June 30, 2005, p. Al.

---

U.S. officials may seek to transfer suspects from a Western ally to the Middle East because the Western ally's laws or inclinations prevent the close monitoring or aggressive interrogation of a terrorism suspect--in contrast to many Middle Eastern countries with poor human rights records and a long record of combating domestic radicals. Mohammed Haydar Zammar, a Syrian-born citizen of Germany, was arrested when he traveled from Germany to Morocco and then was secretly transferred for questioning in Syria. Zammar is believed to have been al-Qaeda's top recruiter in Hamburg and to have helped form the Hamburg cell at the center of the September 11 attacks. He had refused to cooperate with German police in their investigation, and lacking enough evidence to charge him, they allowed him to leave for Morocco.\9\ As Zammar quickly discovered, the laws that protected him in Germany did not apply in Syria and Morocco. Probably for similar reasons, U.S. officials detained Maher Arar, a Canadian citizen born in Syria, when he was changing planes in Kennedy Airport. Arar was sent to Syria for questioning, where he was reportedly tortured repeatedly but released a year later with no charge.\10\

---

\9\ Peter Finn, ``Al-Qaeda Recruiter Reportedly Tortured,'' The Washington Post, January 31, 2003, p. A14.

\10\ Douglas Jehl and David Johnston, ``Rule Change Lets CIA Freely Send Suspects Abroad,'' New York Times, March 6, 2005, p. 1.

---

This problem is not unique to America's European allies. U.S. counterterrorism officials at times find it better to send suspects to the Middle East rather than bring them to the United States because of the high bar U.S. law sets for convicting suspected terrorists. Some cases against terrorists cannot meet the ``beyond a reasonable doubt'' legal standard. Hearsay, rumor, and circumstantial evidence are often the only available intelligence, and information can be maddeningly

imprecise, incomplete, and at times contradictory. Many U.S. allies in the Middle East have a far lower standard of evidence and are willing to bend what rules they have in response to a U.S. request.

Even when evidence is plentiful and solid, it must be available for use in a court of law without revealing sources and methods. Jeopardizing a well-placed informant would turn a conviction into a pyrrhic victory, making it harder to stop future attacks.

Ironically, the operational value of renditions has grown as the U.S. detention of enemy combatants in Guantanamo has become legally, politically, and diplomatically problematic. Renditions, when successful, are a behind-the-scenes program. They do not require new legal systems and codes. Also maintaining jails to hold suspected terrorists indefinitely is labor-intensive.\11\ To be clear, this is a failure of U.S. policy: The United States has no established legal procedures for suspected terrorists who are not U.S. citizens beyond sending them through the U.S. court systems where they are essentially treated as U.S. citizens.

---

\11\ Statement of Mr. Michael F. Scheuer.

---

Interrogations abroad also have their advantages. Jordan has contended with Islamist terrorism for decades, and its officials know a remarkable amount about the motivations, worldview, and desires of jihadists--knowledge that countries like Sweden and Germany still lack and U.S. interrogators are only slowly gaining. Officials like those in Jordan are often able to sort through the confusing array of family names, nicknames, and aliases that are often particularly hard for analysts not fluent in Arabic. Saudi Arabia has used respected clerics to ``deprogram'' terrorists, convincing detainees that their actions are contrary to Islam and will lead them to Hell.\12\ Some Middle Eastern countries also can persuade or coerce a suspect's relatives. In societies where family ties are paramount, this pressure can be decisive in convincing a suspect to talk.

---

\12\ Dana Priest and Joe Stephens, ``Secret World of U.S. Interrogation,'' Washington Post, May 11, 2004, p. A1.

---

                          a flawed instrument
    Renditions often violate the laws of the country in which they occur. Although violating other countries' laws to preserve U.S. security is at times necessary, the United States in general should keep to a policy of supporting the rule of law, particularly in allied countries.

    The most controversial aspect of renditions is sending suspects to third countries where human rights abuses are common. Under the Clinton administration, rendered suspects could only be sent to a country where they were wanted under the country's legal system. Moreover, Clinton administration officials claimed that they demanded that rendered suspects be treated as they would be under the U.S. legal system--a demand that Scheuer denies, instead claiming that U.S. officials like him demanded that subjects be treated fairly according to that country's own laws. The need to send someone to a country where they faced legal charges changed under the Bush administration, but the Bush administration also arranged for many of the high-level suspects to be held directly by the United States.\13\ President Bush has also stated that the United States receives a promise from the recipient country that they will not torture the suspect.\14\

---

\13\ Statement of Mr. Michael F. Scheuer.
\14\ President's Press Conference, White House, Office of the Press
Secretary, March 16, 2005.

---

A number of countries favored for renditions, such as Egypt,
Jordan, Morocco, and particularly Syria are often brutal to
prisoners.\15\ Though the U.S. Government demands that foreign
governments promise not to use torture, officials have little control
over those arrested once they leave U.S custody--one CIA officer called
these promises a ``farce.'' \16\ Scheuer notes that he regularly told
senior lawyers and policymakers that ``Egypt was Egypt'' and that in
response they simply inserted a ``legal nicety.'' \17\

---

\15\ U.S. interpretations of the U.N. Convention against Torture
and Other Cruel, Inhuman, or Degrading Treatment or Punishment, which
the U.S. ratified in 1994, in theory prohibit rendering suspects to
countries where they might be tortured, but an exception is possible if
there are credible assurances that the person will not be tortured. See
Michael John Garcia, ``Renditions: Constraints Imposed by Laws on
Torture,'' Congressional Research Service, updated April 5, 2006, p. 1.
Garcia also notes that the State Department defines torture narrowly,
well beyond what the U.S. legal system would consider cruel treatment
(see note 32). A key uncertainty is whether the state in question
regularly goes back on its diplomatic assurances. Some experts would
note, however, that if assurances are needed, then you are already over
the Convention Against Torture's standard. Hina Shamsi, e-mail
correspondence, July 23, 2007.
\16\ Dana Priest, ``CIA's Assurances on Transferred Suspects
Doubted,'' Washington Post, March 17, 2005, p. A1.
\17\ Michael Scheuer, ``A Find Rendition,'' New York Times, March
11, 2005.

---

Sending anyone to face torture is a heavy moral burden, but this
problem should weigh even more heavily on policymakers' shoulders
because the United States will at times inevitably render the wrong
people. The lower evidentiary standard that makes renditions attractive
also makes mistakes more likely. German prosecutors are investigating
the claims of Khaled al-Masri, a German citizen, who says that on New
Year's Eve 2003 he was kidnapped while traveling in Macedonia,
imprisoned and interrogated in Afghanistan. When his interrogators
realized he had little to say, he was unceremoniously deposited in
Albania's mountains.\18\ Al-Masri was lucky: He claims he ended up in
U.S. hands. Maher Arar, on the other hand, ended up in Syria where,
according to a Canadian investigation, ``he was interrogated and
tortured.'' \19\

---

\18\ Jeffrey Fleishman, ``Man's Claims May Be a Look at Dark Side
of War on Terror,'' Los Angeles Times, April 12, 2005.
\19\ For a description of the Arar case, see the Commission of
Inquiry into the Actions of Canadian Officials in Relation to Maher
Arar, ``Overview of Findings, Report of the Events Relating to Maher
Arar,'' 2006. For the finding of torture, see pp. 53-58.

---

Human rights abuses and arresting the wrong people are both a
diplomatic problem and a broader practical one for intelligence
officials. Such stories hurt America's standing in the eyes of its

allies and erode support for U.S. counterterrorism efforts, something even the best public diplomacy cannot undue. Many German elites, for example, have bitterly criticized the rendition of Zammar to Syria. Canada, Sweden, Germany, and Italy have or are now investigating U.S. renditions.\20\ Weakened ties to friendly governments are felt later when they refuse to send troops to Iraq, resist trade overtures, or otherwise demonstrate their displeasure.

---------------------------------------------------------------------

\20\ Dana Priest, ``CIA's Assurances on Transferred Suspects Doubted,'' Washington Post, March 17, 2005, p. A1.

---------------------------------------------------------------------

More broadly, successful counterterrorism depends in part on convincing the world that there is no moral equivalency between the terrorists and the government they oppose. When the United States muddies these waters, this distinction begins to blur. This is particularly problematic for U.S. attempts to woo fence-sitters in the Muslim world--the very hearts and minds that the United States most needs.

Not is all the information gained from renditions necessarily useful. U.S. officials are aware that the information received from suspects often comes from torture. Even when the means are gentler, the information is filtered through foreign intelligence services which, even when they are friendly, still are usually selective in what they pass on. Too much reliance on information from rendered suspects would lead to a faulty analysis.

building a better program

The decision to render a suspect to a third country is seldom easy, but a more sustainable program that is less prone to mistakes can be fashioned.

One rule of thumb is that renditions are unnecessary when the local intelligence services and court system are good, such as in Britain and France. Similarly, a suspect should never be rendered from the United States. In contrast, renditions are more useful when the government in question is hostile, when the locals will not act, or when an extradition is too sensitive politically.

The trickiest cases are those like Arar, al-Masri, and others where the allies offended are close U.S. friends whose intelligence services and court systems, while far from ideal, are capable. In such cases, counterterrorism officials must judge whether the host government will properly gather intelligence and use its powers to prevent the suspect from fleeing. Inevitably, walking this line will lead to terrorists successfully fleeing when countries are not vigilant enough while other suspects (including some innocents) are nabbed to the outrage of our friends. When in doubt, the presumption should be to trust the allies' legal system.

The United States should exercise greater care with regard to the country that receives a rendered suspect and modify the program to better comport more with the rule of law. In general, Washington should return to the practice of sending suspects to countries where they are wanted under that country's legal system in order to ensure that a legal procedure of some sort is eventually followed and that the individual will not simply ``disappear'' within the country's darkest prisons. Americans should not pretend that Middle Eastern states' legal systems will respect the defendants' rights as would a U.S. or European system, but having the accused appear at a trial at some point is vital. Reducing the likelihood of torture is particularly important. Although judging harsh treatment involves discerning shades of gray

rather than black and white, the United States should avoid the worst offenders such as Damascus. Egypt and Jordan, while often brutal, are far less harsh than is a country like Syria, which should never be the recipient of a rendered suspect. In addition, the United States must redouble efforts to make sure that the assurances it receives regarding torture are honored by the governments in question, as the human rights records of countries like Egypt are poor. Renditions have many advantages that have nothing to do with torture's theoretical benefits.

This increased care regarding treatment and greater attention to the legal dimensions of renditions is particularly important today given that the program is tainted by its lack of transparency and association with torture. In the public mind, torture is the purpose of renditions--a perception even stronger among the publics of U.S. allies. The lack of debate and clear understanding of the program's parameters allow such speculation to flourish. Similarly, one prominent newspaper story claimed that a mistaken rendition occurred because of the ``hunch'' of an intelligence official.\21\ The lack of transparency about the program in general makes it difficult to say whether this report is false, describes a violation of standard procedures, or is indicative of a broader problem.

--------------------------------------------------------------------

\21\ Dana Priest, ``Wrongful Imprisonment: Anatomy of a CIA Mistake,'' Washington Post, December 4, 2005.

--------------------------------------------------------------------

Essential for the legitimacy of this process is legal review. At the very least, a senior official in the Department of Justice who has some degree of separation from the executive branch officials involved in the program should be consulted to ensure that the intelligence used to finger the suspected terrorist is carefully vetted. To add more legitimacy, a small court appointed by the Chief Justice could be used to review the names and evidence--an idea that is currently being considered by Members of Congress. As with the Foreign Intelligence Surveillance Court, the judges would be capable of rapid action, even though that would not usually be necessary as most of the names would be added to the list well in advance of any operation. To be clear, the criteria would not be equivalent to that used in finding a guilty verdict for U.S. courts, as intelligence is often limited and fragmentary. However, the legal review would ensure that at least some standards are maintained and that evidence is carefully vetted. As with the Foreign Intelligence Surveillance Court, the process is likely to make involved agencies especially careful when they propose that any name should be added to the target list.

The United States also needs to ensure that the renditions process regularly involves senior political leaders. This process, in many ways, speaks to the heart of the policy: The moral claims are conflicting, so the question becomes who compares them and how they do so. The burden should be on elected officials, not civil servants. Congressional leaders should be kept informed of both the criteria used to put individuals on the list for renditions and given briefings on the results of past actions to facilitate oversight. Then the worst abuses common to the program can be curbed without jettisoning a vital counterterrorism instrument.

Having no well-defined process in advance of an operation risks either a slow response that allows the terrorist to escape or a rapid one that does not involve careful vetting of intelligence and thus increases the likelihood of costly mistakes. Much of the inevitable lawyering over the quality of the intelligence and the risks involved

will act as a de facto vetting process. Moreover, although politicians will inevitably make the policy more cautious, this over the long term will make it more sustainable as it ensures accountability to the people and a proper consideration of the broader diplomatic and strategic picture.

Because renditions lie in the gray area between the rule of law and the Nation's security, an honest debate would serve our country well-- and thus I particularly welcome hearings like these, even though the subject matter is grim. Liberal voices must answer the painful question of whether suspected terrorists who are not U.S. citizens should be allowed to flee without hindrance when we have some evidence of wrongdoing, but not enough to try them in U.S. courts. Conservatives, in turn, must be open about the moral problem of torture and the political consequences of angering our allies, even when it saves lives. Drawing on this debate, political leaders of both parties must build a consensus behind the general parameters of this program that will enable it to help protect our country in the years to come.

The Chairman. Thank you.
General.

STATEMENT OF MG PAUL EATON, USA (RET.), FORMER COMMANDING
GENERAL, OFFICE OF SECURITY TRANSITION, BAGHDAD, IRAQ

General Eaton. Thank you, Mr. Chairman, for the invitation to speak before this body and thank you for your leadership in this matter.

I've been asked to comment upon the administration's policies regarding torture, Geneva Convention, et al., and their impact upon the American soldier of the Army and Marine Corps in the United States.

First, good order and discipline. Within days of an American soldier's arrival on active duty, training begins to shape him for the difficult duty to fight and win the Nation's wars. He is developed physically, intellectually, and morally. Within the moral component, we have always stressed the proper treatment of prisoners of war, including the so-called five S's: Seize, secure, separate, safeguard, and speed to the rear. We have recently emphasized the proper and prudent behaviors at the point of capture. The legal discussion, where some would deliver different treatment based on POW status or not is simply unwarranted.

For our soldiers to hear their Vice President allegedly say on radio that a dunk in the water is a no-brainer if it can save lives is a threat to the good order and discipline of our Armed Forces. Waterboarding is not safeguarding a prisoner, regardless of the conditions of their capture. To hear our CIA describe waterboarding as a professional interrogation technique, is at once appalling and confusing to our men and women under arms. The good order and discipline of our Armed Forces begins with our Commander in Chief and must weave through the entire rank structure. The President must set the tone for our youngest private soldier and the administration's policies today do not set the right tone.

This is not a natural event. Our men and women arrive in the Armed Forces with a strong Judeo-Christian ethic to do the right thing. And we pride ourselves in returning good men and

women back to civilian life, better people than they were before they put on the American uniform. I am convinced that the disaster of Abu Ghraib is directly attributable to, among other factors, administration policies on detainee treatment.

Isolation of the American soldier. When the drama of Abu Ghraib hit the news, my senior Iraqi advisor, now second in command of the Iraqi Armed Forces and a secular Shia, came into my office with his arms outstretched and the question: ``How can this be?'' The immediate and profound impact on me and my mission was serious. I had lost face before my Iraqi soldiers and no amount of explanation could overcome the images of the hooded man and electrodes. The United States has enjoyed, until recently, a wonderful reputation for humanitarian excellence, ably imaged by our Statue of Liberty. Today, it is difficult to lecture our Iraqi soldiers, let alone the Chinese or the Russians or anybody else, on human rights abuses.

Our soldiers became more isolated from our allies. We undoubtedly lost allies in the fight for Iraq because of our policies on extraordinary renditions, secret detention, and the use of torture. The French Army has yet to recover from the images of genital electric shock used during the battle of Algiers. Indeed, the risk of attack against the American soldier has increased. The comment, ``these are different times,'' well, we are in different times, and at no more important time, while we were at war with ideologues do we need to display the strong moral code that has set the United States apart from so many other nations.

The argument, ``the ticking timebomb,'' Jack Bauer, the program ``24 Hours'' gets a lot of press for his solutions to the threats of our Nation. Recently, his performance under the pressure of the ticking timebomb scenario was favorably received by many people, with criminal behavior excused for the greater good. Ladies and gentlemen, as a retired Marine four-star general observed, squad leaders in Iraq are faced with a ticking timebomb scenario every day. The question is: Do we want our soldiers and Marines to play Jack Bauer?

At a recent Republican candidate debate, Senator McCain demonstrated the moral courage to reject the use of torture. He was the only man on stage to do so, rejected on the basis that it is immoral and doesn't work. As one man stated, ``The only thing you are sure of with torture is that pain is involved.'' The information you get may waste your time or worse. Senator McCain understands that the exception does become the rule, leading him to author the McCain amendment, designed to ban cruel, inhumane, or degrading treatment.

Recently, Human Rights First invited our Presidential candidates to sit down with a group of retired general officers to hear them discuss the impact of some of these policies on the military. Our distinguished chairman today was among the three candidates to accept that invitation. For me, the most compelling story was by a retired Marine major general who, while serving during World War II, described the capture of a Japanese soldier, with subsequent appropriate treatment, an eventual windfall of information and help. That is the real story for our troops and our civilian leadership. The rule of law and the Geneva Convention taken at face value.

Thank you.

[The prepared statement of General Eaton follows:]

Prepared Statement of MG Paul Eaton, USA (Ret.), Former Commanding
General, Office of Security Transition, Baghdad, Iraq

Thank you, Mr. Chairman, for the invitation to speak before this
body and thank you for your leadership in this matter.

I am Paul D. Eaton, retired now 18 months from the United States
Army in the rank of major general. My last operational assignment was
commander of the organization charged with the mission to rebuild the
Iraqi Security Forces, from 2003 to 2004.

My remarks will address this administration's policies regarding
torture, the Geneva Conventions, Military Commissions, habeas corpus,
extraordinary rendition and secret detention, and their impact upon the
American soldier, the U.S. Army, and Marine Corps and the United
States.

### good order and discipline

Within days of an American soldier's arrival on active duty,
training begins to shape him for the difficult duty to fight and win
the Nation's wars. He is developed physically, intellectually, and
morally.

Within the moral component, we have always stressed the proper
treatment of Prisoner's of War, including the so-called five S's--
seize, secure, separate, safeguard, and speed to the rear. We have
recently emphasized the proper and prudent behaviors at the point of
capture. The legal discussion where some would deliver different
treatment because of technical POW status is simply not warranted.

For our soldiers to hear their Vice President say on radio that a
``dunk in the water'' is a ``no brainer'' if it can save lives, is a
threat to the good order and discipline of our Armed Forces.
Waterboarding is not safeguarding a prisoner, regardless of the
conditions of their capture. To hear our CIA describe waterboarding as
a ``professional interrogation technique'' is at once appalling and
confusing to our men and women under arms.

The good order and discipline of our Armed Forces begins with our
Commander in Chief and must weave through the entire rank structure.
The President must set the tone for our youngest private soldier and
the administration's policies today do not set the right tone. This is
not a natural event--our men and women arrive in the Armed Forces with
a strong Judeo-Christian ethic to do the right thing. And we pride
ourselves in returning a good man or woman back to civilian life a
better person than they were before putting on the American uniform.

I am convinced that the disaster of Abu Ghraib is directly
attributable to, among other factors, administration policies on
detainee treatment.

### isolation of the american soldier

When the drama of Abu Ghraib hit the news, my senior Iraqi advisor,
now the second in command of the Iraqi Armed Forces and a secular Shia,
came into my office with his hands outstretched and the question, ``How
can this be?'' The immediate and profound impact on me and my mission
was serious--I had lost face before my Iraqi soldiers and no amount of
explanation could overcome the images of the hooded man and electrodes.

The United States has enjoyed until recently a wonderful reputation
for humanitarian excellence ably imaged by the Statue of Liberty.
Today, it is difficult to lecture our Iraqi soldiers, let alone the
Chinese, the Russians, or anyone else, on human rights abuses.

Our soldiers became more isolated from our allies, we undoubtedly

lost allies in the fight for Iraq, because of our policies on extraordinary rendition, secret detention, and the use of torture. The French Army has yet to recover from the images of genital electric shock used during the Battle of Algiers.

Indeed, the risk of attack against the American soldier increased. These are different times . . .

Indeed, we are in different times. And at no more important time, while we are at war with ideologs, do we need to display the strong moral code that has set the United States apart from so many other nations.

The ticking timebomb . . .

Jack Bauer gets a lot of press on his solutions to the threats to our Nation. Recently, his performance under the pressure of the ticking timebomb scenario was favorably received by many people, with criminal behavior excused for the greater good. Ladies and gentlemen, as a retired Marine four-star general observed, ``Squad Leaders in Iraq are faced with the `ticking timebomb' scenario every day. Do we want our soldiers and Marines playing Jack Bauer''?

At a recent Republican candidate debate, Senator McCain demonstrated the moral courage to reject the use of torture. He was the only man on that stage to do so. Rejected on the basis that it is immoral and doesn't work. As one man stated, the only thing you are sure of with torture is that pain is involved--the information you get may waste your time or worse. Senator McCain understands that the exception does become the rule, leading him to author the McCain amendment designed to ban cruel, inhuman, or degrading treatment.

Recently, Human Rights First invited our Presidential candidates to sit down with a group of retired general officers to hear them discuss the impact of some of these policies on the military. Our distinguished chairman today was among the three candidates to accept the invitation. For me, the most compelling story was by a retired Marine major general, who described the capture of a Japanese soldier, subsequent appropriate treatment and eventual windfall of information and help.

That is the real story for our troops and our civilian leadership.

The Chairman. Thank you very much, General.
We'll do 7-minute rounds. Is that OK?
General, let me begin with you. I must tell you, one of the most extraordinary meetings I've ever attended--I've been here a long while, I mean it sincerely--was when I got a call from your fellow retired general who's now the dean of Franklin Pierce Law School, would I fly to Concord and meet with, I don't know the number, I think it was 15, 16, 17 three- and four-stars. There may have been a two-star there, I didn't see it, there may have been, admirals and generals.

I, quite frankly, thought you all were wanting to speak with me because of a speech I had made at Drake Law School, where I made the case against utility, the morality or the notion that we learned anything with torture. And I must tell you, say it publicly here, it was the most gratifying moment in my 34-year career. Because I came down here as a young 29-year-old Senator, thinking all you guys wearing four stars were like Slim Pickens jumping out of--and Dr. Strangelove--jumping out of the back of a plane and an atom bomb yelling ``yippee-ky-aye.''

It's a bit of an exaggeration, but I had, and I must tell you I've had a profound, for the last 30 years, profound

respect for the people who lead our military, including you. And, one of the things that was raised at that meeting with those, whatever the number was, more than a dozen retired generals, commandants in the Marine Corps, Supreme Allied Commanders, Chairman of the
Joint Chiefs of Staff, et cetera, was the point you made, that it (a) endangers our troops, (b) undermines your mission, and (c) ends up many times producing--seldom ends up producing actionable information.

Can you elaborate on what the attitude was of your guys under your command, the kids you go out and speak to who are in the field in Iraq, what their reaction was when they read and they heard about Abu Ghraib? I know that's a generalization, you've got a lot of troops under your command, but could you characterize the response?

General Eaton. Sure, Senator.

First I was in immediate and direct contact with my two sons who are soldiers. And one, an infantry lieutenant at that time in Iraq, and the feedback was just basically disbelief on their part. And, then throughout my command, the question: How did this happen? What's the basis for it? How do you explain the behaviors that led to Abu Ghraib? And, multiple command failures, and we've had this investigated pretty well, but it is, the initial reaction was, how did it happen? And what do we do to prevent its recurrence?

The Chairman. I obviously didn't spend anywhere near the time you spent in Iraq, but I've been in and out of there seven times so far, and right after Abu Ghraib. And the guys I'd sit in the mess with, or whether I was out in Fallujah or in Baghdad or wherever, Marines, Army, there was this thing like, ``Whoa,'' you know, like ``What in the heck, what in the heck are we doing?'' You know, it wasn't like, you know, ``Glad they got those guys.'' You know what I mean. ``These guys are really bad guys, these guys are.'' It was like, ``Oh man.'' I mean, it was almost uniform. I'm sure there were people who said, ``Right on, you know, that's the way to treat these guys.'' But, I must tell you, General, I was pleased that, you know, whether I'm talking to privates or colonels, it was like, ``This is a giant mistake.''

Because they, I think, immediately in my discussions got the message that that put them in--more in jeopardy. It didn't help their mission at all.

Let me go to Dr. Zelikow, as well as you, Dr. Byman. You both had a similar message, which was that, you know, this warrants, the distrust of a single administration doesn't warrant legislative actions that may be beyond what is needed. You should arrive at a consensus. The President is, in 2006, says he's looking for a common foundation to deal with other countries as well, our allies and what constitutes appropriate behavior. And you reference Executive order, maybe you both did. Is it your reading of the President's Executive order that he has disavowed the White House position up to that point under the Geneva Convention torture only exists if there is organ failure or death? Is this an absolute refutation of that? Section C of the order says, 2C, ``Cruel, inhumane, and degrading treatment or punishment means the cruel, unusual, inhumane treatment of punishment prohibited by the 5th, 8th,

and 14th amendments of the Constitution of the United States.'' Does that supplant the original meaning we operated on for a while, with the President's consent?

Dr. Zelikow. Yes; a hundred percent.

The Chairman. A hundred percent.

Dr. Zelikow. In fact, that extreme legal interpretation, which I thought was appalling, was actually disavowed by the administration and rewritten by the Department of Justice in, I think, 2004.

The Chairman. It was disavowed, but we kept getting reports that it wasn't--where would you think waterboarding would fall into? I happen to, you know, there's an old, bad joke. If you want to learn a subject, teach it. The last 18 years I've been teaching separation of powers and the eighth amendment, as well. And I--what's your judgment, Doctor, as to whether or not under the eighth amendment waterboarding would be considered, in any case, appropriate?

Dr. Zelikow. I used to be an eighth amendment lawyer many years ago. It would be prohibited.

The Chairman. Right. It's not even close.

Dr. Zelikow. In my personal opinion, it would be prohibited under the EO. It would not be a close call.

The Chairman. But, why do they keep using that as an example of something that is appropriate?

Dr. Zelikow. I don't think the administration----

The Chairman. Read the memo.

Dr. Zelikow [continuing]. Will--does or will use waterboarding as an example of a currently appropriate interrogation technique.

The Chairman. Well, you would think, since it's received so much publicity, so much publicity and was by the Vice President and others, looked at as sort of, I forget the phrase, a no-brainer if you want to get information. Don't you think in order for us to regain some trust in this administration, an outright disavow by the President of the United States of America or the Attorney General or someone saying, ``By the way, waterboarding is absolutely prohibited''? Because as I travel around the world, our friends still think it's, we think it's appropriate and they think we're using it. Do you have a different impression?

Dr. Zelikow. I don't, Senator, and I think that's wise counsel.

The Chairman. And you can maybe understand why guys like me put zero faith in this administration's assertions, with generic language like the 5th, 8th, and 14th amendments. And I admit to you--my time is up--I admit to you that in my years here with seven Presidents, there is a direct correlation between legislative actions on the part of the Congress and the degree of trust and confidence they have in a President. We've seen this swing about, you know, the famous dictum, the War Clause of the Constitution just invites the Senate, excuse me, the Congress and the President to compete for who has what responsibility--I'm paraphrasing it. And it just is, it's amazing how difficult it is to get a straight answer out of the Attorney General. Well, the Attorney General doesn't know how to give a straight answer to anything, in his recent hearing again. And that's not just coming from me, it's coming from

Republicans, as well, in that committee.

But, to get a straight answer from the administration on a simple thing that is doing us incredible damage around the world, like waterboarding, is absolutely prohibited.

Anyway, I just wanted you to understand, Doctor, why I waited as long as I did to draft the legislation, hoping that this could be, actually could be a consensus arrived at. But anyway, my time is up. I'll come back. I yield to the ranking member.

Senator Lugar. Well, thank you very much, Mr. Chairman.

I want to yield for a moment to my colleague from Tennessee because he will have to leave and so I want him to have a moment.

Senator Corker. Thank you, Senator Lugar and Mr. Chairman.

I do want to say, Mr. Chairman, that I think the comment you made at the very end about the relationship to legislation and trust is direct and I would also say that, obviously, legislation transcends many administrations and, certainly all of us, I know, want to keep that in mind as we look at this.

But I want to thank you for, I think, bringing excellent witnesses who have framed this debate, I think, very, very well and have educated us in a way that hopefully will lead to very appropriate legislation. I want to thank you for this hearing.

Senator Lugar. I thank my colleague.

Let me just comment, Mr. Chairman, that I share Senator Corker's views that this has been a remarkable education for us and for all who will be witnessing this hearing. I suspect that as someone pointed out already, our Nation faced, after 9/11, a existential problem. Many felt that without trying to frame the War on Terror and progress immediately, we were all in great danger.

As someone pointed out, this has occurred before in history, and I think Mr. Malinowski's testimony went through various periods, perhaps not so extreme, and a lot argue that. But, I would say that there is the possibility that after we face the moment, we move ahead and we begin to reshape, rethink what we are doing.

So, in the best light, perhaps by the time we come to 2007, there is more thought about how the executive and legislative branches might cooperate, how there could be, as you've all pointed out, greater transparency, at least among us who have some responsibility in the Government, legislators and President and his administration. And from that, a dialog and the checks and balances inherent in our system, perhaps better policies. At least I hope that that is the case.

I appreciate when we get into forums of this sort, that there will be at least some discussion of whether this administration is more protective of executive privilege and executive possibilities than have been others. And I don't want to get into a constitutional argument on a scale of one to ten. But nevertheless, there have been a great number of assertions by this administration, which have not really been inviting to those of us who might have had interest in these questions.

Conceivably, members of our Intelligence committees dwell on such subjects from time to time behind closed doors and that may be appropriate for security purposes to have closure and to some extent. But I think, Mr. Chairman, you and I are not

members of either of the Intelligence committees, although I've
served 18 years during my time on the Senate Intelligence
Committee. And so I suppose I would resent the thought that--
the fact that I'm not a member of the committee precludes our
becoming involved in a dialog with the President or the
Secretary of State of Defense, whoever, on these issues. I
think it's very important.

I sort of come, first of all, to the basic thought that you
presented, General Eaton, and that is that as you enlist
members in the Armed Forces, you start with the thought that,
at least, that there is going to be a moral aspect to their
service. You've identified the Judeo-Christian tradition, maybe
some would expand that larger, but clearly that's maybe a good
standard to think about to begin with. And therefore, if, as a
part of training, or experience coming out of training, there
are at least violations of that moral code or tradition, on the
basis of expediency this is going to be a great problem. And
not just for those young men and women, but for our country,
for the continuity of our traditions. I think that's very
serious.

I don't think for a moment the thought that somehow people
are saying it's a common sense matter we're at war. So, that
was then, this is now, and so forth. Let's get over that. But
the thought, it's been 6 years since 9/11 and that we are still
at war and some would say, and that's part of the rendition
question, I guess, that it's sort of universal over many
countries, many involved.

But, I like the idea that was presented by, I think, Mr.
Zelikow, that national strategy here, in addition to being a
shared power situation, also should be a shared coalition
strategy. In other words, we have to get used to the fact that
we are going to have to have many partners, many countries who
share our ethic. It may be Judeo-Christian, it may be a broader
moral tone, but without that, why we're going to have continual
trouble. As we perceive now, potential negotiations in moving
the situation in Iraq along. We're really going to have to have
a lot of partners around the table, a very vigorous, continuous
diplomacy with people who trust us.

And so, I applaud the chairman's pushing to, at least,
bring greater clarification to this. I'm not endorsing the
legislation, I'm not familiar all the aspects. It seems to me,
however, the whole idea of rendition, as some of you have
pointed out as a practical matter of finding leads. I think you
said, Dr. Byman, the thought that the wrong person, in some
cases is almost inevitable given the hazards of the trail here.
Well, that's--that's a serious problem. And if you say, ``Well,
one in a hundred or two or so forth,'' is still serious. Under
our system of law we are not perfect, but we try to be. So,
even the concession that somehow this is almost bound to be
difficult.

And then furthermore, the thought that's one of the big
issues for much of our public that has thought about this, is
that it's expedient to send a prisoner to a country, one of you
have cited Syria as being especially egregious, but there have
been other candidates for this, which is well known. That the
problems of torture are likely to await somebody in that
situation. To knowingly send somebody into that situation

probably is worthy of a debate in the Congress, sort of a show of hands. I'm not certain how many Senators would vote, simply to say, ``Well after all, we're at war. You've got to be tough about these things.''

Well, some of you have testified, even after you're tough about some of these things, the information coming after the torture in Syria or elsewhere may not be particularly useful. And we're still, if it is utilized by our Government, as you've suggested Dr. Malinowski, so the testimony even by our public officials is informed by this sort of information.

So, I apologize for not asking any questions, but simply editorializing.

The Chairman. Go ahead and take some more time.

Senator Lugar. But, I think this is a set of serious issues that, sort of, come to a head at this point. What I would hope, and maybe you're not in a position to judge this, but let me just ask you, General Eaton. After all is said and done and you say you've tried to train young men and women as they face military service with high moral standards, and that's tough in a war situation. And people have philosophized about that for a long time. Where do things stand in your judgment now? What is the outlook of our troops with regard to the sorts of things we're talking about today? Do they regard this as something that is above their pay grade? Somehow the President and his people have ordained or the Congress, likewise, along with the President. In other words, how do they look at these commands of leadership that you're suggesting might have failed at Abu Ghraib or elsewhere in which some people were asked, maybe, to do some things that they morally felt were reprehensible. And why did they go along with it in any event? What sort of problems have led you to testify, as you have, publicly on these subjects?

General Eaton. Thank you Senator. The American soldier, as I observed, is an extraordinary wonderful human being. And he will do the right thing. The tone that I discussed, that does come through the chain of command, is vital to the good order and discipline of any unit, from our largest command down to a rifle squad. And that tone has to be aggressively transmitted.

When you are engaged in a war like what we have going on right now in Iraq, where there are racial differences, where you have men with white skin and men with brown skin, the chain of command must address that cultural difference and must deep down focus and provide the instruction of cultural awareness with our soldiers.

So, men and women 18 years of age deserve that. They deserve the anecdotal training. They deserve the, ``What now, Sergeant?'' ``What now, Private?''-type of case-study approach to managing situations, so our soldiers are inclined to do the right thing. The chain of command is vital to ensure that that happens.

Senator Lugar. And Dr. Zelikow, let me just ask a final question of my time, and that is, your experience in government and even this administration, as well as in the past, has been extensive. What is an appropriate course of action for the Congress or for the Senate, this body, at least where we have some possibilities? How should we approach the President or the Attorney General or others? With legislation? Should we wait

upon officials with committees of some of the leadership of Congress? As a practical matter, if we are in process of moving from the crisis of 2001 to something that is sustainable as a nation policy, how do we go about this?

Dr. Zelikow. Several suggestions, Senator, with due humility. Whenever making suggestions as to how Senators should be affected.

Senator Lugar. I understand.

Dr. Zelikow. All right. First, where you have an enormous comparative advantage is: You're supposed to represent the values of the American people. So an administration, I think, should draw on that.

Frankly, they're stronger and they're in a more sustainable position with their policies if they feel like there's a basic partnership of understanding that, here's what we think the American people want us to do and here's the way we think the American people want us to strike the balance. And to check that and to check to see that our values are calibrated right, we have a colloquy with the Congress and a partnership with the Congress.

Where I think you have the comparative advantage is in helping them sense where the balance should be struck. I think you have a comparative advantage in that regard over executive officials and should be part of the process.

You can be part of the process in several ways. In formal legislation, I actually think we do need additional formal legislation to address the future of Guantanamo and the future incarceration of enemy combatants under the Law of Armed Conflict, which is an option I think we need to retain, but then do this in a way that's sustainable as a coalition and sustainable under international law.

On rendition and interrogation, what I suggest here is, for now, reliance on your oversight powers, not on new legislation. Now the prerequisite to that was the administration had to make the move to bring you in and brief committees more fully on what was being done and treat this as a partnership with Congress. I think that has now happened. Those decisions were made last year and that is now working its way forward.

On the oversight side, for example, I gave the example of what the British Parliament has recently done, in my statement. You can look at the particular rendition cases that trouble you. Dig into them. Figure out what you think went wrong in those cases. Do a diagnosis. See if you think the executive branch has learned its lessons and has adopted management procedures that reassure you that this is now being run in a more credible way. If they're not, recommend it. If you think the accountable officials have failed in their public duties, say so and use your tools that way.

If, in the final analysis, you think the situation simply can't be resolved through oversight, and you really need a systemic answer, and the problem is not just of a particular official or a particular moment in time, then maybe legislation, new laws, and courts as a last resort. I don't think you're at that point yet. After all, the opposition party has been in control of this body for only 6 months, too soon for you to give up on your oversight role.

Senator Lugar. Let me just conclude by saying I think

there's merit in the suggestion that this committee or others
might take up half a dozen rendition cases and explore exactly
what has occurred. My guess is, just following up your idea,
that we are representatives of the people, our constituents,
and their feelings. My guess is they, our constituents, have no
more idea about these rendition cases than we do--except
anecdotally or press accounts or occasionally somebody who
happened to actually stumble into one.

But after you have, sort of, a dose of this, then there's
likely to be much more of a public opinion about whether this
is vital for our international security or important, in terms
of our national ethic and all. So, I'm intrigued by that
possibility. If we can't have these cases in a public session,
why I'd be prepared to look at some in private or at least on
paper, if somebody wanted to write them up and give my own
opinion.

Thank you, Mr. Chairman.

The Chairman. Thank you very much.

A point of clarification, if I may, and I'll yield to my
friend from Wisconsin.

The legislation that was briefly referenced that I
introduced, and we will have a hearing on it later, but I want
to make it clear. It doesn't end rendition. It says that
somebody other than the President--whose track record in 6
years has not been particularly admirable in terms of rule of
law--somebody gets to see what it is the President wants to do.
And that's the FISA Court.

I was one of the three drafters of that legislation back in
the old days when I was on this committee and Judiciary. And
for people out there listening, it's a secret court in the
sense that the Government walks in, talks to a Federal judge
having special responsibilities, and says, ``We want to do
this, Judge. This is the thing we want to do, is it
applicable?'' Basically, we're saying, ``Is it applicable under
the Constitution?'' And the values of the American people, I
kind of thought were embodied in the Constitution. That's why
we ultimately have a court. Because sometimes Presidents do
things that are not good, and sometimes Senators and Senate
bodies, in the heat of battle, in the heat of fear and concern,
do things that don't make any sense.

But, I just want to make it clear--all this requires is
each application for rendition go to that court and has to
include what date that the Attorney General looked at it and
says he wants to do this. That you have to specifically
identify the person you're rendering, and you have to give the
statement of why you're rendering him, just the facts. And, you
can't render him in a country which you know uses torture.

Now, I know of no other way and I'm wide open. I publicly
invite the administration to sit down and talk with me about
this, or any of us. But thus far, there has been not a whole
lot of forthrightness coming from the administration. So maybe
this will prompt it. I just wanted you to understand, that's
the operative element, piece of this legislation relating to
rendition.

Senator, thank you. I'm sorry.

Senator Feingold. Absolutely. Thank you, Mr. Chairman, very
much, and both the chairman and ranking member for their

comments.

It's long past time that we, as a nation, consider the damage that the Bush administration's policies have done, not only to our standing in the world, but to our ability to fight al-Qaeda and its affiliates. I have opposed the CIA detention and interrogation program authorized by this President on moral, legal, and national security grounds. I strongly support efforts to pursue, detain, and interrogate suspected members of al-Qaeda. But in interrogating these detainees we should follow the letter and the spirit of the U.S. Army field manual.

It is also my firm belief, which is widely shared in this country, including in the military, that the refusal to abide by this simple principle endangers our personnel overseas. Whatever value the administration believes this program may have, the cost to our larger strategic effort to mobilize governments and populations in the fight against al-Qaeda has been immense and it has made us less safe.

I understand this has already been alluded to, but I've asked each member during my time here, each member of the panel to address the impact that the administration's detention and other related policies have had on U.S. credibility and standing among the international community. How have they affected our ability to be a leader in combating human rights and other related atrocities, as well as our ability to lead a strong and effective coalition against al-Qaeda and its affiliates?

Let's start with Mr. Malinowski.

Mr. Malinowski. Well, as I suggested in my opening statement, I think the impact has been devastating, both in terms of our ability to protect our values and protect our interests. I can tell you anecdotally, as a member of an organization that goes around the world and tries to confront governments that commit terrible human rights abuses, that increasingly this is the answer that we get. They say, ``Hey, we're just doing what the American's do. We're no different than you.'' And, it's an exaggeration, of course. The United States is not a dictatorship. We are not North Korea, we are not Cuba, not even close. But we are the most influential country in the world. We are a standard-setter.

Let me put it this way. If Saddam Hussein tortures a thousand people in some dark dungeon, no one around the world says, ``Oh, Saddam can do it. That means that's the new standard. It's legitimate. So can we.'' The United States does that to one person, then all bets are off. The whole framework that we rely upon to protect our values around the world begins to fall apart.

In terms of the impact on the war on terror, a number of people have discussed that. I think it's devastating, as well. Mainly because the fundamental task I think we have in this conflict is to diminish the number of people who can be recruited by the enemy. You know, we can't kill or capture all of them. We have to diminish that population. We have to appear legitimate in their eyes. Our enemy needs to appear illegitimate. This makes that task impossible.

Senator Feingold. I find that interesting because I remember meeting with the President in Congo in 1999 before 9/11, before all of this and I was pressing him on this,

outrageous things were being done to journalists. And his response was, ``You have a death penalty,'' which of course, I happened to agree with him on that. That was, sort of, what they had. And now, there's this menu of things that can be thrown back in our face. I think that's a powerful observation.

Dr. Zelikow.

Dr. Zelikow. Well, I think foreign leaders judge us on two, really on, well, on three main grounds. One, are we doing things they like? Second, do they think we're competent? And third, they do make judgments about our values, either to strengthen a sense of solidarity with us or to accuse us of hypocrisy and find solace for practices that they want to condone.

So, I agreed with General Eaton's statement. I agree with, actually, many of the things Tom Malinowski has said. And I think that there were some serious problems in the way we applied, not so much legal analysis, but moral analysis. And policy analysis about what works in a systematic way, when we made some early decisions as we mobilized to combat the war on terror.

And so now we are left with the issue of what to do now? But the issue of what to do now, in addition to restoring a sense of credibility about our values, also has to address the issue of competence. And people still have to regard us as competent and formidable in being able to serve our own interests, protect our countries. Because that's also a source of respect and cooperation among these foreign governments. And ultimately, you're going to sustain the value balance you want with the American people if they think that you can manage to protect the country while you're doing it. If they think you're falling down in protecting the country and they become more fearful, that's the most dangerous threat to civil liberties.

Senator Feingold. Thank you.

Dr. Byman.

Dr. Byman. Thank you.

There's no question that our interrogation policies have hurt the U.S. image tremendously around the world. And I applaud recent moves to bring this into accord with traditional interpretations of U.S. law. I will point out, however, that the pre-9/11 rendition program did not cause serious damage to the U.S. reputation around the world, yet was quite an effective program. And the question to me is: Can we go back to retaining this program, using it at times in a way that I think many critics would still be uncomfortable with? And, because the image of the program is so tarnished by accusations of torture, to me the key is trying to make sure the procedures for reducing the abuses are clear, for embedding it more in law, and in general for trying to make this more transparent. So, we can point to any mistakes or problems as aberrations, rather than as part and parcel of the program.

Senator Feingold. Very good.

General.

General Eaton. Thank you, Senator.

The tone that this administration has set has imposed upon the military chain of command a far greater load than would otherwise be necessary. Abu Ghraib is a--is symptomatic of that drama, and Abu Ghraib is directly related to a command failure

in Iraq. So, I don't put the entire thing on the
administration, but the tone the administration sets today, has
imposed upon the military chain of command a far greater load
to ensure appropriate behavior on the part of the rank and file
in the military to ensure they do not interpret the use of
waterboarding and other unusual interrogation techniques as
appropriate and available to them for use at point of capture
or further down the processing of the prisoner.

Senator Feingold. Thank you all.

The Chairman. Senator Casey.

Senator Casey. Thank you, Mr. Chairman. I want to thank you
and Ranking Member Lugar for being with us today and getting us
together for this hearing. And, I think what you've seen here
today with this distinguished panel and with these two members
of our committee, the chairman and ranking member, you see the
way it should work, in the sense that these two Senators, both
chairman at one time or another, bring to bear about three-
quarters of a century of combined experience and are a great
example of what we should be doing in the Congress. And this
panel is, as well. Not everyone on this panel agrees, there's a
lot of difference of opinion.

The problem I have--and the problem a lot of people in this
capital have, not to mention millions of Americans--is that the
administration, in my judgment, doesn't share that basic
belief. Doesn't share the belief that we should have debates,
doesn't share the belief that we should have differences of
opinion and try to work things out. This is a ``my way or the
highway'' administration.

And look, I know some people will say, ``Well this guy's a
Democrat, and it's the usual Democratic line.'' But I'll tell
you, when it comes to an issue like this, that is so difficult,
and so complex, and balances very difficult principles.

On the one hand, the urgent matter of finding and
destroying terrorists around the world and on the other hand,
the other side of the balance, the rule of law and our values.
And I have to say, Doctor, your testimony today was very
compelling. In terms of the scholarship, in terms of the
underpinning that you put in your testimony, in American law,
in our history and our traditions, and the urgent fight we have
against terrorists. And I appreciate the fact that, contained
within your testimony, you talk about oversight and you talk
about the role that Congress can play.

But I have to say, I don't think this administration really
believes that, and it pains me to say that. And I also believe
that it's different than almost any administration we've seen
in 50 years, some believed it more than others. But this crowd
is different. This is a different group of people that are in
charge of the executive branch. And I know that there are a lot
people that support the President who would say, ``You know,
when allies complain that we're not working with them, that we
have a kind of unilateral policy, they're just whiners.'' The
administration says, ``All those allies are complaining.''

But you know what? I think there are a lot of people in the
House and the Senate--I've only been here 6 months and I feel
it--a lot of people in the House and Senate who understand what
those allies are telling us--that there's little collaboration,
that there's not a belief in oversight, and all of that, I

don't want to belabor it, but all that brings me back to your testimony, Doctor.

On page seven, you talk about the President's Executive order and you say, ``I believe the Executive order can set interrogation practices on a sustainable path, addressing concerns about some of the practices that have been alleged in the media.'' And you go on from there. But before you say I believe, you have these two words, ``properly applied.'' And that's the problem. There are too few people in the Congress, I would argue with good reason, that believe that no matter what the Congress does, that no matter what the rules are, no matter what the law says, that this administration will not properly apply it, because it is their belief that the rules don't matter. That as long as they have a goal in mind, that anything goes to get to that. And I don't like saying that, I don't like saying that at all. And, I think that's at the foundation of this discussion, is that lack of confidence that this administration really believes in the rule of law when it comes to these things and really believes in congressional oversight. And I hate to ask you to comment on that because I'm putting you in a bad position, but I just want to give you a few minutes to respond to that and I also want to ask a question of the General.

Dr. Zelikow. Well, my first answer, Senator, is: Since when do you need administrations to believe in your oversight powers? They'll always say they believe in it, but they never like it when they see it. So, you just need to do what you need to do and you need to----

Senator Casey. We will.

Dr. Zelikow. The Constitution was----

Senator Casey. We will.

Dr. Zelikow. OK. And the Constitution wasn't designed so that the Executive and the Congress would like the way each play their roles, but you've each got your roles to play in the design. And I think there's an opportunity here to do that. My worry is, and the reason I stressed the oversight opportunities, which I think could be more explored. That would be constructive. You're seeing concerns about abuses. You need a constructive answer to that, better than just saying: I really don't care that much about this.

But, I do worry that sometimes if you act for a legislative cure because of breakdown in trust in executive discretion in a particular administration, you'll set in motion things that will have effects you can't foresee. I remember what happened, for example, after the Church Committee disclosures of executive abuse in the 1950s and 1960s. We did a lot of things in the 1970s where the pendulum swung pretty hard the other way, and it had some pretty fateful consequences we later came to regret.

When I worked on the 9/11 Commission we did the whole history of the wall between criminal and intelligence sharing of information--and we went through, where did this wall come from? How was it erected? And there was a whole story there and it was erected, basically, as an understandable response to executive abuses, but once you've built it, it was there for a long time, and it grew, and it actually began to cast bureaucratic shadows that were far larger than, actually, the

formal legal rules underneath it, and then became a really
important aspect in the story that led to the catastrophic
attack on the United States.

So, I just approach the issue of systemic legislative
remedies in a really difficult area like this with great
wariness and care because of the unforeseen consequences of
adopting entirely new legal requirements and court
requirements. And I tried to spell out how that might actually
work in practice.

But fundamentally, you're going to have to have--you're
going to have to have some ability to trust the exercise of
executive discretion and feel that it's being done credibly if
you're going to grant the executive discretion in such a
terribly dangerous and awesome area as this.

Senator Casey. Well, and I appreciate that. We need to have
that trust, but they've got a role to play as well. And when
you see what's transpired, just think of what happened in the
last 24 to 48 hours. We have an Attorney General who's been on
Capitol Hill, hour after hour now, for many weeks. His
credibility now has been questioned to the point where a
Republican member of the committee is questioning now, not
whether or not something was a little misleading, but whether
or not he committed perjury or something very close to that.

Now, even if you could wave a magic wand and say nothing
about the top law enforcement officer in the country, nothing
about his credibility is based upon some dishonesty or some
breach of the public trust. The lack of confidence alone is
reason that he should not be there. But the reason he stays
there, in my judgment, is because this administration, on a
fight like this, has a two-word strategy, ``Just win.''

So if people on Capitol Hill are calling for a change
there, they're going to resist that to the end of the earth.
They'll never make a change there. I think the country expects
that. Even if you say, ``We're going to replace him with
someone of a like-minded point of view or ideology, that's
fine.'' But when the top law enforcement officer's credibility
is questioned to the degree it's been questioned to this point
in time, my God it's time for some kind of change. And that's
the problem. I mean, how do they expect Americans to believe
them when he's still there and he's the Attorney General? And
they make pronouncements about legal doctrine on torture, or on
any other significant legal issue.

So, I'll tell you, we certainly have our role to play, but
I think the administration has a long way to go to restoring
some measure of the confidence that has to be the--has to
undergird the way the executive and legislative branches
interact. And I think that's been, been pretty close to being
destroyed, but at a minimum has been frayed in a way that I
don't think we've seen in recent American history. But that's
only one man's opinion.

The Chairman. You can have more time, Senator.

Senator Casey. I know I'm over, but I did want to ask the
General one quick question. You make some very compelling
statements about the meaning and the impact, I should say, of
the administration's policy on the military. And, in
particular, you say on the second page of your statement,
``Indeed the risk of attack against the American soldier

increased,'' after you had made the assertion that we've undoubtedly lost allies in the fight for Iraq because of our policies on extraordinary rendition, secret detention, and the use of torture. And I just wanted to have you expand upon that and what your sense of that is. Because I think that's what people are concerned about, in addition to the fine points of the legal issue.

General Eaton. Thank you, Senator. The wise commander in Iraq will always ask at the end of the day: Did we create more enemies than we captured or killed by the actions of the American soldier on the ground in Iraq? And the way you treat the individuals when you--when you break into their house, when you go into their home to convince yourself that there are no weapons, contraband, enemy in the home. Your behavior when you do that, will create a legacy within that house.

I mentioned that my senior Iraqi advisor, now the No. 2 man, had two home incursions by the American soldier. The first one went very, very well, very polite. ``Sir, we need to come into your home,'' and he opened the door. The soldiers went through the house and were convinced that all was well. The second incursion did not go that well. We had a long talk about the outcome. And he said, ``What happens, particularly to an Arab, when you go into a house and do not treat the men and the women with respect, is the legacy is very serious, and the issue of revenge is very much on the table.''

And we have created, by certain misbehaviors, more enemy than we needed to. And they weren't--they didn't want in the beginning to be an enemy, but every prisoner that you mistreat, when you put them back on the street is going to come back and exact his revenge. So, it has become, clearly, more dangerous for the American soldier because we have created vengeful men where they did not exist before our treatment of them.

Senator Casey. Thank you.

I know I'm over time. Thank you.

The Chairman. General, is it, this is Monday-morning quarterbacking, and you're a pretty precise guy, so you might not want to do this, and it may not even be a fair question to the President, or to you. But, do you think that had Abu Ghraib not occurred or had--when it occurred, we took really extraordinary action. For example, I think--I'm not sure whether you and I went down to see the President after Abu Ghraib together. The President had asked me to come down. He often asked Senator Lugar and I over the years, the last 4 or 5 years, and I asked him about Abu Ghraib. It was right on the heels of it, within days of it being made public. He said, ``Well we have a serious,'' and he was being serious, he said, ``We have a serious''--I'm paraphrasing now--``a serious cosmetic problem,'' in other words an appearance problem.

And, my response was, ``We do, and it requires a serious, serious public relations response.'' And he asked what I would suggest and I said, ``Bulldoze down Abu Ghraib, literally bulldoze it to the ground. Let the whole world see it, and turn around, and build a hospital on that site. Turn around and build a library on that site, do something.''

And it was interesting, a couple years after, recent, not in the distant past, the President made an aside to me in one of the meetings that something that drastic should have

happened because he underestimated the impact of it, or something to that effect. He didn't use the words, ``I underestimated the impact.'' Had we either not been engaged in the behavior some of our military was in that prison, or had we acted with overwhelming response to demonstrate how disgusting it was to us, do you think--and I mean this in a literal sense--do you think there would have been more cooperation when we knocked on doors? Or do you think it is, I know that's hard to judge, I mean, but can you talk to me about that? I mean, I guess what I'm getting at here is what do we do when we make serious mistakes like Abu Ghraib obviously was? Is there anything after that point we can do to better our circumstances and our chances in the field? Or do we just, it's a watermark we pass and there's not much we can do beyond that?

General Eaton. Thank you, Mr. Chairman.

We have a saying in the Army that ``bad things happen to good units,'' as well. And when something bad happens to the unit, then you open it up, you shine the bright light on it and you investigate it and you solve it as quickly as you can and if somebody's to be found guilty then you handle that with great speed.

Abu Ghraib was allowed to fester. It came to the light of day by means of the press rather than the President of the United States or the Secretary of Defense coming up and taking the podium and say, ``Ladies and gentlemen we have a problem. This is what's happened and this is what we're doing about it.'' Had we done that, it would have saved me, personally, and a lot of other Americans in Iraq, a lot of pain trying to explain to the Iraqis they were working with what was going on in Abu Ghraib. And your comments about its impact, and would it have changed things? Absolutely. Had Abu Ghraib not happened, we would have kept that moral high ground that we had heretofore enjoyed.

The Chairman. The thing you often hear, and I like a closing question, ask any of you to comment on, but start with you again, General, is, when I said that there was someone in the meeting, as I recall it, in the Oval Office, who said that the--I'm again paraphrasing--said that the Iraqis are used to torture, that it was engaged in by Saddam Hussein. In that part of the world it's not viewed the same way, with the sense of moral outrage that it's viewed in countries that don't engage or haven't engaged in torture.

And you heard that, sort of, reverberate. I can't name a time, a person, but that sort of was a counterdefense, like, you know, do you think they're surprised?

I mean, do you think it matters to them very much because look, Saddam did that, everybody does that in this region and, you know, so the idea that we're going to be damaged very badly is a vast exaggeration. That was a subtext, that I read anyway. Maybe I'm mistaken. That was, sort of, a subtext justification for not having acted swiftly, for not having acted more strongly, for not having held people accountable, for not having done something of visual consequence to demonstrate to the Arab world that we found it reprehensible.

Because it was, ``Well they expected that, they expect, you know, people who arrest countries or individuals, arrest bad guys, that you're going to engage in that torture.'' So, it

really didn't have any impact on us. I mean, did you hear any of that justification bounced around or was I the only one that, kind of, you know, got a sense of that every time I'd press someone in administration or others who are defenders of the administrations?

I'd like any of you to comment on that, if you could.

General Eaton. The reaction on the part of the Iraqis to Abu Ghraib was profound and immediate. And my colleague's testimony, ``If Syria does that, no surprise. It the United States does it, it is a huge event.''

The Chairman. Because I assume--because they assumed that we had higher standards and higher values.

General Eaton. Absolutely.

The Chairman. How would you all respond to that? I'd like each of you, if you wouldn't mind.

Mr. Malinowski. Well, I'd agree with you, with the General. We are different, and we say we're different. It's part of our self-image, it was part of the justification for the war. There was a moral justification for the war, which we made, and I think many believed. And, what these policies did was just to foster a tremendous cynicism among Iraqis, among others. So that whenever we made that moral justification, whenever we said that we are about is a set of interests and values that unite all of us. They were just profoundly cynical about that.

The Chairman. Gentlemen, either of you have any comment?

Dr. Zelikow. Well, two, Senator. First is, we actually looked at bulldozing Abu Ghraib.

The Chairman. I--say again?

Dr. Zelikow. We actually looked at bulldozing Abu Ghraib and razing it to the ground, for exactly the reasons you commended the idea. I don't know whether your idea somehow percolated into the State Department by osmosis or whether we had it on our own, but I remember looking at it personally. I thought it was actually a pretty intriguing idea. And then it turned out we needed the bed space for detaining Iraqi prisoners and there was a story.

The Chairman. Yeah. No; but I think that's probably true. When the President asked me, why don't you just say it's your intention to bulldoze it down? It just takes time to remove these prisoners.

Dr. Zelikow. No; and you're making a larger point now about the tone that leadership sets in trying to find some way of dramatically illustrating the conviction with which you mean these principles. And I think those are, I think those are important points.

And the second comment I just wanted to offer is: If you heard people talking about, kind of, Arab values and how they go along with stuff like that, you see how totally inconsistent that is with the President's repeated and insistent and, I believe, completely sincere views that it's not just our values, that they have these values too----

The Chairman. Right.

Dr. Zelikow [continuing]. And you shouldn't be patronizing and thinking that they actually don't care about freedom and they actually don't care about human rights. I mean, the President practically bristles when people use that kind of phrase around him. And of course, it's just that patronizing

attitude that is evident in the kind of whispering you heard.
And I think the President would be the first in adamantly
disavowing that kind of argument as being an admissible
argument for Americans to consider.

Dr. Byman. Senator, I'll briefly add two additional
problems this created. One was, we're foreigners in Iraq and we
were doing abuses that we're not only morally outrageous, but
they were being done by an occupying power and that resentment
was especially large because it was not the government of the
people, in terms of how they saw their own representatives,
their own government doing it. But perhaps an even bigger
problem for counterterrorism was that the reverberations were
felt for other detention programs of the United States, for
Guantanamo, for the secret prison program. When abuses--when
problems happened in these programs, immediately much of the
world, and many Americans, thought of Abu Ghraib. And they
thought that this is what is going on. And it was extremely
hard to shake this perception, even though in several
individual cases what was going on was not necessarily
wonderful, but was quite distinct.

The Chairman. Well, gentlemen, I really appreciate your
testimony.

You all gave equally good testimony, but I just want to go
back to you, General.

One of the things that I've been worried about--and I'll
end with this--that I've been worried about from what I
consider to be a debacle in Iraq, in the way in which it was
handled. I don't mean just Abu Ghraib, is that people who are
most upset about the war--and that's many people--I think,
instinctively, lay the blame on the military. And I find myself
constantly on the road talking about this and having to say, to
set the record straight, that my deep involvement as Senator
Lugar's deep involvement from day one in trying to affect,
alter, support, change this policy was that the most reluctant
partner, the most reluctant force in the U.S. Government about
going to war, when we went to war, how we went to war, what we
did during the war, what their strategy should have been--has
been the military.

All of the things I come back, when I come back, or the
chairman comes back, and we go on these, you know, meet the
presses and we say, ``We found this.'' I'm not hearing it from
press people, I'm hearing it from military guys and women,
people wearing stars and bars and stripes on their sleeves.

And so, I just want the record to show, and the reason why
it's so important for you to be here. That, this wasn't a case
where, you know, you've got a military run amuck, either in its
strategy or in its actions. I think it's important because what
I'm worried about, is I'm worried about, to use an old
neighborhood expression, you guys are going to wear the jacket.

I remember us sitting in Oman with a--I think we were all
together. I was coming back from--no, I'm sorry, I was with
another Senator--it was my first trip into Kirkuk, I mean into,
excuse me, Arbil before the war began because I wanted to meet
with Talibani and Brazani to see what the deal was with them.
And we went down to Oman and we were, General Franks, and we
walked into a room twice as big as this with a giant screen,
literally as big as that back wall. And I was told there were

101 generals and command officers at consoles, sitting there with computer consoles and you were doing war games on that screen in case the President asked you to go.

And I was asked to speak to these folks. Each one had forgot more about military tactics than I'm going to learn. And I looked at General Franks and I said, ``What do you want me to say?'' He said, ``Just tell them the truth.'' And I realized what he meant. And I got up, and the first thing I got asked by a three-star general, Special Forces guy, ``If we're asked to go, are the people going to be with us, remain with us, Senator?'' And I said, ``Well, it depends on what the President tells them about how hard this is going to be afterwards.'' And that generated a discussion among these generals.

I want to say for the record, there was not enthusiasm in that room. There was absolute resolve, that if you asked us to go, we will go, and get the job done. But the idea that we, the military—they the military—are the architects of this policy and signed on. I just remind people—remind people of what the Chief of Staff of the Army said beforehand and what happened. I remind people how hard it was to get a new commander in the region. I want to remind people how difficult it was to get a Chairman of the Joint Chiefs of Staff and the people that got passed over, who passed it over.

So, I just want to thank you, General. It's very important to me as a U.S Senator, that the reputation and the leadership and the confidence of the American people in the military leaders of this country not be, take the hit here, because there's a lot of guys, of women. The vast majority with whom I've spoken to, in country, out of country, retired and still there, who are men like you who would have done it, you're not saying it, a different way had you been able to do it the way you wanted to do. And you're showing up here.

I bet it surprises people that a four-star general is coming here, talking about ``We can't torture, we shouldn't do these things, we should have a better.'' I just want to put that down for the record. Because as I said, I'm afraid—and I've been saying this for 3 years—I'm afraid when all is said and done, when this chapter in our history is over—there's going to be a lot of revisionist history talking about how you guys who put your life on the line, and many lost their lives, somehow, one of the—would have done it the way it was done.

I'm not asking you to comment, get you in trouble, but I want to thank you and tell you how much I appreciate you and all your colleagues.

I thank you all. I'd end by saying that if—I would really appreciate the constructive criticism of the legislation. I don't have any—my pride of authorship is that I'm trying to figure out how to do something rational so that we set basic standards. And so, I invite both of you or—actually, all of you—to give me any constructive criticism you have about, not only whether to do it, but if you do it, what to do and what's wrong with the legislation and how it should be changed, if you can. I know that's asking a lot, but I'd appreciate it if you'd consider it.

Again, I thank you very much.

This hearing is adjourned.

[Whereupon, at 12:45 p.m., the hearing was adjourned.]

----------

Additional Material Submitted for the Record


Press Release of Senator Joseph R. Biden, Jr.--July 26, 2007

biden champions legislation to strengthen counterterrorism authorities,
restore rule of law

    Washington, DC.--In advance of today's Senate Foreign Relations
Committee hearing to examine the practice of extraordinary rendition,
chairman of the Senate Foreign Relations Committee and senior member of
the Senate Judiciary Committee, Senator Joseph R. Biden, Jr. (D-DE)
introduced the National Security with Justice Act of 2007. The
legislation offers sweeping reforms of United States policies governing
the apprehension, detention, treatment, and transfer of suspected
terrorists. The practice of detaining a suspect in one country and
transferring him to another is known as ``rendition.''

    ``We need to get terrorism suspects off the street so that they're
no longer a threat. But that's a short-term solution and terrorism is a
long-term problem,'' said Senator Joe Biden. ``To solve the long-term
problem, we need policies that will help us build effective
counterterrorism coalitions with foreign governments and diminish
recruitment. This is a fight we won't win by ourselves and we won't win
by force of arms alone. By bringing rendition within the rule of law,
banning torture, and shutting down black site prisons, this legislation
does that.

    Rendition is an effective means of capturing terrorism suspects and
gathering valuable intelligence. Despite its effectiveness, however,
the United States Government's use of rendition has been controversial.
Foreign governments have criticized the practice as ungoverned by law.
Moreover, they have decried the alleged use of rendition to transfer
suspects to countries that torture or mistreat them or to secret,
extraterritorial prisons. Our relations with several key foreign
governments have eroded as a result, throwing a stumbling block into
our efforts to build the effective international coalitions we need to
combat terrorism.

    Italy has indicted 26 Americans for their alleged role in a
rendition. Germany has issued arrest warrants for 13 United States
intelligence officers for their role in another alleged rendition. A
Canadian Government commission has censured the United States for
rendering a Canadian-Syrian dual citizen to Syria. The Council of
Europe and the European Union have each issued reports critical of the
U.S. rendition program and European countries' involvement or
complicity in it. Sweden, Switzerland, and the United Kingdom have each
initiated investigations as well.

    The National Security with Justice Act also closes a hole
intentionally left open by the President's recent Executive order on
the CIA's treatment of detainees. The President's order is notably
silent on some of the more controversial techniques the CIA has
allegedly used in the past, such as waterboarding, sleep deprivation,
sensory deprivation, and extremes of heat and cold. Senator Biden's
bill closes this hole by prohibiting all officers and agents of the
United States from using techniques of interrogation not authorized by
the United States Army Field Manual on Intelligence Interrogation.

    ``The United States has always been the pole star by which the

world has set its moral compass. The world is looking to us again to develop counterterrorism authorities that comport with human rights and the rule of law. This legislation does that by keeping rendition in our arsenal of counterterrorism weapons, but ensuring that it reflects core American values--protection of basic human rights and respect for the rule of law,'' said Senator Biden.

More specifically, the legislation will:

Prohibit Extraordinary Rendition

This legislation creates new safeguards by requiring intelligence services to apply for and obtain an order of rendition--similar to an arrest warrant for national security purposes--from the FISA Court prior to any rendition. The application and order process ensures that rendition is used only if we have solid intelligence indicating that the suspect is a dangerous terrorist. Most importantly, the bill prohibits rendition to countries that torture or mistreat detainees or to secret prisons. The bill includes an emergency exception allowing intelligence services to obtain an order of rendition after taking an individual into custody (but always before that individual is turned over to another country) when special circumstances exist.

Close Black Sites and Extra-Judicial Prisons

This legislation will prohibits U.S. detention of terrorism suspects in secret, extraterritorial prisons such as CIA ``black sites.'' Under this legislation, the United States must timely transfer terrorism suspects to legal custody in the United States or a foreign country that will not torture or mistreat them.

Prohibit the Torture or Mistreatment of Detainees in U.S. Custody

This legislation closes gaps intentionally left in the President's July 20, 2007, Executive order to allow the CIA to use interrogation techniques prohibited by the Army Field Manual. The legislation prohibits all U.S. personnel, including the CIA, from using interrogation techniques not authorized in the Field Manual.

Modify the Definition of ``Unlawful Enemy Combatant''

This legislation changes the Military Commission Act's definition of the term to clarify that U.S. citizens or lawfully admitted aliens taken into custody within the territorial jurisdiction of the United States cannot be considered unlawful enemy combatants. These individuals must be prosecuted within the criminal justice system.

Extend Habeas Corpus to Detainees

This legislation repeals the provisions in the Detainee Treatment Act and Military Commission Act that purport to deprive Guantanamo detainees of the writ of habeas corpus--the ability to argue to a court of law that they are being held in error. The legislation clarifies that all detained terrorism suspects held by the United States can invoke habeas corpus to challenge their classification as an unlawful enemy combatant and their conviction by a military commission of a war crime.

————

Responses of Dr. Zelikow to Questions Submitted by Senator Feingold

Question. In your recent speech about the administration's counterterrorism policies you indicated that dubious legal interpretations became a substitute for moral and policy deliberations. Can you provide any specific examples from your time in the administration? Can you offer examples you have personally observed?

Answer. The formative policy development that I discussed in my April 2007 address was during the first Bush administration. I was not an official in that administration. My address did describe the policy choices of concern, including policies on the treatment of terrorist captives.

Question. You describe the failure of administration lawyers to apply moral reasoning to their analyses, which in turn perverted the policymaking process. Did no one raise moral concerns, or were those concerns overridden? Do you believe that administration policies have been immoral or amoral?

Answer. I went as far as I could, given my limited first-hand knowledge of the details of how these matters were actually decided in those earlier years and the agreements I have signed concerning the disclosure of classified information learned during my government service. My address was worded accordingly.

Question. You have described a ``deformed'' public debate on counterterrorism policy. In fact, you have said that the public discourse became ``coarsened'' into questions like ``are you for civil liberties?'' or ``are you for fighting terrorism?'' You describe the polarizing false choice of ``liberty versus security'' as ``one of the most vicious byproducts of the debate.'' I couldn't agree more. I believe that the administration's repeated attempts to cast its critics as somehow opposed to fighting terrorism has been worse than unfair. It has been highly damaging to our country. In your speech you stated that this polarizing rhetoric ``can be politically useful, but it is bad policy.'' In your view, what came first, the polarizing political rhetoric or the bad policy, and which informed the other?

Answer. I don't know. So I commented on what was evident. As a sometime historian, I expect that these choices will eventually be analyzed with care. I offered what I called a ``hypothesis'' that later study, with access to much more evidence, may confirm.

———

Prepared Statement of Amnesty International USA, Washington, DC

Amnesty International commends the Senate Committee on Foreign Relations for having the first open hearing in the Senate to investigate the current practice of extraordinary renditions.

Amnesty International's 1.8 million members worldwide are dedicated to working against human rights abuses committed by governments and armed groups around the world. For more than four decades, our work has been guided by the Universal Declaration of Human Rights and other international laws and standards, including the Geneva Conventions and the Convention Against Torture, which the United States championed and helped create over many decades. Our annual report summarizes human rights concerns in 149 countries and territories. We strive to be objective and impartial.

Amnesty International joined the world in condemning the brutal attacks on September 11, 2001, denouncing them as crimes against humanity and demanding justice in accordance with the law. Amnesty International recognizes that governments not only have the right, but the obligation to ensure the security of their people. The best and

most effective way to promote security is to preserve human rights and the rule of law. Departure from long established, fundamental legal protections only promotes lawlessness and ultimately makes everyone less safe.

The world looks to the United States as a leader to set the standards for protecting and promoting human rights, human dignity, and the rule of law. That is why it is especially devastating that policies and practices of the U.S. Government today are inconsistent with U.S. law and international human rights standards. Evidence continues to mount of U.S. complicity in the extralegal transfer of people into the custody of countries where they are at risk of torture and other human rights abuses.

Amnesty International uses the term ``rendition'' to describe the transfer of individuals from one country to another, by means that bypass all judicial and administrative due process. In the ``war on terror'' context, the practice is mainly--although not exclusively-- initiated by the United States, and carried out with the collaboration, complicity, or acquiescence of other governments. The most widely known manifestation of rendition is the secret transfer of terror suspects into the custody of other states--including Egypt, Jordan, and Syria-- where physical and psychological brutality feature prominently in interrogations. The rendition network's aim is to use whatever means necessary to gather intelligence, and to keep detainees away from any judicial oversight.

However, the rendition network has also served to transfer people into U.S. custody, where they may end up in detention centers in Guantanamo Bay, Cuba, Iraq, or Afghanistan, or in secret facilities known as ``black sites'' run by the Central Intelligence Agency (CIA). In a number of cases, individuals have been transferred in and out of U.S. custody several times.

Rendition is sometimes presented simply as an efficient means of transporting terror suspects from one place to another without redtape. Such benign characterizations conceal the truth about a system that puts the victim beyond the protection of the law, and sets the perpetrator above it.

Renditions involve multiple layers of human rights violations. Most victims of rendition were arrested and detained illegally in the first place: Some were abducted; others were denied access to any legal process, including the ability to challenge the decision to transfer them because of the risk of torture. There is also a close link between renditions and enforced disappearances. Many of those who have been illegally detained in one country and illegally transported to another have subsequently ``disappeared,'' including dozens who have ``disappeared'' in U.S. custody. Every one of the victims of rendition interviewed by Amnesty International has described incidents of torture and other ill-treatment.

Because of the secrecy surrounding the practice of rendition, and because many of the victims have ``disappeared,'' it is difficult to estimate the scope of the program. In many countries, families are reluctant to report their relatives as missing for fear that intelligence officials will turn their attention on them. The number of renditions cases currently appears to be in the hundreds: Egypt's Prime Minister noted in 2005 that the United States had transferred some 60-70 detainees to Egypt alone, and a former CIA agent with experience in the region believes that hundreds of detainees have been sent by the United States to prisons in the Middle East. However, this is a minimum estimate. Rendition, like ``disappearance,'' is designed to evade

public and judicial scrutiny, to hide the identity of the perpetrators and the fate of the victims.

Amnesty International welcomes Senator Biden's commitment to holding oversight hearings and passing legislation to curb this unlawful practice. Any legislation addressing the practice of extraordinary rendition must also address the use of diplomatic assurances. AI considers diplomatic assurances, which the U.S. Government relies on in certain cases, to be unacceptable as evidence that no substantial risk of torture or ill-treatment exists in the receiving state. We note also that, in his interim report to the General Assembly, the U.N. Special Rapporteur on torture also expressed the firm view that such assurances are unreliable and ineffective in the protection against torture and ill-treatment; that such assurances are sought usually from states where the practice of torture is systematic; and that states cannot resort to them as a safeguard where there are substantial grounds for believing that a person would be subjected to such treatment upon return.\1\

------------------------------------------------------------------------

\1\ Report of the Special Rapporteur on torture and other cruel, inhuman, or degrading treatment or punishment, U.N. Doc. A/60/316, 30 August 2005, paras. 51-2.

------------------------------------------------------------------------

Experience has shown that monitoring alone does not mitigate the threat of torture when diplomatic assurances are obtained from countries with a record of using torture and ill-treatment on suspects in custody. The U.N. Committee Against Torture laid out four factors that must be taken into consideration before accepting such assurances from any country. In its periodic review of U.S. compliance with the Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, the committee stated: ``When determining the applicability of its nonrefoulement obligations under article 3 of the Convention, the State party should only rely on `diplomatic assurances' in regard to States which do not systematically violate the Convention's provisions, and after a thorough examination of the merits of each individual case. The State party should establish and implement clear procedures for obtaining such assurances, with adequate judicial mechanisms for review, and effective post-return monitoring arrangements.'' \2\

------------------------------------------------------------------------

\2\ http://www.ohchr.org/english/bodies/cat/docs/AdvanceVersions/CAT.C.USA.CO.2.pdf.

------------------------------------------------------------------------

The need for these critical safeguards was brought to light by the cases of Mohammed El Zari and Ahmed Agiza. Following their forcible return to Egypt, Mohammed El Zari and Ahmed Agiza alleged that they were tortured while in custody. The Swedish Government has stated that there had been discussions with the Egyptian Government about the right to visit them in prison. The Swedish authorities also requested that personnel from the Swedish Embassy in Egypt would be allowed to attend their trial.

In the end, notwithstanding the diplomatic assurances, Mohammed El Zari and Ahmed Agiza were, in fact, held incommunicado after their summary expulsion to Egypt. When they did get to see the Swedish Ambassador during his first visit, which only took place 5 weeks after they had been returned to Egypt, they both told him that they had been tortured or otherwise ill-treated in detention.

During the Swedish Ambassador's first prison visit to Ahmed Agiza

on January 23, 2002, Ahmed Agiza complained of being forced to remain in a painful position during the flight from Sweden to Egypt, of being blindfolded during interrogation, of beatings by prison guards, and of threats against his family by interrogators.

Mohammed El Zari has subsequently complained that he was interrogated for a further 5 weeks during which he was subjected to torture or other ill-treatment, including by having electric shocks applied to his genitals, nipples, and ears. Further, he has stated that his torture was monitored by doctors who made sure that it would not leave him with visible scars. He has recounted how, eventually, he was forced to confess to crimes that he had not committed. Mohammed El Zari has also stated that he continued to attempt to alert the Swedish Ambassador to what was going on. In addition, the Swedish Ambassador's first and subsequent prison visits were not conducted in private; Egyptian prison personnel were present and took notes.\3\

------------------------------------------------------------------------

\3\ For more information on this case, see Amnesty International's report ``The case of Mohammed El Zari and Ahmed Agiza: Violations of fundamental human rights by Sweden confirmed,'' http://web.amnesty.org/library/Index/ENGEUR420012006?open&of=ENG-SWE.

------------------------------------------------------------------------

This case--in which Sweden relied on ``diplomatic assurances'' purporting to sufficiently reduce the well-founded risk of torture faced by the two men upon return to Egypt--illustrates the flaws inherent in resorting to such assurances. Diplomatic assurances are, in effect, attempts to replace insistence on full, statewide implementation of binding multilateral treaties and customary obligations prohibiting torture and other ill-treatment absolutely, with bilateral arrangements secured with states which fail to respect their multilateral international obligations in the first place.

Diplomatic assurances' inherent flaws have prompted Amnesty International and other human rights nongovernmental organizations, as well as U.N. and other international experts and mechanisms, to oppose their use in principle, and to denounce them as practices that circumvent, and therefore undermine, the absolute prohibition on torture and other ill-treatment generally, and the prohibition of refoulement, in particular.

Amnesty International will continue to press the U.S. Government not to accept diplomatic assurances as a basis for return, to cooperate with any and all investigations into this reprehensible practice, and to ensure accountability for any of its agents who are found to have violated the laws of the countries in which they are operating. The practice of extraordinary renditions violates U.S. and international law, has led to false confessions under torture, and has interfered with U.S. relations with its allies. Recently, John Bellinger, legal advisor to Secretary of State Condoleezza Rice, told journalists in Brussels ``I do think these continuing investigations can harm intelligence cooperation--that's simply a fact of life.\4\ It is Amnesty International's position that it is the illegal behavior of U.S. agents overseas and policies that directly contravene international law that have interfered with U.S. relations with its allies. Rather than criticize European bodies for investigating alleged human rights abuses, the United States should fulfill its own responsibility to conduct investigations and cooperate with others in order to ensure transparency and accountability for policies that violate its laws and treaty obligations. This hearing is an important step in that process.

```
-------------------------------------------------------------------------------
     \4\ Craig Whitlock, ``U.S. Won't Send CIA Defendants To Italy,''
Washington Post, March 1, 2007.
-------------------------------------------------------------------------------
```

     Amnesty International recommendations:
Stop the practice of Extraordinary Renditions
--Do not render or otherwise transfer to the custody of another state
     anyone suspected or accused of security offences unless the
     transfer is carried out under judicial supervision and in full
     observance of due legal process.
--Ensure that anyone subject to transfer--prior to being transferred--
     has the right to challenge its legality before an independent
     tribunal, and that they have access to an independent lawyer and an
     effective right of appeal.
--Do not receive into custody anyone suspected or accused of security
     offences unless the transfer is carried out under judicial
     supervision and in full observance of due legal process.
--Investigate any allegations that their territory hosts or has hosted
     secret detention facilities, and make public the results of such
     investigations.
No diplomatic assurances
--Prohibit the return or transfer of people to places where they are at
     risk of torture or other ill-treatment.
--Do not require or accept ``diplomatic assurances'' or similar
     bilateral agreements to justify renditions or any other form of
     involuntary transfers of individuals to countries where there is a
     risk of torture or other ill-treatment.
No renditions flights
--Ensure that airports and airspace are not used to support and
     facilitate renditions or rendition flights.
Investigate violations
--Ensure the accountability of intelligence agencies, including by
     prohibiting the practice of mutual assistance in circumstances
     where there is a substantial risk that such cooperation would
     contribute to unlawful detention, torture or other ill-treatment,
     enforced disappearance, unfair trial, or the imposition of the
     death penalty.
--Ensure countries' full cooperation with ongoing national and
     international investigations on rendition and secret detention,
     including by providing them with access to all relevant people and
     information.

                            _____


     American Civil Liberties Union News Release--July 26, 2007

     aclu encouraged with senate hearing on extraordinary rendition
     Washington, DC.--The American Civil Liberties Union was encouraged
today by the Senate Foreign Relations Committee hearing titled
``Treatment of Detainees.'' The committee met to discuss extraordinary
rendition, extraterritorial detention, and the treatment of detainees
held in U.S. custody. The ACLU hopes the hearing is a step toward
passage of legislation aimed at ending these un-American practices.
     ``The ACLU is glad to see the Senate Foreign Relations Committee
meeting to discuss America's policies of extraordinary rendition and
secret prisons. The idea of sending people to foreign countries where
they are tortured is illegal and immoral,'' said Caroline Fredrickson,

director of the ACLU Washington Legislative Office. ``This is the first time that the Senate has held a public hearing on the issues of extraordinary rendition and secret prisons, and we hope that it is the start of a full investigation of these horrific practices. The United States must live up to our own high standards of freedom and democracy.''

Extraordinary rendition is the practice of kidnapping or capturing people and sending them, without any legal process, to countries that use torture or abuse. The Government has sent detainees to countries infamous for their mistreatment of prisoners, including Syria, Jordan, Morocco, and Egypt.

The administration's rendition policy was disclosed by Jane Mayer in February 2005, in her piece, ``Outsourcing Torture--The Battle Over `Extraordinary Rendition' '' in the New Yorker. Since then, the ACLU has been vigorously working to end the policy, including a recent lawsuit aimed at the Boeing subsidiary that serviced the flights. The CIA also operates secret prisons, which were first disclosed in 2005 by the Washington Post.

``The Senate needs to ensure that the Government's use of torture, abuse, and illegal detention ends,'' said Christopher Anders, legislative counsel for the ACLU. ``There could not be anything less American, or more illegal, than the Federal Government running secret prisons in Europe, or outsourcing torture by shipping people off to torture countries such as Syria and Egypt.''

2.

Kidnapping Suspects Abroad, Hearings before the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary, 102d Cong., 2d Sess. (1992)

# HEARINGS

BEFORE THE

## SUBCOMMITTEE ON
## CIVIL AND CONSTITUTIONAL RIGHTS

OF THE

# COMMITTEE ON THE JUDICIARY
# HOUSE OF REPRESENTATIVES

## ONE HUNDRED SECOND CONGRESS

### SECOND SESSION

JUNE 22 AND JULY 29, 1992

## Serial No. 82



Printed for the use of the Committee on the Judiciary

**U.S. GOVERNMENT PRINTING OFFICE**

60–833 CC          **WASHINGTON : 1993**

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-040084-8

H521-30

## COMMITTEE ON THE JUDICIARY

JACK BROOKS, Texas, *Chairman*

DON EDWARDS, California
JOHN CONYERS, JR., Michigan
ROMANO L. MAZZOLI, Kentucky
WILLIAM J. HUGHES, New Jersey
MIKE SYNAR, Oklahoma
PATRICIA SCHROEDER, Colorado
DAN GLICKMAN, Kansas
BARNEY FRANK, Massachusetts
CHARLES E. SCHUMER, New York
EDWARD F. FEIGHAN, Ohio
HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
HARLEY O. STAGGERS, JR., West Virginia
JOHN BRYANT, Texas
MEL LEVINE, California
GEORGE E. SANGMEISTER, Illinois
CRAIG A. WASHINGTON, Texas
PETER HOAGLAND, Nebraska
MICHAEL J. KOPETSKI, Oregon
JACK REED, Rhode Island

HAMILTON FISH, JR., New York
CARLOS J. MOORHEAD, California
HENRY J. HYDE, Illinois
F. JAMES SENSENBRENNER, JR.,
    Wisconsin
BILL McCOLLUM, Florida
GEORGE W. GEKAS, Pennsylvania
HOWARD COBLE, North Carolina
LAMAR S. SMITH, Texas
CRAIG T. JAMES, Florida
TOM CAMPBELL, California
STEVEN SCHIFF, New Mexico
JIM RAMSTAD, Minnesota
GEORGE ALLEN, Virginia

JONATHAN R. YAROWSKY, *General Counsel*
ROBERT H. BRINK, *Deputy General Counsel*
ALAN F. COFFEY, JR., *Minority Chief Counsel*

---

## SUBCOMMITTEE ON CIVIL AND CONSTITUTIONAL RIGHTS

DON EDWARDS, California, *Chairman*

JOHN CONYERS, JR., Michigan
PATRICIA SCHROEDER, Colorado
CRAIG A. WASHINGTON, Texas
MICHAEL J. KOPETSKI, Oregon

HENRY J. HYDE, Illinois
HOWARD COBLE, North Carolina
BILL McCOLLUM, Florida

CATHERINE LEROY, *Counsel*
IVY DAVIS-FOX, *Assistant Counsel*
JAMES X. DEMPSEY, *Assistant Counsel*
KATHRYN HAZEEM, *Minority Counsel*

(II)

# CONTENTS

## HEARINGS DATES

|  | Page |
|---|---|
| June 22, 1992 | 1 |
| July 29, 1992 | 95 |

## OPENING STATEMENT

Edwards, Hon. Don, a Representative in Congress from the State of California, and chairman, Subcommittee on Civil and Constitutional Rights ........... 1

## WITNESSES

Abbell, Michael, partner, Ristau & Abbell, Washington, DC ............................... 171

Glennon, Michael J., professor of law, University of California, Davis Law School ............................................................................................................................ 62

Kreczko, Alan J., Deputy Legal Adviser, U.S. Department of State ................... 104

Lowenfeld, Andreas F., professor of law, New York University School of Law ......................................................................................................................................... 45

McBride, Andrew G., special assistant U.S. attorney, Eastern District of Virginia ......................................................................................................................... 121

Panetta, Hon. Leon E., a Representative in Congress from the State of California ..................................................................................................................... 96

Schneebaum, Steven M., Esq., partner, Patton, Boggs & Blow, and member, board of directors, International Human Rights Law Group ............................ 153

Sofaer, Abraham D., Hughes, Hubbard & Reed ....................................................... 6

Steinhardt, Ralph G., associate professor of law, George Washington University Law School ..................................................................................................... 13

## LETTERS, STATEMENTS, ETC., SUBMITTED FOR THE HEARINGS

Abbell, Michael, partner, Ristau & Abbell, Washington, DC: Prepared statement ....................................................................................................................... 175

Edwards, Hon. Don, a Representative in Congress from the State of California, and chairman, Subcommittee on Civil and Constitutional Rights: "U.S. Power on Abductions Detailed," article by Michael Isikoff, August 14, 1991, Washington Post ............................................................................................................ 150

Glennon, Michael J., professor of law, University of California, Davis Law School: Prepared statement ...................................................................................... 67

Kreczko, Alan J., Deputy Legal Adviser, U.S. Department of State: Prepared statement ...................................................................................................................... 107

Lowenfeld, Andreas F., professor of law, New York University School of Law: Prepared statement ........................................................................................ 51

McBride, Andrew G., special assistant U.S. attorney, Eastern District of Virginia: Prepared statement ................................................................................... 124

Panetta, Hon. Leon E., a Representative in Congress from the State of California:
    H.R. 5565, a bill to give effect to the norms of international law forbidding the abduction of persons from foreign places in order to try them for criminal offenses ................................................................................................. 101
    Prepared statement ............................................................................................. 99

Schneebaum, Steven M., Esq., partner, Patton, Boggs & Blow, and member, board of directors, International Human Rights Law Group: Prepared statement ...................................................................................................................... 157

Steinhardt, Ralph G., associate professor of law, George Washington University Law School: Prepared statement ............................................................... 19

(III)

# APPENDIX

Page

Supreme Court opinion in *United States* v. *Alvarez-Machain*, June 15, 1992 ... 195

Statement of Paul L. Hoffman, American Civil Liberties Union ........................ 231

"Mexican Doctor Freed in Agent's Killing," article by Seth Mydans, New York Times, December 15, 1992 .................................................................. 305

"Mexico Seeks DEA Agents on Charges of Kidnapping," article by Tod Robberson, the Washington Post, December 16, 1992 .............................. 306

"Judge Says U.S. Was Told It Held Wrong Doctor in Agent's Killing," New York Times, December 17, 1992 ........................................................... 307

# APPENDIX

## MATERIAL SUBMITTED FOR THE HEARINGS

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.*, 200 U. S. 321, 337.

## SUPREME COURT OF THE UNITED STATES

### Syllabus

## UNITED STATES *v.* ALVAREZ-MACHAIN

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

#### No. 91–712. Argued April 1, 1992—Decided June 15, 1992

Respondent, a citizen and resident of Mexico, was forcibly kidnapped from his home and flown by private plane to Texas, where he was arrested for his participation in the kidnapping and murder of a Drug Enforcement Administration (DEA) agent and the agent's pilot. After concluding that DEA agents were responsible for the abduction, the District Court dismissed the indictment on the ground that it violated the Extradition Treaty between the United States and Mexico (Extradition Treaty or Treaty), and ordered respondent's repatriation. The Court of Appeals affirmed. Based on one of its prior decisions, the court found that, since the United States had authorized the abduction and since the Mexican government had protested the Treaty violation, jurisdiction was improper.

*Held:* The fact of respondent's forcible abduction does not prohibit his trial in a United States court for violations of this country's criminal laws. Pp. 3–15.

(a) A defendant may not be prosecuted in violation of the terms of an extradition treaty. *United States v. Rauscher,* 119 U. S. 407. However, when a treaty has not been invoked, a court may properly exercise jurisdiction even though the defendant's presence is procured by means of a forcible abduction. *Ker v. Illinois,* 119 U. S. 436. Thus, if the Extradition Treaty does not prohibit respondent's abduction, the rule of *Ker* applies and jurisdiction was proper. Pp. 3–7.

(b) Neither the Treaty's language nor the history of negotiations and practice under it supports the proposition that it prohibits abductions outside of its terms. The Treaty says nothing about either country refraining from forcibly abducting people from the other's territory or the consequences if an abduction occurs. In addition, although the Mexican government was made aware of the

I

— EXHIBIT "C"

JURIDICAL OPINION OF

THE U.S. SUPREME COURT DECISION

[IN U.S. v. ALVAREZ-MACHAIN]

I.   Antecedents....

II.  Competence (or Jurisdiction)....

III. The Sentence (the Decision)....

IV.  The Opinion of the Inter-American Juridical Committee


7.) The present opinion, in conformance with the request, is limited to analyzing the decision of the Supreme Court of the United States of America from the point of view of its conformity with public international law. It does not correspond to this Committee to opine about the conformity of said decision with the internal law of the United States but the Committee recalls that the undisputed norm of an international law is that the dispositions of internal law of a given state cannot be invoked by the state to avoid compliance with its international obligations.

8.) The Committee is aware that the state is responsible for the violation of its international obligations, not only by the executive branch but by any of its agencies, including the judicial branch. And that the acts or omissions of the latter can constitute transgressions of international law, whether in and of themselves or by confirming or leaving without remedy violations by other state agencies.


c:\alvarez\misc\consul.op          1

9.) The Committee has based its decision, in terms of the facts, exclusively in that which is affirmed as undisputed by the very decision that it studies. As such, it is clear that the Mexican citizen, Humberto Alvarez-Machain, was kidnapped in Mexican territory and taken to U.S. territory and that the responsibility for that kidnapping corresponds to the Drug Enforcement Administration (DEA, agency of the Government of the United States of America) that is charged with the fight against drug trafficking.

In the same way, the Committee considers that it is also completely undisputed, completely outside of any discussion or doubt, that the kidnapping in question constitutes a serious violation of international public law as it constitutes a transgression of the territorial sovereignty of Mexico. Nor do we need to discuss the responsibility of the United States of America for the conduct of the DEA in this case because it is recognized that the DEA has abstained from disputing or opposing its responsibility [for the kidnapping].

10.) In conformance with the norms that govern state responsibility in international law, every state that violates an international obligation must remedy the consequences of that violation. The remedy has as its goal to return in every possible way everything to the state in which it was found before the transgression occurred. Only insofar as this is impossible or that the aggrieved party consents to it, can there be a substitute remedy.

2

11.) In virtue of that which is explained above, it is clear that the United States of America, as the state responsible for the violation of the sovereignty of Mexico in kidnapping Mexican citizen Humberto Alvarez-Machain, is obligated to repatriate, without prejudice to other remedies that the United States' conduct may have given rise to.

12.) The analysis of the decision of the Supreme Court of the United States is contrary to the norms of international law for the following reasons:

a)      Because by affirming the jurisdiction of the United States of America to try Mexican citizen Humberto Alvarez-Machain, who was brought by force from his country of origin, the decision ignores the obligation of the United States to return Alvarez to the country from whose jurisdiction he was kidnapped.

b)      Because by approving the thesis that the United States of America is free to try persons who are kidnapped by actions of the Government from territories of other States, except when this is expressly prohibited by a treaty enforced between the United States and the country with whom it has contracted, it ignores the fundamental principle of international law, namely, respect for the territorial sovereignty of states.

3

c)   Because by interpreting the extradition treaty between the United States and Mexico to not impose impediment to the kidnapping of persons, it overlooks the precepts upon which treaties should be interpreted in conformance with its objectives and purpose in relation to the applicable norms and principles of international law.

13.) Finally, the Committee observes that if the principles invoked in the decision in study were carried to their final consequences, the International Juridical Order would be irreversibly shattered by attributing to every State the ability to violate with impunity the territorial sovereignty of other States. It should be equally emphasized by the Committee the incompatibility of the practice of kidnapping with due process which corresponds to every person, no matter how serious the crime of which he is accused, and it constitutes one of the human rights consecrated by international law.

This opinion was approved by nine votes in favor and one abstention.

Rio de Janeiro, 15 August of 1992.

| | |
|---|---|
| MANUEL A. VIEIRA | JOSE LUIS SIQUEIROS |
| SEYMOUR J. RUBIN | EDUARDO VIO GROSSI |
| LUIS HERRERA MARCANO | GALO LEORO FRANCO |
| JUAN BAUTISTA RIVAROLA PAOLI | FRANCISCO VILLAGRAN-KRAMER |
| RAMIRO SARAIVA GUERREIRO | JORGE REINALDO A. VANOSSI |

4

3.

S.C. Res. 579, pmbl., U.N. Doc. S/RES/579 (Dec. 18, 1985)

# Resolution 579 (1985) Adopted by the Security Council at its 2637th meeting, on 18 December 1985

| | |
|---|---|
| Publisher | UN Security Council |
| Publication Date | 18 December 1985 |
| Citation / Document Symbol | S/RES/579 (1985) |
| Reference | 1985 Security Council Resolutions |
| Cite as | UN Security Council, *Resolution 579 (1985) Adopted by the Security Council at its 2637th meeting, on 18 December 1985*, 18 December 1985, S/RES/579 (1985), available at: http://www.refworld.org/docid/3b00f17370.html [accessed 23 July 2014] |

The Security Council, Deeply disturbed at the prevalence of incidents of hostage-taking and abduction, several of which are of protracted duration and have included loss of life,

Considering that the taking of hostages and abductions are offences of grave concern to the international community, having severe adverse consequences for the rights of the victims and for the promotion of friendly relations and co-operation among States,

Recalling the statement of 9 October 1985 by the President of Security Council resolutely condemning all acts of terrorism, including hostage-taking (S/17554),

Recalling also resolution 40/61 of 9 December 1985 of the General Assembly,

Bearing in mind the International Convention against the Taking of Hostages adopted on 17 December 1979, the Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons Including Diplomatic Agents adopted on 14 December 1973, the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation adopted on 23 September 1971, the Convention for the Suppression of Unlawful Seizure of Aircraft adopted on 16 December 1970, and other relevant conventions,

1.      Condemns unequivocally all acts of hostage-taking and abduction;

2.      Calls for the immediate safe release of all hostages and abducted persons wherever and by whomever they are being held;

3.    Affirms the obligation of all States in whose territory hostages or abducted persons are held urgently to take all appropriate measures to secure their safe release and to prevent the commission of acts of hostage-taking and abduction in the future;

4.    Appeals to all States that have not yet done so to consider the possibility of becoming parties to the International Convention against the Taking of Hostages adopted on 17 December 1979, the Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons Including Diplomatic Agents adopted on 14 December 1973, the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation adopted on 23 September 1971, the Convention for the Suppression of Unlawful Seizure of Aircraft adopted on 16 December 1970, and other relevant conventions;

5.    Urges the further development of international co-operation among States in devising and adopting effective measures which are in accordance with the rules of international law to facilitate the prevention, prosecution and punishment of all acts of hostage-taking and abduction as manifestations of international terrorism.