IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

UNITED STATES OF AMERICA, ) Magistrate Case No. 14-00056
)
Plaintiff, )
)
vs. )
)
ROMAN SELEZNEV, )
aka TRACK2, )
aka ROMAN IVANOV, )
aka RUBEN SAMVELICH, )
aka nCuX, )
aka Bulba, )
aka bandysli64, )
aka smaus, )
aka Zagreb, )
aka shmak, )
)
Defendant. )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE FRANCES TYDINGCO-GATEWOOD
CHIEF JUDGE
8:53 A.M.; JULY 31, 2014
HAGATNA, GUAM

**Motion to Discharge and Release Defendant Pursuant to FRCP12(b)(3)(A); if Motion Denied, Rule 5 Hearing**

Proceedings recorded by *mechanical stenography*, transcript produced by computer.

APPEARANCES

Appearing on behalf of plaintiff:

**OFFICE OF THE UNITED STATES ATTORNEY**
**BY: MARIVIC DAVID, AUSA,**
**ANDREW FREEDMAN, AUSA (via telephone)**
**MICHAEL MORGAN, AUSA (via telephone)**
Suite 500, Sirena Plaza
108 Hernan Cortez Avenue
Hagatna, Guam

Appearing on behalf of defendant:

**LAW OFFICES OF CIVILLE & TANG**
**BY: PATRICK CIVILLE, ESQ.,**
**JOSHUA WALSH, ESQ.**
330 Hernan Cortez Avenue
Suite 200
Hagatna, Guam

**LAW OFFICES OF FOX ROTHSCHILD**
**BY: ROBERT RAY, ESQ.,**
**ELY GOLDIN, ESQ.**
10 Sentry Parkway
Suite 200
Blue Bell, PA

ALSO PRESENT:

David Iacovetti, Secret Service

Polina Collins, Russian interpreter

I N D E X


| | Page |
|---|---|
| The Court hereby denies motion to continue | 32 |
| The Court finds that it does have personal jurisdiction over defendant | 68 |
| The Court denies request to continue the identify hearing | 73 |
| Court finds that the government have met its burden of proof regarding whether or not there's probable cause to believe that the person arrested is the person named in the charging instrument | 197 |
| The Court will order that the defendant will be held and transferred | 201 |
| The Court also will issue a decision on the personal jurisdiction matter | 201 |


EXAMINATION


| **GOVERNMENT WITNESSES:** | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Dan Schwandner | 83 | 108(C) | 133(D)<br>136(F) | 134(C)<br>138(C) |
| Michael Fischlin | 140 | 164(G) | 180(D) | 184(G)<br>188(C) |


EXHIBITS


| **GOVERNMENT EXHIBITS:** | Description | Admitted |
|---|---|---|
| 1 | Arrest warrant | 89 |
| 2 | Superseding indictment | 89 |

| | | |
|---|---|---|
| 3 | Red Notice | 89 |
| 4 640410831 | Russian Federation passport No. | 107 |
| 5 4511393969 | Russian Federation passport No. | 107 |
| 6 | Departure card | 107 |
| 7 | Transaero itinerary | 107 |
| 8 | Boarding pass | 107 |
| 4-B | Translation | 162 |
| 5-B | Translation | 162 |
| 7-B | Translation | 162 |
| 9 | Domain registration | 162 |
| 10-A | Screenshot of e-mail | 162 |
| 11-A | Paypal transaction log | 162 |
| 11-B | Paypal activity log | 162 |
| 12-A | Screenshot 1 | 162 |
| 12-B | Screenshot 2 | 162 |
| 13-A | Ozon travel reservation | 162 |
| 13-B | Translation | 162 |

**July 31, 2014; at 8:53 a.m.; Hagatna, Guam**

* * *

THE COURT: Please be seated. We'll call the case.

THE CLERK: Criminal Case Number -- Magistrate Case Number 14-00056, *United States of America v. Roman Seleznev;* hearing on motion to continue hearing on Mr. Seleznev's motion to discharge and release, hearing on motion to discharge and release defendant pursuant to FRCP 12(b)(3)(A); and if motion is denied, Rule 5 hearing.

Counsel, please state your appearances.

MS. DAVID: Good morning, Your Honor. Marivic David for the United States, with Resident Agent in Charge David Iacovetti from Secret Service. And I believe government counsel from Seattle, Washington, is -- are also on the telephone.

THE COURT: Okay. Let me just see. This is David -- how do you say your last name, sir?

AGENT: Iacovetti, ma'am.

THE COURT: Iacovetti?

AGENT: Yes, ma'am.

THE COURT: Okay. David Iacovetti.

All right. And on line is Assistant U.S. Attorney. Is that -- you want to go ahead and identify yourself for the record.

MR. MORGAN: Yes. Good morning, Your Honor. United States Attorney Michael Morgan for the United States.

MR. FREEDMAN: And also Assistant United States Attorney Andrew Freedman, both in Seattle.

THE COURT: Okay. Mr. Morgan and Mr. Freedman, thank you. And I understand there was a little delay based on some technical difficulties arising from coordinating with Washington, D.C., and so forth. Is that right? On the VTC?

MR. MORGAN: There was certainly a technical problem, so, yes. I apologize, Your Honor.

THE COURT: That's fine. That's fine. We can proceed with you telephonically.

Yes, Mr. Civille.

MR. CIVILLE: Buenas and hafa adai, Your Honor. Patrick Civille, Joshua Walsh.

THE COURT: Okay. Good morning.

MR. CIVILLE: And we are here for the person charged as being the defendant, Roman Seleznev. This -- that person is sitting in court. He apologizes for his attire, Your Honor. The -- apparently the marshals office has taken it upon itself to decide when a person -- in detention can dress appropriately to come into court, but that's another matter we can raise.

With Mr. Seleznev is our translator, Polina Collins. Also on the line are our -- my co-counsel, Robert

Ray and Ely Goldin.

THE COURT: Okay. Mr. Goldin and Mr. Ray, are you there?

MR. RAY: Yes.

MR. GOLDIN: We are.

THE COURT: Okay. Very well.

MR. GOLDIN: Yes, Your Honor.

THE COURT: All right. Good evening, I guess, or good morning here.

And I just want to reconfirm that the interpreter -- Russian interpreter, Ms. Polina Collins, you have already been sworn in previously? She has not? I thought she said she had.

Okay. Why don't you please rise and be sworn in, Ms. Polina Collins.

THE CLERK: Ma'am, please raise your right hand.

(Interpreter Polina Collins, sworn.)

THE CLERK: Ma'am, please speak into the mic.

INTERPRETER: I do.

THE CLERK: And for the record, again, please state your name and spell your last name.

INTERPRETER: Polina Collins, C-O-L-L-I-N-S.

THE CLERK: Thank you.

THE COURT: Thank you.

All right. Okay. The -- okay, let me just go

ahead and begin before I hear from you, Mr. Civille. The Court is in receipt of the motion to continue hearing, which I received -- let's see. Today is Thursday, so I received it late Tuesday afternoon, as did the U.S. Attorneys' Office. And then the United States submitted an opposition this morning, I believe, at 7:30 a.m. Is that correct, Ms. David?

MS. DAVID: That is correct, Your Honor.

THE COURT: Which the Court was reading this morning. And then the defense then filed a supplemental memorandum, which the Court has also read before. I was just trying to get all this reading done this morning. I just want to ensure that -- first of all, have you had an opportunity to review the opposition filed by Mr. Civille, Ms. David?

MS. DAVID: Um, just very quickly, Your Honor, given the time allotted until the Court called us in session.

THE COURT: Okay. All right. Well --

MR. CIVILLE: Your Honor, I've -- when I came in, I had a chance to -- to the courtroom, I had a chance to read over the government's documents.

THE COURT: Okay. Can you bring the mic a little closer, up a little higher, Mr. Civille?

MR. CIVILLE: Yes, Your Honor.

THE COURT: All right. Let me just -- before we begin, let me just say, the Court has read your motion and the exhibits filed, and it appears to me that the discovery

request is tailored in such a way that you're trying to prove that there was a -- that -- whether or not there was an agreement between the Republic of Maldives and the United States. And this is also supported by your last-minute filing this morning, ECF37. Is this an accurate assessment of what you're trying to accomplish with your discovery request?

MR. CIVILLE: Your Honor, I think that's too narrow a reading of what we're trying to accomplish. What we are trying to establish, and what we believe we have a right to establish and a right to develop evidence on at this stage of the proceedings, is that Mr. Seleznev was forcibly rendered to the United States by conduct of -- by outrageous conduct of the United States, and that under the outra- -- we have several theories on why this Court does not have jurisdiction over Mr. Seleznev, but the discovery in -- is in particular focused on the shocking and outrageous behavioral allegation that we are making.

Part of that is -- is directed, as you can see from the papers we've submitted, to the representations that United States agents made to Maldivian authorities, whether those were accurate representations, truthful representations, whether the Maldivian -- whether U.S. agents actively participated and circumvent[sic] a ruling of the Maldivian court. And I think that those are -- those are issues that are fairly raised.

I would note that the Ninth Circuit most recent pronouncement on this is in *U.S. v. Struckman* --

THE COURT: Okay.

MR. CIVILLE: -- a 2010 decision.

THE COURT: Mm-hmm.

MR. CIVILLE: In part there at page 574 of -- 611 F.3d 574, the Court noted, "In *Anderson*, we decline to" -- which is another Ninth Circuit decision which supports generally our right to pursue this line of inquiry. But in *Struckman*, decided four years after *Anderson*, the Court said -- let me put it on the screen here.

THE COURT: Mm-hmm.

MR. CIVILLE: "In *Anderson*, we declined to apply the *Ker/Frisbie* shocking and outrageous conduct exception because Costa Rica's decision to expedite the defendant was not dependant on representations made by United States government agents to Costa Rican authorities that may have misled Costa Rica."

Here, similarly, *Struckman* has not demonstrated prejudice from O'Brien's misstatement. But what's important, Your Honor, is that the Court recognize that misstatements or misrepresentations by the United States could form a basis for -- potentially form a basis for an outrageous conduct claim. And you can see that in the paragraph above where the -- that's under -- that's highlighted here: "The lies told by

O'Brien to Panamanian officials" -- and this is in the *Struckman* case -- "are considerably more troubling than other aspects of U.S. governmental involvement in Panama. We are not prepared to say that blatant lies to a foreign government that induce the foreign government to transfer a defendant to the United States when it otherwise would not could never amount to conduct so shocking and outrageous as it violate due process and require dismissal of pending criminal proceedings in the United States."

Okay. So the Ninth Circuit has -- has clearly announced that this -- that we are well beyond the -- the notion that only torture is the way for a person in Mr. Seleznev's shoes to challenge the jurisdiction of the Court at this stage.

THE COURT: And you're not claiming that there was any torture of any kind by any agents?

MR. CIVILLE: No, we're not, Your Honor.

THE COURT: I mean, this particular -- I mean, even assuming everything Mr. Seleznev has said in his declaration is true, obviously that does not amount to the level of shocking and outrageous conduct found in the Second Circuit case of *Toscanino*.

MR. CIVILLE: *Toscanino* was -- no, that -- *Toscanino* was -- frankly, Your Honor, that was low-hanging fruit. Despite the fact that the Department of Justice argued

that -- you may recall, I mean, the facts in that case were so shocking. It involved kidnapping, torture over a period of days, starvation, injecting fluids into the anal cavity, injecting fluids by -- forcibly by mouth, beatings. It was such -- such a -- I mean, that's at one end of the spectrum where if you don't find that's outrageous conduct, well, I mean, there -- you know, call Satan and tell him when the day of judgment comes, you're coming to live with him because you've lost your conscience. That is so far at one end of the spectrum.

What's important, though, Your Honor, is that -- and the Ninth Circuit is very clear on this, that you don't have to be all the way out at the far end of that spectrum for there to be a finding of outrageous governmental misconduct. And what *Struckman* stands for, Your Honor, is that even misrepresentations by the United States to induce -- to falsely -- or to trick a foreign country into releasing somebody can amount to outrageous conduct, conduct that shocks the conscience. And that's really the key phrase, does it shock the conscience. And I don't -- I don't think we have to have that discussion this morning --

THE COURT: Right.

MR. CIVILLE: -- I'm hoping. What we're asking for, what we've suggested, Your Honor, and what we've presented the Court with is evidence that we're not whistling

in the dark here. We have what we think is solid -- or we're developing solid evidence that there were misrepresentations. We think certainly we've raised a serious enough question that the government should be required to respond to our discovery request so that we can know fully what were the circumstances under which Mr. Seleznev was forcibly rendered to the United States.

THE COURT: But what you cite in *Struckman* -- I'm looking at the particular highlighted portion above -- above the highlighted portion, when you talk about the lies. In that particular paragraph, wasn't it a situation where the misstatements caused the local government to expel the defendant?

MR. CIVILLE: And the -- it appears that way. Yes, Your Honor. And here -- yes. Now, here, the government -- the United States is on -- at least in its press release, claims that the Maldives expelled Mr. Seleznev. We don't believe that's true, and that's one of the things we want to explore. What we think is -- actually, we think this is even more serious than *Struckman*, is that -- that the United States ignored Maldivian judicial process.

We have reliable information, and we think that this -- and we're look -- and -- well, let me tell what you the reliable information is and I'll tell you what -- how I think this relates to this -- the discovery request. We have

reliable information that at the United States' request, perhaps it was -- and we don't know. We're not sure if the United States directly made this or the Maldivian police made this request to the Maldivian court for an order of -- calling for Mr. Seleznev's arrest and removal. We understand that that was denied and that the United States, instead of -- and we want to know the circumstances of that, whether it was denied subject to Mr. Seleznev being brought before a Maldivian court and allowed -- and being given notice of the charges against him and being given counselor access before being removed.

THE COURT: But even if -- let's assume the Court accepts your representation in your favor, the worst-case scenario where there was no agreement, they alledgedly violated Maldives law. Is there any case law -- any case law that requires this Court or, actually, any federal Court -- but let's just focus on my Court right now -- that requires a mandatory divestment of personal jurisdiction because the government's conduct violated Maldives law or customary international law? Is there anything that requires that?

MR. CIVILLE: Well, Your Honor, I do -- yes. Well, I guess I'm troubled by the Court's use of the word "required." I always hate to tell a judge you have to do --

THE COURT: Okay.

MR. CIVILLE: Okay. But I think that when we

read the development -- this is a dynamic area of the law. There aren't that many cases, but it is a dynamic area. We've -- we've gone -- we've seen a real progression of judicial thought since *Ker* and *Frisbie*, which is in 1952 -- *Frisbie* in 1952. We've even seen a progression of thought in the past ten years.

Certainly in this circuit, Your Honor, which is, I think, a particular concern for this Court, we've seen a real development of thought in this area. And what that is, is that development is showing that, yes, we're going have -- we're going to allow defendants to bring before the Court, and in the form of an evidentiary hearing, their claim that their forcible rendition to the United States was the result of some sort of outrageous government conduct that shocks the conscience. And we submit that if we can establish that, that this -- that Your Honor -- that the remedy that Your Honor is -- and, once again, I hate to always say -- tell the judge you have to, but I think the appropriate remedy is dismissal or to return Mr. Seleznev outside the United States.

So in specific answer, Your Honor, I think the *Anderson* and *Struckman* in particular, read together, and also, oddly, an old case out of the Southern District of New York, *United States v. Malik*, is another -- stands for -- *Malik* is important, Your Honor, and instructive because it stands for the well-established principle that in removal proceedings,

the issue of jurisdiction should be addressed -- if raised by the defendant, must be addressed at that point.

And I don't know if the Court has any -- is thinking about that or that's an issue for you, but we think that the case law is very clear that we -- that -- the criminal proceedings that have certainly been initiated. Even -- this is the second time in my career I've cited to Justice Thomas. Even Justice Thomas, who normally would rely with the government on these things, very forcefully and clearly has said that once the indictment -- certainly by the time the indictment is handed down, criminal proceeding has been initiated. Under Rule 16, we think criminal proceedings have been initiated.

So we are appropriately raising at the first possible instance, which is what you need to do, which any -- any lawyer worth their salt would do, is raise at the first possible instance the issue of Court's jurisdiction over the person of the defendant. And we have to do that. That's a waivable issue. So you have -- you have -- certainly have the authority to decide this issue of jurisdiction over Mr. Seleznev. And we think, yes, you are required, that this isn't something, you know, take this cup from my lips, you can pass it off to the Western District in Washington. This is -- for better or worse, has landed on your lap, and I think it needs to be decided here.

THE COURT: Well, but focus -- let's just focus on the discovery aspect, though. And so you're saying the Court is just taking a narrow view of your request made in the letter submitted by Mr. Walsh on July 9th and then 20 days later, July 29th, and then now at this motion for continuance. It seems to me that it -- that all of the request -- the requested discovery specifically is dealing with the arrest of -- I mean the circumstances of his arrest, his rendition, whether or not there was an agreement, even if -- you know, whether or not there was an agreement with the Maldives government, how did the -- how did the Secret Service get over there and assert its jurisdiction over the defendant. I mean, that's what you're saying.

MR. CIVILLE: Yes, Your Honor. That's specifically -- our discovery at this point is -- you're -- you've -- that's spot on, is narrowly focused to those two issues.

The only thing I thought was a little confining in your previous question is, we're not sure what that discovery -- I mean, we have some good ideas of what that discovery is going to show, but we don't -- it may show some things we're not fully expecting. So I don't want to limit -- when we come back and say, okay, Your Honor, here's what we think is the outrageous conduct, I don't want to limit myself today to saying it's just one thing if the discovery is --

proves that it's really more extensive than even we know at this point or believe at this point.

THE COURT: All right. So let me hear from the U.S. Attorneys' Office, then, on the particular request for discovery.

MS. DAVID: Your Honor, my colleagues from Seattle who are on the phone can address that particular issue.

THE COURT: Okay. Who is going to be speaking, then? Will it be Mr. Morgan or Mr. Freedman?

MR. MORGAN: It's gonna be Mr. Morgan, Your Honor. Thank you.

With respect to the discovery request, there is simply no authority for the notion that Rule 16 provides any discovery in the context of a Rule 5 proceeding. The government's Rule 16 obligations aren't gonna be triggered when and until Mr. Seleznev is removed to the Western District of Washington. So the short answer is that the defense has no right to discovery at this stage of the proceeding.

That point aside, I think the Court hit it right on the head when it described the nature of the defense's motion, which is the motion to divest itself of jurisdiction. Well, of course you can't divest yourself of jurisdiction unless you have jurisdiction, and the Court plainly has personal jurisdiction over Mr. Seleznev. The proper forum for

a motion to dismiss in the context that defense is raising it is a motion to dismiss the indictment, and that is a motion that is properly addressed in the Western District of Washington.

So the defense is certainly entitled to explore these issues; they're just doing it in the wrong forum.

THE COURT: Anything else? Anything else, Mr. Morgan?

MR. MORGAN: With respect to the discovery --

THE COURT: Right.

MR. MORGAN: -- no. I mean, I suppose counsel has -- his argument has sort of morphed over into the merits of their motion, and I guess the short answer to that is that the allegations they've made, even accepting them as true, as a matter of law will not support their motion. The *Struckman* case they cite, as the Court rightly pointed out, involved a case in which the government affirmatively misrepresented facts to the Panamanian government to secure the defendant's expulsion from the country and rendition to the United States.

That is, in essence, what they're alleging here. And I would want to point out, it's purely allegation. None of the attachments, none of the exhibits I've seen present any concrete proof of any of their allegations. They may have suspicions, and I don't know what those suspicions are based on, but it's certainly not in anything in the record before

this Court.

And I think it's quite clear that when the Court asked is there any case law that supports this, there's not a single reported decision where a Court has ever divested itself of jurisdiction on the basis of an outrageous government misconduct claim. And with respect to claims far more severe than Mr. Seleznev has alleged -- and I would just point the Court to the *Matta-Ballesteros* case from the Ninth Circuit, which is a pretty severe case. So that's the case where the defendant was literally kidnapped, hooded, bound, in a military raid from his home. I mean, if that's not in violation of the law of Honduras, I would be surprised. And the Ninth Circuit was quite clear that that's not enough to divest this Court of jurisdiction.

So I guess as far as discovery and a continuance, it's pointless because they're trying to litigate something that is -- their allegations at present will not succeed.

THE COURT: Okay. Yes, finally, Mr. Civille.

MR. CIVILLE: Thank you, Your Honor.

THE COURT: Before I make my ruling on the motion for continuance.

MR. CIVILLE: Your Honor, I always love to get a chance to use Paul Newman's line in -- what's that movie where he was, I don't know, a washed up lawyer and then he makes the big comeback? Okay. Well, in that case, the judge kept

interrupting his examination and asking the witness very -- questions that were just prejudicial to Newman's case. And when I heard the -- the gentleman from DOJ just argue that, eh, Judge, don't worry, you don't need -- you don't not[sic] need this discovery or Seleznev doesn't need this discovery because it doesn't make any difference. I remember this line. Paul Newman in that case looked at the judge and said -- the prosecutor, and said, "If you're gonna try my case for me, would you try not to lose it."

And that's -- of course the government is gonna say it doesn't worry. Interestingly, they don't say they don't have discovery that's responsive, they don't have information that's responsive to our request. They're not saying that. And I think it's very -- and we have raised, I think, issues, Your Honor, that fairly -- that show once again that this is not a fishing trip. We have good reason to pursue this line of inquiry.

The Court in -- I think it was *Struckman*, Your Honor -- and this is one of those things that I always think trial courts may find helpful, just trying to guess what you might find helpful, Your Honor. There, the judge allowed an evidentiary hearing, and he ended up issuing in that -- and I don't think you'll need to do that here, but he issued an 83-page opinion. And the Ninth Circuit in, I think, at least three instances very positively alluded to the record that the

trial court had allowed to be developed, said, well, the judge did this, the judge did that. And they were very impressed by that.

And I think that is what we are looking for the opportunity to do, is to develop the record and to present the record fully so that -- so that Your Honor can make a ruling. And, Your Honor, we think that what we're asking the Court to do at the end of the day -- we believe we will be asking the Court to make a decision that is well within the parameters that -- of the Ninth Circuit case law in *Anderson* and *Struckman*.

When the -- one other thing I wanted to point out, and the government raised this in the -- in their opposition, is that they said, well, we're not entitled to discovery. Well, under Rule 16(a)(E)(i), it very clearly says that we are entitled -- and this is -- if you're in the purple. Oh, I'm in the wrong book, Your Honor. I'm in the blue book. Anyway, it's --

THE COURT: Okay, it's purple. But go ahead.

MR. CIVILLE: I have the blue one.

THE COURT: Well, hopefully it hasn't changed.

MR. CIVILLE: The panel will get me my fresh copy.

THE COURT: Okay.

MR. CIVILLE: It's one of the benefits.

Your Honor, the --

THE COURT: Rule 16.

MR. CIVILLE: -- 16(a)(E) -- okay. "Upon defendant's request, the government must permit inspection." Small i: "The item is material to preparing the defense." And that's what this is, Your Honor. This is material -- at this stage of proceeding, the defense is -- that -- it's a jurisdictional defense. And we are -- and I believe we are entitled to those documents.

THE COURT: Don't you think the Court can make a decision by accepting your factual allegations as true, all the allegations that you have submitted, even the allegations that you believe you're going to receive in terms of discovery in the future regarding the arrest and the expulsion of Mr. Seleznev -- and so if I accept it as true for purposes of this motion -- motion of discharge and release and make a ruling and -- still allowing you to preserve -- allowing your client to preserve his right to bring up the motion again before the indicting Court after full discovery, then he will have not lost his right to proceed forward.

MR. CIVILLE: Your Honor, I don't -- I think that would -- no, I don't think that would be appropriate or the better -- I don't think that would be the correct course of conduct for a couple -- one, is to force us to rely simply on the record we have now without the benefit of the

specifically-tailored discovery that we've requested as to these issues, is going to result in an incomplete record. And the prejudice to Mr. Seleznev is that it also means that we may be overlooking issues or we may not be fully articulating issues that we have because we haven't seen evidence that's in the government's possession that's relevant to this issue.

THE COURT: What you're saying is, though, relevant to the facts of shocking and outrageous conduct. That's what you're saying. That's what --

MR. CIVILLE: Yes, relevant to our challenge to jurisdiction over --

THE COURT: Right. And the two challenges -- I mean, the two exceptions would be, number one, either the violation of an extradition treaty, which there are none, and the second one would be this -- a shocking and outrageous governmental conduct.

MR. CIVILLE: Yes.

THE COURT: That's what you're focusing in on?

MR. CIVILLE: Yes, Your Honor.

And -- and we think that at -- and I think the cases that we've cited and -- stand for the proposition that we should have the opportunity to develop the record at this stage, that we're entitled to at least the limited discovery we've requested at this stage, not -- and that it's prejudicial to Mr. Seleznev to have to go to Washington and --

I mean, he's here -- by our position, he was forcibly rendered here. He should not be here.

The rule of law kicks in right here. I mean, that's where it starts, the rule of law. And he's entitled to -- at this -- and the *Melekh* case fully supports this idea that you have the authority and the power and, with all respect, the duty to decide this threshold jurisdictional issue.

So I think it's really important that we be allowed to have the limited discovery that we've requested, and then we can present that to you. We would like to call the witnesses. We -- certainly the Secret Service agent who is here, we would probably want to call him to the stand. And there -- depend -- and there may be other witnesses that we want to call that we -- that will be disclosed in the discovery, to address this jurisdictional issue. And I think that has to happen here and now, Your Honor. Or not today, but that has to happen here in this Court, and that's -- the case law, I think, supports that. The rule, Rule 5, supports that. And the Supreme Court pronouncements that we refer to in our papers about when a criminal proceeding starts -- and it has started. There's no doubt about it. The proceedings have started. Mean that this is the place where you should raise them.

THE COURT: Okay. All right.

MR. CIVILLE: Thank you, Your Honor.

THE COURT: Thank you.

I will allow the U.S. Attorneys to go ahead and speak on this issue because it's an important issue for them as well. Mr. Morgan?

MR. MORGAN: Yes, Your Honor. I -- truthfully, I have little to add to what I had said previously. We don't dispute that at some juncture the defense is perfectly entitled to raise a challenge to the circumstances of Mr. Seleznev's apprehension in the context of a motion to dismiss the indictment. That is, in every single case that the defense has cited, the vehicle by which that motion was brought before the Court. That's the proper vehicle, and the forum for that is in the district of indictment. Rule 5 is quite clear that in a removal proceeding like this, the Court's inquiry is very circumscribed. Once you've been presented with an indictment, the issue before the Court is identity. Any other issue that's a defense -- and the defense has raised that. They're calling it a jurisdictional defense, but it's nevertheless the defense for the indictment. Those issues are properly addressed in the district of indictment.

So the defense will -- the defense will be entitled to discovery once they're in the District of Washington, and then they can pursue the issue there. They lose -- they don't lose anything, frankly, except they would

like to litigate this issue now. And with respect, this is simply the wrong forum.

MR. CIVILLE: Your Honor?

THE COURT: Okay. Yes?

(Pause.)

MR. CIVILLE: Your Honor, the Mikla [sic] decision is -- *Melekh* decision is also, I think, a good source of guidance on this for -- standing for the proposition that if the Court doesn't -- if the -- and what I think the government is missing -- okay. This is a jurisdictional question, jurisdiction over the person of this man sitting here. What *Melekh* said is that if you don't -- if the Court doesn't have jurisdiction, which is what you're saying here, then it doesn't have the power to remove. Your power to remove is based on your jurisdiction over this person, but if you don't have that jurisdiction, then you don't have the power to remove.

The Supreme Court -- or the Guam Supreme Court -- and these are civil contexts in light of the recent DFS Lotte, criticized the trial court for making comments -- after finding that it did not have jurisdiction, it made some comments on the record. And the Court said, no, once you -- once the Court doesn't have jurisdiction, you can't make it -- you can't continue to do things in the case. And I think that's -- if Your Honor doesn't have jurisdiction, if we get

our discovery and we show you that -- that we don't have -- that Your Honor, for whatever reason, doesn't have jurisdiction -- I shouldn't say -- if we establish our argument that the Court does not have jurisdiction over the person of Mr. -- of Mr. Seleznev, then I think the only appropriate remedy is -- has to be in this Court.

And we're not talking about the indictment. The indictment may be -- we're not arguing about whether the indictment was proper. This is --

THE COURT: Although you did ask in the initial motion to discharge the case. I mean, basically, a dismissal of the case.

MR. CIVILLE: Well, it would be a dismissal at least as to this person, as to him. Now, I don't -- frankly, I don't know that that requires then a dismissal of the indictment. I don't want to commit myself on that. Your Honor, if I can just -- just so you'll know, some of the major issues that we want -- that we believe the discovery will raise: Did the U.S. know that the Maldives had denied -- the judge in the Maldives denied an arrest warrant; did the U.S. agents there do anything to circumvent the lawful process by arranging for his extraterritorial arrest; did the U.S.A. use the idea of the Red Notice, the INTERPOL Red Notice, as a pretext to cover up what actually happened.

And the INTERPOL Red Notice is interesting, Your

Honor, because it's dated July 5th, the same day that he was -- that Seleznev was taken -- was arrested in the Maldives by the U.S. agent. And that needs to be explored because -- just on the time difference alone. The Maldives -- first of all, that would have been still July 4th in the Western District of Washington. So -- and where this issue -- where was this issue from, when was it issued? It seems there's something amiss about just the fact that Seleznev's arrested in the early -- mid-morning on July 5th, and the U.S. apparently used a INTERPOL Red Notice dated July 5th, so we want to inquire into that.

THE COURT: But, again, even if the United States did do that -- I mean, you've seen the case law about forceful abductions allowed or sanctioned. And even if there was some discrepancy with regard to the INTERPOL Red Notice and you were to try to find this in the discovery, and if you were to discover that the United States Secret Service or other -- and/or other law enforcement agents disregarded a Maldives judge's order -- even if you were to assume all that, all to the benefit of your client --

MR. CIVILLE: Okay.

THE COURT: -- then the Court can -- the Court can accept those factual allegations as true and move on to the issue of whether or not that's shocking and outrageous. We can go ahead and proceed forward.

MR. CIVILLE: Well, except you won't have the record. And I think -- and, certainly, it's prejudicial farther down the road because we don't have -- then if somebody is looking at this, they say, well, you know, the judge just accepted all of these unsupported allegations. If you're going to -- even if the Court were inclined to do it as -- to -- let's say, worst-case scenario, that you're inclined to rule against us on the merits of our jurisdictional argument. I think that, in fairness, we should be allowed to develop the record so that it's not -- it's not just the suppositions by the defendant that, okay, we'll accept these wild, fanciful notions by Mr. Seleznev, even accepting those as true. That's -- that's a completely different flavor than if we have testimony and we have documents and we say, "Judge, look, here it is. Here is the arrest warrant, here is the internal memo from DO- -- from the Secret Service saying, 'The Maldives judge turned us down. They want to have Seleznev brought before him before we can take him out of the country. What are we gonna do? Hey, I got an idea.'"

That kind of evidence is far more -- I mean, it's important, and fair play demands that if that evidence is out there, we be given an opportunity to bring it before you. Even if you think you -- it may not make a difference to you, we have a right to develop that record. That's what I'm suggesting. And we think that there is evidence -- I mean, we

think that there's something there that -- that we're -- I keep saying this. We're not on a fishing expedition. There's enough discrepancies that we think that -- in the information that the government's provided and in the information that we've developed and the research we've been able to do, investigation we've been able to do, to suggest that we're not getting -- that Your Honor is not getting the full story.

And so if Your Honor is going to -- even if Your Honor were to say at the end of the day, "I don't think this is outrageous. This conduct by the government doesn't shock my conscience," we very much want the opportunity to allow you to make that decision on a full record, or certainly a much more developed record than just what will certainly be characterized as defendant's speculation.

THE COURT: All right. All right.

MR. CIVILLE: Thank you.

THE COURT: Okay. Let me -- okay. Mr. Morgan, I'm gonna take about a five-minute -- let me take a ten-minute recess and I'll come back and make my ruling on the motion for continuance. Ten minutes, Counsels.

MR. CIVILLE: Thank you.

THE CLERK: All rise. The Court's in recess.

(Recess taken at 9:36 a.m.)

(Back on the record at 10:43 a.m.)

THE COURT: We're back on the record. This is

*USA v. Roman Seleznev* and this is Criminal Case No. 14-56. All counsels are present. Defendant is present. Interpreter is present. Agent's present.

All right. The Court -- thank you for your patience, Counsels. Of course this is an important position for the defense. And the Court believes, though, based on all of the filings before the Court, the Court will accept all the fact -- factual allegations in defendant's favor as true, including the allegations made today for the purposes of the hearing -- of hearing Mr. Seleznev's motion to discharge and release defendant pursuant to Federal Rule Criminal Procedure 12(b)(3)(A). Accordingly, the Court hereby denies the motion to the -- continue, and this Court will move forward with the hearing.

The Court, as stated -- notes that it does have the motion to discharge and release the defendant pursuant to this motion -- to Federal Rule Criminal Procedure 12(b)(3)(A), alleging a defect and instituting the prosecution. Mr. Seleznev moves the Court to:

Number 1, decline jurisdiction and terminate the prosecution; 2, discharge the case; 3, release him; and 4, issue such orders and further relief as may be appropriate.

Mr. Seleznev makes the following legal arguments:

Number 1, the Court lacks jurisdiction because the manner in which he was arrested constitutes shocking and

outrageous government conduct amounting to a due process violation, such that this Court has  divested a personal jurisdiction over him; 2, the arrest violates customary international law and should shock the conscience of this Court and cause it to divest itself of jurisdiction; and 3, the arrest violates jus cogens norms of international law, and thus the Court should exercise its supervisory power and dismiss the case.

The Court will first address Mr. Seleznev's argument that the arrest violates jus cogens norms of international law, and thus the Court should exercise its supervisory power and dismiss the case.  A Court may dismiss an indictment under its inherent supervisory authority if it finds that the government's conduct violated the jus cogens norms of national law, citing to *U.S. v Struckman*, Ninth Circuit case, 2010. However, the Court finds this to be a matter of substance that must be addressed by the transferee Court or the indicting Court and not by the removal Court, given that the indictment is pending in the Western District of Washington.

The Court's subject matter jurisdiction is limited by Federal Rule Criminal Procedure 5(c)(3)(D), which provides that this Court must transfer the defendant to the district where the offense was alledgedly committed if the government produces a warrant, a certified copy of the warrant, or a reliable electronic form of either and the judge finds that

the defendant is the same person named in the indictment, information or warrant.

In this case, the United States, I believe, will be producing a copy of an arrest warrant for an individual named Roman Seleznev. And if it does that and the Court finds that it's proper, then the only remaining issue is whether the arrestee is the same person named in the superseding indictment. Any other matter must be addressed by the district where the offense was alledgedly committed. And that -- the Court cites to *U.S. v Green*, 499 F.2d 538, 541 (DC Cir. 1974). The clear mandate of former Rule 40 sharply limits the function and authority of the magistrate and, by the same token, the jurisdiction of the district court for the transfer or district.

Where the terms of the removal are met in a proceeding for removal in furtherance of a prosecution by indictment, that Court lacks power to dismiss either the proceeding or the prosecution. However, because Mr. Seleznev is challenging this Court's personal jurisdiction over him, the Court believes it must address this before it can proceed with the Rule 5 hearing.

The Ninth Circuit has noted that the starting point in a personal jurisdictional challenge is, quote, "The venerable principle that the manner by which a defendant is brought to trial does not affect the government's ability to

try him," end quote; citing *Struckman* -- which case -- that case cites to *U.S. v Matta-Ballesteros.* And this is known -- and the *Matta-Ballesteros* case is 71 F.3d 754, 762 (9th Cir. 1995). This is known as the *Ker-Frisbie* doctrine. Recognized exceptions to the *Ker-Frisbie* doctrine are if either, one, the transfer of the defendant violated the applicable extradition treaty; or two, the United States government engaged in misconduct of the most shocking and outrageous kind to obtain its presence. And the Court cites to *U.S. v Anderson*, Ninth Circuit case, 472 F.3d 662, 666.

So I'd like to ask the defense counsel, aside from these two exceptions, the extradition treaty or the shocking outrageous conduct, are there any other exceptions to this doctrine, Mr. --

MR. CIVILLE: If I could have just one moment, Your Honor.

THE COURT: Yeah.

MR. WALSH: Your Honor, if I may.

THE COURT: Yes, Mr. Walsh, you may proceed.

MR. WALSH: Your Honor, this is just for clarity of the record. And I think it would have been an aspect that might have been developed if we were able to pursue some more discovery, what I understand the Ninth Circuit *Anderson* exceptions to the *Ker-Frisbie* Doctrine look for an extradition treaty and look for, perhaps, outrageous conduct.

THE COURT: Right.

MR. WALSH: But we would also ask for -- again, for clarity of the record of the Court, the International Covenant on Civil and Political Rights, the United States is a party to that treaty -- to that covenant, as is the Maldives, and we would say Article 9 and Article 13 of that convention --

THE COURT: Of the international what? I'm sorry.

MR. WALSH: The International Covenant on Civil and Political Rights --

THE COURT: Mm-hmm.

MR. WALSH: -- of which the United States is a party, as is the Maldives. While that is not an extradition treaty that exists between the United States and the Maldives, since both -- since both the United States and the Maldives are party to that convention, and Article 9 of that convention lays out certain rights for arrestees and Article 13 of that convention specifically prevents the expulsion without judicial process of somebody, as the defendant is here, from the Maldives, we would say that that would fall under the *Anderson* exceptions and *Ker-Frisbie*. That would be the only other thing we would add.

THE COURT: Is there any federal case law that specifically addresses that International Covenant of Civil

and Political Rights such that it would require the Court to divest itself of jurisdiction because it violates customary international law?

MR. WALSH: No, Your Honor. I -- I am -- but, again, Your Honor, this has -- because of the time constraints that we've been dealing with, this aspect of briefing was never fully completed. But I'm not going to misrepresent anything to the Court. The ICCPR is dealt with by federal districts in various challenges that various litigants have brought. As to the specific question as to whether or not the ICCPR carves out a new area of law under the Ninth Circuit jurisprudence here, I don't know the answer to that. All I would respectfully submit to the Court is what Mr. Civille said earlier, which is this is a moving area of law, this is a moving area of jurisprudence. So I think each juris, as these issues come up, will look toward international law and try to see, is this what the Ninth Circuit meant when we're looking for the violations of the international treaties.

And I'll just give a recent example to the Court about that. Previously, in the United States of America, we executed juveniles. We executed juveniles. States allowed the execution of juveniles. Various international covenants and conventions were put together that laid out what seemed to be a developing norm of customary international law saying you don't do that. And eventually, the United States of America,

our Supreme Court -- I don't remember the citation, Your Honor. I apologize, but I'll submit it to Court. The United States Supreme Court eventually said, well, as we look toward the rest of the world -- again, the development of law -- we are the only nation that is around that still does this, so we're going to look toward some of that law and then we will lay down a new tentative law. We don't execute juveniles anymore in the United States.

So what we're urging is this sort of continual analysis of what's going on in the rest of the world. And we think this is one more thing to add to our papers, that when the Ninth Circuit in *Anderson* says look toward the violation of a treaty -- look toward the violation of an extradition treaty, we think the ICCPR would fit into that category. And, again, Your Honor, there is no extradition treaty between the FSM and the United States. There is no extradition treaty from the RMI and the United States. That doesn't mean that there isn't judicial processes that exist, and it doesn't mean that there is a codified international law that would be violated if a kidnapping occurred. So I think because the United States and the Maldives are both parties to the ICCPR, we'd submit that that would be something the Court should consider when trying to figure out if there's an exception here under the *Ker-Frisbie* doctrine. Thank you.

THE COURT: Okay. All right. Very well. Let me

just ask Mr. -- Mr. Morgan, from the justice department, do you want to respond to that -- this particular argument in question that the Court had?

MR. MORGAN: Yes, Your Honor. Noting that this is the first time this particular treaty has ever been mentioned at any point in the litigation --

THE COURT: Right.

MR. MORGAN: -- I would note that my understanding is, that treaty is not self-executing, so it would confer no rights upon any individual defendant. It would simply be a diplomatic matter between the states. More importantly, the United States Supreme Court decision in *United States v. Alvarez Machain* makes quite clear that only the violation of an extradition treaty can be an exception to the *Ker-Frisbie* doctrine. Any other alleged violation of international law will not suffice as an exception to *Ker-Frisbie*. That's the square holding of the United States Supreme Court.

THE COURT: Okay. Very well. So -- okay. The Court finding is that defense counsel has not provided any particular case law or federal legal authority to support this particular argument.

The Court will now examine the defense's other argument on personal jurisdiction, whether this Court lacks jurisdiction because the manner in which Mr. Seleznev was

arrested constitutes shocking and outrageous government conduct amounting to a due process violation. As noted earlier, shocking and outrageous governmental misconduct amounting to due process -- to a due process violation is one of two exceptions to the *Ker-Frisbie* doctrine. I will not concern myself with the other exception to the doctrine because, as I understand it, both parties agree that there is no extradition treaty between the United States and the Republic of the Maldives; correct? U.S. Attorney?

MR. MORGAN: Yes, Your Honor.

THE COURT: And defense?

MR. CIVILLE: Yes, Your Honor.

THE COURT: All right. Very well.

So Mr. Seleznev alleges the following with respect to the manner in which he was arrested: On or about July 5, 2014, the U.S. Secret Service agents detained him at the Ibrahim -- Ibrahim Nasir International Airport, more commonly known as the Male International Airport, as he was boarding -- preparing to board a commercial airline scheduled to depart at approximately 11:55 a.m., local time, to Moscow. They informed him that he was under arrest. Then a U.S. Secret Service agent separated him from his partner and her minor child. They confiscated his mobile phone and laptop and prohibited him from having any communication with his family, prohibited him from making telephone calls, placed him in a

confined holding area, searched his person, physically pushed him on to a couch and instructed him to remain seated, presented him with a copy of an indictment originating from the Western District of Washington, informed him that he was under arrest and handcuffed him. Therefore -- thereafter, Mr. Seleznev was led from the holding facility in the airport onto a private jet that was flown to Guam -- Guam.

Upon arrival on Guam, Mr. Seleznev was transferred into the custody of the United States Marshal Service and he was permitted to make one telephone call. He contends that -- that is, Mr. Seleznev contends that he was never taken into custody by law enforcement officials of the Republic of the Maldives based on the Red Notice issued by INTERPOL.

So I want to ask defense and prosecution to present their argument on the following:

Assuming Mr. Seleznev's factual allegations are all true, including the statements made by. Mr. Civille earlier today, what constitutes shocking and -- what constitutes a shocking and outrageous arrest? I'd like the counsels to focus their argument on this particular issue. So we'll start with defense counsel, and then I'll hear from prosecution after that.

And again, Counsels, please make sure that you focus on, you know, shocking and outrageous as defined by the

federal courts, and in particular the Ninth Circuit and the United States Supreme Court, such that it would require the Court to divest its personal jurisdiction over the defendant.

Okay. Before you do that, Mr. -- Mr. Civille, give me a couple minutes. I'm going to check about my jury trial, the jurors. But you can get ready.

(Pause.)

THE COURT: Okay, Mr. Civille. You may proceed.

MR. WALSH: Thank you, Your Honor.

(Pause.)

(Judge conferring with clerks.)

(Pause.)

MR. CIVILLE: Oh, I'm sorry.

THE COURT: That's okay.

Go ahead. You may proceed. So let's talk about your argument on the shocking and outrageous arrest here.

MR. CIVILLE: Okay. Your Honor, I'll start with the -- with the comment -- and I understand your ruling. I'm not challenging your ruling at this moment, but we are working on an incomplete record and we think -- and that was why discovery was so important, was to be able to present a complete record. And -- and we just -- we have bits and pieces of what happened there, but the full story of what happened in the Maldives, we don't know because we haven't received the documents. The government has provided us the

evidence it plans to use today, but it hasn't provided us the other discovery --

THE COURT: Mm-hmm.

MR. CIVILLE: -- that we requested, and so we're handicapped by that. But the record as you've read it -- the facts that you've read into the record thus far, Your Honor, we would suggest are incomplete. And the reason they are -- sorry, Carm. The reason they are incomplete is that they leave out, basically, most of the facts the defendant alleges in this case, and those would include that the U.S. agents went to the Maldives, that they did not have an INTERPOL Red Notice at the time, that they either directly -- and we don't know yet the answer to this -- they either directly or through Maldivian authorities applied for an arrest warrant through the Maldivian court, which is, of course, the proper thing to do, and that was denied. We don't know the full reasons -- or we don't know the reasons for the denial. And that the United States -- and we don't know what representations the United States made to obtain or to apply for that arrest warrant.

And that's -- the *Struckman* court, I think, makes it pretty clear, Your Honor -- the Ninth -- this circuit has made it pretty clear that those kind of representations are important to the shock of the conscience test. The facts that would illuminate what sort of representations or misrepresentations or inaccurate representations or even

outright lies, those are -- that's information that is critical and relevant to a shock the conscience test.

We also think the evidence would -- will show that we -- we, through discovery, if we're able to get it -- but we've presented what we do have to show that after being denied judicial relief in the Maldives through the normal appropriate process, that somehow the United States was able to convince other Maldivian authorities to cooperate in allowing them to directly arrest Mr. Seleznev in the Maldives when he had not been taken into custody by the Maldivians. He had not been issued a detention order. And the United States later lied about that. We think the United States later lied, because this is the kind of thing -- of course there's an outcry, and it becomes -- you know, it's not CNN News, but it is -- it is a matter of international comment. And the United -- and apparently the Secret Service felt sufficiently concerned about what happened that they -- they issued -- their press officer gave -- issued a press release on it and said, oh, well he was -- he was removed -- or not removed...

THE COURT: Expelled?

MR. CIVILLE: Expelled. And we believe that that wasn't true, that that was -- the U.S. was simply misrepresenting what happened there. Because they -- okay. And what do you do when you have, you know, a criminal case like we're going to start? Somebody -- if somebody

misrepresents something, there's an inference that can be drawn that it is -- it is proof of -- the inference is that if you lie about something, it is an indication of guilty knowledge, that you know you did something wrong and so now you put a spin on it; or in this case, it appears just flat out you make stuff up: Oh, he was -- he was removed. Yeah, we picked him up after he was removed. And we think that's absolutely not true. He wasn't removed. The U.S. guys went into the airport, and they obviously had to have some cooperation from the Maldivian police or the airport people, and they just grabbed our boy; plain and simple, arrested him. We had a declaration from an eyewitness who said the Maldivian authorities didn't do anything. I mean, they were watching, and the U.S. agents did everything.

The Red Notice, which is now purportedly being used to justify the --

THE COURT: Isn't that -- that's allowed under U.S. law, isn't it, just to go in and abduct someone?

MR. CIVILLE: No, Your Honor. I don't think -- I don't think those agents had -- U.S. agents, I don't think they had the authority to arrest in the Maldives. And -- but more importantly, I don't -- okay. Now you're -- I don't think they had the right to circumvent the Maldivian judicial system. And interestingly, the Red Notice -- okay, we are apparently part of this INTERPOL system by some agreement by

the U.S., and the Red Notice provides -- you know, we make the representation -- and I'll throw it up on the screen here if I can.

THE COURT: Okay. We'll have it marked as an exhibit, please. What do you want to call this Mr. Civille, Exhibit...

MR. CIVILLE: This is, I think, a government exhibit. But it's -- it's also ours. However, the Court --

THE COURT: Well, let's just mark it as an exhibit since you're putting up. And then we're going to -- the Court will consider that. Exhibit A.

MR. CIVILLE: Exhibit A, Your Honor.

THE COURT: Okay. Defense exhibit.

(Exhibit A marked: Red Notice.)

THE COURT: Go ahead.

MR. CIVILLE: And this is -- just so -- and this will be the first page of the Red Notice, Your Honor. And then the last page --

THE COURT: Okay. So that's Defendant's Exhibit -- okay. So I'm sorry. Are they all the same?

MR. CIVILLE: This is all the same document.

THE COURT: Okay. So Exhibit A -- what, is that page 2? And that's page 1?

MR. CIVILLE: Okay. They're not numbered. Let me see -- 1, 2, 3, 4, 5 -- page 5 of the Red Notice. So the

final -- it appears to be the final page of the Red Notice. It provides that -- the U.S. represents that, "The country, at the request of which the present notice has been published, has given assurances that extradition will be sought upon arrest of the person in conformity with its national laws and/or the applicable bilateral and multilateral treaties."

There is not an extradition treaty. But as Mr. Walsh noted before, both countries are party to a bilateral convention that, while not self-executing in the United States, nonetheless is -- is an agreement entered into between both countries. And we submit that part of the shocking behavior here is that, okay, we have these agreements, we say do -- we want your help and we're going to abide by your laws, and then when we do abide -- apparently we -- and once again, we don't have -- we haven't received discovery on this, but once again -- so it appears that we did initially do that. And when it turned out not to be a pro forma event when the judge in the Maldives actually had a response -- and we think that response was, no, you haven't given me proper evidence, you haven't supported this adequately yet. That being -- the U.S., instead of continuing to go through the proper legal authorities, the judicial process there, just nabbed the guy, just cut -- just made a deal with the cops in the Maldives and apparently -- well, not apparently. By all evidence -- the only evidence we really

have from the eyewitness is that the U.S. grabbed him, nakedly grabbed him, okay. And we believe that that is shocking behavior, shocking in a number of ways, not the least of which, Your Honor -- and this is -- this is -- the Court in *Struckman* foresaw that this is the kind of behavior that is -- is becoming more -- certainly is a particular concern to the Court, is that there were lies and misrepresentations or circumvention in this case, deliberate circumvention of the Maldive judicial process and judicial rulings, then that is -- that is behavior which shocks the conscience.

THE COURT: But what about the cases that have been cited, Mr. Civille, like the *Matta-Ballesteros* case where there was torture and abduction of the defendant by the U.S. Marshals from the defendant's home in Honduras? And the Court found that that's not so shocking and outrageous to warrant a dismissal. And then *Anderson*, when there's no outrageous conduct, despite the defendant alleging that his -- that the government's conduct in removing the defendant during the pendency of his extradition and citizenship appeals in Costa Rica were ongoing; that was not outrageous. I mean, those -- those particular situations even seemed more severe than what's presented here so far.

MR. CIVILLE: Your Honor, a couple of things on that. One, in the Honduras case, *Anderson*, I believe that the Court was not convinced that it was done by U.S. agents, that

it was done by Honduran police, for one thing.

The other -- the other point on this is that is this a dynamic area of the law; the concept of what is shocking is developing. The case -- the Ballesteros case you mentioned really focused primarily on treaty issues. And -- and since then, the Ninth Circuit's view on -- on shocking conscience -- shocking behavior has actually evolved since *Ballesteros*, and that's reflected in *Struckman*. *Struckman* is the latest pronouncement by -- in this circuit. And it is -- and it is -- it shows an evolution of thought, and that's where -- and that's where the Court said we are troubled, more troubled, and we are not prepared to -- are the lies, misrepresentations -- deceitful conduct is what they're talking about. "We're not prepared to say that blatant lies to a foreign government to induce the foreign government to transfer a defendant when it otherwise would not, could never amount to so shocking and outrageous as to violate due process and require dismissal of pending criminal proceedings in the U.S. in this case."

Okay. The Ninth Circuit has clearly said that we are -- we are not -- that the bar is not set at torture. And -- and stop and think about this for a second. The whole concept, the choice of words, "shock to the conscience," what is -- okay. That suggests that, A, you're stepping -- you know, what's our conscience? Our conscience is, I think,

understood. Most people would say, "What's your conscience?" Well, it's that inner voice that really tells us right from wrong, that -- the moral compass inside, that shorn of legalisms and complex analytical nuances, it's your gut that tells you -- well, not your gut; your soul that tells you this is right, that's wrong.

Okay. So the Court -- I think when they use that phrase "shock the conscience," it's referring to the kind of behavior that -- that -- first, it's telegraphing that the Court is not going to be hung up necessarily on real technical legalisms, that it's looking for something deeper. And the trouble with -- my one trouble with this test is that, you know, whose conscience are they talking about? And -- and the reason that's troubling -- and I think the answer is, of course, it's the idealized reasonable person. Because in day-to-day life, the trouble with consciences is that they become numb. You know, the -- Cambodia. Just dramatic examples, the killing fields of Cambodia. Millions of people killed, and of course there's outrage. But Rwanda, then, 30 years later and a million people killed, several million people dispossessed. They're still outraged, but, you know, we're getting kind of accustomed to this. And now, finally, we have Sudan, hundreds of thousands of people killed. But for George Clooney's activism, largely ignored in the world stage. And now Central African Republic, close to a million

people killed, several million people displaced, complete anarchy, and it gets almost no coverage. Why? Because our conscience has just become numbed after a while. And we're seeing that now in the -- what's going on in Israel and the Gaza strip. It's just -- okay.

That's not the conscience, the numb conscience. And I think that this -- when I argue to a judge, you know, of all people who -- no matter how good-hearted the judge is and how conscientious and moral and I -- no questions on that score -- you see the bottom end of society on a daily basis; the beatings, the murders, you had the Blue House Lounge case here, human trafficking. And your conscience becomes numb in the sense of what is acceptable or not acceptable behavior, what does it take to shock you. I mean, you've seen it all, everything. What -- what can you say? What could I say that would shock you? What could I show you? What photographs could I show you that would shock you? Because you've seen it all.

So that test, when we talk about shocking conscience, it's not to the battle-hardened people that, really, we all have become just over the course of life. I think it's really to the reasonable person, what shocks their conscience, what offends their core sense of right and wrong. And, Your Honor, I think that what the Ninth Circuit has said in *Struckman* is that, yes, we're the good -- "we" being the

United States, we're the good guys on the world stage. You know, we are the moral beacon. We are supposed to stand for righteousness and truth and the proper way. And what we stand for above all is the rule of law.

And so if our agents are going out and lying to people, if they're misrepresenting things to -- to get some, you know -- to get some benefit, if they -- if they run roughshod over the judicial system of co-equal countries, well, then what's the difference? How are we different? We're -- you know, we're standing up -- to put it in the context, you know, we're on the brink of some very serious matters right now globally, and the U.S. is ramping up to go after Russia about shooting down -- its participation in shooting down the Malaysian aircraft. And we are going to take the moral high ground and accuse Russia of arming the militants or the separatists or maybe even firing the missiles. Okay. And Russia has, apparently, tens of thousands of troops poised on the Ukraine border, ready to -- we think, ready to invade. And what is our position? We're saying Russia, you have to obey the rule of law.

Now, okay. That's on a much larger -- that's -- this case is not shooting down the Malaysia aircraft. It's not invading a country. But it's the principle, the rule of law, the respect for the rule of law. So when we stand up in the international forum and demand of Russia that it obey the

rule of law, that it respect the law of nations and international law, well, in this small corner of the world, we have said, basically, do as we say, not as we do, and that shocks the conscience. If we can't stand up there with a clear conscience and say, "We obey the law. You should obey the law, too," that shocks the conscience.

And that's what I'm suggesting, Your Honor. And that's why it was so important to us to try to develop the record in this case, to get the information we know the government has had -- that we believe the government has, that they never denied having, to show the Court that in this expanding area of the law, the Ninth Circuit has clearly said torture isn't the test anymore. That should be an absolute given. I mean -- so those cases that agonized about torture, we don't have to agonize about that. We're -- we're -- we're evolving, we're progressing, and that's our -- so our point, Your Honor, is that I think the Court needs to -- that what shocks the conscience is duplicity, deception and corruption of another country's judicial process, knowingly participating in the corruption of another country's judicial process or the abrogation of that process.

THE COURT: Okay. Any other facts that will constitute shocking and outrageous? Because that's really the test, shocking and outrageous.

MR. CIVILLE: Yeah. The facts -- the other --

and this is what's more of a context argument, Your Honor, but -- all right. As this area evolves, okay, the Court will -- courts will do what they always do, and they'll draw distinctions. And you mentioned the Honduras case and the --

THE COURT: *Anderson* case.

MR. CIVILLE: -- *Ballesteros* case.

THE COURT: Yeah, and *Ballesteros*.

MR. CIVILLE: Okay. This is not a case involving terrorism. It's not a case involving violence, murder, a narco-terrorism. This is pretty -- this is, you know -- this is -- the alleged crime does not fall into any of those categories. So in that context where the Court's conscience might not be shocked by us, for example, surreptitiously invading Pakistan to kill Osama bin Laden, okay, because of who Osama bin Laden was and the history of our pursuit him -- this is very different. This is a much more mundane sort of case where the behavior then becomes all the more shocking, that we're not now reserving what would otherwise be outrageous behavior for extreme cases, with now becoming the order of business, SOP.

Other facts. I think we've talked about the dating on the Red Notice, whether that was properly given. Our belief -- not whether it was properly given; our belief that the Red Notice was pretextual, that whatever had been done had been done before the Red Notice had actually been

properly issued. Yeah. And, once again, I just go back to our -- our allegation that we really are looking for discovery for -- to substantiate more fully. You have on the -- that we ignored the judicial process in that country and the -- we've attached the declaration of Ali Naaviz -- Naaviz, N-A-A-V-I-Z, a journalist in the Maldives -- Maldives. I'm sorry, Your Honor. And we've attached both the native language and the English translation, which shows the basis for some of our allegations regarding how this happened factually.

We also have submitted a declaration of an eyewitness to the arrest, showing that the U.S. agents just took over inside the Male Airport in the Maldives and -- without assistance or any -- really -- I mean, they just came in -- our guy walked in, and he was arrested by U.S. agents, without any Maldivian participation.

Let me see if I've hit all the facts, Your Honor.

(Pause.)

(Consulting with co-counsel.)

MR. CIVILLE: The other fact, Your Honor, I -- it's in, actually, our client's declaration, is that when he was arrested and still in the territory of the Maldives, he requested to contact -- that the Russian consulate be contacted, and that was not done. So he was denied access to the consulate there.

THE COURT: Okay.

MR. CIVILLE: Okay.

THE COURT: All right. So, thank you, Mr. Civille.

MR. CIVILLE: Thank you.

THE COURT: So the Court will accept as true for purposes of this motion all the additional factual allegations that you have just made regard -- not only the ones that have been filed through a declaration and/or news articles, but the additional statements made here that the United States agents did not have a proper INTERPOL notice, that it may have been pretextual, that there was an application to the Maldives court, there could have been a violation, and representations made to the Maldives government may have been improper, and that there was no -- potentially no detention order, and that the defendant had been arrested by the U.S. Secret Service. So the Court will accept that as true. And, in particular, all of the filings submitted by defense counsel.

Okay. Let me hear from the United States Attorneys, Mr. Morgan.

MR. MORGAN: Yes, Your Honor.

Accepting the defendant's allegation as true and -- simply for purposes of this motion -- I mean, the government does not concede the allegations in any way -- the facts as alleged do not rise to the level of shocking and outrageous conduct as defined by the precedents which control

this Court. The notion that the conduct was shocking and outrageous because the agent effectively made a warrantless arrest in a foreign country, that, as a matter of law since the *Ker* decision, does not rise to the level of shocking, outrageous conduct.

I would point out that the *Matta-Ballesteros* case, which defense counsel cited, did indeed involve U.S. agents effecting an arrest of a foreign national on foreign soil. And as the Court has pointed out, the facts in that case were quite severe. The agents arrested him at his home, in a pre-dawn raid, with the assistance of the Honduran military. They put a hood on his head, they bound him, they took him to the airport and spirited him away. And there were also allegations that he was physically abused on the flight. The Ninth Circuit squarely held that those allegations, even if true, did not rise to the level of shocking, outrageous conduct as would justify dismissal of the indictment.

With respect to the allegations concerning the circumvention of the Maldivian judicial process, well, that's exactly what happened in the *Anderson* case, which the Court has noted. In *Anderson*, the defendant was attempting to appeal an extradition order and an order depriving him of Costa Rican citizenship, so he was attempting to utilize the Costa Rican judiciary to vindicate his rights in that state. The United States took him and removed him to the United

States. The Ninth Circuit held that that was not outrageous conduct.

With respect to allegations that the United States might have misrepresented some facts to the Maldivian authorities, I would want to point out that there is sort of a logical disconnect with the -- supposedly the U.S. officials went to a Maldivian judge to get a warrant and they didn't get a warrant. How the -- whatever they said to that judge, how that could have been outrageous conduct, since they didn't get a warrant, that's sort of a logical disconnect there because they didn't utilize the Maldivian process. But that's an aside.

The fact of the matter is in *Struckman*, the case upon which the defendant so repeatedly rely, that was a case where agents affirmatively lied to the Panamanian government, secure that government's cooperation, and having that defendant expelled from Panama and rendered into the United States custody. The Ninth Circuit held that those allegations were not sufficient to rise to the level of outrageous conduct.

And on a more general level, there's just -- there's something counterintuitive about the argument the defense is presenting. Essentially, they want to say that a misrepresentation can be shocking, outrageous when forcible rendering cannot, and that just can't be right. It can't be

the case that you can literally kidnap someone by force at gunpoint in a foreign country and have that be sanctioned by the United States Supreme Court; and yet a misrepresentation to a foreign government somehow surpasses that in conscience shocking behavior. That -- that simply isn't -- that just cannot be right.

And I would also point out that there are other cases in which the United States has purportedly circumvented the local authorities. One of those is *United States v. Valot*, which is cited in our most recent filing. This is a case where Thai authorities are -- arrested the defendant, and rather than afford him the benefits of Thai law and Thai extradition proceeding, simply took him to the airport and, over his objections, handed him over to U.S. -- to the DEA agents who were waiting at the airport. The Ninth Circuit held that that was not shocking and outrageous conduct.

So I think that there are circumstances far worse than anything Mr. Seleznev has alleged, and the Ninth Circuit and both the -- and the Supreme Court have made quite clear that they are not enough to rise to that level. Indeed, as the government pointed out earlier, there is not a single reported decision in which any court in the United States has ever held that the government has engaged in sufficiently shocking conduct to justify divestiture of jurisdiction and dismissal of an indictment.

MR. CIVILLE: Your Honor, if I could respond to that?

THE COURT: Yes, you may.

MR. CIVILLE: The government's reliance on *Matta-Ballesteros* is interesting. That was a 1995 case.

THE COURT: Right, okay.

MR. CIVILLE: It predates the *Anderson* and *Struckman* decisions by about ten years, and it doesn't reflect the way that the Ninth Circuit's thought in this area has evolved. In *Matta-Ballesteros*, the Court there did not -- did not frame the -- did not recognize the *Ker-Frisbie* exceptions in the manner that the Ninth Circuit now recognizes those exceptions.

What's interesting about the *Matta-Ballesteros* exception -- or decision, Your Honor, is that there -- and once again, Your Honor, your decision this morning is not etched in stone, and you might want to consider that. The district court conducted a limited evidentiary hearing. Okay. Once again, as in *Struckman* --

THE COURT: This is a limited evidentiary hearing.

MR. CIVILLE: No, no. A limited evidentiary hearing, Your Honor, is like where we put on witnesses --

THE COURT: This is a limited hearing. Let's put it that way.

MR. CIVILLE: It's a limited hearing, okay.

THE COURT: And I'm going to assume for the sake of argument that your facts are true for purposes of this hearing. And if the Court finds that the conduct is not shocking and outrageous, you certainly will have, I believe, the right to proceed forward after further discovery before the transferee court, before the indicting court, to bring this issue up again.

MR. CIVILLE: I understand Your Honor's position on that. And our concern, of course, is by doing that, you are exercising jurisdiction over Mr. Seleznev, and that's the threshold question which we think --

THE COURT: I understand what you're saying.

MR. CIVILLE: Okay. But in any event, in *Matta-Ballesteros*, there wasn't at least an opportunity for an evidentiary hearing. And it's not clear to me, but the manner in which that's -- well, no. It is clear. So the Court actually heard testimony and -- and -- and that would imply that there was an opportunity to really delve into the facts. And that's why I think it's so important to be able to have a -- a more fully developed factual record. I appreciate the Court accepting what we say is true, but that's -- the trouble is, we just -- we don't know everything that's out -- we -- we may have much more -- I'm concerned we have an even more compelling argument or would have an even more compelling

argument if we saw the discovery we requested. That -- I guess that's -- you know, when you put the evidence on the table, the actual papers, the e-mails, correspondence, the reports, that's where you really see the full extent. And that's where you get -- have the opportunity to decide, oh, either this is shocking or it's not.

Okay. I don't know if that answers your question or --

THE COURT: Did you -- I mean, do you have anything to -- to respond to in relation to what U.S. Attorney, the Justice Department, has just indicated?

MR. CIVILLE: I think the Justice Department is simply -- yeah. My final point on that is, the Justice Department is not acknowledging the state of law as it has been recognized in this circuit --

THE COURT: Well, I don't know about that. I mean, the -- you know, I'm looking at all the case law, Mr. Civille. And, I mean, isn't it true -- even if what you're saying is that the world, the international world, the academias and others, have matured in terms of this area of law, it -- you -- I'm not -- I'm not able to ignore, neither are you -- we're not able to ignore the United States Supreme Court decisions and the Ninth Circuit decisions that allow forcible abductions on foreign soil. I mean, that's basically -- they allow it.

MR. CIIVLLE: Your Honor --

THE COURT: That's -- you haven't shown me anything that doesn't allow it, other than -- unless it's shocking and outrageous and it doesn't rise to that level and so forth. But, I mean, that's the case law, and the Court is duty-bound to follow that case law.

MR. CIVILLE: Okay. And, Your Honor, I think my -- I think my response to that is, let's assume for a moment that there are circumstances under which forcible rendition is lawful, okay. And certainly --

THE COURT: Well, you're not disputing any of the cases and the facts that Mr. Morgan has just cited to, are you?

MR. CIVILLE: Well, I'm not disputing the holding in those cases. I am disputing that earlier -- for example, *Ballesteros* now has to be read in conjunction with *Struckman* -- *Anderson* and then *Struckman*. And you can't read *Ballesteros* and *Anderson* and *Struckman* and say the law is fixed and rigid in this area. Those cases represent a -- demonstrate a real progression of thought in this circuit, and *Struckman* being the most recent declaration of where this circuit has evolved to on this. In -- okay.

So -- so now the government comes -- so it's not open season out there for agents -- U.S. agents running around the world. They can't just run amuck. They can't -- saying

just anything you have to say to -- to trick somebody into getting into the van with you or to trick a government into cooperating with you is not acceptable behavior. You know, I understand from -- for the law enforcement guys, of course they -- anything. They're still complaining about *Miranda*, you know, for -- you know, anything that they see as infringing on their absolute right to do whatever they want, they resist. But that's not what the rule of law is about, of course. And the rule of law is about having restrictions and limits on what you can do.

And in this arena, it's about respecting the judicial process. I didn't really understand the government's argument, well, okay, we tried to -- maybe I simply misunderstood him. He doesn't see the logic, well, if the local government -- if the local judiciary didn't allow us to -- give us the arrest warrant, okay, we'll just grab the guy, was apparently the government's position. We don't know why the local judiciary denied that warrant. And very importantly, we don't know -- and the government has this information in confident, because they must have gotten reports and sent reports on this. Did the judge in the Maldives say, under our law, this person is lawfully in the Maldives, and if the U.S. wants him, you have to bring him before me first to see if there is -- you know, under the Maldive constitution, what rights he may have here. So did

the U.S. ignore that?

Now, this is -- you know, this is another area that's come up. And *Struckman*, I think, is -- it represents by this circuit a recognition -- and I don't think the Court needs to anticipate the Supreme Court. We just have to follow the law in this circuit. The law in this circuit is really -- and I think really clear. You look at -- okay. If -- if there is evidence that the judge -- that the U.S. consciously --

THE COURT: Lied to everybody? Lied to everybody?

MR. CIVILLE: Lied to everybody, did something -- no, not just -- no, it's not just -- that's bad enough. But now you go through the process. It appears we actually did the right thing. We went down there and somehow applied for an arrest warrant. Okay. Well, if you -- and then that didn't turn out the way we liked it, so we said, well, enough of this pretense. We're not going to abide by the arrest warrant or the judicial process of the Maldives. Grab the guy in the Maldives, on Maldives territory. Well, that's a very cynical view of -- and that is shocking, Your Honor. Think about that. Does that offend our innate sense of right and wrong, that -- you know, your kid comes up and says, "I want an ice cream cone from the refrigerator."

"No, you can't."

And you turn your back, and the kid goes and gets the ice cream cone.

"Well, I said no."

"Well, I know you said no. I went through the right process, Mom. I asked you. You said no, so what could I do except get it myself."

That's wrong. We know that's wrong. We would tell a child that's wrong, that you have to respect the process, respect the rule of law. And that's what I think the government just can't come to grips with, is that the Ninth Circuit is -- is -- that's what *Struckman* is really saying.

THE COURT: Yeah, but *Struckman* did cite the *Matta-Ballesteros* case with approval. They did do that.

MR. CIVILLE: They did, Your Honor. But they went beyond that, though. They clearly went beyond that. I mean, they didn't overrule *Ballesteros*, but they went beyond that. And they certainty clarified, as *Anderson* had done. *Matta-Ballesteros*, the standard in that case -- announced in that case was, I think, much less clear than the very precise language in both *Anderson* and *Struckman*. The analytical framework -- in *Struckman* and *Anderson*, they both said, okay, we start with the vulnerable principle that -- venerable principle -- sorry -- that the manner by which a defendant is brought to trial does not affect the government's ability to try him, citing *Matta-Ballesteros*, citing Ker and Frisbie.

Okay.

So the Ninth Circuit says, okay, that's our starting point. And you're right; they've -- *Matta-Ballesteros* is right in -- on that starting point. But then -- now the Ninth Circuit says we have however recognized exceptions to the *Ker-Frisbie* doctrine -- and that would also be *Matta-Ballesteros,* they could have added -- if either, one, the transfer violated an extradition treaty or the United States government engaged in misconduct of the most shocking and outrageous kind to obtain his presence.

And so that goes beyond *Matta-Ballesteros*, and that is now the law in this circuit. And I think -- and the other cases we have cited, so misconduct of the most shocking and outrageous kind is -- and has been applied. The standard or the other -- and this goes back to Justice Frankfurter, actually. Does it shock your conscious, when it says the most shocking kind. And Justice Frankfurter, a towering conservative on the board, a legendary conservative, said, "Does it shock your conscience?" The average, the -- kind of very patrician way, he said, "to the English-speaking people of the world, would it shock our conscience."

And that's the standard that now exists, Your Honor. And it's not tethered to torture. The government, as a fallback position, wants to tether all of this to torture and say anything we do is okay as long as we don't torture

you. And that, I submit, is not the law any longer. *Struckman* is -- has certainly laid rest that notion that only torture shocks the conscience. Because if that's the standard, then that's the numbed conscience -- conscience that I was describing. If we've got -- if we are so beaten down by life that our consciences can only be shocked by horrible, grizzly torture stories, then we have a real problem. And that's not what the standard is.

THE COURT: Okay. Thank you.

MR. CIVILLE: Thank you.

THE COURT: All right. The Court has considered the federal case law, in particular the Ninth Circuit case law and the U.S. Supreme Court, that would require the Court to divest its personal jurisdiction over the defendant. Based on what has been presented to the Court thus far -- and the Court is assuming that all the factual allegations as Mr. Seleznev has indicated in his declaration and all the other declarations submitted by the other witnesses and all the other exhibits submitted by defense -- assuming all of that is true, the Court finds that the Court cannot simply ignore federal law, and the Court finds that these allegations thus far are not shock -- so shocking and outrageous that it would warrant this Court to divest its jurisdiction. Accordingly, the Court finds that because the allegations of his arrest are not so shocking and outrageous as submitted, the Court finds

that it does have personal jurisdiction over Mr. Seleznev. His motion for discharge and release is hereby denied, and the Court will proceed forward with the identity hearing, the Rule 5 hearing.

The Court notes, however, that its decision on the motion to preclude Mr. Seleznev from reasserting the same allegations -- it will not preclude him from reasserting the same allegations before the United States District Court for the Western District of Washington for further consideration by that court after full and additional discovery if counsels are going to proceed forward that way. So the Court will now proceed with the Rule 5 hearing.

MR. CIVILLE: Your Honor, may we approach for a moment?

THE COURT: Yes.

(Sidebar.)

MR. CIVILLE: Thank you, Your Honor. Thank you for giving me so much time. Your Honor, in anticipation of the ruling, I have discussed with Ms. David -- as you know, we have a jury to pick today.

THE COURT: Right.

MR. CIVILLE: If we could do -- the Rule 5 hearing -- I'm not sure, in light of some of the other evidence we have, how quickly that's going to go, and my suggestion, my request, would be that we proceed with picking

the jury and perhaps and do the Rule 5 hearing at 8:30 or 9 o'clock tomorrow.

MS. DAVID: Your Honor, we would like to proceed. The Court has indicated that in its earlier order, the government is proceeding pursuant to that -- wishes to proceed pursuant to that order. We have the binders ready to proceed, to the Court, to counsel and to the witness.

THE COURT: We might have some issues with jurors. We may not have enough jurors.

THE CLERK: You can get additional jurors there.

THE COURT: But we don't have any right now. We don't have any additional -- oh, we can just bring them in later?

LAW CLERK: Bring in another set, so if we don't have enough right now, we can bring in another set.

THE COURT: We may not have -- I don't think we -- we may not have enough jurors anyway right now anyway to proceed forward. I've got to talk to the counsels. Why don't we -- let me talk to the -- I think we should proceed forward this afternoon. It's not that difficult, is it?

MR. CIVILLE: Is anything in this case not difficult?

THE COURT: No, no. I mean but you know, we're trying --

MR. CIVILLE: Okay.

THE COURT: -- to, you know, give you your day in court.

MS. DAVID: We didn't want to distribute the binders because we were obviously waiting for the Court's ruling, but I do have the judge's copy, the defense copy and the witness copy.

THE COURT: How big is it? It shouldn't be that big.

MS. DAVID: It's not, Your Honor. It's -- there are government exhibits that Mr. Civille has already received. They're designated 1 through 13, except there are 20 exhibits; some are like 13-A, 13-B.

THE COURT: Have you given him all of these exhibits?

MS. DAVID: Yes.

THE COURT: So he has received all of them previous to today?

MS. DAVID: Correct, Your Honor.

THE COURT: Oh, okay. So it's not like anything new.

MR. CIVILLE: I don't think -- I hope not. She's very good about that.

THE COURT: So why don't we -- we'll go ahead and proceed forward with the identity hearing this afternoon.

MR. CIVILLE: Okay.

THE COURT: What I'm going to do with the jury is I'm going to talk to the other defense counsels, so we'll let you -- we'll give you -- how many -- you want to start at 1:15?

MR. CIVILLE: Okay.

THE COURT: That will give him a chance to have lunch. All of you guys have time for lunch. Then I'll talk to your other counsels, your co-counsels, and we might move out our jury selection 'til August -- the day that we are going to start opening, maybe that date. Okay.

MR. CIVILLE: Thank you, Your Honor.

THE COURT: All right. Because of the numbers of jurors.

MS. DAVID: So that would be August 11th, right, Your Honor?

THE COURT: That's right. August 11th. Yeah.

MS. DAVID: Thank you.

THE COURT: I'll look at the date. Hold on, you guys. Why don't you talk to your client and then talk to your agent. And we will go proceed this afternoon. Okay.

MS. DAVID: The identity hearing will proceed at 1:15?

THE COURT: Yeah. Definitely, yeah.

(Off the record discussion with the Court and law clerk.)

THE COURT: Okay. We're good? I'm gonna talk to -- I'll call up the other case real quick.

MR. CIVILLE: Your Honor, so we're not gonna pick the jury today?

THE COURT: We're not going pick the jurors. We don't have enough jurors. You know what --

MR. CIVILLE: I didn't think we were going to.

THE COURT: Well, I was -- we already called them. We only have 49. We only have 49. So I can talk to them and just say, you know, because of the storm, they just -- we just don't have enough.

MR. CIVILLE: Okay. Can I -- I'm fine to do Rule 5. Can we start it at 2:00 instead of 1:15?

THE COURT: Sure. Two is fine. We'll call --

(End of sidebar.)

THE COURT: Okay, let me just -- we're back on the record.

What we're going to do is -- I know there's a request to continue the identity hearing, but the Court will deny that request and we will proceed forward this afternoon at two. We'll allow Mr. Seleznev to have lunch.

And then let me just talk to the other attorneys, Mr. Civille, Ms. David, Mr. Gavras and Mr. Van de veld. Okay. So because of the typhoon Condition of Readiness 1 yesterday, the Court had summoned in 100 jurors for our trial for jury

selection and only 40 -- how many appeared? Forty-nine have appeared. That's not enough to proceed forward with the challenges for cause. It's enough to just like -- if you only had -- okay. If we have 49 jurors, if we only had 3 challenges for cause -- if I could just assume that there's only 3 challenges for cause and that you exercise all your peremptory challenges, doing the mathematics, we'd need 45 jurors here. So there's just no way that we would have enough to proceed forward, so what the Court is gonna do, because of an act of God, we're not able to get all the jurors in. I'm going to move out the jury selection until next week, and that will give us enough time to summons in -- no. The following week. What day do we have that set for?

(Discussion with clerks.)

THE COURT: August 11th -- but she had needs until August 12th. So my jury administrator needs until August 12th, which is Tuesday, to proceed forward with jury selection. We were going to proceed forward with opening statement anyway on August 11th, as you will recall, on Monday, but the Court's going to have to move that to August 12th.

MR. VAN DE VELD: Your Honor, as I explained when we last met --

THE CLERK: Microphone, please. Thank you.

MR. VAN DE VELD: As I explained when we last

met, I have a trial scheduled before Judge Cenzon in Superior Court on a criminal sexual conduct case, and that was -- that's scheduled to start on the 5th. Because the jury selection in this case was going to start before that, I have a basis for a motion for it to be continued. But if we don't start the jury selection until the 12th, that case will have started beforehand and I will not be complete with it by the 12th. And so, you know, I really need to have the jury selection on this case start before the 5th; otherwise, I'm gonna have to ask the Court to continue this matter.

THE COURT: Well, I have a call out to Judge Cenzon. Have you spoken to her since then?

MR. VAN DE VELD: Yes. And she said, "Well, submit your motion." But I haven't heard anything from the chief judge, so...

THE COURT: Right. Okay. Yeah. All right. So -- no, no. I did submit a -- I mean, we do have a call out to her, and I have -- I don't know if she called me yesterday. I haven't checked my calls because we were in court yesterday. So I will get ahold of her.

But what we're going do as of right now -- let 's just do this, and I'll try to work out something between myself and Judge Cenzon-Duenas, because this is an older case than -- as you've represented to me. Correct, Mr. --

MR. VAN DE VELD: That's correct.

THE COURT: Okay. So let me get ahold of her. But as of right now, the Court will -- based on the inability to get enough jurors to come in today because of the storm, the Court will continue the jury selection until August 12th, and that will give the jury administrator enough time to call in the additional jurors. In the meantime, we will try to work out the situation with you, Mr. Van de veld, sometime this afternoon. Okay?

MR. VAN DE VELD: Thank you.

THE COURT: Okay. Very well.

MR. CIVILLE: Thank you, Your Honor.

THE COURT: Mr. Civille and Ms. David, I'll see you all at 2 o'clock. We'll begin the identity hearing at that time. Thank you.

MR. CIVILLE: Thank you, Your Honor.

THE COURT: Mm-hmm. We'll get the -- okay. Thank you, Counsels, on the phone.

MR. MORGAN: Thank you, Your Honor.

THE COURT: Talk to you soon.

(Recess taken at 12:01 p.m.)

(Back on the record at 2:12 p.m.)

THE CLERK: Magistrate Case No. 14-00056, *United States of America v. Roman Seleznev;* identity hearing.

Counsel, please state your appearances.

MS. DAVID: Good afternoon. Marivic David for

the United States, and Agent David Iacovetti from Secret Service.

THE COURT: Okay. Good afternoon. You may be seated.

MR. CIVILLE: Buenas again, Your Honor. Patrick Civille; Joshua Walsh; the person being detained as the defendant, Roman Seleznev; and our interpreter, Polina Collins, are all present.

THE COURT: Okay. Good afternoon. You may be seated, everyone.

MR. CIVILLE: Your Honor, as a preliminary matter, if I may...

(Pause.)

(The Court conferred with courtroom deputy.)

THE COURT: Okay. Also present on the phone, Mr. Freedman, you're there and I -- is that correct?

MR. FREEDMAN: I am. In Seattle, Your Honor.

THE COURT: Very well. And Mr. Ray and Mr. Goldin, you are also present for the defense team?

MR. RAY: We are, yes.

THE COURT: Okay, very well.

MR. GOLDIN: Yes, Your Honor.

THE COURT: Yes, Mr. Civille.

MR. CIVILLE: As a preliminary matter -- I hope this is not going to be a problem -- my client's been --

everybody else in this courtroom is cold --

THE COURT: Right.

MR. CIVILLE: Except he's in a T-shirt.

THE COURT: Right.

MR. CIVILLE: I've asked -- I've provided a windbreaker. I understand it's being screened. But I just want to inquire, so I don't get -- we're not interrupted during the hearing, if there's gonna be any problem having him wear a windbreaker.

THE COURT: No, I don't think so. As long -- has it already been screened? Do we have it?

DEPUTY MUNA: It's being screened right now.

THE COURT: Oh, okay. Yeah. All right. How long will it -- how long does it take?

DEPUTY MUNA: It's being conducted right now, Your Honor. It will come up once it's done.

THE COURT: You want to wait until it comes?

MR. CIVILLE: No, it's fine. We can proceed, Your Honor. I assume they're going to bring it into the courtroom.

DEPUTY MUNA: We'll take care of it.

THE COURT: Yeah. No, I know, but the --

DEPUTY MUNA: We'll give it to him once it's done.

MR. CIVILLE: Well, okay, but we're trying to

figure out -- so -- just so long as they do it with some alacrity, Your Honor.

(Deputy Muna conferred with the Court.)

THE COURT: All right. There -- it should be coming up shortly, Mr. Civille. So if your client gets too cold, then the Court will pause and then we could -- I mean, if you want to wait, we can wait for his --

MR. CIVILLE: No, no. We're good. We're good.

THE COURT: -- for his windbreaker to come in. But I just understand that the marshals got it a few minutes ago, as well. I mean, if you guys would have brought it earlier, of course we would have had it prepared for him even this morning. But they do have to screen it.

MR. CIVILLE: It seems like something one could simply pat down, but --

THE COURT: Well, the marshals have to take, you know, extreme caution in all -- and believe me, it's not just Mr. Seleznev. It's all the other defendants that come before my court --

MR. CIVILLE: Thank you, Your Honor.

THE COURT: -- that we have the security issue with. And it does get cold here.

All right. So the Court is in receipt of -- and I haven't had a chance to review the defendant's exhibits, but am I to assume they're the same, they're similar to --

MR. CIVILLE: They are, Your Honor. They are documents that we've already filed.

THE COURT: And, Ms. David, did you have an opportunity to review those?

MS. DAVID: Yes, Your Honor. And I understand Mr. Freedman may have been informed about them, as well.

THE COURT: Okay. Mr. Freedman?

MR. FREEDMAN: Your Honor, I received the defendant's filings from this morning, which included two declarations, if that's the exhibits we're talking about?

MR. CIVILLE: It is, Your Honor.

MR. FREEDMAN: And if so, I have reviewed them.

THE COURT: Right. That's correct, Mr. Civille?

MR. CIVILLE: Yes, Your Honor.

THE COURT: Okay. Are we ready to proceed to the removal proceeding, Ms. David?

MS. DAVID: Yes, Your Honor. At this time, the government calls Daniel Schwandner.

THE COURT: Okay. And just before we begin, I want to be clear: The defendant, Mr. Civille, your client, has full access to his interpreter and there's no issues with -- regarding communication with his interpreter and with you; is that correct?

MR. CIVILLE: That's a good question. Let me just confirm that, Your Honor.

(Pause.)

THE COURT: Agent, you may...

(Witness took the stand.)

(Pause.)

(Mr. Civille and defendant conferred.)

MR. CIVILLE: Your Honor, thank you for that inquiry. Unlike the legal arguments this morning, which Ms. Collins translated as best we could as we went along, the testimony that's going to be given now, it's much more important that my client understand it fully, not -- and so I've asked Ms. Collins to be certain to raise her hand or speak up if things are going too fast for her to translate.

THE COURT: Okay. That's right. And then I'll just ask the agent to slow down in his responses.

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Let me just also say, Mr. Civille and the court interpreter, Mr. Seleznev, do you want to use the hearing aid here? Because it is a -- you know, it actually -- the understanding and the -- is a lot clearer, I think. It's not that it's necessarily a lot clearer. I mean a lot louder, I should say, to use this. So you can give this to your client as well as to -- for sure to the interpreter if she needs that. So the Court has passed that on to both of them if they wish to use that.

MR. CIVILLE: Thank you, Your Honor. They're --

THE COURT: So you want to put it on and see if --

MR. CIVILLE: They're examining the devices now.

THE COURT: So put it on like this. I don't know if he needs to because -- unless if he can understand a little bit of English.

MR. CIVILLE: It's pretty much clear.

THE COURT: So I'll go "testing, testing." Can you hear? Testing, testing, test. Okay. You can hear. Is it a lot easier? It's just a lot louder to hear it -- clearer, I think, or louder, I should say. Okay. In case any of the interpreter or the defense needs this.

Also, for the record, the Court notes that the United States Marshals have completed the screening of the defendant's windbreaker and he now has it. Is the defendant warm enough, Ms. Interpreter?

(Pause.)

THE COURT: Only she needs to do it if he doesn't understand English.

MR. CIVILLE: He can't hear the interpreter as clearly.

THE COURT: Okay.

MR. CIVILLE: So she'll wear it, and he'll listen to the interpreter.

THE COURT: Okay. Very well. And is he warm

enough?

THE DEFENDANT: Yes. Thank you. (In English.)

THE COURT: He's indicating yes?

INTERPRETER: Yes. Thank you.

THE COURT: Oh. "Yes, thank you." I'm sorry. I didn't hear the last few words.

All right. U.S. Attorneys' Office, Ms. David? We have a witness. Let me have him please stand and be sworn in by the clerk.

THE CLERK: Please raise your right hand, sir.

(DAN SCHWANDNER, government witness, sworn.)

THE WITNESS: I do.

THE CLERK: Thank you, sir. Please be seated. Please state your full name and spell your last named for the record.

THE WITNESS: My name is Dan Schwandner, S-C-H-W-A-N-D-N-E-R.

THE CLERK: Thank you, sir.

DIRECT EXAMINATION

BY MS. DAVID:

Q. Sir, where do you work?

A. Ma'am, I work for the U.S. Secret Service. I am a special agent. I have been so employed since December of 1997, and I am currently assigned to our office in Bangkok,

Thailand.

Q. Agent Schwandner, I want to direct your attention to July 5 of this year, 2014. Did you happen to be in Male Maldives on that date?

A. I did, ma'am.

Q. Okay. And did you happen to be in the airport in Male on that date?

A. Yes, ma'am.

Q. Okay. In front of you, sir, is an exhibit binder. If you can take a look at Exhibits 1, 2 and 3 and, for the record, identify each one.

A. Yes, ma'am. Exhibit 1 is a warrant for the arrest of Roman Seleznev issued by the United States District Court in the Western District of Washington. Exhibit No. 2 is a grand jury indictment issued by the grand jury for Roman Seleznev. And Exhibit No. 3 is the Red Notice issued by INTERPOL for Defendant Roman Seleznev.

Q. And did you have copies of these three exhibits with you on July 5th of 2014?

A. I did, ma'am.

Q. Okay. And directing your attention to Exhibit 3, which you identified as a Red Notice for a -- a Mr. Seleznev. For the record, can you explain what a Red Notice is?

A. Yes, ma'am. A Red Notice is issued by INTERPOL, which is a multi-national police cooperating agency that is

designed particularly to induce the cooperation of nations when it comes to conducting investigations. So a Red Notice --

INTERPRETER: Excuse me.

THE COURT: Slow down?

INTERPRETER: A little bit slower, please.

THE WITNESS: A Red Notice in particular is issued by INTERPOL to request the assistance of identifying a defendant or a suspect regarding an investigation currently being conducted, or a wanted person.

THE COURT: Okay. Hold on a second. We'll wait until she completes. All right. Next question.

BY MS. DAVID: (CONTINUING)

Q. By INTERPOL, do you also mean like the international police?

A. Yes.

Q. And is the Maldives also a member of this INTERPOL?

A. Yes, ma'am. To my knowledge, there are approximately 190 members of INTERPOL, of which the Maldives is a member.

Q. What is --

THE COURT: Hold on, hold on. Ms. David, maybe you can just turn back and forth while she's explaining. Okay. Go ahead.

(Pause.)

BY MS. DAVID: (CONTINUING)

Q. What was your purpose for going to the Maldives and being at the airport on July 5th of this year with Exhibits 1, 2 and 3?

A. My purpose of being there was, I was asked on behalf of my headquarters to travel to the Maldives because there was a belief that the defendant, Roman Seleznev, may be located in the Maldives. So my purpose was to work with our diplomatic partners in the U.S. State Department and our partners in law enforcement in the Maldivian authorities -- basically a two-fold purpose:

One was to inquire of the Maldivian authorities whether we could get confirmation that Mr. Seleznev was indeed in the Maldives, and two, if the U.S. Secret Service presented the government of the Maldives with the Red Notice request, what our options would be regarding the possible turning over of Mr. Seleznev to U.S. authorities.

Q. Okay. Sir, if you could take a look at Exhibit 3, which you identified as the Red Notice. Generally, what information is reflected on that form?

A. Well, the Red Notice is always going to have the identifying particulars of the person in question, such as the name, the -- potentially the date of birth if it's known, a photo if it's available, the nationality of the person if it's available, any type of aliases that the person may have if known; also, things such as their occupation, their marital

status, languages spoken, any type of identity documents that could be verified, such as passport numbers. And it will also give a description of the offenses that have occurred and the districts that they've occurred and the jurisdictional venue of where the arrest warrant and the indictment was issued.

Q. So Exhibits 1, 2 and 3, which you've identified, you had copies of these with you when you were in Male on July 5th; correct?

A. Yes, ma'am.

Q. And you recognize them to be copies of the warrant of arrest, which is Exhibit 1 --

A. Yes, ma'am.

Q. -- the superseding indictment, which is Exhibit 2, and the Red Notice which is Exhibit 3; correct?

A. Yes, ma'am.

MS. DAVID: Your Honor, we move to admit these three exhibits at this time.

THE COURT: Defense counsels? Exhibit 3 has already been admitted --

MS. DAVID: That's correct, Your Honor.

THE COURT: -- in the prior hearing, as I recall. The Exhibit A, pages 1 through 5. Mr. Civille, would you agree with that?

MR. CIVILLE: Your Honor, actually, Exhibit 3 was admitted -- was referred to in argument because it was a

document that was used, but I don't think it was -- I would distinguish that from being actually admitted into evidence. But --

THE COURT: It was identified. You're right. It was marked -- it was marked and identified as an Exhibit A-1 through 5.

MR. CIVILLE: And, Your Honor, just to clarify, on Exhibit 1, it is -- the second page of that document is not completed. And am I understanding that they're representing -- the government is offering this as the condition of the document when it was taken to the Maldives -- the Maldives? In other words, I've seen a completed version or a partially completed version of the second page, so I'm -- I'm just trying to inquire, is this meant to be the document as of July 5th?

THE COURT: As of the date that he had it in his possession?

MR. CIVILLE: Yes, Your Honor.

THE COURT: Right. You see the second page?

THE WITNESS: Yes. Yes, sir. This is the document that was in my possession on July the 5th.

THE COURT: So no information provided on that --

THE WITNESS: On page 2?

THE COURT: Right.

THE WITNESS: No, ma'am.

THE COURT: That's correct?

THE WITNESS: That is correct.

MR. CIVILLE: Okay. Thank you, Your Honor. No objection, Your Honor.

THE COURT: All right. For -- Exhibits 1, 2 and 3 are all admitted without objection.

(Exhibits 1, 2 and 3 admitted.)

BY MS. DAVID: (CONTINUING)

Q. So did there come a time --

MR. CIVILLE: I'm sorry, Your Honor. Let me -- because the Court has allowed us to preserve our jurisdictional argument --

THE COURT: Mm-hmm.

MR. CIVILLE: -- um, you know, for identification purposes only, we do not object. We accept that these were the documents that they took, as far as it goes.

THE COURT: Okay. For purposes of this removal hearing, then, the Court is admitting these Exhibits 1, 2 and 3 without objection.

MR. CIVILLE: Thank you.

THE COURT: All right. Go ahead.

BY MS. DAVID: (CONTINUING)

Q. Agent Schwandner, approximately what part of the day on July 5th were you at the Male airport?

A. I believe I arrived at the Male airport shortly after

9 a.m. on the morning of July 5th.

Q. And did -- that morning, did you have an occasion to meet up with an individual later identified to you as a Roman Seleznev?

A. I did.

Q. Can you explain where that encounter took place?

A. Well, the encounter took place in the tourist police station inside the airport in the Maldives. The --

INTERPRETER: I'm sorry. Just one second, please.

THE COURT: Yes, of course. Yeah. So why don't we do it like this.

(Pause.)

INTERPRETER: Thank you.

THE COURT: So I think what we'll do is -- so I'll ask Agent Schwandner -- so, you know, just break it down, like part of your sentence, a little slower, then just wait, let her interpret, and then come back and continue on. Okay?

THE WITNESS: Yes, Your Honor.

THE COURT: We can do that. Just -- it'll make it easier, instead of getting the interruptions.

THE WITNESS: Thank you, Your Honor.

THE COURT: All right. So you arrived at 9:25 a.m.?

THE WITNESS: Approximately. It was probably

shortly after 9 a.m., Your Honor.

THE COURT: Okay. After 9 a.m. Okay. You may proceed.

THE WITNESS: So --

BY MS. DAVID: (CONTINUING)

Q. If you can continue, sir.

A. Right. At approximately 10:20 a.m., the Maldivian tourist police brought Mr. Seleznev and his traveling party into the tourist police station, where he was asked by Special Agent in Charge, Iacovetti, if he would please take a seat on the sofa. His traveling party was asked by the Maldivian authorities to go into the back room of the police station. And at this time, the Maldivian authorities confirmed that -- their -- their concern in looking at the Red Notice was to ensure the identity of Mr. Seleznev. So at that moment, they told me that they indeed had confirmed, based on the Red Notice, that the defendant's name, his identifying birthmark, his passport number, matched those in the Red Notice, and the Maldivian authorities then told me that they were confident that this was the person that was listed in the Red Notice.

So at that moment, with Mr. Seleznev sitting on the sofa, I approached the defendant and I asked the defendant if he was Roman Seleznev, and his response was, "Yes, I am."

Q. And at that time, did you have an opportunity to also review, for example, travel documents related to that

individual?

A. Yes, ma'am, I did. After I introduced myself to the defendant, I told him who I was, who I worked for. I told him the purpose of my being there. I showed him a copy of the indictment and the arrest warrant. And the defendant had a bag that he was carrying on his shoulder that the police authorities then took from him, and then inside that bag were several travel documents relating to the defendant's trip.

Q. And when you say "travel documents," generally, what sort of travel documents? You mentioned passport --

A. Boarding pass, itineraries, receipts for tickets, names of travelers. I believe his departure card from the Maldives was also there.

THE COURT: Slow down a little bit.

THE WITNESS: Sorry, Your Honor.

THE COURT: Just be a little -- just watch the defendant and the interpreter so she can interpret.

Okay.

BY MS. DAVID: (CONTINUING)

Q. Sir, can you take a look at Exhibit 4-A and identify that for the record?

A. Yes, Exhibit 4-A is a copy of the defendant's Russian federation passport that was in his possession when he arrived at the tourist police station in the Maldives.

Q. And can you identify for the record the passport

number for this document?

A. The passport number is 64 November 0410831.

Q. So when you reference November, are you -- do you mean the letter N?

A. The letter N; yes, ma'am.

Q. Where on that document would, for example, the biographical data be located?

A. Well, the defendant's biographical data would be listed -- I have to look.

THE COURT: I'm sorry. Can you just -- what was the passport number again?

THE WITNESS: I'm sorry. I have to look again.

The biographical data page lists the defendant's name as Roman Seleznev. Passport No. 64 N0410881. But it's N-O, actually, so I don't know if that's supposed to be number.

BY MS. DAVID:

Q. Sir, do you mean 0831? As the last three digits?

MR. CIVILLE: Your Honor, if I -- I lost -- I missed what page Ms. Marivic is referring to -- Ms. David is referring to. Sorry.

THE COURT: Let's see. What page is he -- I think he's Exhibit 4, but what page is he referring to in Exhibit 4? Agent?

THE WITNESS: It's 4-A, 21, Your Honor.

THE COURT: Oh, 21.

THE WITNESS: At the top right-hand corner, the biographical page, the passport number is 640410831.

MS. DAVID: Your Honor, that would be the last page.

BY MS. DAVID: (CONTINUING)

Q. Is that the last page of the exhibit, sir?

A. Yes, ma'am.

THE COURT: So for the record, 4-A is pages 4-A, 1 through 21. Okay.

BY MS. DAVID: (CONTINUING)

Q. On that last page for the biographical data, you mentioned the name of the passport holder. Is there also a photograph?

A. Yes, ma'am, there is a photograph.

Q. Okay.

INTERPRETER: Excuse me. I did not hear the question.

THE COURT: Okay. Repeat the question, please. Go ahead, Veronica. What's the last question?

(Ms. David proceeded to repeat question.)

BY MS. DAVID: (CONTINUING)

Q. Sir, on the biographical data page of that passport --

THE COURT: All right. She's going to repeat it.

Never mind.

BY MS. DAVID: (CONTINUING)

Q. -- is there also a photograph?

A. Yes, ma'am, affirmative. There is a photograph.

Q. And did that photograph match the person who identified himself to you as Roman Seleznev?

A. Yes.

MR. CIVILLE: Objection, Your Honor. Calls -- speculation on the part of this witness. That's really a decision for Your Honor to make.

THE COURT: Did he indicate to you that that was his name, Roman Seleznev?

THE WITNESS: Yes, Your Honor. That was the first question that I asked him. When he -- when I approached him, I asked him if he was Roman Seleznev, and he responded, "Yes."

THE COURT: Okay. All right. Overruled. Go ahead.

BY MS. DAVID: (CONTINUING)

Q. Sir, you had a chance to peruse through the pages of this passport; correct?

A. Yes, ma'am.

Q. I want to direct your attention to what is the fourth page of this exhibit.

THE COURT: Is that 4-A-4? Is that what you're

looking at?

MS. DAVID: Yes, Your Honor.

THE COURT: Okay.

BY MS. DAVID: (CONTINUING)

Q. Are you there, sir?

A. Yes, ma'am.

Q. Okay. On the left page of that passport, do you recognize the information reflected on that page?

A. At the top, it looks like an arrival and departure stamp. At the bottom of the page, I recognize the arrival and departure stamp for a visit to Singapore.

Q. And what dates are reflected on that stamp?

A. It appears that the defendant arrived in Singapore on 7 April 2010 and departed on 9 April 2010.

Q. Agent Schwandner, you mentioned in addition to this travel document, there were other documents you saw at the airport. Could you take a look, please, at Exhibit 5-A.

A. Yes, ma'am.

Q. Had you seen -- what is 5-A?

A. 5-A is the -- is an additional passport that was in the possession of the defendant. It was located in the travel bag that he was carrying with him.

Q. And is there also a photograph page in this exhibit, and can you identify what page for the record?

A. Yes, ma'am. It's Exhibit 5-A-3. It shows the

photograph of the defendant, Roman Seleznev.

Q. What, if any, similarities did you find comparing the Red Notice, which is Exhibit 3, and these travel documents that you just identified, Exhibits 5-A and/or Exhibit 4-A?

A. Well, ma'am, the --

MR. CIVILLE: Your Honor, if that question is directed at the photograph in Exhibit 5-A-3, then we make the same objection as to the earlier photograph, that the witness isn't -- it's just speculation on his part. It's really an issue for your court -- Your Honor to decide.

THE COURT: All right.

MS. DAVID: I'm not asking him in particular of the photograph. I'm asking him what, if any, similarities he found with these three exhibits.

THE COURT: Okay. Overruled. Go ahead.

THE WITNESS: Well, the passport numbers matched the Red Notice to the passport numbers that were in the possession of the defendant at that time.

BY MS. DAVID: (CONTINUING)

Q. And which passport number are you referring to?

A. I'm referring to his international passport, which is Exhibit 4-A.

Q. Okay.

A. So that would have been the Passport No. 640410831.

Q. And where on the Red Notice document is that

information reflected?

A. Page 32, identity documents, Russian Passport No. 640410831.

Q. So in -- you're saying -- are there any other similarities other than the passport number that you just mentioned?

A. Well, aside from the photograph, the identifying marks of the defendant's mole underneath his left eye, his name matched, and, obviously, the country of origin.

Q. Okay. And when you talked about distinguishing marks or characteristics, where is that reflected on the Red Notice document, sir?

INTERPRETER: I'm sorry.

THE WITNESS: It's on page 3-2, distinguishing marks and characteristics.

THE COURT: I'm sorry. What is it, Ms. Interpreter?

INTERPRETER: Could you please repeat the last question?

THE COURT: Repeat the last question.

BY MS. DAVID: (CONTINUING)

Q. With respect to distinguishing marks information that you just referred to, where is that referenced in the Red Notice, sir?

A. In the Red Notice, it is on page 3-2, above numeral

2, "distinguishing marks and characteristics." It says "Seleznev's height and weight are estimated, and he has a mole below his left eye."

Q. Do you see that person here in the courtroom today, sir?

A. I do, ma'am.

MR. CIVILLE: Objection as to when she says "that person." You mean the person that they arrested in the Maldives?

MS. DAVID: Let me rephrase, Your Honor.

THE COURT: All right. Very well. Rephrase.

BY MS. DAVID: (CONTINUING)

Q. Agent Schwandner, the person who you encountered in the Maldives who identified himself to you as Roman Seleznev, do you see him in the courtroom today?

A. Yes, ma'am.

Q. For the record, can you describe what color of shirt he's wearing? And if you need to stand...

THE COURT: You may step down.

THE WITNESS: May I step down, Your Honor?

THE COURT: You may. You may.

(Witness stepped down from stand and walked up to defense table.)

THE COURT: Why don't you give him a mic, Carm, just in case there's additional --

THE WITNESS: It appears the defendant is wearing a blue shirt and blue jacket.

THE COURT: Hold on a second, Agent. Why don't you speak on that mic right next to you right there.

THE WITNESS: It appears the defendant is wearing a blue shirt with a blue jacket.

BY MS. DAVID: (CONTINUING)

Q. And, sir, the person that you just identified, do you see that distinguishing mark you just referenced earlier?

A. Yes, ma'am.

Q. And what would that be?

A. The defendant has a mole below his left eye.

Q. If you can go back to the witness stand.

A. (Witness complied.)

Q. Sir, can you next take a look at Exhibit 6 for the record? And have you seen that before?

A. Yes, ma'am.

Q. Can you explain what it is and where you saw it before?

A. It is a departure card. So that's a two-part -- when you arrive in a country, some countries have arrival and departure cards. So they collect the arrival card at the time you arrive, and you hold onto the departure card and then it's taken from you as you pass through Immigration when you're clearing Immigration as you're departing the country. So in

this instance, it's a departure card from the country of the Maldives.

Q. And is there any stamp reflected on this exhibit?

A. Yes, ma'am.

Q. And what is it -- what information is --

A. The stamp is Maldivian immigration stamp of 21 June 2014, which indicates the day of arrival.

Q. And where did you --

MR. CIVILLE: Wait. I'm sorry. Your Honor, I object to that, too. The witness has testified it's a departure stamp, a departure card, and now he's testifying that the June 21 stamp is actually an arrival date. And I don't think the witness has been shown to have any -- the foundation for making that jump.

THE COURT: Okay. So the objection is lack of foundation?

MR. CIVILLE: Yes, Your Honor.

THE COURT: Sustained. You want to build a foundation?

BY MS. DAVID: (CONTINUING)

Q. Sir, you indicated that you are currently stationed in the Bangkok resident office --

A. Yes, ma'am.

Q. -- correct?

So part of your duties -- does it include a lot of

travel?

A. Yes, ma'am.

Q. Like how many ports -- international airports, for example, have -- approximately, have you visited while you were in that region?

A. I have visited probably approximately ten international airports in the Asia-Pacific region in the past two years.

Q. And have you yourself, for example, had to fill out arrival/departure cards of countries and airports you visited?

A. Yes, ma'am. And I filled this card out myself when I arrived in the Maldives on July the 3rd. That's how I knew that that was the date of arrival, because they stamped "3 July" on my card.

Q. So Exhibit No. 6 -- when you reference June 21, 2014, as a stamp of arrival date, that's consistent with your experience traveling to the Maldives yourself; correct?

A. Yes, ma'am. It's also consistent with the information that was provided to us by the Maldivian authorities.

Q. And where did you see a copy of Exhibit 6?

A. I believe it was with his passport.

Q. And when you say "passport," are you referring to the passport listed as 4-A?

A. Yes, ma'am.

Q. You mentioned earlier that you also saw travel-related documents in connection with Mr. Seleznev. Can you take a look at Exhibit 7-A?

A. Yes, ma'am.

Q. Have you seen this exhibit before?

A. Yes, ma'am.

Q. And where?

A. These are the documents that were found in the travel bag that was contained -- that the defendant had on his shoulder. Inside the bag where these itineraries, receipts, boarding passes.

Q. And when you talk about itinerary, are you referring, sir, to Exhibit 7?

A. Exhibit 7; yes, ma'am.

Q. 7-A?

A. Yes, ma'am.

Q. And when you're referencing a boarding pass, are you referring to Exhibit 8?

A. Yes, ma'am.

MR. CIVILLE: Your Honor, if I may interject at this point. We'd like to preserve an objection. My understanding of the case law, Your Honor, is that as a removal proceeding, although it was appropriate for us to raise the issue of jurisdiction, it would not be appropriate for us to raise a substantive challenge such as a motion to

suppress. So we would ask the Court to note simply an ongoing objection to any -- the admission of any evidence or the testimony of any documents that were taken from our client in the Maldives because we believe those are properly subject later on to a motion to suppress.

THE COURT: All right. So you want to preserve your --

MR. CIVILLE: Yes, Your Honor.

THE COURT: -- right to have a motion to suppress heard before the indicting court?

MR. CIVILLE: That's right.

THE COURT: So noted.

MR. CIVILLE: And I won't keep making the same objection, but I'd like to -- I'd ask the Court for a continuing objection.

THE COURT: All right. The Court will accept that as a continuing objection, anything related to -- specifically --

MR. CIVILLE: Any evidence or, actually, any statements by our client.

THE COURT: All right. Very well.

MR. CIVILLE: Thank you.

THE COURT: The Court will preserve that objection for you.

You may proceed.

MS. DAVID: Your Honor, the government at this time, noting counsel's objection, moves to admit Exhibit 4-A, which is the passport identified with the last three digit number 831.

THE COURT: Okay. Let me just make sure, before we do that -- before you go into the other exhibits, I just want to make sure we're on record in terms of the number of pages. With regard to Exhibit 1 that has already been previously admitted, there's only two pages; is that correct?

MS. DAVID: That is correct, Your Honor.

THE COURT: And then Exhibit 3 is the superseding indictment that has been sealed and -- that has not been unsealed, has it? I see "sealed" there.

MS. DAVID: No, it has been unsealed, Your Honor.

THE COURT: It has been unsealed? So that is pages 1 through 27; correct?

MS. DAVID: Actually, for the record, Your Honor, Exhibit 1 is the two-page arrest warrant. Exhibit 2 -- correct, Your Honor -- is the 27-page indictment.

THE COURT: Okay. And then Exhibit 3 is marked as 3 and then all the way up to 3-5. So there's five pages, right?

MS. DAVID: That is correct, Your Honor.

THE COURT: All right. Then Exhibit 4, you're moving to admit -- moving for admission of Exhibit 4, which is

the passport, and that has four -- just for -- 4-A to 4-A-21?

MS. DAVID: That is correct, Your Honor.

THE COURT: Okay. What else?

MS. DAVID: Also, I move to admit Exhibit 5-A. That also has multiple pages.

THE COURT: Okay. So for the record, that's 5-A through -- is it 5-12?

MS. DAVID: That's correct, Your Honor.

THE COURT: So 5-A through 5-12, okay.

MS. DAVID: The Maldives department -- departure card identified as Exhibit 6.

THE COURT: Which has one page. Okay.

MS. DAVID: The itinerary identified as Exhibit 7-A.

THE COURT: Consisting of three pages -- two pages.

MS. DAVID: Two pages, Your Honor.

And the boarding pass identified as Exhibit 8.

THE COURT: All right. Okay, Counsels. Just -- you just want to preserve your objections?

MR. CIVILLE: Yes, Your Honor.

THE COURT: All right. Very well. For purposes of the suppression.

All right. So the Court will admit Exhibit 4 in its entirety, from 4-A to 4-21. The Court will also admit 5-A

to 5-12. The Court also admits, for the record, Exhibit 6, which is -- consists of one page; Exhibit 7, from 7-A to 7-A-2. So there's two pages there. And then, also, Exhibit 8 is admitted. And the Court notes the objection already raised by defense counsel.

(Exhibits 4, 5, 6, 7 and 8 admitted.)

THE COURT: Okay.

BY MS. DAVID: (CONTINUING)

Q. Agent Schwandner, if you can compare Exhibit 7-A and Exhibit 8, can you tell what airline information is reflected on both these exhibits?

A. On Exhibit 7-A, it looks like a receipt from Transaero Airlines, and Exhibit 8 is a boarding pass from Transaero Airlines for Mr. Roman Seleznev from Moscow to Male.

Q. Okay. Showing an arrival date of what?

A. 21 June.

MS. DAVID: May I have a moment, Your Honor?

THE COURT: You may.

(Pause.)

MS. DAVID: Your Honor, may I inquire if my colleague, Mr. Freedman, has any questions at this time for the agent?

THE COURT: Mr. Freedman, yes.

MR. FREEDMAN: I do not. Thank you.

THE COURT: No questions.

MS. DAVID: Um, I have no questions at this time, Your Honor, for Agent Schwandner.

THE COURT: Okay. Mr. Civille, any questions?

MR. CIVILLE: Yes, Your Honor.

THE COURT: Okay. You may proceed.

CROSS-EXAMINATION

BY MR. CIVILLE:

Q. Agent Schwandner, I'm Patrick Civille. I'm counsel for Mr. Seleznev.

Turning to Exhibit 2, the superseding indictment, apparently issued on March 16, 2011. Let me ask you, sir, were you involved in any way in the presentment of evidence -- in presenting evidence to that grand jury that returned that indictment?

A. I was not, sir.

Q. Okay. Were you involved in the investigation that led up to the issuing of that superseding indictment?

A. I was not, sir.

Q. Okay. Listening to your testimony, I had the impression that your first involvement in anything involving a person named Roman Seleznev was shortly before you went to the Maldives in July of this year; is that correct?

A. I initially became aware of the defendant in 2012, also, while I was working in the Bangkok office.

Q. Okay. And when you say "became aware of," knew that there was a warrant out for somebody named Roman Seleznev?

A. Yes, sir.

Q. Were you -- did -- were you -- other than knowing -- having that general information, were you involved at all in 2012 in the investigation into Roman --

A. As far as the facts of the indictment, sir?

Q. Yes.

A. No, sir.

Q. Okay. Or into the -- any efforts to pursue Roman Seleznev?

A. In December of 2012, yes, sir.

Q. Okay. And what was your involvement then?

A. I was in Bali, Indonesia.

Q. And what was the nature of your involvement in Bali -- and that was in December 2012? I'm sorry.

MS. DAVID: Your Honor, the government objects. The purpose of this hearing is strictly identity as to the individual the agent encountered at the Maldives airport.

THE COURT: Okay. Mr. Civille?

MR. CIVILLE: Well, actually, that's not at all correct, Your Honor. The issue is, is the Roman Selez- -- Valerievich Seleznev who is here in the courtroom, is that the person named in the superseding indictment. So far, we haven't heard any testimony on that, nothing to link --

they've arrested a person named Roman Seleznev, and now they're asking you to believe that that's the Roman Seleznev named in the superseding indictment. This witness so far hasn't given us any link to that.

MS. DAVID: And the government does intend to call another witness for that purpose.

MR. CIVILLE: And that's fine. I anticipate, though, they're going to call somebody else, but they've chosen to put this witness on the stand, and I think he's fair for cross-examination.

THE COURT: Okay. Overruled. Go ahead.

MR. CIVILLE: Thank you, Your Honor.

BY MR. CIVILLE: (CONTINUING)

Q. In Bali, sir, was that December 2012?

A. December of 2012; yes, sir.

Q. Okay. And what was your -- give me a brief rundown of what happened in Bali.

A. It was just -- again, there -- we believed that the defendant was possibly traveling in Bali at that time. We were unsure. We, being the Secret Service, were unsure if that was the case or not, and we were just making some initial inquiries with the Indonesian government to potentially see. So I became aware of the actual indictment and the arrest warrant at that time.

Q. Okay. And did anything come of your trip to Bali?

A. No, sir.

Q. It didn't produce any useable information for your investigation?

A. No, sir.

Q. All right. Then you mentioned that -- and I was a little unclear of this -- um -- okay, you got a call from headquarters in Bangkok or wherever your headquarters is -- is that --

A. Washington.

Q. Washington, all right. To head down to the Maldives. I thought you said you arrived a little after 9 a.m. on July 5th, but perhaps what you said was you arrived at the airport. You had actually arrived in the Maldives earlier than that; is that correct?

A. I did, sir.

Q. Okay. And I believe you said you arrived on July 3rd.

A. 3 July; yes, sir.

Q. Were you part of a contingency of Secret Service agents or did you arrive alone?

A. No, sir. At that time, I was the only Secret Service agent in the Maldives.

Q. And when you got there, were there other agents already in place?

A. Not at that time, sir.

Q. Other agents did join you?

A. The next day, sir.

Q. And how many?

A. One, the special agent in charge from our Honolulu field office.

Q. And who is that, sir?

A. Mr. Dave Iacovetti.

Q. Okay. And who else?

A. And Special Agent Mark Smith, the assistant regional security officer from the U.S. Embassy in Columbo, Sri Lanka.

Q. These are all Secret Service agents?

A. No, sir. Special Agent Iacovetti is Secret Service -- Special Agent in Charge Iacovetti is Secret Service. I work for the Secret Service. ARSO Smith works for the Diplomatic Security Service, State Department.

Q. So that would be -- do I have that correct, there were three of you then?

A. Yes, sir.

Q. Okay. Was that the entire contingent, or were you joined by anybody else by July 5th?

A. That was it, sir.

Q. All right. And when -- on the 3rd, did you receive additional information or -- than what you -- let me back up.

What information did you have besides -- when you arrived in the Maldives besides the superseding indictment and

the -- if you had it at the time, the warrant?

A. That's all the information that I had.

Q. Just those two documents?

A. Those two documents, yes.

Q. And then after the -- Agent Iacovetti, who's in charge of the --

A. He's the special agent in charge of the Honolulu field office, so he supervises the entire Asia-Pacific region for the Secret Service.

Q. So this was pretty much his show?

A. (No response.)

Q. He was in charge of this detail then?

A. He was the supervisor on the ground.

Q. Okay. All right. And when he arrived, did you receive additional information?

A. No, sir. Not at that time.

Q. All right. Did you have contact with the Maldivian authorities when you arrived on July 3rd?

A. I did not.

Q. After -- how about on July 4th?

A. July 4th, yes, sir.

Q. Okay. What contact did you have with the Maldivian authorities on July 4th?

A. We met with the Maldivian authorities on July 4th. Again, as I told the assistant U.S. attorney, our purpose in

the Maldives was simply to ascertain information. We believed that the defendant was possibly in the Maldives. We were asking the Maldivian authorities to assist us in determining whether Roman Seleznev was indeed in the Maldives; and, two, if we provided the Maldivian authorities with a INTERPOL Red Notice, would they consider action on their part or what options would they consider then to potentially turn the defendant over to U.S. authorities.

Q. All right. And which authority -- the Maldivian authorities you're talking about, which -- who are they?

A. These are police authorities that we met with on the 4th of July.

Q. I didn't hear that. The --

A. Police authorities.

Q. -- police -- thank you.

Is that like a -- do you know, is it a national police? You mentioned the airport police. What level police authority was this?

A. I believe they -- I wouldn't say for certain, sir, but I believe they were the Maldivian national police force.

Q. You said that you had reason to believe --

INTERPRETER: Excuse me.

MR. CIVILLE: I'm sorry.

INTERPRETER: Uh -- the defendant...

(Mr. Civille consulted with interpreter.)

MR. CIVILLE: I'm sorry, Your Honor. The -- Your Honor, in a few minutes, I'm going to ask -- I always have translators say this, "I'm fine. I'm fine." But, actually, translating is really exhausting --

THE COURT: Sure.

MR. CIVILLE: -- and it leads to a lot of errors. And I'd ask the Court in a few minutes if we could take just a ten-minute break for the translator.

THE COURT: Sure. Okay.

MR. CIVILLE: Thank you.

BY MR. CIVILLE: (CONTINUING)

Q. Okay. Going back to the -- I'm sorry. I think your last answer was, not to hold you to it, but you thought it was some kind of national police force?

A. Yes, sir.

Q. And was this in a -- just for -- so it wasn't at the airport? It was somewhere downtown?

A. It was in Male.

Q. You mentioned that you went there just on -- the information you had is you thought that a person named Seleznev was going to be there in the Maldives. Is that right?

A. Well, I mean, I had the previous information that I knew of the indictment and the arrest warrant.

Q. Okay.

A. So I was familiar with the case. So the knowledge that I went there with was, yes, there was the potential that Roman Seleznev was present in the Maldives, but I did not have any confirmation at the time that I met with the police on July 4th.

Q. And what was the source of the information that you -- that --

A. I received the information from my headquarters, sir. I do not know where they received the information from.

Q. Very good. Thank you.

So you went and had the meeting with the Maldivian police, possibly the national police. How did they respond to your inquiry?

A. Well, on the first part of the inquiry is what we were looking -- seeking confirmation that Roman Seleznev was in the Maldives. The police confirmed through immigration records that a Roman Seleznev matching the passport number was present in the Maldives and did arrive on the 21st, I believe it was, of July.

Q. And as to the second part of your inquiry?

A. We'd asked, of course -- my second part of my inquiry was, if we were able to present the authorities with a Red Notice, would any action be considered or any potential action be considered on the part of the Maldivian authorities to turn the defendant over to U.S. authorities, and we did not receive

any answer on that day. We were not given any specific information by the Maldivian authorities as to whether they would or would not at that time.

Q. Did they indicate to you that they would have to seek authority from a Maldivian court?

A. They did not.

Q. Do you know as to -- did you receive -- subsequently receive information that they had sought authority from a Maldivian court?

A. No, sir.

Q. Okay. All right. What was your next step, then? You had this meeting that was, I gather, inconclusive as least as to the question of --

A. Well, like I said, it was --

Q. -- would they honor a Red Notice.

A. Correct. So the next step was -- I believe it was late -- late in the evening on July 4th in Male. They indicated that the -- the police asked us if we would present or give them a copy of the Red Notice. That was their request.

Q. Now, at that time, am I correct, you did not have a Red Notice yet?

A. The Red Notice was ready to go. The Secret Service was prepared to send out the Red Notice through INTERPOL, through our INTERPOL liaison. So we were prepared to do that,

but we as of yet had not released the Red Notice.

Q. The Red Notice, for those of us who don't deal with these things, it is -- and that's Exhibit 3. It bears at the top right-hand corner a stamp that appears to be a red stamp, hence the term, perhaps. But it appears to be the stamp of INTERPOL?

A. Yes, sir.

Q. Okay. But the notice itself is -- do I understand that was prepared by the Secret Service?

A. The Secret Service has a liaison officer assigned to INTERPOL in Lyon, France. They also have a liaison officer in Washington, D.C., as I believe most federal law enforcement agencies do.

Q. All right. And --

A. So I wouldn't be -- as far as the source of the notice, the source of the notice is actually from INTERPOL. INTERPOL sends out the notice.

Q. All right. But the information in the Red Notice, that's strictly provided by, in this case, the United States?

A. Yes.

Q. I think what I was trying to confirm is that there's no independent verification of this information by INTERPOL as a separate entity. This is information that -- the United States sends this information, prepares the Red Notice or prepares the information, and then INTERPOL issues it; is that

right?

A. To my knowledge, yes, sir.

Q. Okay. The date on the INTERPOL notice at the top -- and that's on first page of Exhibit 3 -- is July 5th. And would I be correct in saying that's the day you received it?

A. Yes. The actual Red Notice was released at 10 p.m., Eastern Standard Time, Washington time, on July 4th, but that would have been early morning hours in Lyon, so that's why it's 5 July. It was actually issued at 7 a.m., local time, in the Maldives on July 5th.

Q. That's what's confusing me. When you say -- if it's issued by INTERPOL --

A. The Secret Service, through our liaison to INTERPOL -- this is the way my understanding is. The Secret Service, through our liaison to INTERPOL, was asked to release the Red Notice at 10 p.m., Eastern Time, Washington time, on the 4th of July. When it was released, that would have been early morning, probably 3 a.m. in Lyon, France, which is where INTERPOL headquarters are, and it was 7 a.m. on Saturday, July 5th in the Maldives.

Q. Did you have any input into the contents of the Red Notice?

A. I did not.

Q. Turning to Exhibit 6; this is the departure stamp from the Maldives?

A. Departure card.

Q. I'm sorry. You got me. Departure card.

A. Yes, sir.

Q. And your testimony, if I understood it, is that the June 21st stamp on the departure card is an arrival date.

A. Yes, sir. That's to my -- best of my knowledge. They also stamped my card when I arrived.

Q. All right. And -- I'm sorry. When you left, they stamped your card again?

A. When they left, I don't know if they stamped my card. They took the card, and that was it.

Q. Okay. All right. And there's no departure stamp that you're aware of on this card?

A. I do not see that.

Q. Okay. Was this card in Mr. Seleznev's possession when you arrested him?

A. I did not arrest him in the Maldives. I did not arrest him in the Maldives, sir.

Q. What is it that you think you did to him?

A. I arrested him when he landed in Guam.

Q. All right. Well, let's walk through that for a moment. So your testimony is that he was escorted or shown into the tourist police station room?

A. That is correct.

Q. Okay. And there, he was met by the three members of

your team?

A. That is correct.

Q. Okay. And you asked him if his name was Roman Seleznev?

A. I did ask him that. Yes, sir.

Q. And at that point, that was -- you didn't -- did you show him any documents at that point or did you simply ask him --

A. Well, my first question was, what is his name.

Q. Pardon me?

A. My first question was, "Are you Roman Seleznev?"

Q. All right. And from that moment, was Mr. Seleznev ever out of your custody before he arrived on Guam?

A. At that moment, Mr. Seleznev was not technically in my custody. He was still in the custody of the Maldivian authorities at that time.

Q. Well, had he been arrested by the Maldivian authorities?

A. I don't know if I could clarify or speak for the Maldivian authorities as to what his status was, sir. All I can tell you is what the Maldivian authorities told me.

Q. What did they tell you?

A. They told me or informed me on the morning of Saturday, July 5th, that they were comfortable with detaining Mr. Seleznev based on the INTERPOL Red Notice as long as they

could verify to their satisfaction that the information contained on the Red Notice matched that of the defendant.

Q. Did you see any documentation that they had -- the Maldivian police had detained him?

A. I also -- just if -- if I also may add further that they told me on the morning of the 5th that the decision to undertake this procedure was made at the highest levels of the Maldivian government. But I was not privy to any internal discussions as to who was involved. I do know the president of the Maldives issued a statement following this operation where he very clearly stated that the -- that the defendant was not arrested or no foreign agents arrested the defendant on Maldivian soil, that this was a -- a operation conducted by Maldivian law enforcement and under the control of Maldivian law enforcement.

Q. Do you know how Mr. Seleznev arrived at the airport?

A. It is my understanding that he arrived via bus. I was in the tourist police station, so I can't confirm.

Q. Was one of the members of your squad out there looking to see when he arrived?

A. At the?

Q. At the airport.

A. I believe the Maldivian police invited Special Agent in Charge Iacovetti to ride on the bus with them from the seaplane to the airport. So one of our agents was actually on

the bus with Mr. Seleznev when he arrived at the airport.

Q. Okay. But -- and it is your understanding that Mr. Seleznev did not know that he was under detention at that point? He was on the bus voluntarily, in other words?

A. Yes. As far as I know, yes, sir.

Q. Okay. As far as you know, he was just checking in to go back home?

A. My understanding from what my counterparts told me is that when Mr. Seleznev approached the departure hall to enter the departure hall, he was then approached by the tourist police at the airport, where he was asked to present his documentation. And at that point, they looked at his documentation to his passport, and my only -- and this is, again, my belief, that they were confirming his identity from his passport -- his name, his passport number, his photo, and such -- because they wanted to ensure that those matched the information that was provided on the INTERPOL Red Notice. And when they were comfortable with that, they brought Mr. Seleznev and his party to the tourist police station.

Q. Okay. And when he was taken into the tourist -- into that room you described in the tourist police station, he was handcuffed by you or one of the members of the --

A. Negative. Not that moment, sir. At that time, he was asked to sit on the couch.

Q. And at some point while he was in that room, was he

handcuffed?

A. He was handcuffed prior to leaving that room to go to the departure hall.

Q. All right. And he went to the departure hall -- and whose handcuffs was he wearing, yours?

A. They were mine, sir.

Q. Okay.

A. Again --

Q. And at that point, you don't think he's under arrest?

A. At that point, he was turned over to the custody of the United States, as instructed by the Maldivian authorities. This was a very coordinated effort on the part of the Maldivian authorities, sir. They were in control of the operation. At no time did I do anything on my own without their consent or authorization.

We were told by the Maldivian authorities that at the time of the escort, there would be two Maldivian police in front, two tourist police in back, and that myself and Special Agent Smith would actually escort the defendant to the departure hall for departure processing.

It was at this point that I asked the Maldivian police if I could handcuff the defendant because I was not going to transport the defendant at their request, because of officer safety, without a pair of handcuffs on. So I asked and was granted permission to handcuff the defendant in front,

with his hands in front, for the short walk from the airport tourist police station to the departure hall.

Q. Okay. So he's in your custody at that point, right? You've handcuffed him?

A. That is the beginning of the point where he is being turned over from the Maldivian authorities to the U.S.

Q. And he was still on -- and geographically, he was --

A. But he's not technically under arrest. He's not under arrest by the U.S. authorities at that time, though. I have no authority in the Maldives.

Q. So he could have walked away?

A. The Maldivian authorities, I don't believe, would have allowed him to do that. But, again, that was their decision.

Q. But from you, he could have walked away?

A. Excuse me?

Q. From you. You're saying from you, he could have walked away?

A. He could have walked away from me if he chose to. I don't believe the Maldivian authorities would have allowed that --

Q. Would you have unlocked the handcuffs --

COURT REPORTER: One at a time.

THE COURT: Okay. One at a time.

BY MR. CIVILLE: (CONTINUING)

Q. Would you have unlocked the handcuffs and said, "Okay"?

A. Sir, the handcuffs were in front. He wasn't detained in any way. He could walk freely.

Q. And at what point do you believe that the Maldivian authorities relinquished control over him to you?

A. Relinquished control completely? When the plane went wheels up from Maldivian soil. That's the actual point of transfer.

Q. Did have a choice about entering the airplane, your airplane?

A. No, he did not have a choice, sir. Again, Maldivian authorities were dictating the circumstances of this -- of this entire operation.

Q. Okay. Is there anything in writing to this effect?

A. No, sir. Again, I was not privy to any of their discussions. I was just told what was going to happen.

Q. Oh, so you don't even know if this is really what the Maldivian authorities said?

A. All I have to say, sir, is what they told me.

Q. Who --

A. They told me. The Maldivian police.

(Pause.)

Q. And, I'm sorry, the aircraft was a United States charted aircraft?

A. I believe the aircraft was charted by the U.S. Secret Service. Yes, sir.

Q. And you're not suggesting that my client voluntarily boarded that aircraft, are you?

A. I'm saying that the Maldivian authorities --

Q. That's not my question. I think you understand my question, sir.

A. Do I think your client voluntarily boarded the aircraft?

Q. Yes.

A. No.

THE COURT: Sorry. The answer is?

THE WITNESS: No, ma'am. No, Your Honor.

MR. CIVILLE: Thank you. If I could have one moment, Your Honor.

Your Honor, would now be a convenient time to let the interpreter take a few minutes?

THE COURT: Oh, sure. Okay. We'll take a ten-minute recess. Do you have any further questions of this witness?

MR. CIVILLE: I do, Your Honor.

THE COURT: Oh, you do. All right. Ten-minute recess.

(Recess taken at 3:24 p.m.)

(Back on the record at 3:47 p.m.)

THE COURT: Please be seated. All counsels are present. The defendant's present with the court interpreter. You may proceed, Mr. Civille. And the agent is still on the stand.

THE WITNESS: Thank you, Your Honor.

MR. CIVILLE: Thank you, Your Honor.

THE COURT: All right.

(Pause.)

BY MR. CIVILLE: (CONTINUING)

Q. Agent Schwandner, thank you. I'll try not to keep you too much longer. Going to Exhibit 4-A-21.

A. Yes, sir.

Q. You recognize the -- there is -- next to the photograph, there's printing both in English and in Cyrillic characters, yes?

A. Yes, sir.

Q. Next to the word "Roman" -- "Roman," actually -- is a Cyrillic word which is not translated. Were you aware that that was his patronymic name?

A. I was not.

THE COURT: I'm sorry. His what kind of name?

MR. CIVILLE: We would call it -- it's similar to -- it's akin to a middle name, Your Honor.

THE COURT: Okay.

MR. CIVILLE: Although it has a different

distinction in Russian. We would represent that -- and we'll see if the government agrees -- that that word next to the name -- and we can actually have the translator, if we have to, testify on this limited issue, that that name is Valerievich.

COURT REPORTER: Can you spell that, please.

THE COURT: Spell.

MR. CIVILLE: I believe it's V-A-L-E-R-I-E-V-I-C-H. Valerievich.

BY MR. CIVILLE: (CONTINUING)

Q. Going back, then, to Exhibit 1, the warrant for arrest. And, actually, start on Exhibit 2. You, on -- in questioning by Ms. David, you pointed out some identifying characteristics that you relied on in the Maldives. You mentioned the photograph and the mole on the face. Do any of these identifying characteristics appear in the superseding indictment, to your knowledge?

A. To my knowledge, I do not know, sir.

Q. Pardon?

A. I do not know, sir.

Q. Okay. And the warrant for arrest, it does not have any of those identifying characteristics?

A. No, sir.

Q. When you asked Mr. Seleznev in the Maldives in that room in the airport if he was Roman Seleznev, you did not

first show him the indictment and ask him, "Now, are you this Roman Seleznev?"

A. I did not show him the indictment or the warrant until afterwards, sir.

Q. Thank you.

Do you know where the identifying characteristics in the Red Notice came from?

A. I do not at this time, sir.

Q. And I'm gathering that since you were not involved in the investigation back in 2011, you would not know whether the information in the Red Notice was part of the grand jury proceedings.

A. I would not know, sir.

Q. Do you know if the photo in the Red Notice -- do you know, did that come from the PISCES system?

A. I do not know that either, sir.

Q. Was that PISCES system information available in the Maldives?

A. I do not know the answer to that, sir.

Q. Was there a Red Notice issued in December 2012 when you went to Bali?

A. Not to my knowledge.

Q. And I think I asked you this, but I just want to back up for one moment and clarify. When you -- you mentioned you spoke to the authorities, the national -- possibly the

national police; do you know if an application for a warrant was made in the Maldives?

A. You mean by the Maldivian authorities?

Q. Yes.

A. I do not know. They did not provide me with any information.

Q. As you were -- once you were all present in that room at the airport, did the Maldivian authorities say anything to you from that point on? Did you have a discussion with them?

A. No, sir. You mean when -- in what room?

Q. In the airport?

A. At the tourist police station?

Q. At the tourist police station, once Mr. Seleznev arrived at the airport, did you have any further discussion with the Maldivian authorities?

A. Yes. Yes. They -- the discussion was to confirm -- again, their concern was that they wanted to match for sure the person listed in the Red Notice with the person that was present in the room. So my discussion with them at the time was examining the defendant's passport and the Red Notice, and from what they observed, they matched the passport numbers to the names, to the identifying marks, to the date of birth. Then they were convinced that it was the same person. And then the next discussion we had with them was when they were ready to move the defendant to the -- to the VIP hall for

immigration processing. Actually, all of us were going to the VIP hall for immigration processing.

Q. Okay. So Mr. Seleznev had not been through processing yet when he was brought into the police room?

A. He had not gone through immigration at that time, no.

Q. And the departure card that I think was in Exhibit 6 that there's been testimony about, that was in Mr. Seleznev's possession when he left the Maldives?

A. It was. I believe in normal procedures, they would normally take the card. They did not. In my experience, they normally do.

Q. Who did you -- who was -- do you recall, who was your point of contact?

A. I'm sorry, sir; I don't know his name. There was more than one.

Q. On the Maldivian side?

A. Yes, sir.

Q. Just as a further point of clarification, you refer to Exhibit 5 as another passport. In fact, do you recognize that, from your experience, as being an internal Russian passport document, something we don't have in the U.S.?

A. I did not recognize that at the time, sir, no.

Q. Okay. Was that later explained to you by someone?

A. I was told that that was most likely what would, I guess, be considered a domestic passport. Something similar

to that, like -- as you said, we would not have in the United States.

MR. CIVILLE: Okay. Thank you. If I have just one second, I think I'm finished.

THE COURT: Okay.

(Pause.)

MR. CIVILLE: Okay. Thank you, Your Honor. No other questions.

Thank you, sir.

THE COURT: Ms. David, any other questions?

MS. DAVID: Just very briefly, Your Honor.

THE COURT: Sure.

REDIRECT EXAMINATION

BY MS. DAVID:

Q. So, sir, Government Exhibit 6, which is the Maldives departure card, you indicated you happened to -- this was one of the travel documents you had in your possession when you left the Maldives -- Maldives; correct?

A. That is correct.

Are you talking about this exhibit, ma'am?

Q. Yes.

A. Yes, ma'am.

Q. Okay. And that stamp reference is an arrival stamp of --

A. Yes, ma'am.

Q. -- June 21st? So approximately what time of the day, then, did you, Mr. Seleznev, your colleagues, leave the airport, "wheels up"?

A. It was approximately 11:20 a.m. on Saturday, July the 5th.

Q. And approximately when, then, did you arrive in Guam?

A. We arrived in Guam at approximately 2:45 a.m. on July the 6th.

MS. DAVID: One moment, Your Honor.

Your Honor, I will just ask my colleague, Mr. Freedman, if he has any follow-up questions for the agent.

THE COURT: Mr. Freedman?

MR. FREEDMAN: I do not. Thank you.

MS. DAVID: Thank you, Your Honor. No further questions for Mr. Schwandner.

THE COURT: You may step down.

THE WITNESS: Thank you, Your Honor.

MR. CIVILLE: Your Honor, I do have one question, just to follow up to --

THE COURT: Okay. Go ahead.

RECROSS-EXAMINATION

BY MR. CIVILLE:

Q. I'm sorry. The last question for you: The departure -- the -- looking at Exhibit 6 again, the departure

card and the passport number that appears there. You know, is that the source of the passport number that was in the Red Notice, do you know?

A. I believe so, sir. I'd have to look to confirm.

Yes, sir, it is.

Q. So the red -- the information on the Red Notice came -- at least for that particular piece of information came from the departure card?

A. The information in the Red Notice?

Q. I'm sorry. Yeah. That was my question.

A. No.

Q. The departure card, the immigration number there or the passport number, that was the source of the information in the Red Notice?

A. As far as what his passport number was?

Q. Yes.

A. Negative, sir. I do not know where the source of the information was, how his passport number was obtained, but this number would have -- he would have filled this out on arrival in the Maldives.

Q. And, well -- all right. Is that where -- so on the 4th, when you met with the Maldivian police, is that where you got his passport number?

A. Right. They had a -- they showed me a printout with that passport number that indicated that he had arrived into

the Maldives on 21 June --

Q. Okay.

A. -- 2014.

Q. I guess my question is, was that information the source of the passport number that went into the Red Notice?

A. I don't believe so, sir. I think the passport number was already known from the Secret Service perspective. I'm not sure what the source of that was, but I believe we had already known what his passport number was or believed his passport number to be.

Q. Thank you.

MR. FREEDMAN: I apologize, Your Honor. This is Andrew Freedman, and I do actually have a couple question, if I might.

THE COURT: All right. Go ahead, Mr. Freedman.

REDIRECT EXAMINATION

BY MR. FREEDMAN:

Q. Agent, would you take a look at Exhibit -- what I believe is Exhibit 5-A.

A. The passport?

Q. Do you recognize that? I'm sorry. 5-B.

A. 5-B?

Q. Yeah. Do you recognize that?

A. Um...

Q. And it might help you to compare it to Exhibit 5-A.

A. (Witness compared exhibits.) You're talking about the translation of the passport?

Q. I am.

A. Okay. I just -- I recognize the name and the passport number.

Q. Okay. And if you turn -- let's look for a moment first, if we could, at Exhibit 5-A.

A. Okay.

Q. If you turn to the fourth page, do you see a stamp with some handwriting on it?

A. I do.

Q. And it's fair to say some of that is in Cyrillic or Russian script?

A. Yes.

Q. Do you see some -- some Arabic numerals that you're able to read?

A. Um, I see 18 2014.

Q. And one line above that, do you see some numerals?

A. One line above that, I see 26. I believe it's 26.

Q. And then in the far right?

A. And then the far right is 113.

Q. And if we turn to Exhibit 5-B, which is the -- a translation on the document, on the third page of -- would you turn to the third page of that?

A. Yes, sir. I see that.

Q. Do you see the same Arabic numerals there?
A. I do. I see Building 26, Apartment 113.
Q. And the two numbers, the 18 and 24, are part of a date?
A. Yes, sir. 18 February 2014 in English.
Q. And so looking at the translation of the whole page, what is the information that that stamp and that page are providing?
A. It appears that it's providing his address.
Q. His residence?
A. His residence; yes, sir.
Q. Okay. And so I'm sure I'm going to butcher the sound of it, but that's on Ostryakova Street, Building No. 26?
A. Yes.
Q. Apartment 113?
A. Ostryakova Street, Building 26, Apartment 113.

MR. FREEDMAN: Thank you. I have no further questions.

MR. CIVILLE: I'm sorry.

RECROSS-EXAMINATION

BY MR. CIVILLE:

Q. Agent, am I correct that the information you were just asked about -- that none of that information appears in either the warrant or the indictment?

A. Not to my knowledge, sir.
Q. Thank you.
THE COURT: Okay. That was not -- as I understand it, the 5-B has not been moved into evidence, Ms. David.
MS. DAVID: Not yet, Your Honor.
THE COURT: Okay. Anything further?
MS. DAVID: I have nothing further. And if I can just verify that with Mr. Freedman.
MR. FREEDMAN: And I do not either. Thank you.
THE COURT: You may step down, sir.
THE WITNESS: Thank you, Your Honor.
THE COURT: Okay. Thank you.
MS. DAVID: Your Honor, the government next calls Michael Fischlin.
THE COURT: Okay. How many witnesses do you have, Ms. David?
MS. DAVID: That would be it.
THE COURT: That's the last witness? Okay.
THE CLERK: Sir, please raise your right hand.
(MICHAEL FISCHLIN, government witness, sworn.)
THE WITNESS: Yes, I do.
THE CLERK: Thank you, sir. Please be seated. Please state your full name and spell your last name for the record.

THE WITNESS: My name is Michael Stephen Fischlin, F-I-S-C-H-L-I-N.

DIRECT EXAMINATION

BY MS. DAVID:

Q. Sir, where do you work?

A. I am a special agent with the Secret Service, assigned to the Seattle field office.

Q. And approximately how many years have you been an agent for that agency?

A. Seven years.

Q. As a preliminary matter, you are also being translated, so when you do answer, just keep that in mind.

A. I'll do my best.

THE COURT: Why don't you, yeah, look at the interpreter, who is seated here to our far left. And when she's trying to translate to the defendant, you can see it and then just slow down a little bit if you need to --

THE WITNESS: Yes, Your Honor.

THE COURT: -- so it won't be interrupted. All right. You may proceed. Thank you.

BY MS. DAVID: (CONTINUING)

Q. Agent Fischlin, are you currently the case agent for the Seattle case of *United States v. Roman Seleznev*?

A. Yes.

Q. And if you can take a look at what's already been admitted. In your -- in front of you is an exhibit binder. If you can take a look at Exhibit 2.

THE COURT: Okay. Are you looking at the -- you want the U.S. exhibits?

MS. DAVID: That is correct, Your Honor.

THE COURT: Okay. Okay. There you go.

BY MS. DAVID: (CONTINUING)

Q. Okay. So you've seen a copy of that superseding indictment from your field office; correct?

A. Yes.

Q. Okay. And you -- you are currently part of the investigative team for *USA v. Roman Seleznev*, that case; correct?

A. Yes.

MR. CIVILLE: Your Honor, I'm sorry. I just didn't hear the first part of that question, Your Honor.

THE COURT: Okay.

MR. CIVILLE: He was some part of what team?

BY MS. DAVID: (CONTINUING)

Q. You were part of the investigation with the Secret Service of *U.S. v. Roman Seleznev;* correct?

A. Yes.

Q. And you just mentioned you -- you're familiar with Exhibit No. 2, which is the indictment or the superseding

indictment out of Seattle; correct?

A. Yes.

Q. Can you also take a look, sir, at Government Exhibit 9 and tell me if you've seen that copy before?

A. Yes, I have.

Q. And can you identify what Exhibit 9 is?

A. It is a Whois record for the domain "track2.name."

Q. And what information is reflected on this Exhibit 9?

A. A Whois record shows who owns a domain and how to contact that --

MR. CIVILLE: I'm sorry, Your Honor. I'd object to this on lack of foundation. This is a fairly technical piece of information he's testifying to.

THE COURT: All right. You want to lay the foundation, then?

BY MS. DAVID: (CONTINUING)

Q. Agent Fischlin, is Exhibit 9 one of the documents obtained as part of this investigation in connection with the indictment out of Seattle?

A. Yes.

Q. And you identified Exhibit 9 -- or you were going to begin to identify Exhibit 9 as a track2.name exhibit. What is the significance of this track2.name in connection with the indictment that is Government Exhibit No. 2?

MR. CIVILLE: Your Honor, once again, the

objection isn't that it was part of the investigation. The objection is that it calls for some technical interpretation, and a foundation has not been laid as to this witness's qualifications.

THE COURT: Why don't you lay the foundation as to how he recognizes this exhibit. How does he know about this type of exhibit?

BY MS. DAVID: (CONTINUING)

Q. How do you recognize Government Exhibit 9, Agent Fischlin?

A. Well, I've been -- I've seen it via -- the ex-case agent showed me a copy of this exhibit, and then the U.S. Attorneys' Office prior to submitting it as an exhibit.

Q. And what do you understand -- also, based on your experience with the Secret Service as an agent for that agency, what Government Exhibit 9 and the information on Government Exhibit 9 to be?

MR. CIVILLE: I'm sorry, Your Honor, but once again, this is not a foundation. The witness has simply said the ex-case agent and U.S. Attorney showed it to him.

MS. DAVID: Your Honor, let me just, for the record --

THE COURT: Why don't you just --

MS. DAVID: -- state that this is a preliminary proceeding where formal rules of evidence don't apply. This

witness is going to explain how he recognizes Exhibit 9 and the other exhibits in connection with the investigation and case.

MR. CIVILLE: Well, Ms. David is correct; the Court does not have to strictly apply the rules of evidence. Nevertheless, it doesn't mean you have to throw the rules of evidence out the window. And this is apparently an important piece of information. They wouldn't bring it to the Court -- you have to have some way of evaluating whether it's sufficient to establish whatever they're trying to establish. And if this witness doesn't really know what it is, if he doesn't have the technical background to know what it is or to draw conclusions from this, then it's not very helpful to you, I suggest, Your Honor, and I don't think you are by any means required to allow it in.

THE COURT: What's the offer of proof on this? What is this exhibit for?

MS. DAVID: Your Honor, Exhibit 9 is a domain registration for a track2.name website. I can ask the exhibit [sic] what technical expertise is needed --

THE COURT: All right. Go ahead.

BY MS. DAVID: (CONTINUING)

Q. Sir, what technical expertise is needed to obtain this information that's reflected in Government Exhibit 9?

A. The information is publicly available via a variety

of online resources. So it's easy to obtain this information.

Q. And how was this information obtained? Exhibit 9?

A. It was obtained by the ex-case agent via a publicly available tool to research domains.

Q. And this public available tool that you just referred to, what is that?

A. I believe he used DomainTools. It's a website to research domains.

Q. And tell me what a domain is.

A. A domain is a website, essentially.

Q. Okay. And what is this track2.name website with respect to this investigation?

A. It was a website that was a part of the investigation. I don't know how much you want me to elaborate on it.

Q. Is track2 listed as one of the aliases in the Seattle indictment?

A. Yes.

Q. So having conducted a search of the track2.name website from that publicly available tool, what information was derived with respect to this track2.name website?

A. Who owns the domain and how to contact them.

Q. And looking at Government Exhibit 9, what information did law enforcement rely on to associate ownership of this track2.name website?

A. Under the registrant info would be the owner. And the primary data they relied on was the e-mail address rubensamvilech@yahoo.com.

MR. CIVILLE: Okay. Object -- Your Honor, objection to the testimony "the primary address they relied upon." I don't know who he's referring to, but that's clearly hearsay.

THE COURT: All right. You want to just clarify that? When you say "they," who are you talking about?

THE WITNESS: The case agents at the time when this investigation started.

BY MS. DAVID: (CONTINUING)

Q. So --

THE COURT: Okay. All right. So the primary address of the domain owner?

THE WITNESS: Yes. The primary contact info is what that shows. It shows the information for the owner of the domain and the e-mail address. That would be a contact e-mail address for the owner.

THE COURT: Okay. Go ahead.

BY MS. DAVID: (CONTINUING)

Q. And what e-mail information was obtained based on this search?

A. It showed that the e-mail address associated with the owner was rubensamvilech@yahoo.com.

Q. And is the name Ruben Samvilech also one of the listed aliases in that Seattle indictment?

A. Yes.

Q. With that information, what next -- what other law enforcement steps was conducted to further determine who's this rubensamvilech@yahoo.com?

A. Multiple federal search warrants were obtained from Yahoo for the e-mail account rubensamvilech@yahoo.com.

Q. Let me direct your attention then to Government Exhibit --

MR. CIVILLE: You know, I'm -- Your Honor, I'm sorry. I have translation going on in my ear, and I'm not -- and that's very important. But I just missed the last part of that answer.

THE COURT: You said -- about multiple search warrants, you want to repeat that?

THE WITNESS: Yes, Your Honor. Multiple federal search warrants were obtained for the -- from Yahoo for the e-mail address rubensamvilech@yahoo.com.

MR. CIVILLE: Thank you.

BY MS. DAVID: (CONTINUING)

Q. Based on the search warrants, what, if any, e-mails, for example, were retrieved in connection with this rubensamvilech@yahoo.com e-mail?

A. In particular, there was an e-mail from PayPal.

Q. Okay. Can I -- please take a look at Exhibit 10-A. And, sir, Exhibit 10-B is the English translation of 10-A. Can you please identify 10-A?

A. Yes. It was an e-mail obtained via a federal search warrant for the e-mail address rubensamvilech@yahoo.com.

Q. And what does 10-A represent?

A. Essentially, it shows -- it's an e-mail to Roman Seleznev, e-mail address rubensamvilech@yahoo.com, dated September 19th, 2009, from PayPal regarding a PayPal account.

Q. Okay. And taking a look at Exhibit 10-B, which is the English translation, what information then -- what further information is reflected on this screen shot, which is 10-A?

A. An e-mail address associated with the PayPal account of rubensamvilech@yahoo.com and an address of Ostryakova 26, Apartment 113, Vladivostok, Russia.

Q. Okay. And that address information that you mentioned, you're referring to Exhibit 10-B; is that correct?

A. That is correct.

Q. Can you next take a look at Government Exhibit 11-A and 11-B? Are these documents also obtained pursuant to the search warrants that you referred to?

A. These records were obtained via a subpoena to PayPal.

Q. Okay. And what information, then, did PayPal provide pursuant to the subpoena?

A. They provided a record which showed a PayPal account

in the name of Roman Seleznev. The e-mail address associated with that PayPal account was rubensamvilech@yahoo.com.

Q. And, sir, are you referring to Government Exhibit 11-A, which is the PayPal transaction log?

A. 11-A, yes.

Q. And can you explain what a PayPal transaction log is in general?

A. The transaction log shows some of the activity on the PayPal account. It shows when the account was created, when an e-mail address was added to the account, and when a physical address was added to the account, among other things.

Q. So if you can next take a look at Exhibit 11-B. For the record, can you identify that exhibit?

A. Yes. It is the activity log that corresponds to the first exhibit with the PayPal account.

Q. And looking at Exhibit 11-B, which is the activity log associated with that rubensamvilech@yahoo.com address, do you see the last column that's -- that shows action data, sir?

A. Yes.

Q. Does this activity log provide information as to address of the user?

A. Yes.

Q. And can you tell us, from the -- starting from the bottom of that column, where you would find that address information?

A. Yes. It is on the far right, three rows up from the bottom.

Q. And what information, then, did PayPal provide with respect to the address of this user?

A. That on September 19, 2009, the address of Ostryakova 26, kv 113, Vladivostok, Russia, was added to the account.

Q. Okay. And that is a consistent address information, for example, with respect to Exhibits 10-A and 10-B; correct?

A. Yes.

Q. Sir, can you next take a look at Exhibits 12-A and 12-B? Have you seen these two exhibits before?

A. Yes.

Q. What are they?

A. Records obtained during a forensic examination of servers owned by HopOne Internet Corporation.

Q. Okay. And what is the connection of HopOne Internet Corporation with, for example, the track2 website?

A. The HopOne servers were identified during the investigation to store credit card data related to the investigation.

Q. And what information is reflected on --

MR. CIVILLE: I'm sorry, Your Honor. That's not really a responsive question. The question was what was the relationship or -- I think is what she asked, between the HopOne server and the track2, and the answer was HopOne

servers are used to store credit card data. That's not really responsive to the question. It doesn't say how they're related to track2.

THE COURT: All right. Ms. David?

BY MS. DAVID: (CONTINUING)

Q. Can you elaborate as to the connection?

A. Yes. The connection would be that track2.name was identified as a site used to sell credit card information. The HopOne servers were found to house some of the credit card information that was sold on that site.

Q. So 12-A and 12-B are what, basically?

A. They reflect the records obtained during a forensic examination of the HopOne servers identified during an investigation. This record in particular relates to an OZON.travel order which reflects travel for four people.

Q. And are you referring, sir, initially to Exhibit 12-A?

A. Yes, initially to 12-A.

Q. And can you just tell us generally where on the page you see information regarding OZON.travel?

A. The very top line.

Q. And what other information were you able to obtain from this exhibit?

A. From 12-A, about midway down on the page, there is an e-mail that is associated with the travel order.

Q. And what e-mail are you referring to?

A. Romariogro1@mail.ru.

Q. So unlike, for example, Exhibit 10-A, which is a screen shot information -- correct?

A. Correct.

Q. What's this data reflected on 12-A and 12-B?

A. It was obtained during computer forensic -- forensics of servers.

Q. Okay. And were these found, for example, in a folder?

A. No.

MR. CIVILLE: I'm sorry. Obtained what, please? I didn't hear the question. I'm sorry.

THE COURT: Okay. Ms. David.

BY MS. DAVID: (CONTINUING)

Q. I asked you, Agent, what data is reflected on Exhibits 12-A and 12-B, and you began to say first where they were -- from where they were obtained and to then identify them.

A. Could you ask the question again?

Q. How was -- how were you able to obtain 12-A and 12-B?

A. Via computer forensics.

Q. Computer forensics of that HopOne server?

A. Correct.

Q. And computer forensics pursuant to a search warrant

of that HopOne server; correct?

A. Yes. Multiple HopOne servers.

Q. Okay. And is the information on 12-A and 12-B -- what -- how do you characterize this information?

A. It was a screen shot of what was found during a forensic examination of those HopOne servers.

Q. 12-A and 12-B?

A. Correct.

Q. So you began to explain that in 12-A there was information with respect to OZON.travel and an e-mail address, Romariogro1@mail.ru. For the record, can you spell that?

A. R-O-M-A-R-I-O-G-R-O-1@mail.ru.

Q. What about information on Exhibit 12-B?

A. 12-B lists four travelers associated with the order.

Q. Okay. And was one of the traveler names pertained to an individual identified as an adult with a first name Svetlana and the last name Selezneva?

A. Yes.

Q. Okay. And where is that information reflected on Exhibit 12-B?

A. About midway down the page.

Q. Okay. And that -- what is the gender information as to that adult name?

A. Female.

Q. Was there any other name reflected on this 12-B

exhibit with respect to a female infant?

A. Yes.

Q. And first tell us where on this page you can find that information and what is the information.

A. The bottom of the page and information lists a first name of Eva, last name Selezneva.

Q. So you said these were screen shots from one of the HopOne servers. Were these -- like where, for example, on the hard drive were they found?

A. In the page file.

Q. Can you next take a look at Exhibits 13-A -- and 13-B is the English translation of that exhibit -- and identify them for the record?

A. Yes. It is another travel order obtained during a forensic examination of the HopOne servers.

Q. And, again, when you mentioned HopOne server, that was one of the servers used for the track2 website; correct?

A. Yes, to house credit card data.

Q. What information is reflected on 13-A? And that is a two-page exhibit.

A. 13-A is the Russian version. Can I read off of 13-B, the English translation?

Q. Pardon me. Yes, Your Honor -- yes, sir.

A. So 13-A shows the travel order is affiliated with OZON.travel. Or the first page of 13-B. My apologies. The

second page shows that this order was for a flight on Singapore Airlines, Flight 941 from Indonesia to Singapore on April 7, 2010. And it lists two travelers. One of the travelers listed is Roman Seleznev, date of birth July 23, 1984, citizenship Russia, and a document travel passport number of 640410831.

Q. And, again, this information was obtained how?

A. Via computer forensics of the HopOne servers.

Q. Agent Fischlin, if you can take a look at Exhibit 5-A and Exhibit 5-B, which is the English translation of Exhibit 5-A. Starting first with Exhibit 5-A, can you flip to the fourth page; and comparing that to Exhibit 5-B, which is on the third page in the box identified as page 5 -- do you see it, sir?

A. Yes.

Q. Okay. Basically, the information -- and it's been already mentioned earlier -- the information on page 5 lists an address for an internal Russian Federation passport in the name of Roman Seleznev. Can you take a moment and take a look at the address information reflected on the English translation? And the Russian version on page 5 of Exhibit 5-A. Was this the same address that you referenced in the PayPal exhibit?

A. Yes.

Q. And, again, let me direct your attention to PayPal,

Exhibits 10-A and 10-B? Are you talking about the Vladivostok address?

A. Yes.

Q. Okay. And for the record, what is that address again?

A. Ostryakova 26, Apartment 113, Vladivostok, Russia.

Q. Directing your attention to Exhibit 12-B, which is another screen shot information you mentioned that was obtained from one of the HopOne servers. You identified two individuals, an adult and infant. Do you have that exhibit in front of you, sir?

A. Yes.

Q. Okay. If you can take a look at -- again comparing the internal Russian Federation passport, Exhibit 5-A, and its English translation. Starting with Exhibit 5-A, can you go to the page where it lists pages 14 and 15 on that internal passport? Are you there, sir?

A. Yes.

Q. Okay. Starting with -- and then can you turn to Government Exhibit 5-B; and on the page that also lists a block at No. 14 -- do you see that, sir?

A. Yes.

THE COURT: I'm sorry. 5-B, what page? 5-B what? What are you looking at?

MS. DAVID: One -- 5-B-5, Your Honor.

THE COURT: 5-B-5. All right.

BY MS. DAVID: (CONTINUING)

Q. Do you see any reference to that adult female whose name was reflected and retrieved on that screen shot information from HopOne? And I'm, again, referring to Exhibit 12-B.

A. Yes.

Q. And what name would that be?

A. Svetlana Selezneva.

Q. And that is a person identified as an individual who had been previously married but now divorced; is that correct?

A. Yes.

Q. Associated with the Russian federation passport belonging to a Roman Seleznev; is that correct?

A. Yes.

Q. Okay. If you -- focusing on that same exhibit, 5-B, if you turn one page over, do you see the page that has a top box portion identified as "children"?

A. Yes.

Q. Okay. And cross-referencing that to the Russian passport page in 5-A --

THE COURT: I'm sorry. Russian passport page 5-A, what number?

MS. DAVID: Ten, Your Honor.

THE COURT: 5-A-10.

BY MS. DAVID: (CONTINUING)

Q. Are you there, sir?

A. Yes.

Q. Okay. What information is reflected as to that page titled "children"?

A. A birth of a child.

Q. Identified how?

A. As Eva Selezneva, date of birth in 2009.

Q. With a gender information; is that correct?

A. That's correct. Female.

Q. Okay. And is that the same information that you had referred to in Exhibit 12-B, which was the -- one of the HopOne screen shot information?

A. Yes.

Q. And going back to the 12-B information, does -- in addition to the adult name and the infant name of these passengers reflecting on this OZON.travel document, does -- are there birthday information, for example, as to the adult and child?

A. Yes.

Q. And are the dates of birth consistent with the dates of birth reflected in the passport?

A. Yes.

Q. Earlier, Agent Fischlin, there was testimony about a stamp on a passport identified as Government Exhibit 4-A. Can

you take a look at that? And the testimony -- and if you can take a look at page 4 of that passport, on the left side of that passport page. There was testimony earlier about a Singapore stamp reflecting travel of April 7, 2010.

MR. CIVILLE: I'm sorry. What exhibit, please?

MS. DAVID: Exhibit 4-A.

MR. CIVILLE: Thank you.

BY MS. DAVID: (CONTINUING)

Q. Do you see that in front of you?

A. Yes.

Q. Okay. Can you again identify in Exhibit 13-B -- do you recall identifying the information on 13-B, sir?

A. Yes.

Q. Okay. And, again, 13-B is -- is -- is what?

A. It relates to a travel order to Singapore on April 7, 2010.

Q. For a passenger name identified as Roman Seleznev; is that correct?

A. Yes.

Q. And, again, this was information obtained from where?

A. Via a computer forensic examination of HopOne servers.

Q. And looking again at Exhibit 13-B, the second page, you identified earlier a travel passport number. Is that number the same as the number on Exhibit 4-A?

A. The passport numbers are the same.

(Pause.)

BY MS. DAVID: (CONTINUING)

Q. Going back, sir, to Exhibit -- pardon me. Going back, sir, to Exhibit 12-A. Again, this is the screen shot information that was retrieved from one of the HopOne servers you identified. And you mentioned an e-mail address and you even identified and spelled out the e-mail address. What e-mail address did you identify on Exhibit 12-A?

A. Romariogro1@mail.ru.

Q. Agent Fischlin, it's been identified earlier, Exhibit 7-A, as one of the travel documents seized in the Maldives. Do you see that same e-mail address on Exhibit 7-A?

A. Yes.

Q. And where would that e-mail address be reflected?

A. At the top.

Q. At the top left-hand corner?

A. Top left-hand corner, the addressing information.

Q. Okay. And for the record, Exhibit 7-B is the English translation of that document. Again, it's -- the same e-mail address is reflected; is that correct?

A. Yes.

THE COURT: That's the -- I'm sorry. Just for clarification, the Romariogro1 address?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Thank you.

MS. DAVID: Your Honor, at this time the government move to admit the translated exhibits, which are 4-B, 5-B, 7-B, and the remaining exhibits, 9 through 13-B; nine being the domain registration, 10-A being the screen shot e-mail information from PayPal, 10-B being the translated version of 10-A, 11-A and 11-B being the PayPal transaction and activity log, 12-A and 12-B being the screen shot information from the HopOne servers, and 13-A and 13-B being, again, information obtained from the HopOne servers, and the translated -- the translated version of Exhibit 13-A.

THE COURT: Okay. Anything further? That's it on the exhibits, Ms. David?

MS. DAVID: Yes, Your Honor.

THE COURT: Okay. Mr. Civille, any --

MR. CIVILLE: Your Honor, we would preserve all of our objections at this stage.

THE COURT: All right. So you're -- okay. I understand that. You are continuing your objection to the admission of these exhibits for purposes of a suppression hearing motion you will have later on at trial?

MR. CIVILLE: Or any other pretrial motion. Yes, Your Honor.

THE COURT: That's fine. That's fine. All right. The Court will admit Exhibits 4-B, 5-B, 7-B, 9-B,

10-A, 11-A, 11-B, 12-A, 12-B, 13-A and 13-B into evidence for purposes of this identity hearing.

(Exhibits 4-B, 5-B, 7-B, 9-B, 10-A, 11-A, 11-B, 12-A, 12-B, 13-A and 13-B admitted.)

MS. DAVID: One moment, Your Honor.

Your Honor, I would like to ask my colleague if Mr. Freedman has any questions for Agent Fischlin.

MR. FREEDMAN: I do not. Thank you.

THE COURT: No questions. Okay.

Mr. Civille. Thank you.

MR. CIVILLE: Your Honor, I'd ask for a few minutes to consult with my client before I start.

THE COURT: Sure.

MR. CIVILLE: May I inquire -- I don't know if my co-counsel are still on the line or not.

THE COURT: Co-counsel for defense, are you still there?

MR. RAY: Yes. This is Mr. Ray. I'm here.

MR. GOLDIN: Yes, Your Honor. Ely Goldin is still on.

MR. CIVILLE: Okay, thank you.

Your Honor, perhaps could we ask for maybe a ten-minute recess and then -- it just takes a while to translate our questions.

THE COURT: All right. Ten minutes. That's

fine. Ten-minute recess.

MR. CIVILLE: But we need to have our client remain.

THE COURT: That's fine. He can remain here in the courtroom with counsel and his interpreter. Very well. He may do so. Okay. Ten minutes. We can take a recess.

THE CLERK: All rise. The Court's in recess.

(Recess taken at 4:50 p.m.)

(Back on the record at 5:21 p.m.)

THE COURT: Please be seated. We're back on the record. All counsel is present. Mr. Seleznev is present, and so is the court interpreter.

You may proceed, Mr. Civille.

MR. CIVILLE: Thank you, Your Honor. Your Honor, I would like to -- I'd ask the Court's indulgence. Mr. Goldin -- 3 o'clock -- 3:30 in the morning there. He's been with us the entire time. He has been admitted pro hac vice, and he would like to conduct at least the first part of this examination.

THE COURT: He may.

MR. CIVILLE: And, Your Honor, if I can stand up here and just -- he doesn't have the numbered exhibits, so I'll call out the numbers if he asks for them.

THE COURT: Okay. Very well. No problem.

MR. CIVILLE: Thank you.

THE COURT: Okay. Mr. Goldin, you may proceed. Hello?

MR. CIVILLE: Hello, Ely?

THE COURT: Okay. Let's see. Mr. Ely Goldin, are you there?

MR. CIVILLE: He was there a moment ago.

MR. GOLDIN: I am. I'm sorry, Your Honor. Can you hear me okay now?

THE COURT: I can hear you now. All right. You may proceed, sir. And Mr. Civille will be here to assist you with the exhibits.

MR. GOLDIN: Thank you very much, Your Honor.

CROSS-EXAMINATION

BY MR. GOLDIN:

Q. Agent, good afternoon.

A. Hello.

Q. Do you have the indictment in front of you that was returned by the grand jury in the Western District of Washington?

MR. CIVILLE: That's Exhibit 2, the superseding indictment.

THE WITNESS: Yes.

BY MR. GOLDIN: (CONTINUING)

Q. Looking at that indictment, would you agree with me

that the indictment makes no effort to identify the accused by the fact that he lives in Vladivostok, Russia?

A. I haven't read the whole thing right before coming up here, so from memory, I couldn't answer that question.

Q. As you sit here today, do you have any reason to believe that the indictment attempts to identify the accused by the fact that he lives in Vladivostok, Russia?

A. I don't believe that's specifically mentioned in the indictment.

Q. And do you have any reason to believe the -- that the indictment attempts to identify the accused by the fact that he lives at a particular address within the Russian Federation?

A. I do not believe it mentions a specific address, no.

Q. Do you know whether the indictment attempts to identify the accused by his current marital status?

A. I do not believe it does.

Q. Do you know whether the indictment attempts to identify the accused by his former marital status? You mentioned something about a former spouse.

A. I do not believe it does.

Q. Does the indictment attempt to identify the accused by the fact that he has any children?

A. I do not believe it does.

Q. Does the indictment attempt to identify the accused

by his -- by some reference to his father?

A. No.

Q. Does the indictment make any mention that the accused's father is a member of the Russian parliament or Duma?

A. I do not believe the indictment does.

Q. Does the indictment make reference to the accused's patronymic name or middle name?

A. I do not believe it does.

Q. Agent, do you speak Russian by any chance?

A. I do not.

Q. Was there a Russian-speaking Secret Service agent who was also physically on the ground at Male?

A. I do not know. I was not there.

Q. Do you have any knowledge, either firsthand, secondhand or thirdhand, whether there were any Russian-speaking Secret Service agent physically present when the person before the Court was taken into custody?

A. I do not know.

Q. Do you know whether the indictment attempts to identify the defendant -- strike that.

Do you know whether the indictment attempts to identify the accused by the fact that he traveled to either Singapore or Indonesia or somewhere else?

A. No, I do not believe it does.

Q. Do you know whether the pre-indictment investigation developed any photographs of the person that is accused in the indictment?

A. I do not know. A photo was obtained, but I do not know if it was before the date of this indictment or after.

Q. Are you referring to the photo on the Red Notice?

A. Yes. I do not know --

Q. Has any -- go ahead.

A. I do not know what date that was obtained, so I cannot say if it was pre-indictment or after.

Q. And you don't know who took that photo; correct?

A. No, I don't.

Q. And a photo of the person who is seated before the Court -- there is no witness or -- strike that.

There is no witness that during the investigation or pre-indictment pointed to a photo and said, "That's the guy. That's the person you want"?

A. I do not know.

Q. Was there any information regarding identity provided to the Secret Service or any other government agencies by a cooperating witness or a co-defendant in some other case?

A. I do not know.

Q. You have no knowledge whether the source of the identifying information comes from any witness or confidential informant or co-defendant or anyone else?

A. I'm unsure. I know that --

Q. I -- please go ahead. I'm sorry.

A. I know that some of the identifying information was obtained via those computer forensics.

Q. Are you a forensic computer professional yourself?

A. Yes, I am.

Q. Did you conduct the actual forensic examinations to which you testified?

A. I did not.

Q. Do you know who conducted the forensic examinations to which you testified?

A. I know one of the forensic examiners, yes.

Q. And did you rely on any reports made by that forensic examiner?

A. No. Had communications with him, though.

Q. What kind of communications?

A. Verbal.

Q. Verbal communications?

A. Verbal communications.

Q. Over the telephone or in person?

A. In person.

Q. And when did those communications take place?

A. Approximately three weeks ago; two, three weeks ago.

Q. Is that before or after the defendant -- the person before the Court was taken into custody?

A. After.

Q. So did you have any conversations with any computer professional or forensic computer professional employed by the government prior to the detention of the person before the bar of the Court?

A. I personally did not.

Q. Now, the indictment makes reference to a bunch of nicknames or nics, N-I-C-S, supposedly used by the accused in connection with certain alleged criminal activity. Do you see that?

A. I do.

Q. As you sit here before the Court, do you have any documentary evidence to show the judge that the person before the Court used the nickname Shmak, S-H-M-A-K?

A. I do not have any documents on me right now to support that.

Q. Do you have any document that would support that the person before the Court used the nickname Zagreb, Z-A-G-R-E-B?

A. Not at this time.

Q. Do you have any document that the person before the Court used the nickname Smaus, S-M-A-U-S?

A. Not on me at this time.

Q. What about Bandysli64, B as in bravo A-N-D-Y-S as in Sam L-I-6-4?

A. Not on me at this time.

Q. How about Bulba, B-U-L-B-A?

A. Not on me at this time.

Q. How about N-C-U-X?

A. Not on me at this time.

Q. Now, you gave some testimony, Agent, on direct examination regarding a name called -- strike that.

You gave some testimony on direct examination regarding something called track2. Do you recall that?

A. Yes.

Q. And I believe, if I'm not mistaken, you told the Court that your predecessor or someone that had previously worked for the Secret Service ran a domain search on a website that bore the track2 name; correct?

A. Yes. Track2.name.

Q. Do you have any documentary evidence to show the Court that the person seated before the Court actually used the nickname track2 as opposed to evidence concerning a website that has the letters track2 in it?

A. I do not have those documents on me at this time.

Q. Now, with regard to the website called track2, your predecessor in interest ran a Whois domain registration search on that website; correct?

A. Yes.

Q. And he used a domain search tool called Whois? Or is it GoDaddy? Which one did he use?

A. I believe he used the site DomainTools. It is a site which you can use to do a Whois search.

Q. And which website did your predecessor in interest search?

A. Track2.name.

Q. And that is one of the four websites identified in paragraph 6 of the indictment?

A. Yes.

Q. And that is the same paragraph that alleges that Roman Seleznev and others unknown --

A. Yes.

Q. -- rented and configured servers and computers in countries outside the United States?

A. Yes.

Q. And these servers were then used, according to the indictment, for hosting carding forum websites?

A. Yes.

Q. Or websites used to allegedly sell stolen credit card numbers, right?

A. Yes.

Q. So one of the websites -- I guess it's your contention that one of the websites -- that track2.name is the website that host -- that contained information that somehow linked to some servers that were set up on -- somewhere around the world?

A. Yes.

Q. Did you run a -- or your predecessor run a domain registration check on the other three websites listed in paragraph 6 of the indictment?

A. I believe so, but I do not have those documents on me today.

Q. So the only documents that you have on you today for purposes of the Rule 5 hearing is the reverse domain registration search on the track2.name website; correct?

A. Yes. Regarding those domains, yes.

MR. CIVILLE: That would be Exhibit 9.

BY MR. GOLDIN: (CONTINUING)

Q. And, ultimately, that led you to an address in Vladivostok that you contend is the defendant's address?

A. Yes.

Q. But the -- you'll agree with me that the indictment itself makes no reference to any address whatsoever; correct?

A. Not a physical address.

Q. Do you know how many adult individuals resided at the physical address in Vladivostok --

A. No.

Q. -- or -- at or around the time of the indictment?

A. Could you ask that question again, please?

Q. Sure. Do you know how many adult individuals physically resided at the address which you claim is tracked

to the defendant in or around the time of the indictment?

A. No.

Q. But you produced or you made reference to some travel documents that the government supposedly found as part of its investigation, showing that multiple adult persons traveled, I guess, around the world that are somehow associated with that address? Is that what you're telling us?

A. No.

Q. All right. Let me ask the scope and then the question. What is the connection between the indictment and the person seated before the bar of the Court?

A. That would be via two nicknames, the nicknames track2 and a nickname Ruben Samvilech.

Q. Okay. And focusing on the nickname Ruben Samvilech, it is your contention that there are e-mails that were sent from that nickname; correct?

A. Yes, sent to that e-mail address.

Q. And what is that e-mail address?

A. Rubensamvilech@yahoo.com.

Q. So you put a subpoena on Yahoo.com to discover the identity of the person who's registered the name Ruben Samvilech?

A. I know they executed three search warrants. I don't know it they executed a subpoena on it.

Q. When you say "three search warrants," is there some

significance to the fact that there's three? In other words, was this impossible to get through one search warrant?

A. Sure, different time frames. So the e-mail account will contain different content in it at different points in time.

Q. So which of the three subpoenas actually yielded information that is part of your testimony today? Was that subpoena one, subpoena two or subpoena three?

A. I don't know. I know three search warrants were executed and this was obtained from one of them.

Q. And what is the time frame of the search warrant that actually yielded the information regarding which you testified to today?

A. I'm unsure. It was prior to my assignment to the case.

Q. And what is the time frame for the e-mail that you contend ties the person before the bar of the Court to the indictment?

A. May I look at the exhibit to get the date of the e-mail?

Q. Of course. Of course.

MR. CIVILLE: I believe you're talking about Exhibit 10-A. 10-B is the trans- -- is perhaps the translation.

THE WITNESS: The e-mail is dated September 19,

2009.

THE COURT: I'm sorry. Where are you looking at, Agent?

THE WITNESS: Um, Your Honor, at Exhibit 10-A and 10-B.

THE COURT: Okay. 10-A. I'm looking -- okay. Like six lines down from the left, top left, 10-A?

THE WITNESS: Yes, Your Honor.

THE COURT: You have September 19, 2009. Okay.

BY MR. GOLDIN: (CONTINUING)

Q. And the indictment reference is a time period of October 2nd, 2009, continuing through February 22, 2011; is that right?

A. I'd have to review it.

Q. Paragraph 1 of the indictment?

THE COURT: Exhibit 2?

THE WITNESS: Yes.

MR. CIVILLE: Exhibit 2.

THE WITNESS: From October 2, 2009, to February 22nd, 2011, on or about.

MR. GOLDIN: Your Honor, not having these documents in front of me and being 3:30 where I am, that's all the questions I have.

THE COURT: Okay. Do you have a -- but you have a copy -- you don't have a copy of the indictment? You want

to know what the dates are that it states just initially?

MR. GOLDIN: No. I do have a copy of the indictment, Your Honor. It was e-mailed to me by the U.S. Attorney in the Western District of Washington. I'm looking at it electronically.

THE COURT: Okay. Very well. Okay. No further questions?

MR. CIVILLE: If I may, Your Honor.

THE COURT: You may proceed.

MR. CIVILLE: Thank you, Your Honor.

RECROSS-EXAMINATION

BY MR. CIVILLE:

Q. Agent, look at Exhibit 11, the PayPal account, it has as the name Seleznev, Roman, and it has the e-mail address you've testified about. But on account type, it says "Russian personal unverified." Do you see that?

A. Yes.

Q. Okay. Are you familiar with unverified accounts?

A. No, I'm not.

Q. Okay. Do you know if that -- through your investigation, do you know that means that pretty much anybody can open an account and use whatever name they choose?

A. No.

Q. And that -- do you know that means that PayPal does not verify the information that it's provided?

A. No, I do not.

Q. Okay. Have you inquired into that, whether they verified the information that's provided?

A. I personally have not.

Q. Looking at Exhibit 9, the track2 domain name, that shows a registrant of Alexey Davydov?

A. Yes.

Q. Okay. And that is a different name than the name of the person accused in the indictment?

A. Yes, it is.

Q. Okay. And that is not a name -- that is not any of the aliases named in the indictment?

A. No.

Q. Were you involved at all in the preparation of the Red Notice of -- I think that's, what, Exhibit 3?

A. I was aware of it but I didn't prep it.

Q. Did you provide any of the information that's -- that's contained in the Red Notice?

A. No. I didn't need to.

Q. Do you know who did prepare this?

A. AUSA Norman Barbosa.

Q. Who is he, please?

A. He's the AUSA on the case in the Western District of Washington.

Q. He's not on the line with us now, I don't believe.

A. (Witness shrugged.)

Q. Do you know?

A. I don't know.

Q. Okay. When did you become involved -- you made several references to the person you took over from. When did you -- what year did you become involved?

A. This year.

Q. Oh, just -- okay. So you were not involved when this case went to the grand jury?

A. No, I was not.

Q. Not involved in any of the investigation up until this year?

A. That's correct.

Q. If you'll look at page 5-B-2 on Exhibit 5, please. And do you see on 5-B-2 that under the name -- in the bottom box there, it shows "Photo," although that's blank, right?

A. Yes, it is.

Q. And then to the right of that is -- this is the English translation of what's taken from the passport that was seized -- the local Russian passport seized in the Maldives. That's your understanding, right?

A. Yup.

Q. Okay. And then it shows the name -- last name Seleznev, name Roman, and then paternal name Valerievich.

A. (Nodded head.)

Q. And are you familiar with the Russian use of paternal names?

A. I am not.

Q. Or patronymics, they're sometimes called?

A. No, I'm not.

Q. All right. And would you agree with me that the name Roman Valerievich does not appear in the indictment?

A. I don't believe it does.

Q. Okay.

MR. CIVILLE: If I could have just a moment.

THE COURT: Mm-hmm.

(Pause.)

BY MR. CIVILLE: (CONTINUING)

Q. Have you participated, Agent Shalin -- did I pronounce that -- I'm sorry. Pronounce your last name.

A. Fischlin. Fischlin.

Q. My hearing is going. I thought it began with an S.

A. F, as in Frank, Fischlin.

Q. Oh, Fischlin. I'm sorry. Boy, I was really off.

Okay. Other than the three search warrants you've mentioned, have there been any other search warrants executed with respect to this matter?

A. I believe there have been.

Q. Do you know how many?

A. I don't.

Q. Okay. When was the last one that you're aware of?

A. I'm unsure.

Q. Okay. What efforts, if any, have you undertaken to ascertain the identity of Alexey Davydov, the person named as the registrant in Exhibit 9?

A. I have not taken any.

Q. Do you know if any -- just so I'm not -- you're not being too literal, when I say "you," do you know if the -- your agency has or any other investigative personnel?

A. I do not know.

Q. On the face of it, it would appear, then, that the track2 name is actually registered to a person named Alexey Davydov based on the evidence before us; is that right?

A. That's the registered owner with the e-mail address seen on the exhibit.

Q. Okay. And do you have any -- okay. And you just don't have any information on who this Alexey Davydov might be?

A. No.

MR. CIVILLE: Your Honor, that's all I have.

THE COURT: All right. Ms. David? And then we'll close up here.

REDIRECT EXAMINATION

BY MS. DAVID:

Q. Agent Fischlin, can you take a look again at Exhibit 9 --

A. Yes.

Q. -- which is the domain registration for that website track2.name?

A. Yes.

Q. Counsel asked you questions about the registrant information on Exhibit 9, you recall?

A. Yes.

Q. Questions about the Alexey Davydov name and the e-mail address rubensamvilech@yahoo.com. Do you recall that?

A. Yes.

Q. You also indicated earlier that your -- you're trained in computer forensics; correct?

A. Yes.

Q. Tell me, if someone is going to manage a website, which would be the more trustworthy information if you want to make sure you know what's happening to that website?

A. Contact information.

Q. And with respect to Government Exhibit 9, what contact information is reflected?

A. An e-mail address.

Q. And, again, that is rubensamvilech@yahoo.com?

A. Yes.

Q. And using that contact information, agents and you --

you testified that that e-mail address tied law enforcement to a PayPal screen shot; is that correct?

A. Yes.

Q. Are you familiar with PayPal?

A. A little bit, yes.

Q. And, generally, what is PayPal?

A. A payment service.

Q. Okay. So whether you receive or make the payment; correct?

A. That's correct.

Q. So at some point, you also want your contact information with PayPal to be reliable; is that correct?

A. Sounds correct to me.

Q. Okay. And with this rubensamvilech Yahoo e-mail on that track2.name website, again, PayPal provided information that that e-mail address was connected to Roman Seleznev with the Vladivostok Ostryoka[sic] address; is that correct?

A. Yes.

Q. And earlier you testified about obtaining, for example, screen shot information from -- from one of the servers that the track2 website used; is that correct?

A. Could you ask the question again, please?

Q. Okay. Earlier you reference about a HopOne server; correct?

A. Yes.

Q. And how screen shots were retrieved from that server with respect to this investigation. Do you recall that?

A. Yes. Yes.

Q. And I'm referring you to -- I'm referring you, for example, to Exhibit 13-A and the translated version, which is 13-B.

A. Yes.

Q. That's information about one of the screen shots from that server; correct?

A. It's information obtained from examination of the server, yes.

Q. Correct.

And you mentioned earlier that 13-A reflects a travel reservation under the name Roman Seleznev for travel to Singapore on April 7, 2010; is that correct?

A. Yes.

Q. And that stamp, you recall, you noticed on Government Exhibit 4-A, which is the one of the -- the Russian Federation passport of Roman Seleznev; is that correct?

A. That's correct.

MS. DAVID: May I have a moment, Your Honor?

THE COURT: Okay.

(Pause.)

MS. DAVID: Your Honor, I have no further questions, unless my colleague, Mr. Freedman, does.

THE COURT: Mr. Freedman?

MR. FREEDMAN: I do not. Thank you.

MR. GOLDIN: Your Honor, this is Ely Goldin. May I briefly?

THE COURT: Go ahead, Mr. Goldin.

MR. GOLDIN: With your permission, Your Honor.

THE COURT: Yes.

RECROSS-EXAMINATION

BY MR. GOLDIN:

Q. Agent, do I understand you correctly that the PayPal account to which you testified was used to book travel for a person named Roman Seleznev?

A. I don't know anything about travel, just there's a PayPal account in the name of Roman Seleznev.

Q. And the travel documents that you mentioned or the travel itineraries that you mentioned, were those travel items purchased with that PayPal account?

A. I don't know.

Q. PayPal is an e-commerce portal that allows people to pay for services purchased over the Internet; correct?

A. Yes.

Q. And PayPal enables people to actually pay for those services with money that emanates from someplace; correct?

A. Yes.

Q. Did your investigation pinpoint any credit cards associated with the PayPal account that you claim belongs to the defendant?

A. I do not know.

Q. Did your investigation pinpoint any bank account which is linked to the PayPal account that you attribute to Mr. Seleznev?

A. I do not know.

Q. But you know that the Secret Service served a subpoena on PayPal; is that correct? Or search warrant?

A. That's correct.

Q. Do you know if that search warrant or subpoena revealed any financial information linking the person before the Court to the PayPal account with money, credit cards, a wire transfer, any financial connection whatsoever?

A. I do not know.

Q. So the only connection between the PayPal account that you gave testimony today is the fact that somewhere on the Internet it is listed that Roman Seleznev owns that PayPal account?

A. That PayPal produced a record showing that there is a PayPal account in Roman Seleznev's name.

Q. Do you know -- did PayPal produce a record showing who set up that PayPal account?

A. They just provided information that was provided by a

user who entered the information.

Q. Did they provide a merchant services agreement like the kind you would get if I'm a store and I sign up to accept American Express, Visa or MasterCard? Is there an electronic or written end user license agreement or any merchant agreement between Seleznev before the Court and PayPal that you were able to find?

A. I don't have any documents like that. I believe you do have to accept a Yula when you sign up, but I don't have any documents with me today.

Q. Do you know if the government attempted to investigate any financial connections between the accused person in the indictment and PayPal --

A. I do not know.

Q. -- to establish a link between that person and some bank or some credit card or some other financial institution that might be the source of payments?

A. I don't know.

Q. The indictment before you accuses the defendant of running a massive carding scheme; correct?

A. Correct.

Q. And the indictment suggests that the defendant earned illicit profits as a result of his activities; correct?

A. Yes.

Q. Is there any information that you can provide the

Court that shows that the supposed illicit profits went into a bank account or a -- went -- a bank account associated with a person named Roman Seleznev?

A. I don't have any records with me like that today, no.

Q. Do you have any documents to show that any illicit profits went into an account that is affiliated in any way with the person that is seated at the bar of the Court?

A. I don't have anything like that with me today.

Q. When the government took Mr. Seleznev into custody, they took from him credit cards, did it not?

A. Yes. There were credit cards in his possession.

Q. Have you linked those credit cards to any of the allegations in the indictment?

A. Not at this time.

Q. Have you linked those credit cards to any of the allegation -- to any of the -- strike that.

Have you linked those credit cards to the PayPal account to which you testified?

A. Not at this time.

Q. Have you linked those credit cards to the servers which supposedly were used in connection with the illicit activity?

A. Not at this time.

Q. Have you linked those credit cards to anything that is even remotely related to the indictment?

A. Not at this time.

MR. GOLDIN: No further questions.

THE COURT: Okay.

MR. CIVILLE: Your Honor, if I may, just a couple follow-up questions to that.

RECROSS-EXAMINATION

BY MR. CIVILLE:

Q. Agent, going back to Exhibit 11-B, PayPal log. You had earlier testified that the indictment -- paragraph 1 of the indictment states that beginning October 2, 2009, and continuing through February 22, 2011, it alleges certain criminal activity. And my question is, on Exhibit 11-B, this PayPal log shows activity of September 27, 2009, through September 19, 2009; is that correct?

A. Yes.

Q. And that's before the period specified in the indictment?

A. Yes, but the indictment notes that activity began no later than October 2, 2009.

Q. And did you make any effort, you know -- and "you," once again I refer to the entire Secret Service or whatever -- and whatever other law enforcement is involved in this investigation -- into determining whether at any time after September 19th did Alexey Davydov, the person named in

Exhibit 9 -- did he reside at the address of Ostryakova 26, 113, in Vladivostok that we've been discussing?

A. No.

Q. Okay. And I believe the answer to this -- but you don't know what other persons may have been living at that address?

A. No.

Q. Okay. And if someone were living at an address and then moved away and -- well, strike that.

With respect to Exhibit 9, you said the contact information -- you thought the e-mail was the most important piece of information. And if -- tell me how this works now. If somebody has an e-mail and then they stop using it for some reason or they share that e-mail with somebody else, but the original -- even assuming the original owner stopped using it, anybody could use -- continue to use that e-mail; correct?

A. So long as it's active and you had the proper user credentials.

Q. Okay. And user credentials would really only mean a password?

A. Yeah. Username, password; yes, sir.

Q. And going to Exhibit 12-B. Did you identify who Sergei Nikulnikov is?

A. No.

Q. And that was a person who was apparently traveling

with the identified -- I think you said was the -- Mr. Seleznev's wife?

A. Yes.

Q. And child?

A. Yes.

Q. Okay. So there was an adult male apparently, a Sergei, and you don't have any information on him?

A. I don't.

Q. Okay. Thank you.

I ask you to have a look at Defense Exhibit 2. And that's the declaration of Ely Goldin. And I recognize you may not have seen that before, so I give you a moment to look at it. And what's -- Mr. Goldin is the lawyer who was just questioning you a few moments ago. But attached to that as Exhibit 1 is a printout which he represents is from a -- a website called -- I'll spell it: O-D-N-O-K-L-A-S-S-N-I-K-I dot R-U, Odnoklassniki in Russian, and showing 162 people just with that one website -- this is for people to identify old classmates -- having the name Roman Seleznev -- Roman Seleznev. Sorry. Did you -- did your investigation look into any other Roman Seleznevs?

A. I don't know.

Q. Okay. That would not have been part of the work you did?

A. No.

Q. Was your function limited -- or your role, not -- was your role really concentrated on the computer aspects of this case?

A. My role was to become the agent -- the case agent upon the departure of the previous case agent.

Q. Okay. And I don't really -- I'm sorry. I just don't know what that means, to say you're the case agent.

A. Sure. Previous case agent moved on. Somebody has to take that case in Seattle to work it, and so it was reassigned to me.

Q. Okay.

A. It stays in the field office. It doesn't move with an individual to different locations.

Q. Okay. I think what I'm asking is, when you say you're the case agent, are you in charge of the case, then, for the Secret Service?

A. I would be the investigating agent on the case now, yes.

Q. Okay. So -- so you're at the top of the totem pole as far as the investigators go for this particular case?

A. At this point in time, yes.

Q. Okay. Okay.

MR. CIVILLE: Thank you, Your Honor. Very patient. Thank you.

THE WITNESS: Oh, you're welcome.

THE COURT: All right.

MS. DAVID: Your Honor, I would ask if my colleague, Mr. Freedman, has any follow-up questions.

THE COURT: Okay. Mr. Freedman?

MR. FREEDMAN: I don't, Your Honor. Thank you.

THE COURT: Okay. Any further evidence, Ms. David?

MS. DAVID: No, Your Honor.

MR. CIVILLE: Your Honor, we would offer into evidence and we -- since the rules of evidence are relaxed, we would ask to do this without a witness -- without testimony, I should say. We offer into evidence Exhibit 1, which is the declaration of a language expert -- a Russian language expert, Tatiana Hay. That's -- and also Exhibit 2, the declaration of Ely Goldin and the exhibit attached to that from the Russian website.

THE COURT: All right.

MS. DAVID: Your Honor, I would defer to my colleague, Mr. Freedman.

THE COURT: Mr. Freedman?

MR. FREEDMAN: We have no objection on behalf of the government, Your Honor.

THE COURT: Very well. Exhibits 1, 2 and 3 are admitted without objection.

(Exhibits 1, 2 and 3 admitted.)

MR. CIVILLE: Thank you, Your Honor.

THE COURT: Okay. There being no further evidence, Mr. Civille?

MR. CIVILLE: No further evidence, Your Honor.

THE COURT: Okay. Let me, just for formality sake, Mr. Civille, before -- before the Court makes its final ruling, I do want to just give the defendant some of the general rights. This is kind of a little backwards that we presented -- yeah, when it was presented --

MS. DAVID: May the witness be excused, Your Honor?

THE COURT: Oh, I'm sorry. Yeah. I'm sorry.

THE WITNESS: Thank you, Your Honor.

THE COURT: You may be excused. You may step down. That's right.

So, Mr. Civille, let's -- let me just indicate a few things to your client to make sure he understands these matters. Do you want to -- can you come up to the podium, Mr. Civille, with your client and the court interpreter? Interpreter can come up as well.

Let me just give you a few rights. All right. So, first of all, from what has been presented so far, the alleged offense is committed in the State of Washington, the defendant has been arrested with a warrant, and an indictment has been returned. A superseding indictment.

INTERPRETER: Is it a question?

THE COURT: No. I'm just informing him of these. Does he understand?

THE DEFENDANT: Yes.

THE COURT: Okay. Very well.

The defendant is a foreign national, and regardless of his immigration status, the Court -- I believe -- I assume that Judge Manibusan had advised him of his right to consular notification. Did he not? Did he do that?

MR. CIVILLE: You know, I believe he did, Your Honor. And he -- he has -- the Russian consulate has come to Guam and visited with him.

THE COURT: Okay. So -- very well. So he has already met with the Russian consulate officer from his country. And I just wanted to at least be assured that he has received that ability to speak to a consulate official. Very well.

MR. CIVILLE: He did, Your Honor.

THE COURT: Okay. Without asking the defendant to state his name, because I know that -- that he is not conceding to his identity or any other identifying information at this time, I want to make sure I advise the defendant of his general rights. Does he understand the nature of the charge as contained in the superseding indictment? Charges.

THE DEFENDANT: Yes, I do.

THE COURT: Okay. Very well. Do you waive a reading of all of those charges?

INTERPRETER: I'm sorry?

THE COURT: Does he waive a reading of the charges? In other words, I don't have -- does he want me to read every charge or does he waive a reading?

MR. CIVILLE: Your Honor...

(Counsel consulting with client and translator.)

THE DEFENDANT: Okay. It's okay. I read.

THE COURT: It's okay? You waive a reading?

MR. CIVILLE: Yes, Your Honor.

THE DEFENDANT: Yes.

MR. CIVILLE: Yes, he waives reading.

THE COURT: Very well. And as you know, you've been advised previously before Judge Manibusan of your right to a lawyer. You do have your attorney present here and also from, I believe, New York. It's like four in the morning. I apologize for that early morning, Mr. Goldin. You understand that? You have your rights and you've been exercising your right to your lawyers?

THE DEFENDANT: Yes, I do.

THE COURT: Okay. You also have the right to remain silent. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Okay. Very well. And the Court is

going to also advise you that you also have a right to waive the removal hearing. But you obviously are not waiving that, and you're obviously not voluntarily returning to the District of Washington, where the charges are pending. But you understand that you do have that right; correct?

INTERPRETER: Sorry. Please repeat the last sentence.

THE COURT: Right. You understand that you do have those rights? You have the right to -- you waive the removal hearing, which you have not done, and you have the right to voluntarily return to -- voluntarily go to Washington state, where the charges are pending?

INTERPRETER: He understands.

THE COURT: He understands. Okay. Very well.

He also understands that we are going through an identity hearing and he has a right to waive that hearing? But as I understand it, he's not doing that. Is that correct?

THE DEFENDANT: Okay. I understand.

THE COURT: Okay. Very well.

And, also, the Court has to advise you that you have the right under Federal Rule Criminal Procedure 20 to plead guilty or no contest in this district if both the United States attorneys consent. Do you understand that?

THE DEFENDANT: I understand.

THE COURT: He understands. Okay. Very well.

The Court having advised you of those rights, do you have any questions about any of them?

INTERPRETER: He doesn't have questions.

THE COURT: Very well.

All right. The Court has heard the evidence as to whether or not this defendant is the person named in the indictment, the person who's been arrested in the -- the person who's before the Court and who has been arrested is the person named in the superseding indictment issued by the grand jury in the State of Washington, the Western District in Seattle, Criminal Case 117ORAJ, and it indicates *United States of America v. Roman Seleznev* and then several aliases or a/k/a's. The two in particular which the United States Attorneys' Office have zeroed in on are a/k/a track2 and a/k/a Ruben Samvilech or Samvilech, according to the testimony.

The Court notes that after having considered all the exhibits that have been admitted and the testimony that has been presented, the Court finds that the United States Attorneys' Office have met its burden of proof regarding whether or not there's probable cause to believe that the person arrested is the person named in the charging instrument. The Court has considered, No. 1, the arrest warrant, along with the INTERPOL notice, Red Notice, and the superseding indictment, along with the forensic investigation results. In particular, the Court notes the -- with regard to

the forensic investigation results submitted today by the second agent, the Court notes that the name of the city -- Vladivostok city, the address, Ostryakova Street, Building 26, wing Apartment 13; the two alias names, track2 and Ruben Samvilech -- Samvilech -- Samvilech, the e-mail addresses rubensamvilech@yahoo.com; and the names -- the name -- even though the name Alexey Davydov -- Davydov, I'm sorry if I'm not saying the names correctly -- was noted as the registrant. The -- on Exhibit 9.

The Court notes on Exhibit 10-B, according to the PayPal search warrant records, it does indicate the name of Roman Seleznev, which is the name noted in the grand jury indictment. Also, the Court notes under 12-B and 5-B-5 and 5-B-6 the names S-V-E-T-L-A-N Selezneva, S-E-L-E-Z-N-A -- N-E-V-A, and Eva or Eva Selezneva, S-E-L-E-Z-N-E-V-A, are contained in the 5-B-5 and 5-B-6 internal -- I believe it's been testified to as an internal passport of Russia, as opposed to the international passport or the foreign passport, and those names are contained therein. And those -- that particular internal passport, if you will, or -- comes from the bag that the person who was arrested was carrying in the Maldives. And the first agent who testified, Agent Dan Schwandner, had looked at, as well.

The Court also notes that the addresses -- the address I've already indicated contained in Exhibit 5, 10-A --

are also contained in Exhibit 10-A and 10-B. The Court notes that. And then, also, the travel information contained in the forensic investigation of Roman Seleznev traveling to Singapore, that particular information has matched up to the Exhibit 4-A, which is the foreign Russian passport, insofar as the date and the name of Roman Seleznev.

In addition, the Court notes that the identifying features contained in the INTERPOL Red Notice states that the person before the Court has a mole below his left eye, which was noted by the Agent Schwandner. And Agent Schwandner testified in court that he compared the photo of the defendant -- I'm sorry, the person before the Court or the defendant -- that's right. He compared the photo of that person with Exhibit 3 and also with Exhibit 4 and 5, the foreign passport and the internal passport. And he also conducted an in-court identification of Roman Seleznev as being the same person in the INTERPOL Red Notice and the two passports and the person he believed to be the person who was taken into custody. The issue of custody can be debated with the trial court, but taken into custody, whether it's by the Maldives authority and/or the U.S. Secret Service at Male Maldives, to be that same person. And, also, the name of Roman Seleznev was -- matches the name as contained in the indictment, as well as the passport, as well as in the INTERPOL notice, including the a/k/a Ruben Samvilech in the Red Notice is also contained here

in the indictment and the Red Notice, as I've indicated.

In addition, the Court has considered the testimony of Agent Schwandner when he indicated that he asked the person who was arrested in -- arrested and who's now before the Court what his name was, and that person identified himself as Roman Seleznev, whose name is consistent with the name contained in the superseding indictment under -- pursuant to Exhibit 2.

In addition, the passport number -- the passport number -- in particular, the Court notes passport number as contained in Exhibit 4-B -- I'm sorry. Strike that. 4-A -- the passport number as contained in 4 as well as -- hold on one second.

(Pause.)

Okay. Passport number as contained in 4-A-5, 640410831, is the same Russian passport number stated belonging to Roman Seleznev in Exhibit 3-2, which is the INTERPOL Red Notice. And... okay. The Court also notes that the agent -- the first agent identified -- that first agent, Dan Schwandner, in-court identification also includes the identification of the defendant in person not just by his mole, but his -- by what he was wearing, the shirt that he was wearing and the jacket that he was wearing. The Court takes notice of that with regard to the in-court identification.

And then with regard to the departure card,

Exhibit 6, the Court has also taken into consideration the date of arrival as testified to by the first agent, even though it says the departure card. The Court notes that on Exhibit 6 in particular, it does state that -- if you look at the stamp, it does state June 21, 2014, and then there's a check indicating permitted to stay at the Male International Airport, it's the Maldives immigration stamp noted. So the Court does note that as well.

Then these exhibits that I've -- that the agent, Dan Schwandner, had testified to, he's indicated all came from the bag that the defendant had in his possession and in which he was able to look through and match up all of this evidence with regard to identification.

Okay. So, therefore -- let me see if I have anything else. Therefore, the Court, as I've indicated, believes that the United States Attorneys' Office have met its burden of proof to show there's probable cause that the person arrested is the person named in the charging indictment, that person being Roman Seleznev. And the Court will order that the defendant will be held and transferred, and I will transmit the papers to the clerk of the charging district. The Court also will issue a decision on the personal jurisdiction matter that I ruled upon earlier today, and that will come out probably in a few days. That will take me a few days to issue that out.

Okay. Any questions, Mr. Civille?

MR. CIVILLE: No, Your Honor.

THE COURT: Okay. Your client have any issues?

MR. CIVILLE: Your Honor, I would like to -- and not take a picture of the courtroom, just for our files, I'd like to take a picture of Mr. Seleznev for our investigative purposes. Then I'll just face him to the back so it's not showing any of the courtroom.

THE COURT: Okay. That's fine. You can do that like right at end of the hearing. That's fine. You have a camera?

MR. CIVILLE: Yes, Your Honor.

THE COURT: All right. Okay. Thank you, Mr. Walsh.

All right. Anything further, Ms. David?

MS. DAVID: No, Your Honor. Thank you.

THE COURT: All right. Do you have a proposed order on the removal?

MS. DAVID: I will have my office submit a copy to chambers.

THE COURT: Oh. You do have -- you already have one? Did you submit an original?

MS. DAVID: We typically submit usually around the first initial appearance before the magistrate.

THE COURT: Oh, okay. Let me see. I don't know

if you did. You do think you submitted that?

MS. DAVID: I believe we may have.

THE COURT: I'm sorry. Let me see. That was before Judge Manibusan, you submitted it?

MS. DAVID: Yes, Your Honor.

THE COURT: Okay. That was assuming, I think, that he waived identity.

MS. DAVID: We will prepare one.

THE COURT: Okay.

MS. DAVID: And send it to chambers for tomorrow morning, if that's okay.

THE COURT: Okay. That's fine. I'll review it then.

MS. DAVID: Thank you, Your Honor.

THE COURT: Yes, Mr. Civille?

MR. CIVILLE: Your Honor, I realize they're always hesitant to give an exact date for security reasons, so I'm not asking for an exact date, but I would like to alert the defense team back in the mainland. May we inquire -- will he be transported -- I know there's some Secret Service agents out here. I don't know if they're going back that way and will take him or he'd be going on the regular U.S. Marshal transport that sometimes takes several weeks to get through. So I'm just curious --

THE COURT: You just want to get an idea, is it

gonna take several weeks or several hours? Several days?

MR. CIVILLE: Yeah. Is he on an expedited track or is he going back with the -- as prisoners --

THE COURT: Agent?

MR. FISCHLIN: Your Honor, I would default to the U.S. marshals.

THE COURT: Okay, so it's going to be the U.S. Marshals to do the transport, not the Secret Service? Am I --

MS. DAVID: That is correct, Your Honor.

THE COURT: Am I remanding him to the custody of the U.S. Marshals, then?

MS. DAVID: Yes, Your Honor.

THE COURT: Not to the U.S. Secret Service.

MS. DAVID: That's correct.

THE COURT: I will -- okay, so I'm remanding him to the custody of U.S. Marshals. I know that our U.S. Marshals have always indicated to me that because it's a top security issue, they have to work that out. But what I'll do is have them -- have them coordinate that with you. You will know. How's that?

MR. CIVILLE: Okay. Thank you, Your Honor.

THE COURT: Just so -- for purposes of -- of what?

MR. CIVILLE: So I can alert the defense team back in the -- on the mainland when -- approximately when

he'll be back. I'm not asking for the flight number or the day of departure, but, you know, something within a few-day range would be helpful.

THE COURT: Well, first of all, I'll have to get the removal order also. That's going to be first and foremost. And then -- then the personal jurisdiction order can follow after that. We'll probably get that next week. So -- yes, Mr. Walsh?

MR. WALSH: I was just going to add one other reason, Your Honor, is because the defendant doesn't have any family or relatives around, so in terms of clothing and/or providing him with quarters while he's in confinement, those sort of little practical matters of being a detainee while confined, information in terms of how long we would be helping him, that would be useful. That's the only thing I wanted to add.

THE COURT: Well, you know, we do have clothing downstairs, too, with Probation. Men's clothing.

Grace, do we still have men's clothing about this size of this defendant if it's necessary?

MS. FLORES: We do have large clothing. It's usually for women. But regarding his size, I'm not absolutely sure. But there is clothing available if necessary.

THE COURT: Okay, well, we can -- Mr. Walsh and Mr. Civille, with regard to clothing for Mr. Seleznev, the

Court can make sure there's arrangements for him. I mean, we've done that. We've had to do that with some of the defendants who don't have clothing. So we can get that for him, especially warmer clothing if he needs that, especially on the plane. And that will be cleared with U.S. Probation, something that we have with one of our probation officers. Would you like that, Mr. Walsh?

MR. WALSH: Yes. Thank you, Judge. Just a practical consideration.

MR. CIVILLE: Thank you, Your Honor.

THE COURT: Okay. Very well. So we'll coordinate that. I'll have Ms. Flores, our chief probation officer, assist Mr. Civille in getting the defendant some clothing. Can you let him know that?

INTERPRETER: Yeah.

THE COURT: Yeah, if you can let him know that. We'll make sure he gets that.

All right. Anything further, Counsels?

MR. CIVILLE: No, Your Honor.

THE COURT: Okay. There being nothing further, thank you very much.

MR. CIVILLE: Thank you, Your Honor.

THE COURT: Okay. Have a nice day.

MR. RAY: Thank you, Your Honor.

THE COURT: Yeah, thank you.

MR. GOLDIN: Bye-bye, Your Honor. Thanks.

THE COURT: Yeah, thank you, both of you. Appreciate your time.

THE CLERK: Court's adjourned.

(Proceedings concluded at 6:32 p.m.)

---------------------------------------------

CERTIFICATE OF OFFICIAL REPORTER

CITY OF HAGATNA )
) ss.
TERRITORY OF GUAM )

I, Veronica F. Reilly, Federal Official Court Reporter for the United States District Court of Guam, do hereby certify the foregoing pages, 1 to 207, to be a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter.

Dated this 29th day of August, 2014.

/s/Veronica F. Reilly
Veronica F. Reilly, CSR NO. 2004
Federal Official Court Reporter